## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDUARDO ORTIZ, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>CANOPY GROWTH CORPORATION, BRUCE LINTON, MARK ZEKULIN, MIKE LEE, TIM SAUNDERS, DAVID KLEIN, and RADE KOVACEVIC<br><br>     Defendants. | Case No. 2:19-cv-20543-KM-ESK<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Anthony Sultan, Ellaine Sultan, Anna Cooney, Formica Industries Limited, David Pendola, and Dean K. Lurie (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint against Defendants Canopy Growth Corporation ("Canopy" or "Company"), Bruce Linton, Mark Zekulin, Tim Saunders, Mike Lee, David Klein, and Rade Kovacevic allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, conference calls and announcements made by Defendants, wire and press releases published by and regarding Canopy, United States Securities and Exchange Commission ("SEC") filings by Canopy, media and analyst reports, and information readily obtainable from public sources. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.   <u>**NATURE OF THE ACTION**</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded Canopy securities sold on the New York Stock Exchange ("NYSE") between June 27, 2018 and May 28, 2020, both dates inclusive ("Class Period"). Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder caused Plaintiffs to suffer damages.

2.      Canopy's repeated assurances since 2018 that its cannabis facilities and cannabis inventory were properly scaled to meet the demand in the nascent Canadian legal recreational cannabis market were a fiction. Defendants knew at all times that they had ***no data*** to support their exponential increase in growing and production facilities and in inventory, and no basis for what they conveyed as their reasoned expectations for the legal cannabis market. Further, Defendants admitted at the end of the Class Period that part of the strategy for pushing product into the market was not because of market demand for their products at all, but to strengthen their brands. When the truth was revealed, Canopy's stock price dropped precipitously, and investors suffered.

3.      Legal sales for recreational use of dry flower cannabis[1] (smoked), and cannabis derivatives—oils (sprayed on the tongue), and gelcaps[2] (swallowed)—began on October 17, 2018. Canopy, Canada's largest cannabis company, boasted to investors that it had positioned itself to lead in the recreational market as it did in Canada's medical

---

[1] "Dry flower cannabis" is sometimes referred to as "dry flower" or "dry cannabis."

[2] Defendants sometimes refer to gelcaps as "softgels" or "soft-gels."

cannabis market. Canopy knew that the sales model for recreational cannabis would be completely different than for medical cannabis. Medical sales were through direct business-to-consumer mail orders to individuals. The much larger legal recreational market would consist of business-to-business transactions between cannabis companies and Canadian provincial governmental entities, as well as direct sales to consumers from brick-and mortar stores.

4.      In the run-up to Canada's legalization of recreational marijuana and after legalization, Canopy touted its "market expectations" for recreational dry flower, oils, and gelcaps, and greatly increased its inventory of these products based, Defendants stated, only on expected demand. Even a year before Canada legalized recreational cannabis in October of 2018, Canopy emphasized its message of exponential scaling of growing facilities and inventory to meet its "commit[ment] to expanding throughout the coming years to meet the demand this system will create." Defendants, however, hid from investors that they had no idea of the potential size of the recreational market for these products, and had no data accurately to justify their statements about market demand for these products or its share of that demand.

5.      Complicating Canopy's market expectations, each Canadian province would decide for itself whether to run legal cannabis stores itself or to allow privately-owned stores, and regulate online or store sales as each province saw fit. Canada's most populous and important market, Ontario, with 37% of Canada's population, would not even open its first store until April 1, 2019, five months after the legal recreational market opened, further complicating Canopy's ability to understand demand. While Defendants confidently conveyed their market expectations to the public, they had no idea when

Canopy would ship oils, gelcaps, or dry flower cannabis products to Ontario for recreational sale. When recreational sales became legal in October 2018, Canopy had opened only 18 stores in all of Canada, and none in Ontario. Canopy's "market expectations" imagined a market that it knew did not exist and that was not developing.

6.     In an August 2019 partial disclosure, Defendants revealed that sales of oils and gelcaps were not keeping pace with its exponential inventory growth. In disclosing financial results for the quarter ended June 30, 2019,[3] Defendants reversed $8 million[4] in previously recorded revenue because of returned oils and gelcaps. Surprised, analysts asked why oils and gelcaps sales for the quarter were "essentially zero," and whether the returns were a one-time event or if investors could expect future revenue reductions. Disclosing for the first time that provinces could return product without limitation, Defendants still insisted that further material returns would not affect future profits. The write-down, they claimed falsely, was merely "precautionary."

7.     Plagued by product returns and price concessions to distributors, a further partial disclosure of Defendants' fraud was revealed on November 14, 2019, when Canopy disclosed that it had recorded a restructuring charge of over $32 million for returns and price concessions for cannabis oils and gelcaps, and written off $16 million of its own inventory of both classes of products. The Company further admitted that it was recording a charge against revenues for 5-7% price concessions to provinces for oils and gelcaps. Analysts and investors were stunned. Just three months earlier Defendants had assured them that the $8 million charge against revenue for returned oils and gelcaps was

---

[3] Canopy's  fiscal year runs from April 1 to March 31.

[4] All "$" figures are in Canadian dollars, except for references to Canopy's stock price.

a one-time event. After repeatedly hearing from Defendants both before and after October 2018 that Canopy would "go full blast" and exponentially increase its inventory, Defendants admitted that they had "no data" supporting the Company's inventory buildup or their expectations of market demand for cannabis products. The $56 million August and November oils and gelcaps revenue reductions and inventory write-offs left the largest provinces with less than $2 million in inventory of these products, and Canopy itself with less than $10 million in oils and gelcaps inventory.

8.      Three months later, on February 14, 2020, Defendant Klein admitted that Canopy's decision to exponentially increase the size of its inventory with no data to support the buildup had, as Defendants knew it would, failed. During a February 20, 2020 earnings conference call ("February 14, 2020 Call"), Defendant Klein told investors that Canopy would have to "align our resources and investments with the size and growth rate of the market as it exists today. We've begun taking steps designed to bring our inventory in balance with our supply demand understand, this includes a thorough strategic review of our footprint which is underway."

9.      Three weeks later, on March 4, 2020, Defendant Klein announced that the Company expected to record pre-tax charges of approximately $700-$800 million when it announced its fourth quarter 2020 and full year 2020 results. Euphemistically calling Canopy's bad news a "production optimization plan," Canopy announced that it was closing two cannabis growing facilities in Canada comprising three million square feet, or over half of its production space in Canada, was firing 500 employees, and was abandoning its plan to build a third greenhouse in Ontario. Hundreds of millions of dollars of Canopy's cannabis inventory was likely worthless.

10.     The total annual Canadian cannabis market as 2020 began was estimated to be only 180 metric tons. Canopy held unsold inventory of 115 metric tons, far more than the total 68 metric tons of recreational cannabis it had sold since legalization. Despite these facts, Canopy never impaired its dry flower inventory from the start of 2017 through February 2020, never alerted investors that it had held an inventory of cannabis equal to almost 60% of Canada's entire annual cannabis market, and never told investors that it would not be able to sell this inventory and would have to discard a material portion.

11.     At the end of the Class Period, on May 29, 2020, before the market opened, Canopy announced its financial results for the full-year and fourth quarter of fiscal year 2020, recording impairments and restructuring charges of $743 million. During an earnings conference call that same day ("May 29, 2020 Call"), Defendants attributed the write-down to asset impairments of $563 million, most of which was for property, plant and equipment tied to Canopy's cultivation assets. $132 million of the total was for inventory write-offs, cannabis that had been grown but was going to be thrown away.

12.     During the May 29, 2020 Call, Defendants finally admitted that Canopy's rapid inventory and facility growth were based on something other than a belief that they would be able to sell that inflated inventory. Defendant Klein stated that "there's no denying that we overbuilt our facilities, and that while the "dramatic[]" increase in inventory and facilities "was a great talking point," it "came with great consequences." Defendant Zekulin went further, admitting that Canopy's oft-repeated statement that the scale of the inventory buildup was only based on market demands had always been false, because "part of our effort to push product out early and obtain market share, wasn't strictly for the purpose of obtaining market share, it was for getting our brands out there."

13.     Canopy also violated accounting standards. International Financial Reporting Standard ("IFRS") 15 is a standard that applies to financial reporting for revenue from customer contracts. Defendants repeatedly violated IFRS 15 by materially overstating revenue in their financial statements, and recognizing revenue when it was not "highly probable" that the revenues from sales of oils and gelcaps would not be reversed because of rights of return and price concessions. Defendants mislead investors by failing to disclose that Canopy's supply contracts with Canadian provinces contained generous rights to return product and could enable provinces to extract significant price concessions "at the election of the [provincial buyer]," backed by each Canadian province's right to terminate the supply contract with Canopy if it was dissatisfied.[5] Finally, Defendants mislead investors by failing to disclose that it had assembled so much inventory of dry flower and that there was no way Canopy would sell all of the cannabis it had harvested and was continuing to grow.

14.     Canopy also violated International Accounting Standard ("IAS") 2, a standard that applies to financial reporting for inventory. Defendants violated IAS 2 by materially overstating inventory in Canopy's financial statements. Defendants had no support for their inventory buildup. Even as provinces were returning millions of dollars of oils and gelcaps products to Canopy because of low demand, Defendants recklessly failed to evaluate for impairment and to impair oils and gelcaps inventory, instead lying to investors by saying that the returns were a one-time event, avoiding a greater material negative impact to their profit and loss statements in August of 2019.

---

[5] Canopy only disclosed the details of the rights to return and price concessions for products after the end of the Class Period, in the June 1, 2020 Annual Report on Form 10-K ("2020 10-K").

15.    When Defendants disclosed the partial truth on August 14, 2019, Canopy's share price dropped over 14%. The second partial disclosure on November 14, 2019, caused Canopy's share price to again fall over 14%. Canopy's share price dropped over 5% when it announced on March 4, 2020 that it expected to record a large write-off when it next reported financial results. Finally, when the full truth was revealed on May 29, 2020, Canopy's share price dropped over 20%. Plaintiffs and the Class suffered damages on each disclosure date.

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Canopy issued and sold securities traded on the NYSE in this Judicial District, and Canopy securities traded on the NYSE using data centers located in this Judicial District.

19.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

III.    **PARTIES**

20.    Plaintiffs Sultan Group, consisting of Anthony Sultan, Ellaine Sultan, Anna Cooney, and Formica Industries Limited, purchased Canopy common stock during the Class Period as stated in their previously filed Certifications (ECF No. 7-2) and Loss Charts (ECF No. 7-2), and suffered losses upon the revelation of the alleged corrective disclosures.

21.    Plaintiffs David Pendola and Dean K. Lurie purchased Canopy common stock during the Class Period as stated in their previously filed Certifications (ECF No. 8-6) and Loss Charts (ECF No. 8-4) and suffered losses upon the revelation of the alleged corrective disclosures.

22.    Defendant Canopy, together with its subsidiaries, engages in the production, distribution, and sale of cannabis. Canopy is incorporated in Canada and has its principal executive offices at 1 Hershey Drive, Smiths Falls, Ontario K7A 0A8, Canada. Defendants Linton and Zekulin founded Canopy in 2009 as LW Capital Pool Inc., and the Company was renamed Canopy Growth Corporation in 2015. Canopy's securities have traded in an efficient market on the New York Stock Exchange ("NYSE") since May 24, 2018 under the ticker symbol "CGC." The Company has also been publicly listed on the Toronto Stock Exchange since April 4, 2014, and was listed on an Over-the-Counter market until May 23, 2018.

23.    Defendant Bruce Linton ("Linton") founded Canopy and served as its Chief Executive Officer ("CEO") until June 2018, and as co-CEO until July 2019. Defendant Linton was fired on July 3, 2019. During the Class Period Linton signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications")

attached as exhibits to the following SEC filings: June 28, 2018 Form 40-F for the period ended March 31, 2018 ("2018 40-F"); June 26, 2019 Form 40-F for the period ended March 31, 2019 ("2019 40-F"). In addition, Linton signed Certifications of Interim Filings attached as exhibits to the following SEC filings on Forms 6-K: August 15, 2018 quarterly statements and exhibits for the three months ended June 30, 2018 and 2017 ("Q1 2019 Report"); November 15, 2018 (quarterly statements and exhibits for the three and six months ended September 30, 2018 and 2017 ("Q2 2019 Report"); February 15, 2019 quarterly statements and exhibits for the three and nine months ended December 31, 2018 and 2017 ("Q3 2019 Report").

24.     Defendant Mark Zekulin ("Zekulin") served as Canopy's President and co-CEO from June 2018 until July 3, 2019, and as its CEO from July 2019 to January 13, 2020. During the Class Period Zekulin signed SOX Certifications attached as exhibits to the following SEC filings: 2019 40-F. In addition, Zekulin signed Certifications of Interim Filings attach as exhibits to the following SEC filings on Form 6-K: August 14, 2019 quarterly statements and exhibits for the three months ended June 30, 2019 and 2018 ("Q1 2020 Report"); November 14, 2019 quarterly statements and exhibits for the three and six months ended September 30, 2019 and 2018 ("Q2 2020 Report").

25.     Defendant David Klein ("Klein") has served as Canopy's President and CEO from January 14, 2020 to the present. During the Class Period Klein signed SOX Certifications attached as exhibits to the following SEC filing on Form 6-K: February 14, 2020 quarterly statements and exhibits for the three and nine months ended December 31, 2019 and 2018 ("Q3 2020 Report").

26.     Defendant Tim Saunders ("Saunders") served as Canopy's Chief Financial Officer ("CFO") until June 1, 2019. During the Class Period Saunders signed SOX Certifications attached as exhibits to the following SEC filings: 2018 40-F. In addition, Saunders signed Certifications of Interim Filings attached as exhibits to the following SEC filings on Form 6-K: Q1 2019 Report; Q2 2019 Report; Q3 2019 Report.

27.     Defendant Mike Lee ("Lee") has served as Canopy's CFO since June 1, 2019. During the Class Period Lee signed SOX Certifications attached as exhibits to the following SEC filings: 2019 40-F. In addition, Lee signed Certifications of Interim Filings attached as exhibits to the following SEC filings on Form 6-K: Q1 2020 Report; Q2 2020 Report; February 14, 2020 quarterly statements and exhibits for the three months ended December 31, 2019 and 2018 ("Q3 2020 Report").

28.     Defendant Rade Kovacevic ("Kovacevic") has served as the Company's President since July 2019. Kovacevic joined Canopy in August 2016, and before July 2019 served as Executive Vice President, Senior Vice President & Managing Director, and Senior Vice President, Sales and Operations. Kovacevic participated in earnings conference calls on August 15, 2019, and November 14, 2019.

29.     Defendants Linton, Zekulin, Klein, Saunders, Lee, and Kovaceviv are collectively referred to herein as the "Individual Defendants."

30.     Defendants Canopy and the Individual Defendants are collectively referred to herein as "Defendants."

31.     Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements and omissions concerning the Company were being issued;

(g) approved or ratified these statements in violation of the federal securities laws; and/or

(h) culpably participated in the misstatements and omissions as set forth herein.

32.    Attached to the SEC-filed Forms 40-F filed on June 28, 2018 and June 25, 2019 were SOX Certifications in which each signatory certified, in part, that:

1. I have reviewed this [Quarterly or Annual] Report on Form [10-Q or 10-K] of [Defendant Canopy];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other

financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

33.     In addition, the SEC-filed Forms 40-F filed on June 28, 2018 and June 25, 2019 included signed Certifications of Periodic Financial Report Pursuant to 18 U.S.C. Section 1350. Each signatory certified that:

In connection with the Annual Report of Canopy Growth Corporation (the "Company") on Form 40-F for the period ended . . . as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, . . . certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

34.     Certifications of Interim Filings, Full Certificate, Form 52-109F2, were attached to each SEC-filed quarterly report on Form 6-K during the Class Period, and each signatory certified, in part, that:

I, . . . , certify the following:

*Review*: I have reviewed the interim financial report and interim MD&A (together, the "interim filings") of Canopy Growth Corporation (the "issuer") for the interim period ended . . . .

*No misrepresentations*: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

> *Fair presentation*: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

35.     Canopy is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

36.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Canopy under *respondeat superior* and agency principles.

## IV.     SUBSTANTIVE ALLEGATIONS

### A. Background

37.     Canopy describes itself as a world-leading multi-brand cannabis company, offering distinct brands and curated cannabis varieties in dry flower,[6] oils[7] and gelcaps forms. Canopy operates in 15 countries through two segments, Cannabis Operations and Canopy Rivers, its affiliated investment arm. By early 2020 Canopy had approximately 5.4 million square feet of licensed capacity in operation in Canada, including indoor and greenhouse cultivation, post-harvest processing, oil extraction, advanced manufacturing,

---

[6] "Dry flower" refers to cannabis plant matter that has been cured and dried and is ready to smoke.

[7] Cannabis oils have a psychoactive effect and are distinct from CBD oils, recreational sales of which only became legal in October of 2019.

and bottling capability. Canopy Growth first sold cannabis oils in 2016, and first sold gelcaps in 2017.

38.    In 2001, Canada became only the second country to implement a program for medical cannabis access. In 2014 regulated commercial sales of medical cannabis replaced government sales. Canopy's sales in the medical cannabis market were business-to-consumer ("B2C") mail-order sales to individual users. Canopy did not sell business-to-business ("B2B") for the medical cannabis market.

39.    On April 13, 2017, the Canadian Federal Government tabled a bill to legalize recreational marijuana use in Canada. On June 18, 2018, the Bill passed the final vote in the Senate, opening the door to retail stores and online sales of recreational cannabis throughout Canada upon final approval and regulatory hurdles. The Canadian government permitted legal recreational sales of dry flower, oils, and gelcaps products starting on October 17, 2018.

40.    The Canadian government left regulation of legal recreational cannabis sales to the provinces. Each province would decide whether it would itself be responsible for both distribution and retail sales of recreational cannabis or instead would distribute to private companies for retail sale. Regardless, suppliers like Canopy sold to provinces for distribution to retail sales outlets.

**B. Canopy Knew that it Would Open Very Few Stores After Recreational Cannabis Legalization**

41.    On May 16, 2018, in its restated Management Discussion & Analysis ("MD&A") for the period ended June 30, 2017, Canopy told investors that it anticipated

that when legal recreational cannabis sales began, "the majority of sales in the first two years of the recreational market will go through the mail order system." Canopy stated that this was because "in certain provinces, it will take two years and possibly longer to rollout the full network of regulated cannabis retail stores that is required to satisfy consumer demand."

42.     Several Canadian provinces elected to market recreational cannabis through government-operated retail stores, while some announced they would license private retail stores. Ontario's ruling Liberal party announced that it would sell recreational cannabis through government-operated retail outlets, a fact Canopy noted in the Annual Information Form it filed with the SEC on June 28, 2018 ("2018 AIF"). Ontario is Canada's most populous and important market, home to 37% of Canada's population.

43.     Defendants knew that Ontario's decision to open province-operated retail stores would depress recreational sales in the province, and require Defendants to plan a cautious inventory buildup and anticipate market demand based on depressed sales of dry flower, oils, and gelcaps in Ontario. Defendants knew, as they stated in an August 20, 2018 press release, that "private retail is a more profitable business model" than government-run retail, and that if Ontario chose a private retail model, the Company could "build a deeper connection with its customers" than if Ontario operated cannabis stores itself.

44.     Defendants also knew that Ontario would not open enough stores in the period after legalization of recreational cannabis for Canopy's sales to match the level of its inventory increase. By June 2018, Ontario had only committed to open 40 province-

operated retail stores throughout the province when legal sales began, or approximately one store for every 358,000 people. The state of Colorado, conversely, has approximately one retail store for every 10,000 people in the state.[8] Further, competition for recreational sales in the government-run Ontario online and brick-and-mortar stores would be fierce. By August 20, 2018, the province had entered into supply agreements with 26 separate licensed producers to supply cannabis to the market.[9] By September 27, 2018, Ontario had supply agreements with 32 licensed producers.[10]

45.     Canopy downplayed that the existing illegal cannabis market would depress store sales. During an earnings conference call on June 28, 2018 ("June 28, 2018 Call"), discussing the challenges Canada's existing, illegal cannabis market posed, Defendant Linton acknowledged that, at best, legal recreational cannabis sales only threatened "50% of … the illicit market in year 1." Nevertheless, Linton stated, "you're going to see a more rapid transition than most people have been predicting," and that Canadians would transition from illicit to legal purchases because of the presence of "government [retail stores] next door." Linton knew, however, that when the legal recreational market opened on October 17, 2018, Canopy would only have 18 Canopy-operated stores in the entire country, all located in three provinces, and none in Ontario.

46.     On August 13, 2018, the newly-elected Ontario provincial government announced that while online recreational sales would remain government-run, it would

---

[8]   *See*   https://www.theglobeandmail.com/cannabis/article-mapping-canadas-cannabis-stores-from-dense-supply-to-zero-footprint/.

[9] *See* https://www.newcannabisventures.com/ontario-names-26-cannabis-suppliers/.

[10]  *See*  https://www.cp24.com/news/ontario-pot-retail-rules-pose-headwinds-for-industry-players-1.4111753.

allow for "tightly regulated private retail" stores. Ontario announced, however, that *no* private retail stores would open before April 1, 2019.[11]

47.     During the August 16, 2018 earnings conference call ("August 16, 2018 Call"), Defendant Linton admitted that at the start of the recreational market there would be "very few stores" in Ontario and a "very slow process to have more stores."

48.     The next month, Ontario's Attorney General dealt a blow to Canopy's desire to dominate the market by building the largest inventory, stating that the province would "make sure" that the retail store "market is not dominated by one or two parties."[12] Since the province was the distributor, even to licensed privately-run stores, Ontario could prevent monopolization of the market by its largest actors.

49.     Canopy applauded what it conveyed were positive developments, but chose not to discuss facts which negatively impacted those developments. In a September 27, 2018 press release, Canopy lauded Ontario's switch to allow privately-run stores, but made no mention of the lack of stores before April 1, 2019, or of Ontario's statement that it would not allow large players to dominate the market. On November 14, 2018, Canopy filed a press release entitled *Canopy Growth Corporation Reports Second Quarter Fiscal 2019 Financial Results*. The only mention of Ontario was the statement that as of that date Canopy did not have any supply commitments to the province.

---

[11]     *See*     https://news.ontario.ca/mof/en/2018/08/ontario-announces-cannabis-retail-model.html.

[12]     *See*  https://globalnews.ca/news/4491435/ontario-government-to-introduce-legislation-regulating-recreational-pot/.

50. On February 15, 2019, Canopy reported its financial results in the Q3 2019 Report. The MD&A contained disappointing news about retail stores in Ontario, announcing that when Ontario finally allowed retail stores on April 1, 2019, Canopy had been licensed to and would open exactly *one* store in the entire province.

51. On June 21, 2019, Canopy filed a press release entitled *Canopy Growth Corporation Reports Fourth Quarter and Fiscal 2019 Results with Annual Sales of $226.3M* that revealed, more than eight months after the start of legal recreational sales, that Canopy had launched (directly or indirectly through licensing agreements) exactly 23 cannabis retail stores in all of Canada. As it had opened 18 of these stores by October 17, 2018, the Company had only opened 5 more stores in the next eight months.

## C. Canopy Dramatically Increased Its Cannabis Production Capabilities and Inventory In the Months Before the Class Period

52. The size of Canopy's cannabis operational and agricultural facilities increased exponentially both before and during the Class Period, as did its cannabis inventory.

53. For example, on February 16, 2018, the Canadian government granted a license for a joint venture called "BC Tweed," which was majority-owned by Canopy Growth. The license allowed for 840,000 square feet of growing space for cannabis plants, to spread (as the cannabis plants grew) into 1.3 million square feet for flowering and harvesting. On April 13, 2018, the Canadian government granted BC Tweed a license for an additional 900,000 square feet of growing space for cannabis plants, to spread into 1.7 million square feet for flowing and harvesting. On May 25, 2018, Canopy announced that

it had entered into a joint venture for 70,000 additional square feet of growing space in Quebec called "Vert Mirabel."

54.     In the 2018 40-F, issued one day after the start of the Class Period, Defendants boasted to investors that Canopy "expects to have the majority of its planned 5.6 million square feet operations licensed by the end of calendar 2018."[13]

55.     Canopy's facilities growth was rapid. In its Q1 2019 Report, filed on August 14, 2018, Canopy disclosed that it had over "2.4 million square feet of licensed indoor and greenhouse production capacity as at June 30, 2018." Three months later, in its Q2 2019 Report, Canopy stated that its cannabis growing space had nearly doubled to 4.3 million square feet. In the 2019 40-F, filed on June 26, 2019, Canopy boasted that its production capacity was now 4.8 million square feet. By the time the Q1 2020 Report was filed on August 14, 2019, Canopy's cannabis growing space had increased to approximately 5.2 million square feet. Finally, by the time the Q2 2020 Report was filed on November 14, 2019, Canopy had 5.4 million square feet of growing space.

56.     The increase in growing space corresponded with a concomitant more than five-fold exponential growth in Canopy's inventory before and during the Class Period. On June 30, 2018, four months before legal recreational cannabis sales, Canopy valued its cannabis inventory at $118,204,000. That inventory value grew to $150,406,000 on September 30, 2018, to $184,961,000 on December 31, 2018, to $262,105,000 on March 31, 2019, to $393,738,000 on June 30, 2019, to $461,757,000 on September 30, 2019, and

---

[13] At the start of the Class Period, Canopy Growth operated eleven cannabis production facilities, including seven authorized to produce and sell cannabis, three operated pursuant to joint ventures, and one solely authorized to produce cannabis.

to \$622,575,000 on December 31, 2019. Inventory only decreased at the end of the next quarter, as of March 31, 2020, when Defendants announced that they were writing off a large portion of their inventory.

57.     Canopy was only able to sell just over one-third of its cannabis inventory during the Class Period. Three months before the end of the Class Period, on February 14, 2020, MKM analyst Bill Kirk calculated that while Canopy had grown 183,000 kilograms of cannabis, it had only sold 68,000 kilograms of that inventory. Canopy thus had *115,000 kilograms* of unsold cannabis.

58.     Properly stored dry flower has a lifespan before expiry of 1-2 years.[14] MKM analyst Kirk estimated that if Canopy ceased all production of cannabis immediately, it would take two-and-a-half years for Canopy to sell its inventory.

**D. Canopy Repeatedly and Materially Mislead Investors by Stating that its Plan to Exponentially Grow its Inventory was Tailored to Market Demands**

59.     Throughout the Class Period, Defendants materially mislead investors by telling them that the rapid and exponential inventory growth was based on "management's expectation of market demands." Defendants failed to reveal that Canopy had "no data" to support either its expectations of demand or the exponential inventory growth of dry flower, oils, and gelcaps, and failed to reveal that their decision to exponentially increase inventory was not based on market demand, but to increase awareness of Canopy's brands regardless of market demand.

---

[14] *See* https://internationalhighlife.com/does-weed-expire/.

60.     Long before legal sales began, Defendants boasted about the size of their inventory. On June 27, 2018, Canopy issued a press release entitled *Canopy Growth Corporation Reports Fourth Quarter and Fiscal Year 2018 Financial Results: Driving Readiness for the Canadian Recreational Cannabis Market*. The press release stated that as of March 31, 2018, the end of FY 2018, Canopy had the largest inventory of any cannabis company.[15] "Inventories," Defendants stated, "are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018." The only justification Canopy gave for the buildup was its purported belief that whichever company had the largest inventory would have the largest market share.

61.     Canopy provided "no data" to support its "management's expectations of market demands" regarding either the size of the market or its statement that having the largest inventory was key to winning the largest market share. Canopy did not describe the precise buildup necessary to meet demand from all provinces, or state whether competitors with smaller inventories would also nonetheless be able to supply to all provinces upon the effective date of recreational use legalization. Canopy further failed to explain why, one month after the May 16, 2018 restated MD&A, it no longer believed that online sales would be a majority of the recreational sales in the first two years of the legal recreational market, rather than store sales.

62.     On June 28, 2018, Canopy filed the 2018 40-F, to which it attached its MD&A. As in the June 27, 2018 press release, the MD&A stated that "[i]nventories are

---

[15] Defendants stated that as of March 31, 2018, Canopy's inventory consisted of 15,726 kilograms of dry cannabis, 6,969 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 356 kilograms of softgel capsules.

continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018."

63.     During the June 28, 2018 Call, in response to an analyst question, Defendant Linton touted the Company's focus on growing the size of its inventory, stating that, months before the legal market opened, Canopy was "going full blast" with building inventory so that the Company could ship "a significant amount of product" to the provinces for online sales.

64.     In the MD&A attached to the Company's Q1 2019 Report, filed on August 15, 2018, Canopy again assured investors that "[i]nventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018." The Company provided no data to justify management's expectations or its inventory buildup, nor did it advise investors that its ability to sell cannabis in Ontario would be limited by the fact that no stores would open in Ontario until April 1, 2019.

65.     During an earnings conference call to report the Company's second quarter 2019 financial results on November 14, 2018 ("November 14, 2018 Call"), Defendant Saunders again stated Canopy's oft-repeated line that "[i]nventories are continuing to be scaled to meet management's expectation of market demands, including demand from the legalized recreational market." During that same call, Canopy told investors, without basis, that demand for gelcaps, in particular, would skyrocket.

66.     On February 15, 2019, Canopy filed the Q3 2019 report and associated MD&A for the third quarter of FY 2019 ending on December 31, 2018. In that MD&A, Defendants noted that since the recreational cannabis market was "brand new," it would

take licensed producers time to develop an understanding of the demand for cannabis products, including type/strain, and quantity. The Company made clear to investors, however, that these limitations would not affect Canopy. After noting the rapid growth in its "deep inventory levels" in the previous three months, Defendants stated twice that the entire buildup was still necessary because "Management believes [all of the inventory] is required to meet expected market demands, including the legalized recreational market."

67.     Defendants also told investors that the rapid expansion of production facilities and inventory were needed to meet *current* market demand. During an earnings conference call on February 15, 2019 ("February 15, 2019 Call"), Defendant Linton told investors just that: "[a]nd so like, this is not a stockpiling exercise at all, and we're constantly looking at as the provinces are turning up more stores, we need to fill that warehouse."

68.     Defendants repeatedly assured investors that the exponential growth in both their cannabis production facilities and inventory levels were tailored to meet market demand, never telling investors until November of 2019 that Canopy had "no data" to on which to base its assessment of the Canadian recreational cannabis market, and revealing only after the Class Period that inventory growth was never calibrated to meet market demand, instead "part of our effort to push product out early and obtain market share, wasn't strictly for the purpose of obtaining market share, it was for getting our brands out there."

**E.  Canopy Materially Overvalued its Inventory and Violated IAS 2**

69.     Throughout much of the Class Period, Defendants violated IAS 2 by failing to evaluate and impair its cannabis inventory.

24

70.     IAS 2, *Inventories*, applies to reporting information on the valuation and classification of inventories.[16] IAS 2 requires that inventory be measured at the lower of cost or net realizable value. IAS 2 ¶9. Net realizable value is the estimated selling price an entity expects to realize from sale of inventory in the ordinary course of business, less the estimated costs of completion and the estimated costs necessary to make the sale. IAS 2.6. The amount the inventories are expected to realize is based on the most reliable evidence available at the time the estimates are made, including events occurring after the end of the period but before financial statements are issued, to the extent such events confirm conditions existing at the end of the period. IAS 2 ¶30. Estimates of net realizable value also take into consideration the purpose for which the inventory is held. IAS 2 ¶31.

71.     When the carrying value of inventory exceeds its net realizable value, the inventory is written down to net realizable value, and the reduction in value is recognized as an expense in the period the write down or loss occurs. IAS 2 ¶34. An entity is required to disclose its accounting policies for measuring inventories, the total carrying amount of inventories in classifications appropriate to the entity, and the amount of any write downs of inventory recognized during the reporting period, among others. IAS 2.36-39.

72.     From the beginning of fiscal year ("FY") 2019 through the end of the Class Period, Canopy increased cannabis inventory exponentially. On March 31, 2018,

---

[16] The IFRS Foundation is a not-for profit, public interest organization established to develop a single set of high-quality, globally accepted accounting standards, and to promote and facilitate adoption of the "IFRS" standards. IFRS' International Accounting Standards Board ("IASB") promulgates standards. IASB standards that predate 2001 are "IAS __" rather than "IFRS __." Since 2007, the SEC has allowed foreign registrants to prepare financial statements in accordance with IFRS, without reconciling the data to Generally Accepted Accounting Principles ("GAAP").

Defendants valued the Company's inventory at $101,607,000. By December 31, 2019, Canopy valued its inventory at $622,575,000, an increase of over 500%.

73.     In the June 27, 2018 press release, and repeatedly thereafter, as noted in detail above, Defendants materially misstated that it scaled inventories to meet market demands.

74.     Canopy violated IAS 2 in SEC filings throughout the Class Period, materially misleading investors by knowingly or recklessly failing to evaluate and impair its excessive inventory of dry flower, oils, and gelcaps. As Canopy's inventory grew exponentially, Defendants recklessly failed to disclose then-known risks associated with this stockpiling, and continued to provide no basis in evidence for its optimistic market assessments or its calculations of net realizable value. Defendants never told the market that they had "***no data***" on which to base their market demand expectations or their rapid inventory growth, or that, contrary to their repeated statements, their inventory buildup was based on something other than market demand.

75.     While Defendants acknowledged that Canada's recreational cannabis market was new, and that they had no external market research on which to rely, they did not caution investors that they had "no data" supporting their expectations of market demand. The 2018 AIF contained sixteen (16) pages of "Risk Factors." None of the risk factors cautioned about inventory levels or the possibility that the Company would need to discard or take impairments on unsold inventory, much less the specific decision exponentially to increase inventory generally, or inventory of dry flower, oils, and gelcaps specifically. In fact, the words "inventory, "gelcaps," and "oils" do not appear in any risk warning.

76.     Nor did the risk warnings caution that Canopy had *no data* to use to set its "market expectations" for the legal recreational cannabis market, *no data* to support the scale of its acquisition, construction and activation of cannabis product facilities, and *no data* to support the scale of its inventory buildup or its buildup of oils and gelcaps specifically. Throughout the Class Period, Defendants misinformed investors that they had *some* basis to support their decision to exponentially increase inventory, when they did not.

77.     Defendants' knowledge that they were required to evaluate and impair inventory, and their recklessness, is further evidenced by their decision to start providing investors with less information about Canopy's inventory. From the start of the Class Period through the November 15, 2018 quarterly filing for the period ended September 30, 2018, Canopy provided not only total inventory figures broken down into "finished product" and "work-in-process," but also inventory values for dry flower, oils and gelcaps, broken down into the same two categories.

78.     On February 15, 2019, Canopy filed its Q2 2019 Report, which included the Company's *Condensed Interim Financial Statements for the three and nine months ended December 31, 2018 and 2017 (in Canadian dollars)*. For the first time, in Note 8, "Inventory," Canopy published only the *total value* of inventory. This hid from investors a separate breakdown for dry cannabis, oils, and gelcaps. For the rest of the Class Period, as the market for recreational oils and gelcaps dried up, Defendants only disclosed the total value of all inventory to avoid providing any information about the inventory value for dry flower, oils, and gelcaps.

79.     Defendants violated IAS 2 in each quarter through the August 14, 2019 quarterly filings and earnings call by materially overvaluing inventory. On that date Defendants announced that they recorded an $8 million revenue charge for returns of oils and gelcaps. Defendants attributed the returns to "***the risk of an over-supply of certain oil and softgel formats may exist in certain markets.***" Yet instead of evaluating and impairing their enormous inventory of oils, gelcaps, and dry flower in the wake of their partial disclosure that those products were not only not being sold, but were being returned, Defendants doubled down. Defendants falsely and recklessly told investors that the revenue reversal was a one-time occurrence that would not repeat itself, a material misstatement that would be revealed just three months later when Defendants stated that they had impaired $16 million of their oils and gelcaps inventory.

## F.  Canopy Materially Overstated its Revenue and Violated IFRS 15

80.     Starting with the February 15, 2019 quarterly filing and continuing through the rest of the Class Period, Defendants mislead investors by materially overstating revenues in violation of IFRS 15 by recognizing revenue that it knew was not "highly probable" to not be reversed, and without a "high degree of confidence" that the revenue would not be reversed.

81.     IFRS 15, *Revenue from Contracts with Customers*, applies to reporting information about the nature, amount, timing and uncertainty of revenue and cash flows from a customer contract.[17] IFRS sets a five-step process for determining when to

---

[17] Canopy stated that its financial statements were prepared in accordance with IFRS, and IFRS 15 specifically, in every quarterly or annual filing during the Class Period until April 1, 2020, after which its financial statements were prepared in accordance with GAAP.

recognize revenue: (a) identify the customer contract(s); (b) identify the contract's "performance obligations," distinct promises to transfer goods or services; (c) determine the "transaction price," the amount of consideration an entity expects to receive in exchange for transferring goods or services; (d) allocate the transaction price to each performance obligation based on the relative stand-alone selling prices of each distinct good or service to be transferred; and (e) recognize revenue when a performance obligation is satisfied by transferring a promised good or service to a customer, which may be at a single point in time, or over time.

82.     A contract's promised consideration may be fixed, variable, or both. IFRS 15.47. The consideration amount may vary due to price concessions, rights of return, or other similar items. IFRS 15.51. Variability may be explicit or implicit, and may arise from customary business practices, specific statements, or other facts and circumstances that create a valid expectation by the customer. If a contract's promised consideration is variable, an entity must estimate the consideration it expects to receive in exchange for the promised goods or services. IFRS 15.48, 50.[18]

83.     IFRS 15 requires an entity to disclose **sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue** and cash flows arising from customer contracts. IFRS15.110. An entity is

---

[18] The two methods for determining the amount of variable consideration to record are the *expected value* method and the *most likely amount* method. IFRS 15.53. Canopy did not disclose the method it applied, if any. The *expected value* method generally applies if an entity has a large number of contracts with similar characteristics, and the *most likely amount* method when a contract has only two possible outcomes, *e.g.*, an entity either achieves a performance bonus or does not. The method chosen must be applied consistently throughout the contract and to similar types of contracts when estimating the effect of uncertainty on the amount of variable consideration to which the entity will be entitled. IFRS 15. 53-54.

required to disclose **qualitative and quantitative information about its customer contracts**. IFRS 15.110, including whether the consideration amount receivable from customers includes a variable component and whether the estimate of this variable component was constrained, and **whether the contract has obligations for returns, refunds and other similar obligations**. IFRS 15.119. Further, IFRS 15 requires an entity to disclose **qualitative and quantitative information about the significant judgements,** and changes in judgements, made in applying IFRS 15 to contracts, IFRS 15.110, including  estimating variable consideration, **assessing whether an estimate of variable consideration is not "highly probable" and must be constrained**, and **measuring obligations for returns, refunds and other similar obligations**. IFRS 15.123, 126.

84.     In order to prevent improper revenue recognition, estimation of variable consideration must be constrained to the extent that it is "**highly probable that a significant reversal in the amount of cumulative revenue recognised will not occur when the uncertainty associated with the variable consideration is subsequently resolved**." IFRS 15.56.[19] An entity must have a "high degree of confidence" that the revenue will not be reversed in a subsequent reporting period. IFRS 15.BC203-BC204.

85.     In assessing whether it is "highly probable" that a significant reversal of revenue will not occur, an entity should consider both the likelihood and magnitude of a revenue reversal. Factors which may increase the likelihood or the magnitude of a revenue reversal include: a high risk of obsolescence of the promised good or service, the entity's limited experience with similar types of contracts (or if previous experiences have limited

---

[19] The term "highly probable" is consistent with the existing definition in IFRS 5 Appendix A, "significantly more likely than probable."

predictive value), whether the entity has a practice of offering either a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances, and if the contract has a broad range of possible consideration amounts IFRS 15.57.

86.     When an entity determines that if it includes all of the variable consideration in the transaction price it cannot meet the "highly probable" threshold, it should recognize as revenue a smaller amount that would not result in a significant revenue reversal.

87.     When a contract includes a right to return products, revenue should not be recognized for products expected to be returned. The expected refund should be recorded as a refund liability, and the returned products as an asset. IFRS 15.55, B20 – B27. Variable consideration should be reassessed, liabilities refunded, the value of the returned asset recorded, and the figures adjusted each reporting period, as either increases or decreases in revenue. IFRS 15.55, 59, B23 - B25.

88.     Canopy's unwarranted and inflated inventory created a risk of oversupply to distributors, and a material risk of product returns and price concessions. Canopy never made public its supply contracts with provinces for recreational cannabis, so investors were unaware until Defendants' statement during an August 15, 2019 earnings conference call ("August 15, 2019 Call") that "***the supply agreements with the provinces allow for returns at any point in the future***." The 2018 AIF's risk factors do not mention these provisions, or caution that significant returns could materially affect Canopy's financial condition. The only mention of "returns" is in an unrelated risk about recall of dangerous or defective products.

31

89.     Investors were further unaware that Canopy's contracts for recreational oils and gelcaps allowed for significant price concessions under specific circumstances. Only after the Class Period, in the 2020 10-K filed on June 1, 2020, did Canopy tell investors that its "supply agreements … are subject to terms that allow for renegotiation of sale prices and termination at the election of the applicable cannabis control authority." The 2018 AIF's risk factors do not mention that the provincial buyers/distributors could receive price concessions whenever they chose, backed by the threat that any province could cancel its supply contract with Canopy at any time. Nor did Defendants caution that significant price concessions could materially affect Canopy's financial condition.

90.     During an earnings conference call held on June 21, 2019 ("June 21, 2019 Call"), in response to an analyst question, Defendant Linton acknowledged that in the fourth quarter of FY 2019, the very first quarter during which recreational sales were legal for the entire quarter, the number of kilograms of recreational cannabis sold was *lower* than the number of kilograms sold in the third quarter of FY 2019, during which recreational sales were not legal for the entire quarter. Defendants continued, nevertheless, to materially increase the size of Canopy's inventory.

91.     Canopy violated IFRS 15 in its Consolidated Financial Statements issued on February 15, 2019, June 26, 2019, and August 14, 2019, knowingly or recklessly materially misleading investors by recording variable revenue that was not "highly probable" not to be reversed, and failing to disclose required information about its customer contracts with provinces.

92.     Defendants failed *entirely* to execute IFRS 15's mandate to disclose sufficient information to enable users of financial statements to understand the nature,

amount, timing, and uncertainty of revenue from its supply contracts with provinces. Only during the earnings conference call on November 14, 2019 ("November 14, 2019 Call") did investors learn that prior to and after October 17, 2018, Canopy had "**no data**," to support its revenue assumptions about returns and pricing concessions, and that Defendants "had nothing within the Canadian regulatory context for recreational legalization for making production decisions." Only after the Class Period did investors learn that Canopy's product supply push to the provinces "wasn't strictly" because Defendants thought that it was needed to meet market demand, but was "for getting our brands out there."

93.     Defendants violated IFRS 15 by failing to disclose that it was "highly probable that a significant reversal in the amount of cumulative revenue recognised will not occur when the uncertainty associated with the variable consideration is subsequently resolved." IFRS 15.56. Defendants' repeated statements to investors that management had specific expectations for market demands were intended to instill in investors the belief that their understanding of the legal cannabis market was based on evidence rather than a desire to build investor interest and inflate its stock value. When Defendants told investors during the November 14, 2019 Call that they understood oils and gelcaps sales to be 15% of the market when they were only 5% of the market, they did not even attempt to support their 15% "market expectation" number with facts demonstrating that the number was anything other than a guess.

94.     Defendants violated IFRS 15 by failing to disclose that its supply contracts with provinces not only contained rights of return, but that the provinces had an unlimited right to return product to Canopy. These undisclosed provisions spoke directly to the

uncertainty of Canopy's revenue recognition.[20] Defendants were required to disclose their existence to investors.

95.     Defendants also violated IFRS 15 by failing to disclose that the supply contracts with provinces enabled provinces to extract price concessions from Canopy "at the election of the [provincial] authority." Investors only learned about price concessions on November 14, 2019, when Canopy announced that it had granted "pricing allowances" for oils and gelcaps in the amount of 5-7%. Investors were never informed that Canopy had agreed to pricing concessions in its supply contracts.

96.     Finally, Defendants violated IFRS 15 by failing to provide information supporting their determinations of transaction prices. Defendants' silence prevented investors from evaluating the wisdom or folly of the supply contracts, and led to investor losses when Canopy was forced to reverse $40.7 million in revenue of oils and gelcaps in August and November of 2019.

97.     Far from disclosing "sufficient information," Defendants provided investors with no information. Canopy violated IFRS 15.

---

[20] Although Canopy stated in its June 28, 2018 *Consolidated Financial Statements for the years ended March 31, 2018 and 2017 (in Canadian dollars"),* that, pursuant to IFRS 15, it "recognizes revenue in an amount that reflects the consideration that the Company expects to receive taking into account any variation that may result from rights of return," this recitation is boilerplate and did not convey the magnitude of such rights of return. Canopy never disclosed that its supply contracts contained rights of return before August 15, 2019.

V.   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

A. **Defendants' False and Misleading Statements Concerning Its Oils and Gelcaps Inventory**

98.   On June 27, 2018, Canopy issued a press release, signed by Defendant Linton, attached to a filed 6-K, entitled *Canopy Growth Corporation Reports Fourth Quarter and Fiscal Year 2018 Financial Results: Driving Readiness for the Canadian Recreational Cannabis Market.* Canopy stated:

> Inventory at March 31, 2018 amounted to $101.6 million (March 31, 2017 - $46.0 million) and biological assets amounted to $16.3 million (March 31, 2017 - $14.7 million), together totaling $117.9 million (March 31, 2017 - $60.7 million). ***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.***[21]

> At March 31, 2018, the Company held 15,726 kilograms of dry cannabis, 6,969 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 356 kilograms of softgel capsules. Included in the dry cannabis quantities was 2,982 kilograms available for sale in the Company's online stores and 3,480 kilograms in process of finishing or awaiting approval for sale and 9,264 kilograms of extract-grade cannabis held for conversion to saleable oils and capsules

99.   The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

> (a) Failed to disclose that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation

---

[21] Emphasis added throughout unless otherwise noted.

of market demands," and that this absence of data disabled them from accurately understanding the appropriate level of inventory of oils and gelcaps, and the market demand for those products. Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there";

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability accurately to understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

(d) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

(e) Failed to disclose that Defendants had "no data" on which to base the opinion that "significant demand will develop for cannabis oil and in particular soft gels in the recreational market."

100.     On June 28, 2018, Canopy filed with the SEC its 2018 AIF as an exhibit to its 2018 40-F. The 2018 AIF has a section entitled "Risk Factors" that is 16 pages long. The Risk Factor section contains no risk factors cautioning about inventory buildup, or inventory buildup of gelcaps and/or oils specifically. None of the words "inventory," "gelcaps," or "oils" appear in the Risk Factor section.

101.     The foregoing "Risk Factor" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of oils and gelcaps in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

102.     On June 28, 2018, Canopy filed with the SEC its "Consolidated Financial Statements for the years ended March 31, 2018 and 2017 (in Canadian dollars"). The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $101,607,000. Note 6 to the Financial Statements, "Inventory," lists total inventory of

$101,607,000, consisting in part of $30,198,000 in inventory of Cannabis Oils, comprised of $9,624,000 of finished goods and $20,574,000 of works-in-process; $2,768,000 in inventory of Capsules- Finished Goods; and $65,423,000 in inventory of Dry Cannabis, comprised of $14,114,000 of finished goods and $51,309,000 in works-in-process.

103.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because they failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to adjust to the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of oils and gelcaps, and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

104.    On August 15, 2018, Canopy issued a press release, signed by Defendant

Linton, attached to a filed 6-K, entitled *Canopy Growth Corporation Reports First Quarter Fiscal 2019 Financial Results*. In a section entitled "First Quarter Fiscal 2019 Balance Sheet Highlights," Canopy wrote that

> Inventory at June 30, 2018 amounted to $118.2 million (March 31, 2018 - $101.6 million) and biological assets amounted to $52.8 million (March 31, 2018 - $16.3 million), together totaling $171.0 million (March 31, 2018 - $117.9 million). ***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.***
>
> At June 30, 2018, the Company held inventory of 19,721 kilograms of dry cannabis, 14,895 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 1,055 kilograms of softgel capsules. Included in the dry cannabis quantities was 2,594 kilograms available for sale in the Company's online stores and 6,576 kilograms in process of finishing or awaiting approval for sale and 10,551 kilograms of cannabis held for conversion to saleable oils and softgel capsules.

105. On August 15, 2018, Defendants filed *Management's Discussion and Analysis of the Financial Condition and Results of Operations for the three months ended June 30, 2018* ("August 15 MD&A"). In the MD&A Defendants wrote that "***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.***"

106. The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that this absence of data acted as a constraint on their ability to accurately determine the appropriate level of inventory of

39

oils and gelcaps, and the market demand for those products. Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there";

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

(d) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

(e) Failed to disclose that Defendants had "no data" on which to base the opinion that "significant demand will develop for cannabis oil and in particular soft gels in the recreational market."

107.    The August 15 MD&A contains a "Risks and Uncertainties" section containing two pages of risks. The section also incorporates by reference the "Risk

Factors" section of the 2018 AIF. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of gelcaps and/or oils specifically. None of the words "inventory," gelcaps," or "oils" appear in the Risk Factor section.

108.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of oils and gelcaps in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

109.    On August 15, 2018, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three months ended June 30, 2018 and 2017 (in Canadian dollar")*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at valued at $118,204,000, compared to $101,607,000 as of March 31, 2018, three months earlier. Note 6 to the Financial Statements, "Inventory," lists total inventory of $118,204,000, consisting in part of $71,755,000 in inventory of Dry Cannabis, comprised of $13,352,000 of finished goods and $58,403,000 in works-in-process; $35,234,000 in inventory of Cannabis Oils, comprised of $20,632,000 of finished goods; and $14,602,000 of works-in-process; and $7,755,000 in inventory of Capsules- Finished Goods.

110.   The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because they failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of oils and gelcaps, and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

111.   On November 14, 2018, Canopy issued a press release, signed by Defendant Linton, attached to a 6-K filed on November 15, 2018, entitled *Canopy Growth Corporation Reports Second Quarter Fiscal 2019 Financial Results*. In a section entitled "Second Quarter Fiscal 2019 Balance Sheet Highlights," Canopy wrote that

> Inventory at September 30, 2018 amounted to $150.4 million (March 31, 2018 - $101.6 million) and biological assets amounted to $20.7 million (March 31, 2018 - $16.3 million), together totaling $171.1 million (March 31, 2018 - $117.9 million). ***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market and meeting medical customer commitments***.

42

> At September 30, 2018, the Company held inventory of 31,214 kilograms of dry cannabis, 21,499 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 1,497 kilograms of Softgel capsules.

112.   On November 15, 2018, Defendants filed *Management's Discussion and Analysis of the Financial Condition and Results of Operations for the three and six months ended September 30, 2018* ("November 15 MD&A"). In the MD&A Defendants wrote that "***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market which commenced October 17, 2018.***"

113.   During the November 14, 2018 Call, in scripted remarks, Defendant Saunders stated that "***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market.***"

114.   The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that this absence of data acted as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products. Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there;"

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

(d) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

(e) Failed to disclose that Defendants had "no data" on which to base the opinion that "significant demand will develop for cannabis oil and in particular soft gels in the recreational market."

115.    During the November 14, 2018 Call, in scripted remarks, Defendant Saunders stated that**:**

> "Management continues to believe that ***significant demand will develop for cannabis oil and in particular soft gels in the recreational market***." As such, ***the company continues to increase inventories*** at extract grade dry cannabis, held for conversion, ***and increased the quantity of cannabis oil and soft gel caps that we have on hand***."

116.    The foregoing statements were materially false and/or misleading because

Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" to support the statement that "significant demand will develop for cannabis oil and in particular soft gels in the recreational market," and that this absence of data acted as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products. Having chosen to speak about inventory and the demand for oils and gelcaps, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "increase inventory" of oils and gelcaps, or to "increase[] the quantity of cannabis oil and soft gel caps that we have on hand" was a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

117.    The November 15 MD&A contains a "Risks and Uncertainties" section containing three pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of gelcaps and/or oils specifically. None of the words "inventory," gelcaps," or "oils" appear in the Risk Factor section.

118.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of oils and gelcaps in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

119.    On November 15, 2018, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three and nine months ended September 30, 2018 and 2017 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $150,406,000, compared to $101,607,000 as of March 31, 2018, three months earlier. Note 6 to the Financial Statements, "Inventory," lists total inventory of $150,406,000, consisting in part of $36,306,000 in inventory of Cannabis Oils, comprised of $31,109,000 of finished goods and $5,197,000 of works-in-process; $9,912 in inventory of Capsules- Finished Goods; and $95,133,000 in inventory of Dry Cannabis, comprised of $14,971,000 of finished goods and $80,162,000 in works-in-process;.

120.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

46

(a) Materially overstated the value of their inventory because they failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of oils and gelcaps, and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

121.   On February 15, 2019, Defendants filed *Management's Discussion and Analysis of the Financial Conditions and Results of Operation for the three and nine months ended December 31, 2018*. With respect to the Company's total inventory as of December 31, 2018 of $184,961,000, Defendants stated that "***Management believes [it] is [all] required to meet expected market demands, including the legalized recreational market***."

122.   The foregoing statements were materially false and/or misleading because

Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" to support the statement that the entire inventory is necessary to meet "market demands," and that this absence of data acted as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products. Having chosen to speak about inventory and demand for oils and gelcaps, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) In violation of IFRS, failed to state that having "no data" upon which to base the statement that the entire inventory is necessary to meet "market demands," was a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products. Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its statement that the entire inventory was necessary to meet "market … demands," was a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products.

123. The February 15, 2019 MD&A contains a "Risks and Uncertainties" section containing two pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The cited risk sections contain no risk factors cautioning

about inventory buildup, or inventory buildup of gelcaps and/or oils specifically. None of the words "inventory," gelcaps," or "oils" appear in the Risk Factor section.

124.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of oils and gelcaps in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

125.    On February 15, 2019, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three and nine months ended December 31, 2018 and 2017 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $184,961,000, compared to $101,607,000 as of March 31, 2018. Note 8 to the Financial Statements, "Inventory," lists total inventory of $184,961,000, consisting in part of $22,245,000 of finished goods and $120,912,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory,

including a breakdown of inventory by dry flower, oils, and gelcaps.

126.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of oils and gelcaps, and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

127.    In the February 15, 2019, *Condensed Interim Consolidated Financial Statements for the three and nine months ended December 31, 2018 and 2017 (in Canadian dollars)*, Canopy reported $83,048,000 in net revenue for the three months

ended December 31, 2018, and $132,291,000 for the nine months ended December 31, 2018.

128.   The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

> (a) In violation of IFRS 15, materially overstated revenue, failing adequately to reserve revenue for returns of oils and gelcaps and price concessions on oils and gelcaps;

> (b) In violation of IFRS 15, materially overstated revenue from oils and gelcaps, recognizing material amounts of revenue when it was not "highly probable" that a significant reversal of that revenue would not occur;

> (c) In violation of IFRS 15, failed to disclose to investors that Canopy had "no data" with which to accurately decide the amount of variable consideration to recognize as revenue.

> (d) In violation of IFRS 15, failed to disclose quantitative and qualitative information about its contracts with customers and the significant judgments made in applying IFRS 15.

129.   On June 26, 2019, Canopy filed its *Consolidated Financial Statements for the years ended March 31, 2019 and 2018 (in Canadian dollars)*, attached as an exhibit to the June 26, 2019 "Form 40-F for the Fiscal Year Ended March 31, 2019," Canopy reported $226,341,000 in net revenue for the year ended March 31, 2019, and $77,948,000 for the year ended March 31, 2018.

130.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) In violation of IFRS 15, materially overstated revenue, failing adequately to reserve revenue for returns of oils and gelcaps and price concessions on oils and gelcaps;

(b) In violation of IFRS 15, materially overstated revenue from oils and gelcaps, recognizing material amounts of revenue when it was not "highly probable" that a significant reversal of that revenue would not occur;

(c) In violation of IFRS 15, failed to disclose to investors that Canopy had "no data" with which to accurately decide the amount of variable consideration to recognize as revenue.

(d) In violation of IFRS 15, failed to disclose quantitative and qualitative information about its contracts with customers and the significant judgments made in applying IFRS 15.

131.    On June 26, 2019, Canopy filed with the SEC its *Annual Information Form for the Period Ended March 31, 2019* ("2019 AIF"), as an exhibit to its 2019 40-F. The 2019 AIF has a section entitled "Risk Factors" that is 24 pages long. The Risk Factor section does not caution about inventory buildup, or inventory buildup of gelcaps and/or oils specifically. None of the words "inventory," gelcaps," or "oils" appear in the Risk Factor section.

132.    The foregoing "Risk Factor" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of oils and gelcaps in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a "Inventory" as an asset valued at inventory of oils and gelcaps, and the market demand for those products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

133.    In the June 26, 2019, *Consolidated Financial Statements for the years ended March 31, 2019 and 2018 (in Canadian dollars)*, the Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $262,105,000 as of March 31, 2019, compared to $101,607,000 as of March 31, 2018. Note 9 to the Financial Statements, "Inventory," lists total inventory of $262,105,000, consisting in part of $38,048,000 of finished goods and $165,462,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry flower, oils, and gelcaps.

134.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants

failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of oils and gelcaps, and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

135.    In the August 14, 2019, *Condensed Interim Consolidated Financial Statements for the three months ended June 30, 2019 and 2018 (in Canadian dollars)*, Canopy reported $90,482,000 in net revenue for the three months ended June 30, 2019, and $25,916,000 for the three months ended June 30, 2018.

136.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) In violation of IFRS 15, materially overstated revenue, failing adequately to reserve revenue for returns of oils and gelcaps and price concessions on

oils and gelcaps;

(b) In violation of IFRS 15, materially overstated revenue from oils and gelcaps, recognizing material amounts of revenue when it was not "highly probable" that a significant reversal of that revenue would not occur;

(c) In violation of IFRS 15, failed to disclose to investors that Canopy had "no data" with which to accurately decide the amount of variable consideration to recognize as revenue.

(d) In violation of IFRS 15, failed to disclose quantitative and qualitative information about its contracts with customers and the significant judgments made in applying IFRS 15.

137. On August 14, 2019, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three months ended June 30, 2019 and 2018 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $393,738,000 as of June 30, 2019, compared to $262,105,000 as of March 31, 2019. Note 7 to the Financial Statements, "Inventory," lists total inventory of $393,738,000, consisting in part of $93,132,000 of finished goods and $247,212,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry flower, oils, and gelcaps.

138. The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration despite being

aware of indicators of over-supply of certain oils and gelcaps formats;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of oils and gelcaps, and impair the inventory. Defendants knew that sales of oils and gelcaps were stagnant, and that they took an $8 million revenue charge because of returns of oils and gelcaps. This was an indicator requiring Canopy to evaluate the net realizable value of its large inventory of oils and gelcaps, and to impair the value of inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

139.   On August 14, 2019, Canopy filed its *Management's Discussion and Analysis of Financial Condition and Results of Operation for the three months ended June 30, 2019*. The MD&A contains a "Risks and Uncertainties" section containing one paragraph of risks. The section also refers investors to the "Risk Factors" section in

Canopy's Annual Information Form filed in conjunction with its stock sold on the Toronto Stock Exchange. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of gelcaps and/or oils specifically. None of the words "inventory," gelcaps," or "oils" appear in the Risk Factor section.

140.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

>   (a) Omitted disclosing that the decision to scale inventory of oils and gelcaps in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

>   (b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of oils and gelcaps, and the market demand for those products;

>   (c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

141.    During the August 15, 2019 Call, in response to an analyst's inquiry about whether the $8 million in returns of oils and gelcaps deducted from revenue was "something that we could expect to have coming in future quarters, Defendant Lee responded "I would say this is something that I wouldn't expect to move the P&L in the future."

142. In response to another analyst question, Defendant Kovacevic assured that the $8 million in returns affecting revenue were not "a cause [for] concern going forward."

143. In response to another analyst question, Defendant Zekulin told analysts that the $8 million revenue reversal did not implicate the correctness of Canopy's inventory levels in any way, stating "[n]o it is not related to our production flow here, simply related to the product mix that we see demand for."

144. The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) In violation of IFRS 15, failed adequately to reserve revenue for returns of oils and gelcaps and price concessions on oils and gelcaps;

(b) Failed to disclose that there was little demand for oils and gelcaps, and material returns and/or price concessions in the near future were highly probable;

(c) Having admitted during the same call that there existed a "risk of an over-supply of certain oil and softgel formats [] in certain markets," Canopy was required to evaluate its inventory of oils and gelcaps inventory for impairment, and should have impaired inventory in August of 2019, and not three months later in November of 2019. Telling the market that the problems with low demand for oils and gelcaps were now over and would not negatively impact future financial statements was false;

(d) In violation of IAS 2, failed to evaluate and impair their enormous inventory of oils and gelcaps in the wake of the truth that those products

58

were not only not being sold, but were being returned.

## B. Defendants' False and Misleading Statements Concerning Its Dry Flower Inventory

145.   On June 27, 2018, Canopy issued a press release, signed by Defendant Linton, attached to a filed 6-K, entitled *Canopy Growth Corporation Reports Fourth Quarter and Fiscal Year 2018 Financial Results: Driving Readiness for the Canadian Recreational Cannabis Market.* Canopy stated:

> Inventory at March 31, 2018 amounted to $101.6 million (March 31, 2017 - $46.0 million) and biological assets amounted to $16.3 million (March 31, 2017 - $14.7 million), together totaling $117.9 million (March 31, 2017 - $60.7 million). ***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.***

> At March 31, 2018, the Company held 15,726 kilograms of dry cannabis . . . . Included in the dry cannabis quantities was 2,982 kilograms available for sale in the Company's online stores and 3,480 kilograms in process of finishing or awaiting approval for sale and 9,264 kilograms of extract-grade cannabis held for conversion to saleable oils and capsules

146.   The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that this absence of data disabled them from accurately understanding the appropriate level of inventory and market demand for dry flower, and the market demand for dry flower products. Having chosen to speak about inventory and their decision to scale dry

flower inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there;"

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability accurately to understand the appropriate level of inventory and market demand for dry flower products.

(d) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry flower products.

147.    On June 28, 2018, Canopy filed with the SEC its 2018 AIF as an exhibit to its 2018 40-F. The 2018 AIF has a section entitled "Risk Factors" that is 16 pages long. The Risk Factor section contains no risk factors cautioning about inventory buildup of dry flower. Indeed, the word "inventory" does not even appear in the Risk Factor section

148.    The foregoing "Risk Factor" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry flower in

anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry flower products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

149.     On June 28, 2018, Canopy filed with the SEC its "Consolidated Financial Statements for the years ended March 31, 2018 and 2017 (in Canadian dollars"). The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $101,607,000. Note 6 to the Financial Statements, "Inventory," lists total inventory of $101,607,000, consisting in part of $65,423,000 in inventory of dry flower, comprised of $14,114,000 of finished goods and $51,309,000 in works-in-process.

150.     The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their dry flower inventory because they failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their dry flower inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market

demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry flower and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory and market demand for dry flower;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

151.    On August 15, 2018, Canopy issued a press release, signed by Defendant Linton, attached to a filed 6-K, entitled *Canopy Growth Corporation Reports First Quarter Fiscal 2019 Financial Results*. In a section entitled "First Quarter Fiscal 2019 Balance Sheet Highlights," Canopy wrote that

> Inventory at June 30, 2018 amounted to $118.2 million (March 31, 2018 - $101.6 million) and biological assets amounted to $52.8 million (March 31, 2018 - $16.3 million), together totaling $171.0 million (March 31, 2018 - $117.9 million). ***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar                                         2018.***

> At June 30, 2018, the Company held inventory of 19,721 kilograms of dry cannabis . . . . Included in the dry cannabis quantities was 2,594 kilograms available for sale in the Company's online stores and 6,576 kilograms in process of finishing or awaiting approval for sale and 10,551 kilograms of cannabis held for conversion to saleable oils and

softgel capsules.

152.    On August 15, 2018, Defendants filed *Management's Discussion and Analysis of the Financial Condition and Results of Operations for the three months ended June 30, 2018* ("August 15 MD&A"). In the MD&A Defendants wrote that "***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.***"

153.    The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that this absence of data disabled them from accurately understanding the appropriate level of inventory and market demand for dry flower, and the market demand for dry flower products. Having chosen to speak about inventory and their decision to scale dry flower inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability accurately to understand the appropriate level of inventory and market

demand for dry flower products.

(d) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry flower products.

154.    The August 15 MD&A contains a "Risks and Uncertainties" section containing two pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of dry flower. Indeed, the word "inventory" does not appear in the Risk Factor section.

155.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry flower in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of dry cannabis and the market demand for those products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period,

that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

156.    On August 15, 2018, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three months ended June 30, 2018 and 2017 (in Canadian dollar")*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at valued at $118,204,000, compared to $101,607,000 as of March 31, 2018, three months earlier. Note 6 to the Financial Statements, "Inventory," lists total inventory of $118,204,000, consisting in part of $71,755,000 in inventory of Dry Cannabis, comprised of $13,352,000 of finished goods and $58,403,000 in works-in-process.

157.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because they failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or understand the market demand for dry cannabis;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory and

market demand for dry cannabis.

158.    During the August 15, 2019 Call, after announcing the $8 million revenue reversal for returns of oils and gelcaps, an analyst asked with respect to dry flower:

> **Owen Bennett**
>
> But I mean, ***how confident are you*** once you kind of fill the channel in terms of us speaking and kind of longer channels over the next few quarters. I mean ***is there rigs there similar to what you see with the softgels and the oils now, where you are going to have to put in provisions to returns on some of these flowers?***
>
> **Mark Zekulin**
>
> ***We remain very confident. I think part of our effort to push product out early and obtain market share, wasn't strictly for the purpose of obtaining market share***, it was for getting our brands out there ….

159.    The foregoing statement was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose material facts incompatible with their "very confident" opinion, namely that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that this absence of data acted as a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis, and undermined Defendants' statement that they were "very confident." Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) In violation of IAS 2, failed to state that having "no data" upon which to

66

base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis.

(c) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis.

160. On November 14, 2018, Canopy issued a press release, signed by Defendant Linton, attached to a 6-K filed on November 15, 2018, entitled *Canopy Growth Corporation Reports Second Quarter Fiscal 2019 Financial Results*. In a section entitled "Second Quarter Fiscal 2019 Balance Sheet Highlights," Canopy wrote that

> Inventory at September 30, 2018 amounted to $150.4 million (March 31, 2018 - $101.6 million) and biological assets amounted to $20.7 million (March 31, 2018 - $16.3 million), together totaling $171.1 million (March 31, 2018 - $117.9 million). ***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market and meeting medical customer commitments***.

> At September 30, 2018, the Company held inventory of 31,214 kilograms of dry cannabis, 21,499 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 1,497 kilograms of Softgel capsules.

161. On November 15, 2018, Defendants filed *Management's Discussion and Analysis of the Financial Condition and Results of Operations for the three and six months ended September 30, 2018* ("November 15 MD&A"). In the MD&A Defendants

wrote that "***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market which commenced October 17, 2018.***"

162.     During the November 14, 2018 Call, in scripted remarks, Defendant Saunders stated that "***Inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market.***"

163.     The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that this absence of data acted as a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis. Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there;"

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a material constraint on their ability to accurately understand the appropriate level of inventory and market

demand for dry cannabis.

    (d) In violation of IFRS 15, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands," was a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis.

164.    The November 15 MD&A contains a "Risks and Uncertainties" section containing three pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of dry cannabis specifically. Indeed, the word "inventory" does not appear in the Risk Factor section.

165.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

    (a) Omitted disclosing that the decision to scale inventory of dry cannabis in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

    (b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of dry cannabis and the market demand for those products;

    (c) Failed to disclose, as Defendants admitted at the end of the Class Period,

69

that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

166.   On November 15, 2018, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three and nine months ended September 30, 2018 and 2017 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $150,406,000, compared to $101,607,000 as of March 31, 2018, three months earlier. Note 6 to the Financial Statements, "Inventory," lists total inventory of $150,406,000, consisting in part of $95,133,000 in inventory of Dry Cannabis, comprised of $14,971,000 of finished goods and $80,162,000 in works-in-process;.

167.   The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their dry cannabis inventory because they failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their dry cannabis inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for dry cannabis;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's

ability to accurately understand the appropriate level of inventory and market demand for dry cannabis;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

168.    On February 15, 2019, Defendants filed *Management's Discussion and Analysis of the Financial Conditions and Results of Operation for the three and nine months ended December 31, 2018*. With respect to the Company's total inventory as of December 31, 2018 of $184,961,000, Defendants stated that "***Management believes [it] is [all] required to meet expected market demands, including the legalized recreational market***."

169.    The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that Defendants had "no data" to support the statement that the entire inventory is necessary to meet "market demands," and that this absence of data acted as a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis. Having chosen to speak about inventory and demand for dry cannabis, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(b) In violation of IFRS, failed to state that having "no data" upon which to base the statement that the entire inventory is necessary to meet "market

demands," was a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis, oils, and gelcaps. Having chosen to speak about inventory and their decision to scale inventory, Defendants were duty-bound not to omit information whose absence rendered their statements misleading;

(c) In violation of IAS 2, failed to state that having "no data" upon which to base its statement that the entire inventory was necessary to meet "market … demands," was a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis.

170. The February 15, 2019 MD&A contains a "Risks and Uncertainties" section containing two pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of dry cannabis specifically. The word "inventory" does not appear in the Risk Factor section.

171. The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry cannabis in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a

constraint on their ability to accurately understand the appropriate level and market demand for dry cannabis;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

172.   On February 15, 2019, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three and nine months ended December 31, 2018 and 2017 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $184,961,000, compared to $101,607,000 as of March 31, 2018. Note 8 to the Financial Statements, "Inventory," lists total inventory of $184,961,000, consisting in part of $22,245,000 of finished goods and $120,912,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry flower, oils, and gelcaps.

173.   The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory and market demand for dry cannabis;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

174.    On June 26, 2019, Canopy filed with the SEC its *Annual Information Form for the Period Ended March 31, 2019* ("2019 AIF"), as an exhibit to its 2019 40-F. The 2019 AIF has a section entitled "Risk Factors" that is 24 pages long. The Risk Factor section does not caution about inventory buildup, or inventory buildup of dry cannabis specifically. Indeed, the word inventory does not appear in the Risk Factor section.

175.    The foregoing "Risk Factor" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry cannabis in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a "Inventory" as an asset valued at inventory and market demand for dry

cannabis;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

176.  In the June 26, 2019, *Consolidated Financial Statements for the years ended March 31, 2019 and 2018 (in Canadian dollars)*, the Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $262,105,000 as of March 31, 2019, compared to $101,607,000 as of March 31, 2018. Note 9 to the Financial Statements, "Inventory," lists total inventory of $262,105,000, consisting in part of $38,048,000 of finished goods and $165,462,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry cannabis.

177.  The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for dry cannabis;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's

expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory and market demand for dry cannabis;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

178.    On August 14, 2019, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three months ended June 30, 2019 and 2018 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $393,738,000 as of June 30, 2019, compared to $262,105,000 as of March 31, 2019. Note 7 to the Financial Statements, "Inventory," lists total inventory of $393,738,000, consisting in part of $93,132,000 of finished goods and $247,212,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry cannabis.

179.    The foregoing financial statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration despite being aware of indicators of over-supply of dry cannabis;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for dry cannabis;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory. Defendants knew that sales of dry cannabis was stagnant, and that they had taken that quarter an $8 million revenue charge because of returns of oils and gelcaps. This was an indicator requiring Canopy to evaluate the net realizable value of its large inventory of dry cannabis, and to impair the value of inventory because Canopy used dry cannabis to make its oils and gelcaps and because Canopy knew that its earlier assessment of the cannabis market was wrong;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory and market demand for dry cannabis;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

180.    On August 14, 2019, Canopy filed its *Management's Discussion and Analysis of Financial Condition and Results of Operation for the three months ended June 30, 2019*. The MD&A contains a "Risks and Uncertainties" section containing one paragraph of risks. The section also refers investors to the "Risk Factors" section in Canopy's Annual Information Form filed in conjunction with its stock sold on the Toronto Stock Exchange. The cited risk sections contain no risk factors cautioning about inventory buildup, or inventory buildup of dry cannabis specifically. Indeed, the word "inventory"

77

does not appear in the Risk Factor section.

181.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

182.    During the August 15, 2019 Call, in response to an analyst question about whether the returns could continue to be an issue or affect dry flow inventory, Defendant Kovacevic assured that the $8 million in returns affecting revenue were not "a cause [for] concern going forward."

183.    In response to another analyst question, Defendant Zekulin told analysts that the $8 million revenue reversal did not implicate the correctness of Canopy's inventory levels in any way, stating "[n]o it is not related to our production flow here, simply related to the product mix that we see demand for." The foregoing statements were

materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that the Company had built up so much inventory of dry flower that it could never sell a material portion of the dry flower inventory, and material returns and/or price concessions in the near future were highly probable;

(b) Having admitted during the same call the "risk of an over-supply of certain oil and softgel formats [] in certain markets," Canopy was required to evaluate its entire inventory for impairment, including of dry flower, and should have impaired inventory of dry flower in August of 2019, and not nine months later in May 2020, because Canopy used dry cannabis to make its oils and gelcaps, and because Canopy knew that its earlier assessment of the cannabis market was wrong. Telling the market that the problems with inventory were limited to oils and gelcaps, and would not negatively impact future financial statements, was false.

184. On November 14, 2019, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three and six months ended September 30, 2019 and 2018 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at $461,757,000 as of June 30, 2019, compared to $262,105,000 as of March 31, 2019. Note 7 to the Financial Statements, "Inventory," lists total inventory of $461,757,000, consisting in part of $131,474,000 of finished goods and $280,093,000 in work-in-process. Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry flower, oils, and gelcaps.

185. The foregoing financial statements were materially false and/or misleading

because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration despite being aware of indicators of over-supply of dry cannabis;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory. Defendants knew that sales of dry cannabis were stagnant, and that they took "a restructuring charge of $32.7 million for returns, return provisions, and pricing allowances primarily related to its softgel & oil portfolio," as well as an "inventory charge of $15.9 million." This was an indicator requiring Canopy to evaluate the net realizable value of its large inventory of dry cannabis, and to impair the value of that inventory, because Canopy used dry cannabis to make its oils and gelcaps and because Canopy knew that its earlier assessment of the cannabis market was wrong;

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of dry cannabis and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

186.   On November 14, 2019, Canopy filed its *Management's Discussion and Analysis of Financial Condition and Results of Operation for the three months ended June 30, 2019*. The MD&A contains a "Risks and Uncertainties" section containing one paragraph of risks. The section also refers investors to the "Risk Factors" section in Canopy's Annual Information Form filed in conjunction with its stock sold on the Toronto Stock Exchange. Even though the Company that same day announced restructuring charges and impairments of over $47 million, including $15.9 million related to its inventory, the cited risk sections contain no risk factors cautioning about inventory buildup. The word "inventory" does not appear in the Risk Factor section.

187.   The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry cannabis in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory and market demand for dry cannabis;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

188. During the November 14, 2019 Earnings Call, referring to dry cannabis, an analyst pointedly asked, "Do you think you're going to have to start to write off inventory anyway?" Defendant Kovacevic denied that Canopy would need to write off inventory, replying, "we see 4 months to 5 months inventory as the ideal length of period for dry flower to make sure we have continuity of availability" and "we feel very happy with our inventory level today and that they're setting us up for success."

189. A second analyst, referring to Canopy's inflated inventory levels, asked whether, if stores in Ontario were not opened quickly, "do you have to like slow down your production? Do you have to shut down some facilities?" Defendant Zekulin evaded the question, responding, "We're waiting for stores, we cannot -- to your point, if Ontario doesn't open stores for *another year*, we all have a problem. I don't think we can wait, you try to look that, but there is no reason to expect that will happen."

190. The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that the Company had built up so much inventory of dry flower that it could never hope to sell it all and would have to write off a significant amount of the product that it could not sell;

(b) Having admitted during the same call that the Company had "reviewed all remaining inventories for both product on hand as well as product in the

provinces to determine which product would be returned, which product would remain with the provinces and be subject to buy downs, and which product would be unaffected," Canopy was required to evaluate its entire inventory for impairment, and should have impaired its inventory in November of 2019, and not six months later in May of 2020, because Canopy used dry cannabis to make its oils and gelcaps, and because Canopy knew that its earlier assessment of the cannabis market was wrong. Telling the market that the inventory problems were over and assuring analysts that inventory levels were not materially inflated was false.

191.  On February 14, 2020, Canopy filed with the SEC its *Condensed Interim Consolidated Financial Statements for the three and nine months ended December 31, 2019 and 2018 (in Canadian dollars)*. The Balance Sheet in the Financial Statements lists "Inventory" as an asset valued at an astonishing $622,575,000 as of June 30, 2019, compared to $262,105,000 as of March 31, 2019. Note 7 to the Financial Statements, "Inventory," lists total inventory of $622,575,000, consisting in part of $78,193,000 of finished goods and an astonishing $472,215,000 in work-in-process. The value of the work-in-process inventory, alone, was $10 million more than the value of Canopy's *entire inventory* as of September 30, 2019 combined. Moreover, Canopy's $622,575,000 in inventory was nearly as much as five of its main competitors—Aurora Cannabis Inc., Aphria Inc., Tilray, Inc., OrganiGram Holdings Inc., and Cronos Group Inc.—*combined*. Despite the size of its inventory, Canopy chose not to provide any further breakdown of its inventory, including a breakdown of inventory by dry flower, oils, and gelcaps.

192.  The foregoing financial statements were materially false and/or misleading

because Defendants knowingly or recklessly:

(a) Materially overstated the value of their inventory because Defendants failed adequately to reserve for obsolescence and expiration despite being aware of indicators of over-supply of dry cannabis;

(b) Materially overstated their inventory because Canopy had "no data" to use in deciding to scale up inventory or to understand the market demand for those products;

(c) In violation of IAS 2, failed to adequately evaluate the net realizable value of inventory of dry cannabis and impair the inventory. Defendants knew that sales of dry cannabis was stagnant, and that they had just taken large restructuring charges in the prior two quarters. These were indicators requiring Canopy to evaluate the net realizable value of its large inventory of dry cannabis, and to impair the value of that inventory because Canopy used dry cannabis to make its oils and gelcaps and because Canopy knew that its earlier assessment of the cannabis market was wrong.

(d) In violation of IAS 2, failed to state that having "no data" upon which to base its decision to "scale inventory" or to determine "management's expectation of market demands" was a material constraint on Canopy's ability to accurately understand the appropriate level of inventory of dry cannabis and the market demand for those products;

(e) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of

obtaining market share," but for "getting our brands out there."

193.    On February 14, 2020, Canopy filed its *Management's Discussion and Analysis of Financial Condition and Results of Operation for the three and nine months ended December 31, 2019*. The MD&A contains a "Risks and Uncertainties" section containing one paragraph of risks. The section also refers investors to the "Risk Factors" section in Canopy's Annual Information Form filed in conjunction with its stock sold on the Toronto Stock Exchange. Even though the Company had just taken large restructuring charges and impairments over the prior two quarters, the cited risk sections contain no risk factors cautioning about inventory buildup. Indeed, the word "inventory" does not appear in the Risk Factor section.

194.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to scale inventory of dry cannabis in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate level of inventory of dry cannabis, and the market demand for those products;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of

obtaining market share," but for "getting our brands out there."

195.    On February 14, 2020, Canopy filed its *Management's Discussion and Analysis of Financial Condition and Results of Operation for the three and nine months ended December 31, 2019*. The MD&A stated that:

> As detailed in our MD&A for the second quarter of fiscal 2020, we recorded charges associated with excess recreational cannabis inventory, primarily related to oils and softgels, in the amount of $17 [million], our gross margin was impacted by $9 [million] related to returns and pricing adjustments, and we recorded other adjustments related to the net realizable value of inventory. ***These charges did not recur to the same extent in the third quarter of fiscal 2020.***

196.    The foregoing statement was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted to state that the charges associated with excess dry cannabis inventory had recurred and far exceeded the charges for excess inventory taken the prior quarter;

(b) Omitted to state that the Company needed to take additional charges associated with excess dry cannabis inventory, but was not doing so despite being aware of indicators of over-supply of dry cannabis;

197.    During the February 14, 2020 Call, Canopy admitted that it was in the process of an internal review and had "begun taking steps designed to bring our inventory in balance with our supply demand understand." Defendant Lee, however, minimized the extent that the Company's inventory was out of "balance," *i.e.*, grossly inflated and overvalued, stating that, "but balance of the inventory is really our bud inventory [*i.e.*, dry flower] and we feel very good that we're balanced on high THC bud. We feel very good

that we're balanced on low THC, high CBD bud. The mainstream bud which is the balance is what we call it. ***We're a little longer than what we'd like to be today***. And that's the piece that we're continuing to work through.

198.    The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Failed to disclose that the Company would have to abandon 40% of its growing space because it had built up so much inventory of dry flower that it could never sell it and would have to write off that product, and had acquired more growing space than it could ever need to meet demand for its products;

(b) Failed to disclose that far from its inventory being "a little long[]," the Company's dry cannabis inventory of was so inflated that the Company would need to write off tens of millions of dollars of inventory in the following quarter;

(c) Having admitted on an earnings call during the prior quarter that the Company had "reviewed all remaining inventories for both product on hand as well as product in the provinces to determine which product would be returned, which product would remain with the provinces and be subject to buy downs, and which product would be unaffected," Canopy was required to evaluate its entire inventory for impairment the prior quarter and should have impaired its inventory in February of 2020, and not three months later in May of 2020. Minimizing the extent of the inventory and

assuring analysts that inventory levels were not materially inflated was false.

## C. Defendants' False and Misleading Statements Concerning Its Production Facilities

199.    On June 28, 2018, Canopy filed with the SEC its 2018 AIF as an exhibit to its 2018 40-F. The 2018 AIF has a section entitled "Risk Factors" that is 16 pages long. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Company merely advised investors that:

> The Company's growth strategy contemplates outfitting its facilities with additional production resources. A variety of factors could cause these activities to not be achieved on time, on budget, or at all. As a result, there is a risk that the Company may not have product or sufficient product available to meet the anticipated demand or to meet future demand when it arises

200.    The foregoing "Risk Factor" section, and individual risk factor, were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis market posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount of growing facilities it needed to operate.

(c) Omitted disclosing that if the Company was unable to sell material portions of the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations;

(d) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

201.   The August 15 MD&A contains a "Risks and Uncertainties" section containing two pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Risk Factors merely disclosed that "The Company is reliant on a small number of facilities."

202.   The foregoing "Risk Factor" section, and individual risk factor, were materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount of growing facilities it needed to operate;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

(d) Omitted disclosing that if the Company was unable to sell the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations.

203.    The November 15 MD&A contains a "Risks and Uncertainties" section containing three pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Risk Factors merely disclosed that "The Company is reliant on a small number of facilities."

204.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount of growing facilities it needed to operate;

(c) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

(d) Omitted disclosing that if the Company was unable to sell the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations.

205. The February 15, 2019 MD&A contains a "Risks and Uncertainties" section containing two pages of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Risk Factors merely disclosed that "The Company is reliant on a small number of facilities."

206. The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount of growing facilities it needed to operate.

(c) Omitted disclosing that if the Company was unable to sell the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations;

(d) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

207. During the February 15, 2019 Call, Defendant Linton downplayed any risk from Canopy's expanded growing facilities, which now totaled 4.3 million square feet. Defendant Linton assured an analyst that "this is not a stockpiling exercise at all, and we're constantly looking at as the provinces are turning up more stores, we need to fill that warehouse."

208. The foregoing statement was materially false and/or misleading because Defendants knowingly or recklessly:

(a) told investors that Canopy's needed all of its facility space to meet current demand, when in fact Defendants knew they were producing substantially more cannabis than could ever be sold, and far more than was necessary to meet the current demand;

(b) failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory and expanding production "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

(c)  omitted disclosing to investors that Defendants' had no data on which to base the facilities expansion or the rapid growth in inventory, and certainly were in fact "stockpiling" inventory.

209.    On June 26, 2019, Canopy filed with the SEC its *Annual Information Form for the Period Ended March 31, 2019* ("2019 AIF"), as an exhibit to its 2019 40-F. The 2019 AIF has a section entitled "Risk Factors" that is 24 pages long. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Risk Factors disclosed the following risks associated with facilities unrelated to overexpansion or excess inventory than cannot that cannot be sold:

> Adverse changes or developments affecting any facility, including but not limited to a breach of security, could have a material and adverse effect on the Company's business, financial condition and prospects. Any breach of the security measures and other facility requirements, including any failure to comply with recommendations or requirements arising from inspections by government regulators, could also have an impact on the Company's ability to continue operating under its licences or the prospect of renewing its licences.

210.    The foregoing "Risk Factor" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount

of growing facilities it needed to operate.

(c) Omitted disclosing that if the Company was unable to sell the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations;

(d) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

211. On August 14, 2019, Canopy filed its *Management's Discussion and Analysis of Financial Condition and Results of Operation for the three months ended June 30, 2019.* The MD&A contains a "Risks and Uncertainties" section containing one paragraph of risks. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Risk Factors merely disclosed that the Company's "reliance on facilities" presented a risk.

212. The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation

of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount of growing facilities it needed to operate.

(c) Omitted disclosing that if the Company was unable to sell the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations;

(d) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

213.    During the November 14, 2019 Earnings Call, an analyst who noted the Company's high inventory levels pointedly asked whether if stores in Ontario did not open more quickly, "do you have to like slow down your production? Do you have to shut down some facilities?" Defendant Zekulin evaded the question, responding, "We're waiting for stores, we cannot -- to your point, if Ontario doesn't open stores for another year, we all have a problem. I don't think we can wait, you try to look that, but there is no reason to expect that will happen."

214.    The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly omitted to disclose that the Company's excessive inventory meant that the Company would have to close growing facilities, and take impairments that would materially affect the Company's financial condition.

215.    On February 14, 2020, Canopy filed its *Management's Discussion and*

*Analysis of Financial Condition and Results of Operation for the three and nine months ended December 31, 2019*. The MD&A contains a "Risks and Uncertainties" section containing one paragraph of risks. The section also refers investors to the "Risk Factors" section in Canopy's Annual Information Form filed in conjunction with its stock sold on the Toronto Stock Exchange. The section also incorporates by reference the "Risk Factors" section of the 2018 AIF. The Risk Factor section contains no risk factors cautioning about the Company's expansion of its growing facilities. Instead, the Risk Factors merely disclosed that the Company's "reliance on facilities" presented a risk.

216.    The foregoing "Risks and Uncertainties" section was materially false and/or misleading because Defendants knowingly or recklessly:

(a) Omitted disclosing that the decision to expand its facilities in anticipation of the legal recreational cannabis posed a material risk to Canopy's business, financial condition and results of operations;

(b) Omitted disclosing that Defendants had "no data" on which to base the decision to "scale inventory" or to determine "management's expectation of market demands," and that the lack of data could and did act as a constraint on their ability to accurately understand the appropriate amount of growing facilities Canopy needed to operate.

(c) Omitted disclosing that if the Company was unable to sell the cannabis grown at any, some, or all of its facilities, the Company would need to abandon that facility, which posed a material risk to Canopy's business, financial condition and results of operations;

(d) Failed to disclose, as Defendants admitted at the end of the Class Period, that the reason for "scaling" inventory "wasn't strictly for the purpose of obtaining market share," but for "getting our brands out there."

217.   During the February 14, 2020 Call, Defendant Lee said, "Gross margin in the quarter **benefited from higher capacity utilization** which is a trend that we've seen over the past few quarters. Operating costs related to underutilized facilities **has continued to decrease** from approximately CAD24 million in the fourth quarter of fiscal '19 to under CAD8 million in the third." This prompted an analyst to ask, "you mentioned that there was higher capacity utilization in the quarter. When I look at the kilograms harvested figure if my numbers are correct it was around 29,000 kilograms this quarter and in the previous quarter it was 40,000 kilograms. So that number coming down. Just wanted to square that away with the higher capacity utilization." Responding, Defendant Lee admitted that "During December, we did take down some capacity at our Delta facility and British Columbia is one of our first steps to help bring supply and demand into balance."

218.   The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly omitted to disclose that the Company's excessive inventory meant that the Company would have to close growing facilities and take impairments that would materially affect the Company's financial condition.

219.   During the February 14, 2020 Call, an analyst asked, "You mentioned that managing inventory relative to demand was a key focus, and you're reviewing your footprint. Clearly that could imply shutting down some production capacity, and I just wonder . . . what could that mean to near-term margins even if positive for the long-term."

Lee responded by assuring investors that shutting down facilities was the last thing the Company was inclined to do, saying, "shutting down facilities is really hard. So, we need to be very thoughtful about it, very mindful about it, and we're taking a strategic approach to say, "Look, we want to make sure that we're designing our supply chain and our footprint for not just the realities of today, but the realities of the next year, two years, three years, as the size of the market develops, but also as the various categories of the market develops, and we know that the value category is here to stay.'"

220.    The foregoing statements were materially false and/or misleading because Defendants knowingly or recklessly omitted to disclose that the Company's excessive inventory meant that the Company would have to disclose growing facilities and take impairments that would materially affect the Company's financial condition.

## VI.    THE TRUTH EMERGES

221.    On July 3, 2019, barely a week after the Company reported its fiscal year 2019 financial results, and as the Company was considering how to disclose its over-valued oils and gelcaps inventory, Canopy abruptly fired co-CEO and company founder Bruce Linton.

222.    On August 14, 2019, after the market close, Canopy issued a press release entitled *Canopy Growth drives revenue with 94% increase in recreational dry cannabis sales in first quarter of fiscal 2020*. After a full year of telling investors that its inventory buildup was necessary and that its cannabis products would sell through to the end user, the Company delivered harsh news. Canopy wrote that after evaluating failing sales of oils and gelcaps:

> As a result of this evaluation, we believe that ***the risk of an over-supply of certain oil and softgel formats may exist in***

98

> *certain markets* due, in part, to incomplete retail platforms in most provinces. Based on this assessment, we have estimated *variable consideration that may result from rights of return in the amount of $8 million dollars in gross revenue*, which corresponds to estimated future returns of $6.4 million, net of excise tax, and the estimated return amount has been reflected in net revenue.

223.     On this news, on August 15, 2019, Canopy's share price fell over 14%, from $31.93 to $27.34, on volume more than twice as high as the day previous.

224.     Canopy had never previously informed its investors that any of its supply contracts with provinces contained rights of return, much less disclose that it anticipated returns of millions of dollars in product, and analysts were surprised. Desjardins Analyst John Chu lowered his target stock price for Canopy, writing that "[t]he significant drop in oil and gelcap sales in 1Q remains a headscratcher. Furthermore, the sales provision of C$8m on oil and gelcap products adds more mystery to the state of Canopy's oil and gelcap products."

225.     Canopy blamed the $8 million revenue charge for returns of oils and gelcaps on "incomplete retail platforms," even though it knew a year earlier, in August 2018, that no retail stores would open in Ontario until April of 2019, and had stated in May of 2018 that recreational sales during the first two years after legalization would mostly come from online sales. From June 2017 onward, however, Canopy and the Individual Defendants repeatedly told investors that inventory was being "scaled to meet management's expectations of market demands" for stores.

226.     During the August 15, 2019 Call, analysts directly challenged the Company about the oils and gelcaps revenue reversal. Canopy sought to repeatedly reassure that the $8 million in returns of oils and gelcaps was a "one-time event," revealing aspects of

Canopy's contracts with provinces/distributors that investors knew nothing about previously:

> #### Analyst Graeme Kreindler
>
> Okay. Thank you. And just to follow-up. With respect to the eight million charge against sales. ***Is that a one-time event or is that something we could expect to have coming in future quarters here***? Thanks.
>
> #### CFO Mike Lee
>
> Yes, Mike here. So it is normal for [] companies that have an ongoing revenue provision for estimated ongoing returns, ***I would remind you that the supply agreements with the provinces allow for returns at any point in the future***. But I would say that now that this is established, and we have processes in place, where the information from the wholesale level inventories is now becoming more available more frequently. ***I would say that this is something that I wouldn't expect to move the P&L in the future***.

227.    This marked the first time that the Company told the market that its contracts with customers had nearly absolute rights of return provisions, and specifically that those customers had the right to return any purchased product at any point in the future.

228.    Responding to another analyst inquiry, Defendant Kovacevic assured that the returns affecting revenue were not "***a cause [for] concern going forward***."

229.    Skeptical analysts continued pressing Defendants about the oil and gelcaps returns, with the Company admitting that there was limited demand for the enormous inventory of oils and gelcaps, while attempting to downplay those products' importance to Canopy:

> #### Analyst Matt Bottomley
>
> Yes, thanks for taking the question. I just wanted to go back

to the sales mix, particular on the recreational side of things. *Can you just give us a little more color as to why the oil and gel caps of this quarter went essentially to zero. I think you were in 30 million or 35 million last quarte*r. Was that a decision in terms of allocation or was there any issues with production in getting those types of products out the door. It didn't seem to be a problem on the medical side

### CEO Mark Zekulin

Yes, thanks Matt. *No it is not related to our production flow here, simply related to the product mix that we see demand for* and ensuring that we allocate products appropriately to that mix. So certainly, as you say, our oils and softgel products remain exceptionally popular and an increasing share of our Canadian medical base and an increasing share of our global exports to medical market. *So I think it is just an indication of properly seating the market with what customers are buying* at the tail.

**** 

### Analyst Douglas Miehm

Yes. I just want to *circle back to pricing issue with respect to product that was returned*. Correct me if I'm wrong. But *I think a majority was gel caps* and in the event we move ahead over the next sort of while and you have a little bit more share gel caps. But it appears that these four products that were having difficulty being sold, but you can correct me if I'm wrong. *Why would you expect margins to jump back so dramatically to previous levels, when those levels of gel caps and oils were probably too high to begin with*?

### CEO Mark Zekulin

Yes. Thank you. I think, so just to clarify it is not that - *there actually have been return, provision reflects our assessment of the overall inventory levels versus rate of sale and precautionary step to account for that now*, because we think it will – it has a probability of coming in the future. So it is not that they have actually been return yet.

So I think speaking probably more importantly to your point about the rate of confidence. Even in, let's say, the most

ambitious product mix understand for the existing SKUs, Flower and pre-roll joints on the one hand and oils and softgels. ***Oils and softgels were always going to be a smaller part of that mix***.

230. While Defendants may have hoped that their oils and gelcaps problem would magically disappear, their words show that their statements assuring analysts that the revenue reversal was a one-time event were false. The "***risk of an over-supply of certain oil and softgel formats [] in certain markets***" and the statement that there was low demand for oils and gelcaps (the revenue reversal was "related to the product mix that we see demand for") are indicators that Canopy knowingly or recklessly failed to evaluate its oils and gelcaps inventory for impairment, and should have impaired inventory no later than August of 2019, rather than three months later in November of 2019. Canopy instead told the market that the returns issue had nothing to do with inventory ("No it is not related to our production flow here, simply related to the product mix that we see demand for"). Defendants' statements were, at a minimum, reckless.

231. Despite Canopy's assurances in August that low demand for oils and gelcaps would not affect future Profit & Loss Schedules, and was not a "cause for concern going forward," the next time Canopy spoke to the market, the news about the demand for oils and gelcaps was catastrophic.

232. On November 14, 2019, before the market opened, Canopy issued a press release announcing earnings for the second quarter of FY 2020, posting a larger-than-expected loss for the quarter, and announcing revenue lower than any analyst's estimate. The press release announced that Canopy would be modifying its retail pricing

architecture, *i.e.*, giving price concessions, and taking a $32.7 million restructuring charge. The press release stated, in relevant part:

> *As part of a management-initiated portfolio review, the Company has taken a restructuring charge of $32.7 million for returns, return provisions, and pricing allowances primarily related to its softgel & oil portfolio. Additionally, management has recorded an inventory charge of $15.9 million to align the portfolio with the new strategy. This new strategy includes new retail pricing architecture, a rationalized package assortment, and a focused marketing/educational strategy to further develop this category*. The Q2 2020 gross margin impact of the portfolio restructuring costs is $40.4 million. With this acute restructuring charge, management believes that current inventory levels both internally and externally are in-line with demand understands.

233.   The press release quoted Defendant Zekulin stating that "We took the necessary steps to address inventory levels on our oils and softgels."

234.   In the November 14, 2019 MD&A, Defendants admitted that their expectations for oils and gelcaps sales, and thus their inventory buildup, had been wrong, again blaming undeveloped retail markets in Ontario, even as they always knew that Ontario would not allow any retail stores before April 1, 2019:

> In the second quarter of fiscal 2020, [our] evaluation indicated that the risk of over-supply of certain oil and softgel formats existed in certain markets due, in part, to underdeveloped retail markets in several provinces. Since identifying the oversupply risk, *we have implemented new pricing* and retail customer education *strategies in order to improve the sell-through velocity of oils and softgel products and we expect these activities to lead to an appreciable reduction in provincial and territorial inventories*. However, based on this assessment, *we have determined returns and pricing adjustments related primarily to the risk of over-supply of certain oil and softgel products in the amount of $32,727,[000], and this amount has been reflected in revenue*.

As ***overall demand for oils and softgels in the recreational cannabis market has not met our initial understands and expectations at the time of launch***, in an effort to balance supply and demand in the recreational cannabis retail channel we have reduced the production of certain of our recreational cannabis oil and softgel products in the second quarter of fiscal 2020.

\*\*\*

***We have assessed current and understood "sell-in" rates of certain oils and softgel products and concluded a risk exists that a portion of our inventory of certain recreational oil and softgel products may not be sold within a reasonable timeframe***.

235.    That same day, November 14, 2019, in Canopy's *Condensed Interim Consolidated Financial Statements for the three and six months ended September 30, 2019 and 2018*, the Company stated that part of the oils and gelcaps inventory written off was "excess and obsolete."

236.    During the November 14, 2019 Call, in scripted remarks, Defendants explained the revenue reversals and inventory write-down related to oils and gelcaps with euphemisms such as "rightsize" to describe inventory levels and the "disconnect" between inventory and demand to explain their unjustified increase in inventory:

> **<u>Mark Zekulin</u>**
>
> We have witnessed a slowdown by provincial buyers and the recreational channel ***as they rightsize their own inventory levels after significant inventory accumulation***.
>
> **<u>Mike Lee</u>**
>
> You may recall that in Q1, we evaluated what was at that point, the most recent provincial and territorial inventory levels related to sales observed in the rec channel and we concluded that our risk of oversupply of certain oils and softgels existed in certain markets due to underdeveloped retail markets in several provinces.
>
> Based on that assessment, we reported in our Q1 results

variable consideration that may result from rates of return in the amount of $8 million of gross revenue. ***And in Q2, we continued to see a disconnect between inventory levels and the rate of sale for certain products in the market***.

\*\*\*

And following the shift in this strategy, we reviewed all remaining inventories for both product on hand as well as product in the provinces to determine which product would be returned, which product would remain with the promises and be subject to buy downs and which product would be unaffected. ***And the result of this evaluation is $32.7 million in revenue provisions broken down into three categories of charges: Number one, pricing actions that are required to establish this new pricing architecture. Number two, returns from provinces for discontinued or slow-moving product. And number three, inventory impairments for excess or obsolete on hand inventories.***

\*\*\*

***Moving on to number two returns. To date we have taken actual returns of $20.5 million from the provinces and we expect another $6.4 million to be returned in coming weeks for a total of $26.9 million in product returns***. And also note that these charges are netted against the $8 million provision from Q1 leaving a net charge of $18.9 million for the quarter.

Moving on to number three. Inventory provisions. With the new retail pricing set within our own retail stores we used the new sales velocities that we're experiencing as well as those seen within markets where we have already implemented pricing to determine our expected days of supply once this new pricing flows through to broad retail. ***And we also use our latest projections on store opening to help calculate our forward-looking demand. And in doing this we identified $15.9 million[22] of products that have been due to excess or obsolete and this charge has been recorded in cost of sales***.

\*\*\*

---

[22] In Canopy's February 15, 2020 *Management's Discussion and Analysis of the Financial Condition and Results of Operations for the three and nine months ended December 31, 2019*, Defendants stated that the $15.9 million inventory write-off had been adjusted to $17 million.

> *With these charges recorded, there is now less than $10 million of oils and softgels in Canopy's inventory on hand. And there's approximately $2 million of inventory across Alberta and Ontario provinces*. So we believe this issue is fully behind us.

237.     Angry   analysts   eschewed   euphemisms,   aggressively   questioning

Defendants, who disclosed the amount of the pricing allowances for oils and gelcaps:

### Analyst Tamy Chen

Okay, thanks. And second question is. Mike, *so I just wanted to confirm when you talked about the new pricing architecture was that specifically or only to the oil fuse in the rec market? Or does that pertain to flower too?* Because what I'm getting at here is I noticed by my math your average net selling price net for rec on flower still is higher than some of the other peers that we've seen. And I'm just wondering, could there be potential downside there because we are seeing a number of LPs becoming more aggressive on flower pricing in the rec market?

### CFO Mike Lee

*The pricing architecture changes that we talk about for softgels and oils does pertain to softgels and oils across Canada. And I would think about it as a 5% to 7% price reduction on average depending on the provinces, there's some variation across the provinces. But I think 5% to 7% would be a good proxy of the architecture changes that we're making.*

238.     Pushed by analysts, Defendants finally revealed the truth, that they had "no

data" to justify the exponential inventory increase for oils and gelcaps:

### Analyst Andrew Carter

Hi thanks. Good morning. I think part of the issue in the first wave which kind of manifested this quarter's results has been really a lack of stability into the market just new and evolving. So, I kind of wanted to first start give a sense of where you think your capabilities are now versus throughout kind of the first way into kind of making adjustments and understanding that? And then also kind of how much is left your customers both provincials and retail. *And then*

*regarding kind of your visibility I think what is does your ability to make changes in the second wave increased significantly now so that you can kind of respond to customer demands more quickly?*

**President Rade Kovacevic**

Yes. So, Rade here. So, I think several points on it. *I think firstly, last year at the rollout of legalization, <u>we had little to no data</u>*. We are looking at what U.S. markets had done but *we had nothing within the Canadian regulatory context for recreational legalization while making production decisions. And so we looked at things such as soft gels and oil understood them to be 15% of the market and kind of be around 5%.*

*I think the big change that we've had over the last 12 months is we now have data, right? It took about four to eight months for us to start gaining provincial asset till data*. So, rather than simply the B2B sales, we're seeing what it's selling through the customers so that we could change our product portfolio and our mix and SKU rationalize to make sure we had the right SKUs in place that we're having pull-through and be able to have that continuous supply to build customer fairly.

239.    Unimpressed, analysts punished the Company. Canaccord Genuity analyst Matt Bottomley lowered his recommendation from "Speculative Buy" to "Hold," writing that [d]uring the quarter, Canopy recorded significant sales allowances/inventory write-downs that we believe represents a red flag for the company." PI Financial analyst Jason Zandberg noted that the charges against revenue "were surprising given the Company took an $8.0M charge in the previous quarter." MKM analyst Bill Kirk described the EBITDA loss of $155.7 million as "astounding," and wrote that he did "not consider this type of adjustment to be one-time, as it reflects returns and new pricing architecture and package assortment going forward."

240.    On this news, on November 14, 2019, Canopy's share price fell over 14%,

from $18.50 to $15.84, on volume more than three times higher than the previous day.

241.    During the February 14, 2020 Call, Defendant Klein finally acknowledged that although Canopy previously stated, repeatedly, that it had set its inventory growth strategy to align with market demand, it had not done so based upon data, stating that:

> My third priority is to define a very visible path to profitability and positive cash flow. This means we need to align our resources and investments with the size and growth rate of the market as it exists today. We've **begun taking steps designed to bring our inventory in balance with our supply demand understand**, this includes a thorough strategic review of our footprint which is underway.

242.    By choosing not to state that Canopy's "supply demand understand[ing]" was *new* or *revised*, Defendant Klein was acknowledging that although Canopy had previously assured investors that it was building inventory to match demand, the Company had, in fact, not done so. Defendant Klein reaffirmed this later in the call, acknowledging to an analyst that "as a company we've built inventory, but we need to get better at connecting the consumer demand signal to the inventory that we're building," and that "we need to be able to bring down our total inventory balance."

243.    During the same February 14, 2020 Call, Defendant Lee expressly downplayed the extent to which Canopy's inventory was out of balance with market demand, saying that, "but balance of the inventory is really our bud inventory [*i.e.*, dry flower] and we feel very good that we're balanced on high THC bud. We feel very good that we're balanced on low THC, high CBD bud. The mainstream bud which is the balance is what we call it. **We're a little longer than what we'd like to be today**. And that's the piece that we're continuing to work through."

244.    Analysts did not believe that Canopy was fully disclosing the extent of its

problems. On February 19, 2020, MKM Partners analyst Bill Kirk highlighted just how bloated Canopy's inventory actually was, and the negative connotations that had for Canopy's financial prospects. Kirk observed that since the end of 2017, Canopy had grown *115,000* more kilograms of cannabis than it had sold. Since the entire annual Canadian market for cannabis at the time was 180,000 kilograms, at its current market share, Kirk highlighted that "[a]ssuming Canopy ceased all growing operations AND maintained current market share, it would take [approximately] 2.5 years to sell this product in Canada." Kirk wrote that he "expect[s] large write-downs/destruction/price concessions" in the near future.

245. Two weeks later, on March 4, 2020, after the market closed, Canopy admitted that there were material problems with the size of its inventory, and that the inventory level was not aligned with market demand for its legal cannabis products. The Company announced that it was closing approximately 40% of its production space and that potentially hundreds of millions of dollars of its production space, and inventory, was worthless.

246. Defendant Klein, Canopy's new CEO, could not hide the magnitude of the bad news, even as Canopy hid behind euphemisms like "production optimization plan." Klein announced that Canopy was closing two of its cannabis growing facilities in Canada comprising approximately *three million square feet* of production space, firing 500 employees, and abandoning its plan to build a third greenhouse in Ontario. The closed production facilities reduced the Canopy's production capacity in Canada by *40%*. Finally, Defendant Klein announced that the Company was expecting to record pre-tax charges of approximately $700-$800 million for the fourth quarter of fiscal 2020, ending March 31,

2020. On this news, Canopy's share price dropped over 5% on March 5, 2020, from $17.75 to $16.80.

247.   A month later on April 16, 2020, the Company announced that it was closing still another growing facility in Yorkton, Saskatchewan, which offered 60,000 square feet of growing space, as well as withdrawing from various international markets.

248.   Nearly three months later, on May 29, 2020, before the market opened, the worst news arrived. Canopy announced that it had recorded impairments and restructuring charges of *$743 million*. During an earnings conference call that same day, Defendants stated that the write-down was attributable to "fixed asset impairments of $563 million, of which $335 million was for property, plant and equipment, mostly tied to the cultivation assets, and $193 million was for impairment of intangible assets, mostly tied to our exit from various international markets. An additional $132 million was for inventory write-offs related to obsolete packaging, flower and biomass inventory," *i.e.*, cannabis that had been grown but was going to be thrown away. On this news, Canopy's share price dropped over 20%.

249.   During the May 29, 2020 Call, Defendants finally admitted that Canopy's rapid inventory and facility growth were based on something other than a belief that they would be able to sell that inflated inventory. Defendant Klein stated that "there's no denying that we overbuilt our facilities," and that while the "dramatic[]" increase in inventory and facilities "was a great talking point," it "came with great consequences." Defendant Zekulin went further stating that "part of our effort to push product out early and obtain market share, wasn't strictly for the purpose of obtaining market share, it was for getting our brands out there."

250.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

251.     Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Canopy securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Canopy, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

252.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Canopy securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

253.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

254.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

255.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Canopy;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Canopy to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Canopy securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

256.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

257.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Canopy shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, Canopy filed periodic public reports;

- Canopy regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Canopy's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Canopy was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

258.    Based on the foregoing, the market for Canopy securities promptly digested current information regarding Canopy from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

259.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

260.     Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

261.     This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

262.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

263.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Canopy securities during the Class Period.

264.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Canopy were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Canopy, their control over, and/or receipt and/or modification of Canopy's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Canopy, participated in the fraudulent scheme alleged herein.

265.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Canopy personnel to members of the investing public, including Plaintiffs and the Class.

266.    As a result of the foregoing, the market price of Canopy securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Canopy securities during the Class Period in purchasing Canopy securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

267.    Had Plaintiffs and the other members of the Class been aware that the market price of Canopy securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Canopy securities at the artificially inflated prices that they did, or at all.

268.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

269.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Canopy securities during the Class Period.

## COUNT II

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

270.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

271.    During the Class Period, the Individual Defendants participated in the operation and management of Canopy, and conducted and participated, directly and

indirectly, in the conduct of Canopy's business affairs. Because of their senior positions, they knew the adverse non-public information about Canopy's misstatement of revenue and profit and false financial statements.

272.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Canopy's financial condition and results of operations, and to correct promptly any public statements issued by Canopy which had become materially false or misleading.

273.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Canopy disseminated in the marketplace during the Class Period concerning Canopy's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Canopy to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Canopy within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Canopy securities.

274.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Canopy.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiffs' counsel as Lead Counsel;

(b)      awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)      awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: June 4, 2020                      Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center
Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Dresher, PA 19046
Tel: (215) 600-2817
Fax: (973) 833-0399
Email: jgoldberg@rosenlegal.com
        ghaklay@rosenlegal.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: /s/ Steve W. Berman
Steve W. Berman
Shayne C. Stevenson

1301 Second Avenue, Suite 2000
Seattle, WA  98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email: steve@hbsslaw.com
          shaynes@hbsslaw.com

and

Reed R. Kathrein
Lucas E. Gilmore
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: reed@hbsslaw.com
          lucasg@hbsslaw.com

**POMERANTZ LLP**

By: /s/ Brian Calandra__
Gustavo A. Bruckner
Jeremy A. Lieberman*
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: gfbruckner@pomlaw.com
          jalieberman@pomlaw.com
          bcalandra@pomlaw.com

and

Patrick V. Dahlstrom*
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Co-Lead Counsel for Lead Plaintiffs and
the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2020, I electronically filed the foregoing

***Consolidated Amended Class Action Complaint for Violations of the Federal Securities***

***Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of

such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Gonen Haklay*
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: ghaklay@rosenlegal.com