Laurence M. Rosen, Esq.
**THE ROSEN LAW FIRM, P.A.**
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
lrosen@rosenlegal.com

Steve W. Berman
Shayne C. Stevenson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Ave., Suite 2000
Telephone: (206) 268-9340
Facsimile: (206) 623-0594
steve@hbsslaw.com
shaynes@hbsslaw.com

*Lead Counsel for Plaintiff Class*
(*additional counsel on signature page*)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EDUARDO ORTIZ, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CANOPY GROWTH CORPORATION, BRUCE LINTON, MARK ZEKULIN, MIKE LEE, TIM SAUNDERS, DAVID KLEIN, and RADE KOVACEVIC, <br><br> Defendants. | Case No.: 2:19-cv-20543-KM-ESK <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION..............................................1

II.  STATEMENT OF FACTS ALLEGED................................4

     A.   Canada legalized recreational marijuana in
          October of 2018, but limited private retail
          stores..............................................4

     B.   Notwithstanding limited demand and consumer
          access, Canopy dramatically increased its
          cannabis inventory and production
          facilities..........................................6

     C.   Former Canopy employees detail what
          defendants misrepresented and concealed——
          that Canopy's gigantic and defective grow
          facilities produced millions of dollars of
          low-grade cannabis suitable only for extract
          products, despite a lack of demand for those
          products............................................8

     D.   Canopy misrepresented that market demand
          necessitated its massive buildup of cannabis
          product inventory and grow facilities,
          including its stockpile of oils and gelcaps.........12

     E.   Canopy belatedly revealed the partial truth
          about its overproduction of cannabis and
          unwarranted expansion of poorly designed
          grow facilities.....................................16

III. ARGUMENT.................................................19

     A.   Plaintiffs satisfy the pleading standards
          for federal securities fraud claims.................19

     B.   Plaintiffs identify several actionable,
          materially false and misleading statements
          and omissions.......................................21

          1.   Defendants' statements on cannabis inventory and
               production capacity were false and misleading...21

               a.   Defendants repeated several affirmative
                    false and misleading statements...........22

- i -

b.    Defendants' risk disclosures never put investors on notice of the omitted truth of Canopy's inflated supply of cannabis and cannabis capacity...........................24

c.    Defendants never disclosed that Canopy massively overproduced oils and gelcaps because Aldergrove and Delta couldn't produce high-quality cannabis..............25

d.    Canopy's belated partial disclosures reinforce the falsity of its prior statements and omissions...................29

2.    Defendants' materially false and misleading statements and omissions find no shelter in any harbor.......................................32

a.    Defendants' false and misleading statements were not mere "immaterial puffery."........32

b.    The PSLRA's safe harbor does not apply to defendants' statements because they addressed the then-present state of affairs without meaningful cautionary statements or were otherwise made with knowledge of their falsity...................................33

3.    Defendants' unreasonable revenue and inventory accounting practices are not protected as mere exercises of discretion or statements of opinion. ...............................................37

4.    Statements by former Canopy employees support plaintiffs' allegations of materially misleading statements and omissions.........................43

C.    Plaintiffs' allegations, supported by statements from former employees, give rise to a strong inference of scienter....................47

1.    Plaintiffs sufficiently allege a strong inference of defendants' conscious misbehavior or recklessness....................................49

2.    Competing inferences excusing defendants' conduct are less compelling—and certainly not more

compelling——than the strong inference of
scienter.......................................53

D.   Plaintiffs sufficiently plead claims under
Section 20(a)...................................54

IV.  CONCLUSION.........................................55

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020) ..................32, 46

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010) ............................33, 36

*Basic v. Levinson*,
   485 U.S. 224 (1988) .......................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................20

*Belmont v. MB Inv. Partners, Inc.*,
   708 F.3d 470 (3d Cir. 2013) ...............................55

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ..............................49

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ...................29, 41, 42, 43

*In re Cambrex Corp. Sec. Litig.*,
   2005 WL 2840336 (D.N.J. Oct. 27, 2005) .................34, 36

*In re Campbell Soup Co. Secs. Litig.*,
   2020 WL 7022655 (D.N.J. Nov. 30, 2020) ....................55

*In re Celgene Corp. Sec. Litig.*,
   2019 WL 6909463 (D.N.J. Dec. 19, 2019) ....................50

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014) ............................39, 41

*Curran v. Freshpet, Inc.*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018) .....................54

*De Vito v. Liquid Holdings Grp., Inc.*,
   2018 WL 6891832 (D.N.J. Dec. 31, 2018) ....................33

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
   2019 WL 1299673 (D.N.J. Mar. 21, 2019) ....................55

- iv -

*EP Medsystems, Inc. v. EchoCath, Inc.*,
   235 F.3d 865 872 (3d Cir. 2000) ............................32

*Fan v. StoneMor Partners LP*,
   927 F.3d 710 (3d Cir. 2019) ................................48

*In re Galena Biopharma, Inc. Sec. Litig.*,
   2019 WL 5957859 (D.N.J. Nov. 12, 2019) ....................51

*In re Galena Biopharma, Inc. Sec. Litig.*,
   336 F. Supp. 3d 378 (D.N.J. Aug. 21, 2018) .................21

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d. Cir. 2004) ...............................34

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017) ................37, 40

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ..................28

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...........................*passim*

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) .........................46

*In Re Newell Brands, Inc. Secs. Litig.*,
   2019 WL 6715055 (D.N.J. Dec. 10, 2019) ....................24

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018) .......................51

*Omnicare, Inc. v. Laborers Dist. Council Const.
   Indus.*,
   575 U.S. 174 (2015) .......................................39

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix
   Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) ........................51

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ...........................51, 52

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ....................42

*Setzer v. Omega Healthcare Investors, Inc.*,
   2020 WL 4431902 (2d Cir. Aug. 3, 2020) ....................53

010876-11/1416593 V1

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ..............................21, 26

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ........................................19

*In re Synchronoss Secs. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010) .........................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ....................................*passim*

*In re Toronto-Dominion Bank Secs. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018) .....................48

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ......................................33

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
  2020 WL 3169506 (D.N.J. June 12, 2020) ................*passim*

## STATUTES

15 U.S.C. § 78u-4(b)(1) .......................................20

15 U.S.C. § 78u-5(i)(1) ...................................34, 36

15 U.S.C. § 78u-5(c)(1)(A)(i) .............................33, 36

## OTHER AUTHORITIES

Fed. R. Civ. P. 15(a)(2) ......................................55

Fed. R. Civ. P 9(b) ...........................................20

## I.   INTRODUCTION

Plaintiffs' Second Amended Complaint ("SAC")[1] adequately pleads that defendants committed securities fraud through a series of materially false and misleading statements and omissions about Canopy's inflated cannabis inventory and production capacity buildup, and about revenue and inventory. The SAC further adequately pleads defendants' scienter.

Defendants' arguments to the contrary are meritless,[2] and ignore the pleaded allegations. The SAC sufficiently alleges that defendants did *not* timely "review and disclose"[3] oversupply and overproduction problems, and that their misrepresentations and omissions are not "forward-looking,"[4] "immaterial puffery,"[5] or "nonactionable" opinions, and are thus unprotected by any safe harbor.[6] The SAC's scienter allegations, moreover, are supported by six former Canopy employees, and do not "fall far

---

[1] Dkt. 65, at ¶ 2. Unless noted, all "¶" cites are to the SAC. The SAC was filed on behalf of a class of persons who purchased or acquired shares of Canopy Growth Inc. (NYSE: CGC) from June 27, 2018 to May 28, 2020 ("Class Period").

[2] Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("MTD"), Dkt. 67-1, at 41. Defendants' musings about an imaginary "third" amended complaint are irrelevant. MTD at 1 n.1, 14-15. Magistrate Judge Kiel directed plaintiffs to file this *Second* Amended Complaint.

[3] MTD at 13.

[4] MTD at 27.

[5] MTD at 26.

[6] MTD at 29.

short" of establishing a strong inference of scienter.[7] The SAC adequately alleges defendants' violations of Section 10(b), Rule 10b-5, and Section 20(a) of the Exchange Act, and the motion to dismiss should be denied.

Throughout the Class Period, defendants misled investors that Canopy's unrivaled buildup of quality cannabis inventory and capacious retrofitted production facilities were necessary to meet massive demand for recreational cannabis. Even though defendants knew they had overproduced cannabis far in excess of demand——including volumes of *low-quality extract* oils and gelcaps[8]——and could not successfully grow "bud"[9]-quality cannabis in new grow facilities, they repeatedly told investors that the "dramatic"[10] increase in supply and facilities was necessary and prudent.

Defendants knew, quarter after quarter, that their inventory buildup was not "scaled"[11] and "required"[12] to meet market demand, and that Canopy's millions of dollars' worth of low-grade cannabis plants could only be used for extracts, or

---

[7] MTD at 49.

[8] "Extracts" refers to cannabis oils and gelcaps. The terms are used interchangeably.

[9] "Bud" refers to the highest grade of cannabis.

[10] ¶¶ 18, 301.

[11] *See, e.g.,* ¶¶ 111, 113, 147, 160.

[12] *See, e.g.,* ¶¶ 115, 170, 217.

- 2 -

thrown away. Defendants' misrepresentations concealed the true facts of Canopy's imprudent and costly production of low-quality cannabis and its massive increase in grow facilities unsuitable for growing high-quality cannabis. And concealed that Canopy's failure to grow high-quality cannabis, rather than market demand, was the reason for Canopy's massive build-up of cannabis extracts it could never hope to sell.

Numerous former Canopy employees support the fraud allegations, confirming a massive oversupply of both dry cannabis and of cannabis extracts produced to salvage enormous harvests of otherwise unsellable low-quality cannabis produced in poor grow facilities. These employees further confirm that defendant Linton and other Canopy executives visited the inadequate grow facilities during the Class Period, were aware of fundamental problems at the sites, and internally discussed the known oversupply and inability to sell product, in particular extracts, long before these facts were disclosed.

Not until August 2019 did defendants first partially reveal the truth about Canopy's oversupply of cannabis products, specifically oils and gelcaps. Canopy took an $8 million charge against revenue——with an attendant 14% drop in share price——but assured investors it was merely precautionary. Three months later defendants' deceit was further revealed. In November 2019, Canopy took a charge of over $32 million in returns and price

- 3 -

concessions on extracts and wrote off $16 million of its own inventory of extracts, causing its share price to drop more than 14%. Three months after that, in March 2020, Canopy revealed it anticipated a large pre-tax charge in the near term and would close two massive grow facilities, causing shares to trade down more than 5%.

On May 29, 2020, after nearly two years of deception, defendant Klein finally acknowledged in an earnings call that the "dramatic" increase in supply and facilities, though "a great talking point," did "come with great consequences."[13] Canopy disclosed to investors an enormous $743 million impairment and restructuring charge, including more than $130 million in cannabis inventory slated for destruction. On this news, Canopy's share price plummeted more than 20%.

For the reasons argued below, plaintiffs respectfully request that the Court deny defendants' motion *in toto*.

## II.   STATEMENT OF FACTS ALLEGED

### A.   Canada legalized recreational marijuana in October of 2018, but limited private retail stores.

Nearly twenty years ago, Canada became just the second country to allow consumer access to "medicinal" cannabis, first through government sales, and then in 2014 through private commercial sale. In June 2018, the Canadian government passed a

---

[13] ¶ 301.

law legalizing the sale of "recreational cannabis" throughout the country,[14] with legal sales of cannabis products, namely dry flower, oils, and gelcaps, to begin on October 17, 2018.[15]

The details of regulating and distributing cannabis were largely left to the individual Canadian provinces.[16] Ontario, home to 37% of Canada's population, announced in mid-2018 that cannabis sales in the province would be handled by government-run retail stores selling privately-produced cannabis products.[17]

Canopy knew that Ontario's decision would dampen recreational sales, having acknowledged in an August 20, 2018 press release that "private retail is a more profitable business model."[18] In addition, by June of 2018, Ontario was only committed to open 40 provincial outlets——roughly one store for every 358,000 persons, as compared to one for every 10,000 in the State of Colorado——and had supply agreements with more than two-dozen of Canopy's competitors.[19] That summer Ontario also announced that *no* private retail stores would open in the province before April 2019.[20]

---

[14] ¶ 45.

[15] *Id.*

[16] ¶ 46.

[17] ¶ 48.

[18] ¶ 49.

[19] ¶ 50.

[20] ¶ 52.

Canopy was only able to open a single store in Ontario on April 1, 2019.[21] Canopy later disclosed that in June 2019 (more than eight months following legalization) Canopy had opened a mere 23 stores in all of Canada——only five of which were opened in the eight months *following* legalization.[22]

**B.  Notwithstanding limited demand and consumer access, Canopy dramatically increased its cannabis inventory and production facilities.**

Despite these organic limits to consumer demand and access to its products, Canopy went all-in to increase cannabis inventory. On February 16, 2018, defendants announced the licensing of a massive production facility in Aldergrove, British Columbia, which offered 840,000 square feet of growing space (the "Aldergrove facility").[23] Defendants touted that the facility had been "renovated with lighting, shade systems, security, and automated systems to meet *the rigorous standards* of both the ACMPR [*i.e.*, Canada's governing standards] and Canopy Growth" and "positions us...as Canada's, and indeed the world's largest, most reliable and most diversified producer and seller of *high quality regulated cannabis*."[24]

---

[21] ¶ 56.

[22] ¶ 57.

[23] ¶ 59.

[24] ¶ 60 (emphasis added).

Likewise, on April 13, 2018, defendants described the 900,000 square feet of growing space at its facility in Delta, British Columbia (the "Delta facility") as "*high-end*, automated greenhouse production space."[25] Investors thus understood Canopy was retrofitting and developing grow facilities to expand its ability to produce high-quality cannabis. Indeed, Canopy touted its production facility footprint in its quarterly report filed August 14, 2018, which stated that it held more than "2.4 million square feet of licensed indoor and greenhouse production capacity as of June 30, 2018," some four months prior to legalization.[26] This was just the beginning, as Canopy's total production footprint had spiked to 5.4 million square feet by November of 2019.[27]

Canopy's explosion in production space developed *pari passu*, with a five-fold increase in its cannabis inventory during the Class Period,[28] from $118,204,000 in June 2018 (four months prior to legal sales)[29] to $622,575,000 by December 31, 2019.[30] Canopy grew its inventory without pause until it

---

[25] *Id.* (emphasis added).

[26] ¶ 62 (Form 10-Q).

[27] ¶ *Id.* (citing Canopy's Q2 2020 quarterly filing dated Nov. 14, 2019).

[28] ¶ 63.

[29] *Id.*

[30] *Id.*

announced a massive write-off in March 2020. According to one analyst, if Canopy ceased further production altogether as of February 2020, it would take two-and-a-half years to sell off its remaining inventory because of overproduction.[31]

**C.    Former Canopy employees detail what defendants misrepresented and concealed——that Canopy's gigantic and defective grow facilities produced millions of dollars of low-grade cannabis suitable only for extract products, despite a lack of demand for those products.**

Touting itself as the "world's largest, most reliable and most diversified producer and seller of *high quality* regulated cannabis,"[32] Canopy in fact produced a costly oversupply of cannabis, including an abundance of low-quality cannabis.

Former Employee 1 ("FE1"), Canopy's Lead Director of Genetic Research, saw the oversupply of low-quality cannabis first-hand.[33] In early 2019, he observed a massive vault (one of many) packed with stacks of dried cannabis and thousands of gelcaps in bags, which he compared to a Walmart distribution center holding product for a few small stores.[34] He also observed, shortly after joining the company in December 2018, fundamental problems impairing Canopy's grow facilities——*e.g.*, poor lighting and climate control——which he confirms was the

---

[31] ¶ 64.

[32] ¶ 60 (emphasis added).

[33] ¶ 65 (Lead Director from Dec. 2018 through Jan. 2020).

[34] ¶ 67. All FEs are referred to as "he" or "his" to protect anonymity regardless of actual gender.

reason for excess production of low-grade cannabis.[35] Since cannabis products would expire one year from the date of production, FE1 states that Canopy had to throw away and write off millions of dollars in cannabis flower, oils and gelcaps.[36]

Defendants saw or had access to information and systems documenting Canopy's overproduction of cannabis.[37] FE2, a former cost accountant and finance operations controller, explained that Canopy kept scrupulous records for tracking inventory and valuation, and had an ongoing real-time inventory, which separately tracked cannabis extract products.[38] Defendants were always aware of the surplus products they were warehousing.[39]

Former employees also described mismanagement of poorly constructed and retrofitted warehouses, particularly at Canopy's massive Aldergrove and Delta facilities, where a tremendous oversupply of poor-quality cannabis was grown. Both FE3, a compliance officer, and FE4, a manager of finance operations, worked from 2018 until spring of 2020 with responsibilities in

---

[35] ¶ 103.

[36] ¶¶ 66–67.

[37] ¶ 70

[38] *Id.* Canopy had ERP (Enterprise Resource Planning) software that it used to prepare a quarterly census of every plant the Company grew because it needed to report that headcount to Health Canada. *Id.*

[39] ¶¶ 69–70.

- 9 -

British Columbia.[40] According to FE3, rather than buy new greenhouses in Aldergrove and Delta, Canopy purchased and retrofitted old, existing greenhouses that had been used to grow peppers.[41] The old greenhouses did not have the necessary lighting, humidifiers, and watering capabilities needed to produce high-quality cannabis.[42] FE4 stated that, although the Aldergrove and Delta facilities were supposed to be Canopy's major source of "bud" grade cannabis——and Canopy expected that the entire harvest would be "bud" grade——*none* of the cannabis grown in Aldergrove or Delta was "bud" grade.[43] The tons of otherwise unsellable poor-quality cannabis could only be salvaged for use in extracts.[44] In addition, FE1 visited many of Canopy's grow sites and stated that the growing and greenhouse problems were present at *all* of Canopy's facilities, which were generally of low quality. This, according to FE1, resulted in an oversupply of gelcaps *by necessity*.[45]

According to FE3 and FE4, defendants toured these facilities regularly and were aware of the excessive, poor-quality cannabis grown there. Defendant CEO Linton made multiple

---

[40] ¶¶ 71-72.

[41] ¶ 73.

[42] *Id.*

[43] ¶ 74.

[44] ¶¶ 73-76.

[45] ¶ 77.

visits to both B.C. facilities in 2018 and 2019, and observed and commented on the poor conditions and poor-quality of the cannabis plants.[46] FE1 confirms that defendant Kovacevic participated in weekly meetings where these facts were routinely discussed[47] and that other Canopy employees discussed these issues with Canopy's leadership.[48]

Similarly, FE5, a brand manager for premium brands until late 2019 who worked closely with defendant Kovacevic, confirms that the oversupply of oil and gelcap products was a function of Canopy having produced volumes of poor-quality cannabis.[49] FE6, a Toronto-based senior brand manager until December 2019, echoed this and confirmed that this overproduction was not because of any anticipated consumer demand.[50]

In fact, Canopy had no basis for its claim of consumer demand for the amount of extracts it overproduced. Both FE5 and FE6 stated that Canopy pressured provinces and cannabis stores to purchase large amounts of these extract products in order to push its overproduced inventory.[51] Both also confirmed that by February 2019, defendant Kovacevic told Canopy's Chief Marketing

---

[46] ¶¶ 85-87.

[47] ¶ 88.

[48] ¶¶ 95-98.

[49] ¶¶ 101-102.

[50] ¶ 105.

[51] *Id*.

Officer, Dave Bigioni, that Canopy had produced far more oils and gelcaps than it could sell.[52]

**D.   Canopy misrepresented that market demand necessitated its massive buildup of cannabis product inventory and grow facilities, including its stockpile of oils and gelcaps.**

Canopy told investors throughout the Class Period that its rapid and exponential inventory and facility growth——including the explosion of oil and gelcaps supply——was dictated by management's then-existing "expectation of market demands."[53]

As alleged, defendants continued this core misrepresentation, along with several others, in SEC filings and releases throughout the period, including in Canopy's:

- June 27, 2018 6-K filing and attendant press release: "Inventories are continuing to be scaled to meet management's expectation of market demands...."[54]

- June 28, 2018 40-F filing, omitting reference to inventory and production facilities in discussion of "Risk Factors," and including in its "Consolidated Financial Statement" an inflated valuation of inventory.[55]

- August 15, 2018 and November 14, 2018 6-Ks and accompanying press releases, reciting that "Inventories are continuing to be scaled to meet management's expectation of market demands,"[56] as it recited in the respective MD&As,[57] while failing to

---

[52] ¶ 106.

[53] ¶ 109 (June 27, 2018——the start of the Class Period).

[54] *E.g.*, ¶ 147.

[55] *E.g.*, ¶¶ 149-151.

[56] *E.g.*, ¶¶ 153 & 160, respectively.

[57] "MD&A" refers throughout to "Management's Discussion and Analysis of the Financial Condition and Results of Operations"

include inventory or facility capacity in discussion of "Risks and Uncertainties," and overvaluing inventory in the included respective quarterly financial statements.[58]

- November 14, 2018 earnings call, repeating the "scaled to meeting management's expectation of market demands" misrepresentation and stating that "significant demand will develop for cannabis oils and in particular soft gels," and "[a]s such, the company continues to increase inventories...and increased the quantity of cannabis oil and soft gelcaps that we have on hand."[59]

- February 15, 2019 MD&A, including inflated inventory valuation and revenue (as did its quarterly financial statement) claiming, with respect to inventory, "[m]anagement believes [it] is [all] required to meet expected market demands...," and omitting in its "Risks and Uncertainties" any mention of inventory or expansion of grow facilities.[60]

- February 15, 2019 earnings call, during which defendant Linton downplayed the risk associated with expanding facility capacity, stating "this is not a stockpiling exercise at all, and we're constantly looking at [sic] as the provinces are turning up more stores, we need to fill that warehouse."[61]

- June 26, 2019 annual 40-F filing, including inflated revenue and inventory figures failing to account for inventory likely to be impaired and overvalued, and omitting mention of inventory or grow facilities in "Risks and Uncertainties" discussion.[62]

- August 14, 2019 quarterly financial statement, misrepresenting revenue (in light of likely reversal) and inventory (in light of likely impairment), and quarterly MD&A omitting any reference

---

for the reporting period, and is generally filed with Canopy's quarterly Form 6-K.

[58] *E.g.*, ¶¶ 154-158 & 161, 166, 168, respectively.

[59] *E.g.*, ¶¶ 162, 164.

[60] *E.g.*, ¶¶ 170-176.

[61] ¶ 256.

[62] *E.g.*, ¶¶ 178-183.

to inventory or facilities in "Risks and Uncertainties" discussion.[63]

*   August 15, 2019 earnings call, where defendant Lee stated that Canopy's $8 million charge on oil and gelcaps wasn't something he "expect[ed] to move the P&L in the future," and defendant Kovacevic assured that returns were not "a cause [for] concern going forward" nor "related to our production flow here."[64]

*   November 14, 2019 quarterly financial filing, misrepresenting revenue (in light of likely reversal) and inventory (in light of likely impairment), and quarterly MD&A omitting any reference to inventory in "Risks and Uncertainties" discussion, despite the fact Canopy announced over $47 million in charges and impairments, with $15.9 million attributed to inflated inventory.[65]

*   November 14, 2019 earnings call, where defendant Kovacevic denied that Canopy would need to write off inventory, stating "we feel very happy with our inventory level today and that they're setting us up for success," and defendant Zekulin downplayed the risk of closing facilities, observing "there is no reason to expect that."[66]

*   February 14, 2020 quarterly financial filing, misrepresenting inventory (in light of likely impairment), and quarterly MD&A omitting any reference to facilities or inventory in "Risks and Uncertainties," despite having taken large impairments over the two prior quarters.[67]

*   February 14, 2020 earnings call disclosing Canopy had "*begun* taking steps designed to bring our inventory in balance with our supply demand understand[ing]," but was still, according to defendant Lee, "a little longer than what we'd like to be today," on some cannabis inventory, and "we did

---

[63] *E.g.*, ¶¶ 184-189.

[64] *E.g.*, ¶¶ 190-193.

[65] ¶¶ 233-236.

[66] *E.g.*, ¶¶ 237-239.

[67] *E.g.*, ¶¶ 240-245.

– 14 –

take down some capacity at our Delta facility and British Columbia is one of our first steps to help bring supply and demand into balance."[68]

Defendants did not disclose in these misrepresentations: (i) that Canopy's exponential increase in cannabis supply——including oils and gelcaps resulting from an oversupply of low-quality cannabis——was all contrary to market demand; (ii) that Canopy had "no data" upon which to exercise judgment and determine the proper scaling of inventory; (iii) that Canopy was inflating inventory for brand saturation purposes——and out of desperation——as opposed to meeting actual demand; (iv) that failure to understand or reasonably account for the actual demand for its products materially impaired Canopy's ability to properly value or timely impair its oil, gelcaps, and dry flower inventory, in violation of IAS 2; (v) that failure to understand or reasonably account for the demand for Canopy products materially impaired the ability properly to recognize revenue for sales to provinces, in violation of IFRS 15; and (vi) that the absence of data supporting massive demand meant there was no ground for assuring investors of the wisdom of its inventory and facility growth.[69]

---

[68] *E.g.*, ¶¶ 246-247 (emphasis added).

[69] *E.g.*, ¶ 148.

- 15 -

Defendants did not disclose until May of 2020 that the unwarranted buildup of oils, gelcaps, and dry flower inventory, alongside the ill-considered production facility expansion, was driven by a reckless aspiration toward brand saturation rather than by a need to satisfy the massive demand they told investors Canopy was supplying, but which they knew did not exist.[70]

**E.      Canopy belatedly revealed the partial truth about its overproduction of cannabis and unwarranted expansion of poorly designed grow facilities.**

Canopy abruptly fired defendant Linton in July 2019.[71] Barely a month later, on August 14, 2019, Canopy revealed an $8 million revenue charge for returns of cannabis oils and gelcaps.[72] Dubbed a "headscratcher" and a "mystery" by one analyst,[73] this charge came after repeat assurances from defendants that the supply of these products was properly scaled——even "required to meet expected market demand."[74] In response, Canopy's share price plummeted 14%.

Rather than disclose the truth about, *e.g.*, Canopy's failure to retrofit its massive grow facilities and its oversupply of poor-quality cannabis, defendants downplayed the

---

[70] *E.g.*, ¶ 12.

[71] ¶ 270.

[72] ¶¶ 271-272.

[73] ¶ 273.

[74] ¶ 170.

significance of the charge. Defendant Lee assured investors on an August 15 earnings call, "[t]his is something that I wouldn't expect to move the P+L in the future,"[75] and defendant Kovacevic echoed that returns against revenue weren't "a cause [for] concern going forward."[76] Lee also disclosed for the first time that Canopy's "supply agreements with the provinces allow for returns at any point in the future," *i.e.*, Canopy's government customers in Canada could return any unsold product at any time, so recognized revenue could be reversed.[77]

Despite management's assurances, just three months later, in its November 14, 2019, Q2 FY 2020 earnings release, Canopy took a much larger $32.7 million charge on those same products, $15.9 million of which was another inventory charge.[78] As in August, Canopy tried to soften the blow: "[w]ith this acute restructuring charge, management believes that current inventory levels both internally and externally are in-line with demand."[79]

During Canopy's November 14, 2019 earnings call, analysts hammered defendants for the ongoing oversupply problem,

---

[75] ¶ 275.

[76] ¶ 277.

[77] *Id.*

[78] ¶ 282.

[79] *Id.*

describing the write-downs as a "red flag for the company," and "astounding."[80] Canopy's share price fell over 14% on the news.[81]

Investor concern deepened following Canopy's February 14, 2020 quarterly earnings call. Defendant Klein announced——more than 15 months after legal sales began——that Canopy had "*begun taking steps designed to bring our inventory in balance with our supply demand understand[ing],*" and that "*as a company we've built inventory, but we need to get better at connecting the consumer demand signal to the inventory that we're building*" and "*bring down our total inventory balance.*"[82]

The news got worse just two weeks later, on March 4, 2020, when Canopy disclosed a fundamental inventory and capacity overbuild.[83] Canopy announced it was closing two massive grow facilities constituting *nearly half of its entire Canadian capacity*.[84] Its share price fell over 5% on the news.[85]

The worst, however, was yet to come. On May 29, 2020, defendants announced impairment and restructuring charges of $743 million, including $335 million in impairments for "property, plant and equipment mostly tied to the cultivation

---

[80] ¶ 290.

[81] ¶ 291.

[82] ¶¶ 292-293 (emphasis added).

[83] ¶¶ 297-298.

[84] *Id*.

[85] ¶ 298.

assets" and "$132 million...for inventory write-offs."[86] Defendant Klein finally admitted to investors in the earnings call that "*there's no denying that we overbuilt our facilities*" and that although the mammoth build was "dramatic" and a "great talking point," it was a buildup that "came with great consequences."[87] Further, defendant Zekulin admitted for the first time that the massive build-up "*wasn't strictly for the purpose of obtaining market share*, it was for getting our brands out there"[88]; that is, contrary to prior statements, the build-up was not scaled to meet demand. Stunned investors drove Canopy's share price down over 20%.[89]

### III.  ARGUMENT

**A.   Plaintiffs satisfy the pleading standards for federal securities fraud claims.**

Plaintiffs state a claim under Section 10(b) and Rule 10b-5 by alleging: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.[90] Here, defendants

---

[86] ¶ 300.

[87] ¶ 301 (emphasis added).

[88] *Id.* (emphasis added).

[89] ¶ 300.

[90] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

challenge two elements of plaintiffs' claim, falsity and scienter. The SAC sufficiently alleges both of these elements.

"[C]ourts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."[91] A complaint provides "enough facts to state a claim to relief that is plausible on its face,"[92] and satisfies the PSLRA's heightened requirements, when it pleads "with particularity the circumstances constituting fraud"[93] and specifies "the statement[s] alleged to have been misleading, [and] the reason or reasons why the statement[s] [are] misleading...."[94]

Supported by allegations from several former Canopy employees, the SAC satisfies the PSLRA's scienter pleading requirement as "all the facts in the complaint as alleged, taken collectively, give rise to a 'strong inference of scienter.'"[95] A person of reason would, per *Tellabs*, "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[96]

---

[91] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

[92] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[93] Fed. R. Civ. P. 9(b).

[94] 15 U.S.C. § 78u-4(b)(1); *see Tellabs,* 551 U.S. at 321.

[95] *Zhengyu He v. China Zenix Auto Int'l Ltd.,* 2020 WL 3169506, at *5 (D.N.J. June 12, 2020) (citing *Tellabs*, 551 U.S. at 323).

[96] *Tellabs, Inc.*, 551 U.S. at 324.

**B.   Plaintiffs identify several actionable, materially false and misleading statements and omissions.**

Plaintiffs properly "specify each allegedly misleading statement [and] the reason or reasons why the statement is misleading."[97] Though "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5,"[98] courts have long recognized that a "duty to disclose may arise, however, when there is...a corporate statement that, absent disclosure, would be inaccurate, incomplete, or misleading."[99]

**1.   Defendants' statements on cannabis inventory and production capacity were false and misleading.**

By placing inventory and production capacity levels "in play," through repeated misstatements that Canopy's cannabis build-up, including of extracts, was scaled to meet actual demand, the defendants were required to disclose "certain facts contradicting th[ose] representations."[100]

Defendants argue that despite the hundreds of millions of dollars in impairments, the oversupply of wasted inventory, the write-offs, and the millions of square feet in shuttered grow facilities resulting from Canopy's reckless buildup, plaintiffs

---

[97] *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009).

[98] *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

[99] *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 390 (D.N.J. Aug. 21, 2018) (internal quotation omitted).

[100] *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).

cannot "feign ignorance" of Canopy's (undisclosed) build-up strategy blunder.[101] Because, they say, the plan to "continue efforts to increase its inventory" was "the strategy all along," plaintiffs "could determine for themselves whether to invest" in the company.[102] Further, according to defendants, "targeted risks were repeatedly disclosed...."[103]

But this version of events is not loyal to the facts.[104]

### a. Defendants repeated several affirmative false and misleading statements.

Months before legalization and consistently throughout the Class Period, Canopy repeated this misrepresentation or variations of it: "[i]nventories are continuing to be scaled to meet management's expectation of market demands."[105] For example:

- Nov. 14, 2018 earnings call (the month after legalization): because of demand "the company continues to increase inventories."[106]

---

[101] MTD at 17.

[102] *Id.* at 17-18.

[103] *Id.* at 17.

[104] The entirely misleading and insufficient boilerplate risk statements here are distinguishable from the "extensive risk discussions" concerning possible revenue decline found adequate in *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 412 (D.N.J. 2010), and cannot "insulate [defendants] from liability." *Id.*

[105] *E.g.,* ¶¶ 109, 113, 114.

[106] *E.g.,* ¶ 164.

- Feb. 15, 2019 MD&A: with respect to inventory "[m]anagement believes [it] is [all] required to meet expected market demands...."[107]

- Feb. 15, 2019 earnings call: "this is not a stockpiling exercise at all...we need to fill that warehouse" because of market demand.[108]

- August 15, 2019 earnings call: returns on inventory because of insufficient demand were not "a cause [for] concern going forward" nor was an $8 million charge "related to our production flow here."[109]

- November 14, 2019 earnings call: "we feel very happy with our inventory level today."[110]

- February 14, 2020 earnings call: on some cannabis we're "a little longer than what we'd like to be today."[111]

These statements were false and misleading for failing to disclose that defendants had "no data" to support their statements of consumer demand, and had built up Canopy's over-supply of oils and gelcaps only because their grow facilities could not produce "bud quality" cannabis. Investors could not "determine for themselves whether to invest"[112] because defendants' *disclosed* strategy was predicated on a falsehood, *to wit*, that massive demand necessitated a massive buildup.

---

[107] *E.g.*, ¶ 170.

[108] ¶ 256.

[109] ¶¶ 191-192.

[110] ¶ 237.

[111] ¶¶ 246, 295.

[112] MTD at 17-18.

- 23 -

Investors reasonably relied on Canopy's contemporaneous assessments of that demand and suffered damages.[113]

> **b.   Defendants' risk disclosures never put investors on notice of the omitted truth of Canopy's inflated supply of cannabis and cannabis capacity.**

No timely, particularized risk disclosure ever put investors on notice of Canopy's oversupply of cannabis and cannabis facilities. The language defendants highlight did not meaningfully qualify their false and misleading statements. General disclosure of rising inventory levels,[114] and boilerplate disclosures, *e.g.,* that "sales" may be affected by government "management systems" as might "changes or developments affecting any facility," did not disclose that Canopy was not building capacity and inventory because of any actual determination of demand, but because, among other things, they were terrible at growing "bud"-grade cannabis.[115] Told that massive supply was necessary to meet actual demand, investors would not conclude Canopy's supply was *excessive*; defendants told them to believe otherwise.

---

[113] Defendants misplace reliance upon *In Re Newell Brands, Inc. Secs. Litig.*, 2019 WL 6715055 (D.N.J. Dec. 10, 2019), MTD at 18-19, to challenge plaintiffs' mention that Canopy's inventory dwarfed its competition. This fact was not pled as a premise to establish fraud. ¶ 240.

[114] MTD at 18.

[115] *Id*.

Defendants did not disclose true, relevant, material facts regarding inventory or capacity as against consumer demand. They did not, as defendants argue, disclose (much less timely disclose) material "[i]ssues related to inventory and facilities,"[116] or "the data [  ] relied on to support [Canopy's] inventory supply"[117] or the "brand building,"[118] *i.e.*, non-market-demand, basis for its massive buildup. Given repeated misleading statements about massive demand for its products, disclosing an obvious business principle that "sales of the Company's products" will be "impacted by," *inter alia,* "the size and frequency of wholesale cannabis orders," disclosed nothing.[119]

> ### c. Defendants never disclosed that Canopy massively overproduced oils and gelcaps because Aldergrove and Delta couldn't produce high-quality cannabis.

Defendants told investors that Canopy scaled inventories to meet "management's expectations of market demands,"[120] valued inventories and net revenues in accordance with accounting standards,[121] claimed that revenue reversal was "not a cause for

---

[116] MTD at 19.

[117] MTD at 24 (de-capitalized).

[118] MTD at 25 (de-capitalized).

[119] MTD at 18.

[120] ¶¶ 147, 153, 154, 160, 161, 162, 170. *See also* ¶ 164.

[121] ¶¶ 151, 158, 168, 174, 176, 178, 182, 184, 186

concern,"[122] and repeated boilerplate risk factors.[123] These statements are actionable because defendants knew but failed to disclose that the Aldergrove and Delta facilities had not been properly retrofitted and could *only* produce low-quality cannabis. Canopy's oil and gelcap inventory was not scaled to meet *any* expectation of market demand, nor properly valued, and revenues would need to be reversed. Defendants had a duty to disclose this information because their statements put the reasons for the massive oil and gelcap inventories, and value of and revenues from those inventories, "in play."[124]

Defendants claim that these statements were not false because Canopy disclosed the *amounts* of oils and gelcaps produced, that cannabis grown in Aldergrove and Delta was used for extraction, that they intended to (but never did) build an extraction facility at Aldergrove, and that defendant Kovacevic posted three photos of cannabis plants on Twitter after he visited Delta and Aldergrove in July 2018. Defendants concede that they visited these facilities at the start of the Class Period and that cannabis grown there was used only to produce

---

[122] ¶¶ 190–92.

[123] ¶¶ 149, 156, 166, 172, 180, 188, 248, 250.

[124] *Shapiro*, 964 F.2d at 282.

010876-11/1416593 V1

oils and gelcaps,[125] *confirming* the statements of FE1, FE3, FE4, and FE6.

Defendants' disclosures did not correct, or even address, their assurances that Canopy was producing massive amounts of oils and gelcaps to meet market demand.[126] In reality, defendants had *no evidence* of market demand, but were overproducing the products because *they had no choice*.[127]

Defendants claim they disclosed that Canopy "intended these two facilities to grow extraction quality cannabis."[128] Defendants' claim is false, and at best creates a factual dispute that should not be resolved on a motion to dismiss.[129] Defendants stated that Aldergrove and Delta would produce high-quality cannabis.[130] FE4 corroborated that defendants intended the entire Aldergrove and Delta harvests to be "bud grade,"[131] and FE3 described how defendant Linton questioned the crops' quality.[132] Indeed, Defendant Kovacevic described Aldergrove's

---

[125] MTD at 23.

[126] ¶¶ 147, 153, 154, 160, 161, 162, 170. *See also* ¶164.

[127] ¶¶ 71–117.

[128] MTD at 44.

[129] *Avaya*, 564 F.3d at 260 n.31 (when considering a motion to dismiss, "we do not resolve factual disputes——even in cases governed by the PSLRA").

[130] ¶ 59.

[131] ¶ 74.

[132] ¶¶ 86–87.

- 27 -

plants in July 2018, as "looking super healthy!"——*i.e.*, not "larfy" or infected with "bud rot" or "grey mold."[133]

The disclosures defendants point to said *nothing* about the quality of the cannabis at Aldergrove or Delta, merely that cannabis was being used for extraction. Having been repeatedly assured by defendants that the facilities were designed to produce high-quality cannabis and that the plants were "super healthy," defendants' disclosures communicated that Canopy was harvesting the high-quality cannabis to meet actual demand. In reality, defendants had *no evidence* of demand and were overproducing oils and gelcaps because they had no choice.[134]

At best, defendants assert a "truth was on the market" defense that that should not be resolved on a motion to dismiss.[135] Plaintiffs adequately plead falsity.

---

[133] ¶¶ 80, 83, 89. Defendant Kovacevic's photos of the Delta facility did not reveal the problems at Aldergrove and Delta and he assured investors that the plants were "super healthy!" ¶ 89. No reasonable investor would understand from Kovacevic's words that the facilities would not produce high-quality cannabis.

[134] ¶¶ 71-117.

[135] *See, e.g.*, *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *15 (E.D. Pa. Mar. 25, 2020) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality")).

####     d.   **Canopy's belated partial disclosures reinforce the falsity of its prior statements and omissions.**

Defendants' partial corrective disclosures undermine defendants' "fraud by hindsight" theory and their defense of the false and misleading statements by defendants Lee, Kovacevic, Zekulin, and Linton.[136] Defendant Kovacevic's assurance in August 2019 that Canopy's $8 million revenue reversal was not a "cause [for] concern going forward,"[137] and defendant Lee's agreement that he did not "expect [it] to move the P&L in the future,"[138] came just weeks after Canopy's Form 40-F[139] and prior disclosures failed to even hint that an oversupply of extracts might lead to a material charge against inventory of extracts. Because of longstanding assurances that inventory was scaled to meet demand, the August charge (and subsequent November 2019 charge) were a "headscratcher" and "mystery" for analysts, as were the larger 2020 charges.[140]

---

[136] MTD, *e.g.*, at 20 (citing *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004)). Unlike in *Chubb*, plaintiffs aren't alleging an inference of fraud "merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy." Here the allegations concern then-known facts about supply and demand and defendants concealing their complete absence of data about actual demand. *Id.* (citation and internal quotation omitted).

[137] ¶¶ 191, 277.

[138] ¶¶ 190, 275.

[139] ¶¶ 223-226.

[140] ¶ 273.

Further, Canopy's announcement that it would abandon "approximately 40% of its production space,"[141] just weeks after downplaying any concerns over inventory, leads to the reasonable inference that defendants were not coming clean with investors even as late as February 2020.[142] Despite the effort to salvage defendant Lee's remarks on the February earnings call,[143] the "strategic approach" vaguely invoked by Lee did not warn investors that nearly half of Canopy's capacity would be closed in weeks,[144] a decision that could not have been made overnight, especially in the context of defendants' repeated statements that inventory and production were scaled to meet demand.

Last, Canopy most certainly did not "disclose[] the data it relied on to support its inventory supply,"[145] nor disclose that, notwithstanding the evident, limited demand for its cannabis products, it commenced and developed massive inventory and facilities for the purpose of getting "brands out there."[146]

Canopy's vague reference to looking at U.S. markets and a third-party prediction about potential market size, along with

---

[141] ¶ 297.

[142] ¶¶ 292-249.

[143] MTD at 20 n.12.

[144] ¶ 297 ("[t]wo weeks later, on March 4, 2020...[Canopy] announced that it was closing approximately 40% of its production space...").

[145] MTD at 24 (de-capitalized).

[146] MTD at 25 (de-capitalized).

"its own market research," hardly qualifies as "disclosing the data it relied on" to inform investors there was massive demand necessitating rapid, exponential growth.[147] Further, Canopy mischaracterizes the "brand building" idea behind its ill-fated and wasteful buildup.[148] Defendants did not disclose that Canopy's inventory and capacity build continued apace during the Class Period *despite* the lack of consumer demand *because* Canopy wanted to get its brand "out there,"[149] but rather stated that inventory was based on actual demand, with no mention of branding. The distinction made all the difference to investors, who, upon hearing the "brand building" rationale, dropped the stock price by 20%. Again, defendants were entitled to adopt the strategy of saturating a market for brand recognition purposes——eschewing a clear-eyed assessment of actual market demand——but not entitled to conceal this strategy as the driving force of Canopy's buildup while repeatedly misleading investors that the buildup was based on actual market demand.

Plaintiffs sufficiently allege material, false and misleading statements and omissions by defendants.

---

[147] MTD at 2, 24.

[148] MTD at 25-26.

[149] *E.g.*, ¶ 207.

- 31 -

2.  **Defendants' materially false and misleading statements and omissions find no shelter in any harbor.**

a.  **Defendants' false and misleading statements were not mere "immaterial puffery."**

Defendants claim that "[m]any of the challenged statements" regarding inventory and production capacity[150] were nonactionable "puffery." They are not puffery, as they are neither "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism...."[151] or "so vague or such obvious hyperbole that no reasonable investor would reply upon them."[152]

The Supreme Court has held that the use of "conclusory terms," *e.g.,* "we're balanced,"[153] "we feel very happy with our inventory level today,"[154] "this is something that I wouldn't expect to move the P&L in the future,"[155] and "we're a little longer than what we'd like to be today,"[156] made "in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders

---

[150] MTD at 26-27.

[151] *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 872 (3d Cir. 2000).

[152] *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *5 (D. Del. Feb. 7, 2020) (citation omitted).

[153] ¶ 246.

[154] ¶ 237.

[155] ¶ 275.

[156] ¶ 295.

them misleading."[157] The statements challenged in the SAC are not
"non-specific statements of optimism or hope."[158] They are false
and misleading statements regarding Canopy's then-existing
inventory and determinations of consumer demand.

And whether the statements are mere immaterial puffery is a
fact-intensive inquiry that cannot be answered now because
defendants' statements were not "so *obviously unimportant*" to an
investor that all reasonable minds would agree.[159]

> **b.  The PSLRA's safe harbor does not apply to
> defendants' statements because they addressed the
> then-present state of affairs without meaningful
> cautionary statements or were otherwise made with
> knowledge of their falsity.**

The PSLRA's safe harbor requires that defendants'
statements be both *actually* forward-looking and "accompanied by
meaningful cautionary statements"[160] or "immaterial" or "made
without actual knowledge that the statement was false or
misleading."[161] And the "[c]autionary language must be extensive

---

[157] *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1094
(1991).

[158] MTD at 27 (quoting *Takata v. Riot Blockchain, Inc.*, 2020 WL
2079375, at *12 (D.N.J. Apr. 30, 2020)).

[159] *See, e.g., De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL
6891832, at *28 (D.N.J. Dec. 31, 2018) (quoting *In re Adams
Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004))
(emphasis in original).

[160] 15 U.S.C. § 78u-5(c)(1)(A)(i).

[161] *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278-79 (3d
Cir. 2010).

and specific."[162] Use of "vague or blanket (boilerplate)

disclaimer[s]" is "inadequate to prevent misinformation."[163]

Where a statement contains a mix of then-present or past facts

it "is not entitled to the safe harbor with respect to the part

of the statement that refers to the present."[164] The "threshold

inquiry" is whether the challenged statements are "forward-

looking" under the statute.[165] Many of the statements defendants

challenge are not "actually forward-looking" at all.[166]

First, several of the challenged statements are then-

current statements of then-existing inventory and defendants'

contemporaneous assessments of same and corresponding demand——

not, *e.g.*, "projections of future performance, plans and

objectives for future operations."[167] For example:

- "Inventories are continuing to be scaled to meet management's expectation of market demands..."[168]——a false and misleading present-tense ("continuing") statement of management's *then-existing* expectation of *then-existing* demand.

---

[162] *Avaya*, 564 F.3d at 256 (internal quotation and citation omitted).

[163] *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d. Cir. 2004) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).

[164] *Avaya,* 564 F.3d at 255 (further citation omitted).

[165] 15 U.S.C. § 78u-5(i)(1).

[166] *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *7 (D.N.J. Oct. 27, 2005).

[167] 15 U.S.C. § 78u-5(i)(1).

[168] *E.g.*, ¶¶ 147, 153, 160.

- Canopy's several statements in periodic financials overstating the value of its inventory and inflating its revenue are all then-current or *past*-looking.[169]

- With regard to its inflated inventory, the statement "Management believes [it] is [all] required to meet expected market demands…"[170]—another false and misleading present-tense statement ("*believes* [it] *is* [all] required") of management's *then-existing* expectation of demand.

- Defendant Linton's statement, on Canopy's February 15, 2019 earnings call, that the explosion in facility capacity "is not a stockpiling exercise at all, and we're constantly looking at [sic] as the provinces are turning up more stores, we need to fill that warehouse"—a then-current assessment of supply and demand.[171]

- Defendant Kovacevic's statements on Canopy's August 15, 2019 earnings call that its announced revenue reversal was "not related to our production flow here" and defendant Zekulin's statement "[w]e remain very confident" on dry flower inventory[172]—obvious statements of current conditions.

- Defendant Kovacevic's statement on the November 14, 2019 earnings call: "we feel very happy with our inventory level today and that they're setting us up for success."[173]

- Defendant Zekulin in the same call responding to questions whether Canopy would "slow down production" or "shut down some facilities," stating "there is no reason to expect that will happen"[174]—a statement of management's *then-current* position.

- Defendant Lee's statement, on Canopy's February 14, 2020 earnings call, that "we feel very good that

---

[169] *E.g.*, ¶¶ 147, 153, 160, 174, 176, 178, 182, 184, 186.

[170] ¶ 170.

[171] ¶ 256.

[172] ¶ 278.

[173] ¶ 237.

[174] ¶¶ 238, 262.

we're balanced on high THC bud" and "low THC, high CBD bud" but "a little longer than what we'd like to be today" on "mainstream bud"[175]—a then-current assessment of then-current inventory as it relates to then-current demand.

These statements are misrepresentations of present fact, not forward-looking.[176] The safe harbor does not apply.[177]

Second, even those statements which might be adjudged forward-looking are not protected by the safe harbor for lack of "meaningful cautionary statements"[178] and because plaintiffs' sufficiently allege the statements were made with "actual knowledge" of their falsity.[179] Canopy's boilerplate cautionary statements of uncertainty are not "meaningful,"[180] and

---

[175] ¶ 246.

[176] *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *7 (internal citation omitted).

[177] *China Zenix Auto*, 2020 WL 3169506, at *5.

[178] 15 U.S.C. § 78u-5(c)(1)(A)(i). Contrary to defendants' argument, merely claiming the statements are forward-looking and repeating *ad nauseam* that "actual results" may differ, does not sufficiently protect them. MTD at 28 n.21.

[179] *In re Aetna, Inc. Sec. Litig.*, 617 F.3d at 278-79. *E.g.*, defendant Saunders' statement in the Nov. 14, 2018 earnings call: "[m]anagement continues to believe that significant demand will develop for cannabis oil and in particular soft gels in the recreational market" and therefore "the company continues to increase inventories." ¶ 164; and defendant Lee's claim on the Aug. 15, 2019 earnings call addressing return of products: "I would say this is something that I wouldn't expect to move the P&L in the future"[179] and defendant Kovacevic's assurance that returns against revenue were not "a cause [for] concern going forward. ¶ 275.

[180] *E.g.,* examples provided in defendants' MTD at 27-29. For the same reasons, defendants' statements are not protected by

plaintiffs' sufficiently allege defendants knew at the time there was no basis for the claims made in these statements.

### 3. Defendants' unreasonable revenue and inventory accounting practices are not protected as mere exercises of discretion or statements of opinion.

Defendants repeatedly assured investors that Canopy's financial statements were prepared in accordance with, in relevant part, IAS and IFRS accounting standards.[181] Both IAS 2 and IFRS 15 supply objective standards and compliance requirements for properly valuing inventory and properly stating revenue, respectively, notwithstanding that some metrics involve more than "a single objective set of calculations."[182]

Under IAS 2, inventory is valued based on the most reliable evidence at the lower of cost or net realizable value, and must be written down when the carrying value exceeds the net realizable value.[183] Plaintiffs allege, throughout, that defendants violated IAS 2 because, *inter alia*, Canopy's statements of inventory valuations did not reflect a good faith, subjective determination based on "reliable evidence available

---

the "bespeaks caution" doctrine, for its cautionary language was neither sufficient nor "robust." MTD at 27 n.19.

[181] *E.g.,* ¶ 130 n.17 ("Canopy stated that its financial statements were prepared in accordance with IFRS...in every ...filing during the Class Period...); MTD at 32.

[182] ¶¶ 119-146; *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017).

[183] ¶¶ 119-120.

at the time,"[184] and were thus false and misleading, given the absence of actual market demand for their inflated supply.

IFRS 15 requires a multi-step process for revenue recognition, including determination and disclosure of "obligations for returns, refunds and other similar obligations"[185] and a determination "whether it is 'highly probable' that a significant reversal of revenue will not occur."[186] Plaintiffs allege, throughout, that defendants violated IFRS 15 because, *inter alia*, they did not disclose the absolute right of return and significant price concessions Canadian provinces could extract per Canopy's contracts, and because they knew it was not "highly probable" that a significant reversal of revenue would not occur, rendering their statements of revenue false and misleading.[187]

Defendants argue that, however false and misleading, these were all "nonactionable opinion statements."[188] Even opinion statements, however, and as defendants concede, are actionable where the statements are "not honestly believed and lack a

---

[184] ¶ 119.

[185] ¶ 132.

[186] ¶¶ 134-136.

[187] ¶¶ 137-146.

[188] MTD at 30 (de-capitalized).

reasonable basis."[189] Plaintiffs, supported by former Canopy employees, allege that these statements were not honestly believed and lacked a reasonable basis. Canopy had "no data" upon which to determine it could recognize inflated revenue and value inflated inventory as it did. Defendants knew, but did not disclose, that their inventory was inflated to get Canopy's "brands out there"——not in response to consumer demand——and its grow facilities had produced tons of poor-quality cannabis only suitable for extract products. Thus, defendants did not honestly believe and had no reasonable basis upon which to believe that their stated judgments under IAS 2 and IFRS 15 were true.

Defendants' reliance on the Supreme Court's decision in *Omnicare* is misplaced. *Omnicare* addressed claims under Section 11 of the 1933 Act, "[w]e believe" statements in Omnicare's registration statement unrelated to accounting.[190] The case itself did not address accounting statements, much less statements of inventory or revenue recognition.[191]

---

[189] *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014); MTD at 31.

[190] *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*, 575 U.S. 174, 179-180 (2015); MTD at 30-33, 35-36.

[191] As defendants concede, *Omnicare* does not govern Section 10(b) claims, even if some of its discussion is "to some extent, instructive." MTD at 33 n.25 (citation omitted). Even under *Omnicare* the allegations survive because defendants omitted facts material to investors which directly contradicted their statements, such as that they had no basis for their claim of market demand for their products.

Defendants otherwise rely upon *In re Hertz*,[192] where the court held that subsequent disclosures and adjustments did not demonstrate that the defendants had violated Generally Accepted Accounting Principles.[193] But in *Hertz* the company belatedly disclosed information concerning "misidentified estimate[d] recoveries from third parties and receivables with significantly different credit risk profiles,"[194] and plaintiffs lacked a basis upon which to allege those "misidentifi[cations]" were knowingly false or unreasonable at the time.[195] By contrast, with knowledge throughout the Class Period that massive demand did not exist to meet its inflated supply, defendants never—prior to or after taking impairments and charges for oversupply in 2019 and 2020— properly accounted for this reality in its statements of revenue and inventory.[196] Again, even applying the "opinion" standard, the question is whether plaintiffs sufficiently allege that

---

[192] MTD at, *e.g.,* 30-32.

[193] *In re Hertz*, 2017 WL 1536223, at *12.

[194] *Id.* at *11 (citations omitted).

[195] *Id.*

[196] It strains credulity to describe financial metrics of inventory value and recognized revenue as mere opinions. That reasonable, subjective judgments can determine *variables* in the calculations of inventory value and recognized revenue does not render the figures arrived at mere "opinions."

defendants' accounting statements were "not honestly believed and lack[ed] a reasonable basis," which plaintiffs do.[197]

Defendants knew Canopy's inventory was not properly valued and that its revenue from cannabis sales was likely to be impaired. For example:

- defendants had "no data" to support the likelihood of selling its inventory or recognizing revenue without substantial impairment;[198]

- defendants, in contravention of IFRS 15, failed to inform investors that its supply contracts contained generous, near absolute "rights to return product" and "extract significant price concessions";[199]

- defendants took an $8 million revenue charge on August 14, 2019 on oil/gelcap returns but *did not* adjust its inventory valuation accordingly, despite admitting in November a "risk of oversupply,"[200] this coming months after Canopy's

---

[197] *City of Edinburgh Council,* 754 F.3d at 170. Defendants indict their own position with reference to Canopy's Nov. 2019 statement that after about "4 to 8 months" following the Oct. 2018 legalization (*i.e.,* Feb.-June 2019) it had "at-the-till data" allowing it to calibrate supply and demand. MTD at 2. Why then did it take *another year, to wit*, February 2020, to *begin* aligning supply with demand, to the astonishment of analysts?

[198] ¶ 288.

[199] ¶¶ 19, 144. Contrary to defendants' argument, MTD at 38-39, Canopy's disclosure that it "could be subject to the recall or return of their products for a variety of reasons," and that "material changes could occur," regardless of their timing, were not meaningful disclosures because they failed to inform investors of the material fact of its one-sided contract terms with Canadian provinces, or that it forced inventory on provinces based on false demand statements.

[200] ¶ 286. Defendants argue that *Chubb,* 394 F.3d at 153, demands plaintiffs plead the dollar value of Canopy's improper revenue recognition. MTD at 41. *Chubb* does not so demand. There

- 41 -

February 2019 decision to suddenly stop disclosing its cannabis inventory to investors by product category;[201]

- defendants took a "charge of $32.7 million for returns, return provisions, and pricing allowances" and an "inventory charge of $15.9 million" on November 14, 2019, but *did not* adjust its inventory valuation or revenue recognition accordingly and in a timely manner;[202]

- defendants, in March 2020, admitted to material problems with the misalignment of inventory and consumer demand, announcing the closing of roughly 40% of its production space and hundreds of millions of dollars in inventory write-downs not properly accounted for in terms of either inventory valuation or revenue recognition in a timely manner, stunning investors.[203]

Taken as a whole and in context, Plaintiffs sufficiently plead that defendants——having recklessly built up 2.5 years of excessive inventory and unproductive facilities[204]——did not believe in good faith, and had no reasonable basis upon which to so believe, that its statements of inventory and revenue were other than false and misleading during the Class Period.[205]

---

the claim involved allegations of "distorted" *data* in its calculation of loss reserves. *Id*. Plaintiffs here challenge the failure to abide the "not likely" standard of IFRS 15.

[201] ¶ 127.

[202] ¶ 234.

[203] ¶ 297.

[204] ¶¶ 57-58.

[205] The mere fact that "annual financial statements were audited by Deloitte or KPMG" does not end the inquiry. MTD at 32. "[A] clean audit opinion does not categorically insulate a defendant from liability." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *19 (D.N.J. July 27, 2018).

4.  **Statements by former Canopy employees support plaintiffs' allegations of materially misleading statements and omissions.**

The use of a defendant company's confidential, former employees as sources of information in securities fraud cases is well established in this Circuit. A complaint meets the PSLRA's pleading requirement where it provides "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[206]

The former employees whose statements support plaintiffs' allegations are identified with sufficient and reliable particularity to determine, at the pleading stage, the reasonable basis for their knowledge.[207]

---

[206] *Chubb*, 394 F.3d at 146-47. As discussed at length by the court in *Avaya*, the Third Circuit did not change its treatment of confidential witnesses following the decision in *Tellabs* and "*Chubb* remains good law." 564 F.3d at 261-63.

[207] FE1: Lead Director of Genetic Research (Dec. 2018-Jan. 2020); reported to VP of Genomics, who reported to Chief Science Officer Shipley, who reported to defendant Kovacevic, who reported to CEO. ¶ 65. FE2: Cost Accountant / Fin. Operations Controller (Oct. 2016-Oct. 2017); reported to VP for Financial Planning and Analysis. ¶ 69. FE3: Compliance Officer (July 2018-April 2020); reported to K. Wilson in Quality Assurance who reported to Phil Lynch Head of Quality and Regulatory Affairs. ¶ 71. FE4: Manager of Fin. Operations for Western Region (Jan. 2018-June 2019), Operations Manager at Aldergrove (June 2019-May 2020); reported to Gen. Manager of Aldergrove who reported to Reg. General Manager B. Donovan who reported to VP of Operations Canada. ¶ 72. FE5: Brand Manager (2016-late 2019) who worked closely in Ontario with defendant Kovacevic and interacted with defendant Linton. ¶ 101. FE6: Brand Manager/Senior Brand Manager (June 2018-Dec. 2019) who reported to A. Wasserman, Marketing

- 43 -

As the Third Circuit requires, the SAC "adequately describe[es] the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information."[208] The SAC also provides meaningful "content" from these sources supporting the allegations of defendants' misleading statements and omissions regarding oversupply of cannabis, and knowing overproduction of cannabis extract oil and gelcap products.[209]

For example, FE1, in January 2019, personally observed a Walmart-sized stockpile of cannabis and gelcaps,[210] and prior to that witnessed significant problems at several Canopy grow facilities.[211] He also participated in weekly meetings *with defendant Kovacevic* where these issues were routinely discussed, and his supervisor told him about his direct discussions with Kovacevic on the issues.[212] FE2 confirms from direct knowledge that defendants' real-time software put them on routine notice of cannabis supply and demand.[213] Both FE3 and FE4, with

---

VP, who reported to D. Bigioni, Chief Marketing Officer, who reported to defendant Kovacevic. ¶ 104.

[208] *Avaya*, 564 F.3d at 263 (citing *Chubb*, 394 F.3d at 150).

[209] *Id*. at 263 n.33 (distinguishing questions of "form" from those of "content" provided by confidential sources).

[210] ¶ 67.

[211] ¶ 103.

[212] ¶¶ 88, 95-98

[213] ¶¶ 69-70.

- 44 -

responsibilities at massive grow operations in B.C., echo FE1 and confirm that low-quality cannabis was overproduced in poor-quality facilities and that visits by defendant Linton and others executives confirmed defendants' knowledge of same.[214]

FE3 also stated that Alan Cooke, Canopy's VP of Canada Operations, admitted that the facilities were not producing "bud"-grade cannabis, describing that Canopy's regional general manager said on multiple occasions that the cannabis was only going to be suitable for extraction.[215] Like FE1, FE3 learned these facts through performing his daily responsibilities at Canopy. FE5, who worked closely with defendant Kovacevic, confirms that oversupply of poor-quality cannabis led defendants to flood the market with oils and gelcaps, with no data to support the idea that supply was scaled to meet consumer demand.[216] And FE6, responsible for marketing at Canopy (one step removed from the Chief Marketing Officer), also confirms the undisclosed reason for oversupply of extract products absent any data supporting it, and that by February of 2019, at the latest, his boss informed him that defendant Kovacevic internally admitted the same.[217]

---

[214] ¶¶ 71-76.

[215] ¶ 78.

[216] ¶¶ 101-102.

[217] ¶¶ 104-106. Defendants denigrate these employees as "low and mid-level" and ask the court to "ignore[]" them as

Relying on inapposite cases, defendants paint with a broad brush and dismiss the statements of all six former employees as "unsupported personal conclusions."[218] But FE1, no "low-level employee," directly observed a massive cannabis and gelcap stockpile, directly observed undisclosed, material impairments to quality cannabis production, and directly participated in weekly meetings with defendant Kovacevic where oversupply and poor facility conditions were discussed. It is not "unclear" how FE1 learned these facts——he learned them *directly from Kovacevic*.[219] And FE6 was directly told by the Chief Marketing Officer that defendant Kovacevic in early 2019 informed him the

---

"irrelevant." MTD at 39 (*quoting Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517 (D.N.J. 2010)). The nearly ten pages of briefing defendants dedicate to discrediting their own employees——even before further disparagement in their attack on scienter——speaks volumes. MTD at 39-48. "Courts," however, "will not disregard a confidential witness' allegations simply because he or she was a low-level employee. *In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *3 (D. Del. Feb. 7, 2020). This is because "[w]here the complaint adequately describe[s] the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information, *that information will be credited*." *Id.* (quoting *Avaya*, 564 F.3d at 263) (emphasis added).

[218] MTD at 41. Unlike plaintiffs in *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007), plaintiffs here rely on FEs who present facts and direct knowledge not "personal opinions," *id.* at 360, and, unlike that case, plaintiffs do not rely on vague statements about defendants being, *e.g.*, "very autocratic" or "over [their] head[s]" or "playing fast and loose." *Id.* at 360-363.

[219] MTD at 42 (quoting *In re Cancer Genetics, Inc. Sec. Litig.*, 2020 WL 3276740, at *5 (D.N.J. Feb. 26, 2020)).

- 46 -

company was aware of oversupply of oils and gelcaps. So too FE3
and FE4 *directly* observed conditions at two massive, poor-
quality grow facilities as part of their responsibilities,
*directly* witnessed defendants' visits to same, and *directly*
learned——as did FE5 from defendant Kovacevic——that excessive oil
and gelcaps were produced because these facilities could only
produce poor-quality cannabis.[220] The former employees are
adequately described, and their statements support plaintiffs'
falsity allegations.

## C. Plaintiffs' allegations, supported by statements from former employees, give rise to a strong inference of scienter.

Plaintiffs allege facts sufficient to create a "strong
inference" of scienter that is "at least as likely as any
plausible opposing inference."[221] Scienter is a "mental state
embracing intent to deceive, manipulate, or defraud, and
requires a knowing or reckless mind,"[222] that can "be

---

[220] Defendants are mistaken. Plaintiffs, of course, *do* allege
that Canopy's so-called "operational issues" resulted in
overproduction of poor-quality cannabis and then, by necessity,
excessive oil and gelcaps. MTD at 43 ("[n]or do Plaintiffs
allege the...impact of any operational glitches"). And because
defendants affirmatively misrepresented that *actual demand*
justified inflated supply, it could not omit the actual reason
for Canopy's oversupply. Contrary to defendants' argument, MTD
at 44-45, disclosure that some extract products would be
produced at those facilities does not disclose the reason for
*wildly excessive* production of them.

[221] *Tellabs,* 551 U.S. at 308, 328.

[222] *Avaya,* 564 F.3d at 252.

demonstrated by pleading an extreme departure from the standards of ordinary care."[223]

The Supreme Court has cautioned that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'."[224] The scienter inference simply must be as plausible as any competing inference. The allegations here, supported by the statements of former employees, suffice.

Per *Avaya*, "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."[225] At the pleading stage "the case may be a circumstantial one," so long as the allegations sufficiently raise the inference of scienter, as they do here.[226] The scienter inference "may be established...by

---

[223] *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (internal quotation and citation omitted).

[224] *Tellabs*, 551 U.S. at 324.

[225] 564 F.3d at 272-73.

[226] *China Zenix Auto,* 2020 WL 3169506, at *8. Contrary to defendants' argument, Plaintiffs "have not relied upon group pleading in alleging" false and misleading statements challenged here, instead such statements are "attributed to specific [d]efendants, whether they are SOX certifications or on earnings calls" or otherwise. *In re Toronto-Dominion Bank Secs. Litig.*, 2018 WL 6381882, at *14 (D.N.J. Dec. 6, 2018) (denying motion to dismiss).

alleging facts...that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[227]

### 1. Plaintiffs sufficiently allege a strong inference of defendants' conscious misbehavior or recklessness.

Plaintiffs adequately allege that defendants made an "extreme departure from the standards of ordinary care."[228] Defendants touted massive consumer demand while knowingly or recklessly disregarding that the demand did not exist, a fact "either known to the defendant[s] or [ ] so obvious that the actor[s] must have been aware of it."[229]

Plaintiffs allege that defendants toured facilities, saw and commented on the poor-quality cannabis grown there, relied upon internal inventory software that tracked every cannabis plant, produced oils and gelcaps out of necessity, had "no data" to support their inventory levels, and knew they were not scaling their inventory to meet market demand. These allegations are "sufficient circumstantial evidence to suggest" that defendants' misleading statements were "at a minimum, recklessly

---

[227] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (citation and internal quotation omitted). Plaintiffs need not, and do not, plead motive. *Id.*

[228] *Avaya*, 564 F.3d at 267 n.42 (internal citation omitted).

[229] *Id.* Defendants' reliance upon the decision in *Roofer's* is misplaced. MTD at 54 n.38 (quoting *Roofer's Pension Fund,* 2018 WL 3601229, at *20). The matter referenced as "probative" by the court there concerned a long-standing royalty revenue accounting classification question——a far cry from the inventory and impairment questions at issue here.

made" and thereby "recklessly disregard[ed] the risk of misleading the public" regarding demand for its products, the reason(s) for excessive supply and facilities, and the related valuations of its inventory and recognition of revenue.[230]

Defendants' arguments are unpersuasive and misstate the allegations. First, defendants did not "openly and often discuss[]" *publicly* the oversupply of poor-quality cannabis at its facilities; they did so privately.[231] That a few people opined on the quality of some plants defendant Kovacevic photographed *prior to the Class Period* and called "super healthy" hardly means that "[d]efendants public[ly] discussed and acknowledged the...matter" of oversupply of cannabis and poor-quality cannabis in particular.[232] Second, unlike in *PharmaNet*, where "not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by" individual defendants,[233] several FEs here met with, spoke with,

---

[230] *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *63 (D.N.J. Dec. 19, 2019) (finding named defendant "at best, recklessly disregard[ed] the risk of misleading the public" as to company's "ability to meet [] sales projections").

[231] MTD at 50 (misrepresenting SAC ¶ 78).

[232] MTD at 51 (quoting *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 2011 WL 338865, at *26 (S.D. Ind. Jan. 28, 2011)). ¶ 89. Defendants obviously did not intend for those photographs to "disclose" the true conditions at the facilities, which is why they called them "super healthy." *Id.*

[233] MTD at 51 (quoting *PharmaNet*, 720 F. Supp. 2d at 555).

- 50 -

and heard statements from individual defendants regarding oversupply of cannabis products.[234] The law does not require that a confidential witness speak directly with a defendant for her allegations to be accepted as true.[235] It suffices that the FEs were in a position to know the information alleged.

Last, defendants mistakenly argue that plaintiffs merely allege the individual defendants' scienter based upon their respective titles at Canopy.[236] Though "sometimes a Defendant's position...strongly supports a finding of sufficient scienter allegations,"[237] here the allegations attribute specific false and misleading statements to *each* of the individual defendants,

---

[234] *Kid Brands* is not to the contrary. MTD at 53. There a "CEO visited a subsidiary's premises to meet with its President," *Rahman v. Kid Brands, Inc.,* 736 F.3d 237, 245 (3d Cir. 2013), whereas here identified defendants and other executives visited grow facilities and discussed *the very issues* central to the allegations.

[235] *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) ("While a confidential witness's direct contact with the individual defendants makes it more likely that the witness's observations about the alleged misstatements are truthful and credible, a plaintiff is not required to allege specific contact."); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615–16 (S.D.N.Y. 2015) (holding "there is no baseline requirement of such [direct] contact in order to allege" scienter).

[236] MTD at 53–54.

[237] *In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *18 (D.N.J. Nov. 12, 2019).

all in furtherance of the concealment of Canopy's undisclosed oversupply and overcapacity.[238]

Plaintiffs' allegations also satisfy the "core operations" test because defendants are alleged to have made misstatements concerning "core matters" of central importance to the company.[239] The decision in *Kid Brands* is not to the contrary. The allegations in *Kid Brands* addressed a mere $10 million in anticipated liabilities over a five-year period for a company with "hundreds of millions of dollars in annual net sales."[240] It is indisputable that Canopy's core operation and the individual defendants' core responsibilities concerned the sale, inventory, and production of cannabis products. The oversupply and overcapacity at Canopy was a "core matter" of existential concern for defendants. The allegations here are closer to the facts in *Avaya*, where, just as here, the company CEO and CFO were similarly questioned by analysts on the very practices at the core of the company's operation.[241]

---

[238] *E.g.*, defendants Linton (¶ 116); Zekulin (¶¶ 192, 207, 262 278); Lee (¶¶ 266, 275, 295); Saunders (¶¶ 114, 164, 211); Klein (¶¶ 292-293); Kovacevic (¶¶ 191, 237).

[239] *Avaya*, 564 F.3d at 263 (internal citation omitted).

[240] 736 F.3d at 247.

[241] *Avaya*, 564 F.3d at 268. Further Canopy's "knowledge is imputed through principles of *respondeat superior*." *China Zenix Auto*, 2020 WL 3169506, at *9.

- 52 -

### 2. Competing inferences excusing defendants' conduct are less compelling——and certainly not more compelling—— than the strong inference of scienter.

*Tellabs* asks "[h]ow likely is it that one conclusion, as compared to others, follows from the underlying facts?"[242] Put different, "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[243]

Here, plaintiffs' allegations "raise a strong inference that Defendants acted, at the very least, recklessly in choosing to disclose incomplete and misleading information regarding..."[244] its costly overbuild of cannabis supply and production capacity, absent any basis in consumer demand——the purported ground for the buildup. Belated and costly disclosures regarding its oversupply, together with statements by former Canopy employees, create a compelling inference of scienter. Defendants' claim that they "honestly believed" that demand would meet supply (across the many months they *knew* it had not) is no more plausible or reasonable an inference.[245] Here it is less reasonable than the inference of scienter.

---

[242] 551 U.S. at 323.

[243] *Id.* at 326; *China Zenix Auto*, 2020 WL 3169506, at *9 ("the test is "whether the allegations *as a whole* support a strong inference of scienter".)

[244] *Setzer v. Omega Healthcare Investors, Inc.*, 2020 WL 4431902, at *8 (2d Cir. Aug. 3, 2020).

[245] MTD at 55.

Of course, "Plaintiff's guilty inference need not be the most likely one, or even more likely than not,"──but "need only be at least as likely as the competing inferences."[246] The allegations raise the inference of scienter with a degree of likelihood at least equal to the inferences defendants offer.[247]

**D.   Plaintiffs sufficiently plead claims under Section 20(a).**

Plaintiffs sufficiently allege claims against the individual defendants under Section 20(a) of the Exchange Act. Because "liability under Section 20(a) is derivative of an underlying violation of Section 10(b)," and because plaintiffs sufficiently allege claims under Section 10(b), these claims should not be dismissed.[248] Plaintiffs plead defendants' "culpable participation" in the fraud, identify misstatements by them, and "adequately allege[] that the individual defendants

---

[246] *China Zenix Auto*, 2020 WL 3169506, at *10.

[247] And though "[d]efendants also dispute many of the allegations" in the SAC in an effort to undermine scienter (and falsity)──particularly in challenging statements by its former employees──"at the motion to dismiss stage, the Court is obliged to accept all factual allegations in the complaints as true." *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *6 (D.N.J. Jan. 12, 2018) (denying motion to dismiss section 10(b) claims).

[248] *Avaya*, 564 F.3d at 252.

010876-11/1416593 V1

were controlling persons."[249] Accordingly, plaintiffs' Section 20(a) claims should survive challenge.[250]

## IV.   CONCLUSION

For the reasons argued, defendants' motion should be denied. If granted, plaintiffs request leave to amend, as contemplated by Fed. R. Civ. P. 15(a)(2), following the Court's first consideration of plaintiffs' allegations.[251]

Dated: January 7, 2021          Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Steve W. Berman*
   Steve W. Berman
Shayne C. Stevenson
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
Email: steve@hbsslaw.com
shaynes@hbsslaw.com

and

Reed R. Kathrein
Lucas E. Gilmore
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: reed@hbsslaw.com
lucasg@hbsslaw.com

---

[249] *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *19 (D.N.J. Mar. 21, 2019) (internal citation omitted).

[250] *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013).

[251] *In re Campbell Soup Co. Secs. Litig.*, 2020 WL 7022655, at *12 (D.N.J. Nov. 30, 2020).

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
    Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Dresher, PA 19046
Tel: (215) 600-2817
Fax: (973) 833-0399
Email: jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

**POMERANTZ LLP**

By: */s/ Brian Calandra*
    Brian Calandra
Jeremy Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
bcalandra@pomlaw.com

and

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2021, I electronically filed the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

*/s/ Laurence M. Rosen*

Laurence M. Rosen, Esq.

010876-11/1416593 V1