## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **EDUARDO ORTIZ**, *individually and on behalf of all others similarly situated*, et al.,<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**CANOPY GROWTH CORPORATION, BRUCE LINTON, MARK ZEKULIN, MIKE LEE, TIM SAUNDERS, DAVID KLEIN and RADE KOVACEVIC,**<br><br>**Defendants.** | No. 2:19-cv-20543-KM-ESK<br><br>**AMENDED OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs bring a putative securities class action against Canopy Growth Corporation ("Canopy"), the largest cannabis company in Canada, and against numerous individuals who served or are currently serving in high-ranking positions with that company. Plaintiffs allege that Canopy failed to timely disclose numerous facts, and that as a result the company's stock price was artificially inflated. Ultimately, plaintiffs claim, the truth came out and Canopy's stock price fell precipitously.

Now before the Court is defendants' motion to dismiss the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Defendants argue that plaintiffs have failed to plead scienter or any false or misleading statements. For the reasons stated below, the defendants' motion to dismiss the complaint is GRANTED. Plaintiffs, however, will be permitted the opportunity to amend the complaint.

1

I.    **BACKGROUND**[1]

   **A. Plaintiffs**

Plaintiffs are a class of all persons and entities who purchased or otherwise acquired publicly traded Canopy securities sold on the New York Stock Exchange ("NYSE") between June 27, 2018 and May 28, 2020, inclusive. (DE 65, Second Amended Complaint ("SAC") ¶¶ 1, 26–27.) They bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. (*Id.*; 15 U.S.C. 78j(b); 15 U.S.C. § 78t(a).)

   **B. Canopy**

Defendant Canopy is a Canadian corporation with its principal executive offices in Ontario, Canada. (SAC ¶ 28.) The company describes itself as a world-leading, multi-brand cannabis company, offering varieties in dry flower, oil, and gelcap forms. (*Id.* ¶ 43.) It has been listed on the NYSE since May 24, 2018 and the Toronto Stock Exchange since April 4, 2014. (*Id.* ¶ 28.) The company first sold cannabis oils in 2016 and began selling cannabis in gelcap form in 2017. (*Id.* ¶ 43.)

Defendant Bruce Linton founded Canopy. He served as its CEO until June 2018, and as co-CEO until July 2, 2019. (*Id.* ¶ 29.) On July 3, 2019, he was fired. (*Id.* ¶ 29.) Defendant Mark Zekulin served as Canopy's President and co-CEO from June 27, 2018 to July 3, 2019 and as CEO from July 2, 2019 to January 13, 2020. (*Id.*) At that point, defendant David Klein took over as President and CEO, though defendant Zekulin remained at the company as a strategic adviser until June 30, 2020. (*Id.* ¶¶ 30–31.) Defendant Tim Saunders served as CFO until June 1, 2019, after which that role was taken over by defendant Mike Lee. (*Id.* ¶¶ 32–33.) Defendant Rade Kovacevic joined Canopy in 2016 and served in a variety of Vice President-level roles before becoming the

---

[1]    For the purposes of this motion to dismiss, I assume all facts alleged in the complaint are true and draw all reasonable inference in plaintiffs' favor. *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

company's president in July 2019 and Chief Product Officer in June 2020. (*Id.* ¶ 34.)

### C. Canada Legalizes Cannabis Use in Canada

On June 18, 2018, the Canadian Federal Government passed a bill legalizing recreational marijuana use in Canada. (*Id.* at ¶ 45.)[2] The bill permitted legal recreational sales of certain cannabis products, including dry flower, oils, and gelcap products, starting October 17, 2018. (*Id.*) Regulation of recreational sales, however, was left to Canada's provinces. (*Id.* ¶ 46.)

Several Canadian provinces, including the most populous, Ontario,[3] initially opted to permit recreational cannabis sales solely through government-operated retail stores, and committed only to opening 40 such stores, or approximately one store for every 358,000 people. (*Id.* ¶¶ 48, 50.) Though Ontario eventually announced in August 2018 that it would permit private retail stores, it stated that no such stores would open prior to April 1, 2019. (*Id.* ¶ 52.) Canopy noted that those provinces' slow move towards retail would delay its sales growth; in disclosures prior to the Class Period, Canopy anticipated that it would take two years or longer to develop a full network of retail cannabis stores capable of satisfying consumer demand. (*Id.* ¶ 47.) Indeed, when the recreational market opened on October 17, 2018, there were only 18 Canopy-operated stores in all of Canada, and none in Ontario. (*Id.* ¶ 51.)

### D. Canopy Increases its Cannabis Production Capacity

On February 16, 2018, the Canadian government granted a license for a joint venture in which Canopy had a majority stake. (*Id.* ¶ 59.) The license permitted 840,000 square feet of growing space for cannabis plants in Aldergrove, British Columbia, which could spread into 1.3 million square feet

---

[2] Medical marijuana had been permitted for some uses in Canada since 2001; Canopy has for some time been selling marijuana in that market via business-to-consumer mail order sales. (*Id.* ¶ 44.)

[3] Ontario comprises 37% of Canada's population. (*Id.* ¶ 8.)

for flowering and harvesting. (*Id.*) On April 13, 2018, the government granted the joint venture an additional 900,000 square feet for growing cannabis plants in Delta, British Columbia, to spread into 1.7 million square feet for flowing and harvesting. (*Id.*) In a February 16, 2018 press release, defendant Zekulin stated that the site would position the company "to continue this trend as Canada's, and indeed the world's largest, most reliable and most diversified producer and seller of high quality regulated cannabis." (*Id.* ¶ 60.)

According to former employees FE3 and FE4,[4] instead of purchasing and outfitting new greenhouses to grow cannabis in Aldergrove and Delta, Canopy opted to retrofit old, existing greenhouses which had been used to grow peppers. (*Id.* ¶ 73.) Those greenhouses lacked the necessary lighting, humidifiers, and watering capabilities needed to produce high-quality cannabis. (*Id.*) FE1 stated that those problems led to seeds mixed with flowers, lower yield, and low-quality, immature buds. (*Id.* ¶ 82.) FE4 confirms that the absence of light in the facilities caused immature cannabis. (*Id.* ¶ 81.) FE3 and FE4 both further noted that the humidity problems in the facilities caused "bud rot" and "grey mold." (*Id.* ¶ 83.) FE3 states that Canopy never solved the lighting problems in those facilities. (*Id.* ¶ 81.)

Cannabis is graded according to quality. "Bud"-grade cannabis, which is the highest grade, can be sold in its dry flower form. (*Id.* ¶¶ 74–75.) Any grade lower than "bud"-grade cannot be used in dry flower form but can nevertheless be used for extraction, in which the active ingredients are extracted from the

---

[4] Plaintiffs plead a portion of their case through confidential informants. I will refer to those informants throughout this opinion as "FE" ("former employee") and the number assigned to them in Plaintiffs' complaint. FE3 was a compliance officer based in Canopy's Aldergrove facility who worked in the Delta facility as well. (*Id.* ¶ 71.) FE3 trained employees in standard operating procedures, audited the amount of cannabis plants and dried cannabis stock, and produced inventory reports. (*Id.*) FE3 reported to other employees in quality assurance but did not directly work with the individual defendants. (*Id.*) FE4 was manager of finance operations for Canopy's western region, which included Aldergrove and Delta, and at a time served as operations manager for the Aldergrove facility. (*Id.* ¶ 72.) FE4 reported to the general manager of the Aldergrove facility. (*Id.*)

plant and reduced to oil or gelcap form. Canopy's Aldergrove and Delta facilities did not grow "bud" quality cannabis, but rather only C or C-minus grade cannabis, which could only be used to produce extracts like oil or gelcap products. (SAC ¶ 75.) FEs 1, 3, and 4 attribute the failure to grow "bud" quality cannabis to the lighting, humidity, and watering problems they identified at the facilities. (*Id.* ¶¶ 77, 80–83.) Plaintiffs claim that because Canopy's facilities were only capable of producing extracts, the company produced an oversupply of extract products like oils and gelcaps. (*Id.* ¶ 79.) According to FE4, Aldergrove and Delta produced such a large quantity of extract products only because the greenhouses were not suitable for growing anything else. (*Id.* ¶¶ 79–80.)

According to FE3, the low quality of the plants at these facilities was openly and often discussed, including by several company vice presidents and regional general managers. (*Id.* ¶ 78.) FE3 claims that Canopy senior executives, including defendant Linton, visited the sites regularly in 2018 and 2019 and knew about the low quality of the plants. (*Id.* ¶¶ 85–86.) FE3 recalled a particular occasion in which defendant Linton asked employees direct and detailed questions and the employees answered honestly regarding lighting issues and other causes of low-grade cannabis production. (*Id.* ¶ 86.) Linton specifically asked the master grower why the plants were so small and the master grower cited lighting problems. (*Id.* ¶ 87.)

Defendant Kovacevic posted on Twitter that he had visited the Aldergrove facility, where he found that Canopy's "vegging plants [were] looking super healthy!" (*Id.* ¶ 89.) He attached pictures of cannabis plants to his post, but, according to FE3, the plant photos were actually of plants from the Delta facility. (*Id.*) FE1[5] states that Canopy's executives knew about the production challenges faced at the Aldergrove and Delta facilities, and recalls weekly

---

[5] FE1 was lead director of genetic research at Canopy from December 2018 through January 2020. (SAC ¶ 65.)

meetings attended by defendant Kovacevic in which the attendees mocked the poor conditions of the growing facilities and low-quality product. (*Id.* ¶ 88.)

FE1 explains that his supervisor, Jim Brandle, told FE1 that he personally conveyed to defendant Linton the problems in Canopy's greenhouses. (*Id.* ¶ 95.) FE1 claims that Linton knew about the problems with the greenhouses even before speaking with Bundle, because, according to FE1, the company had been budgeting to fix those problems. (*Id.* ¶ 96.) Brandle told FE1 that he told Kovacevic about the problems with the low quality of the cannabis in every interaction he had with Kovacevic. (*Id.* ¶ 97.)

As 2020 began, Canopy held 115 metric tons of unsold cannabis inventory, nearly double the 68 metric tons it had sold since Canada legalized recreational marijuana. (*Id.* ¶ 16.) According to FE1, cannabis products expire one year from the date of production. (*Id.* ¶¶ 66–67.)

### E. Canopy's Market Predictions

Canopy repeatedly told investors that it anticipated the cannabis market would grow, and that its inventory was matched to its expectations of market demand. (*See, e.g., id.* ¶ 147 (June 27, 2018 press release attached to Canopy's 6-K[6] which stated that "[i]nventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.").) The company explained that its goal was to "position itself as an early leader in terms of cannabis and cannabis oil production." (DE 67-14, Ex. L to Motion to Dismiss (June 2018 6-K at 4–5).[7]) It warned, however, that it had to "rely largely on [its] own market

---

[6] A 6-K form is used by foreign issuers of securities to inform investors of certain information. Because foreign issuers are not required to submit Forms 10-Q or 8-K, this is often the only information furnished by foreign private securities issuers between annual reports. SEC Form 6-K, Investopedia https://www.investopedia.com/terms/s/sec-form-6k.asp.

[7] The Court may, on a motion to dismiss, "consider 'document[s] integral to or explicitly relied upon in the complaint,'" *In re Asbestos Products Liability Litig.*, 822 F.3d 125, 134 n.7 (3d Cir. 2016) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)), such as the financial disclosures and call transcripts attached to Canopy's motion to dismiss, *see In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272,

research and market demand which may not materialize" and cautioned that "trends in the adult-use cannabis market can only be forecast ahead of its anticipated legalization in the summer of 2018." (DE 67-6, Ex. D to Motion to Dismiss, (June 2018 AIF[8] at 34).)

The company also warned that there could be no guarantee that the provinces would legalize cannabis on the timescale that the company hoped. (*See id.* (June 2018 AIF at 35) (noting that regulation was left to the provinces and that there was "no guarantee" that "terms announced by such provinces . . . will create the growth opportunities that we currently anticipate.").) Indeed, many provinces were slow to roll out retail stores: Ontario, for instance, delayed private retail store openings until April 1, 2019, and initially committed to issuing only 40 retail licenses, to be awarded via random lottery. (DE 67-11, Ex. I to Motion to Dismiss, (Nov. 2018 Earnings Call Tr. at 6).) By June 2019, Canopy had opened only 23 stores in all of Canada. (SAC ¶ 57.) The company remained "upbeat," however, stating that it believed the retail channel was "growing" (DE 67-16, Ex. N to Motion to Dismiss (June 2019 Earnings Call Tr. at 13)), and that provinces like Ontario were "looking for supply to come on to meet demand across the product mix . . .," (DE 67-15, Ex. M to Motion to Dismiss (Aug. 2019 Earnings Call. Tr. at 27).)

Plaintiffs claim, however, that internally the company did not believe its own statements about expected demand. FE5,[9] who worked closely with

---

285 (3d Cir. 2010) ("What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.") (quoting *Burlington Coat Factory*, 114 F.3d at 1426).

[8] An Annual Information Form, or "AIF," is a document which is filed annually and which contains comprehensive business and financial information about an issuer. Annual Information Form (AIF), Westlaw Practical Law, Glossary https://ca.practicallaw.thomsonreuters.com/0-570-.0162?transitionType=Default&contextData=(sc.Default)&firstPage=true.

[9] FE5 was a brand manager for Canopy's premium brands from 2016 to 2019 in Ontario. (*Id.* ¶ 101.)

defendants Kovacevic and Linton, claims that Canopy had "no data at all" to predict the cannabis market or what products would be popular with consumers. (*Id.* ¶¶ 101–02.) FE5 explains that because the quality of Canopy's cannabis declined, the company invested heavily in producing oils and gelcaps and flooded the market with those products. (*Id.*) FE6[10] confirms this assertion, explaining that the decision to overproduce oils and gelcaps was not rooted in market expectations and that Canopy had no research indicating consumers were interested in such products. (*Id.* ¶¶ 104–05.) According to FE6, the reason for overproduction was that cannabis harvests had been low quality. (*Id.* ¶ 105.) FE4 states that the Aldergrove and Delta facilities were intended to serve as a major source of "bud" grade cannabis but in fact did not produce any "bud" grade cannabis at all. (*Id.* ¶¶ 73–76.) FE6 states that overproduction was not due to anticipated consumer demand. (*Id.* ¶ 105.) In February 2019, Chief Marketing Officer Bigioni told FE6 that defendant Kovacevic had told Bigioni that Canopy had produced far more oils and softgels than it could sell. (*Id.* ¶ 106.)

Additionally, plaintiffs claim that defendants either saw or had access to their inventory records and overproduction of cannabis. According to FE2,[11] Canopy kept scrupulous records for tracking inventory and valuation and had real-time inventory tracking which separately evaluated the company's extract products. (*Id.* ¶ 70.)

### F. Canopy's Statements to Investors

Over the course of the Class Period, Canopy made numerous statements in filings with the SEC, press releases, and earnings calls with investors. In numerous press releases between June and November of 2018, the company stated some variation of the following: "inventories are continuing to be scaled

---

[10] FE6 was a Toronto-based brand manager and senior brand manager at Canopy from June 2018 through December 2019. (*Id.* ¶ 104.)

[11] FE2 was a cost accountant and finance operations controller responsible for manufacturing accounting for Canopy's Canadian operations. (SAC ¶ 69.)

to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018." (*See, e.g.*, *id.* ¶ 109 (June 27, 2018 press release accompanying financial results for fourth quarter of fiscal year 2019); *id.* ¶ 111 (June 28, 2018 (2018 Form 40-F[12]); *id.* ¶ 113 (MD&A[13] attached to August 15, 2018 Q1 2019 report); *id.* ¶ 114 (November 14, 2018 earning conference call reporting second quarter 2018 financial results).)

On February 15, 2019, Canopy filed its quarterly report and associated MD&A for the period ending December 31, 2018. (*Id.* ¶ 115.) In the MD&A, Canopy noted that it had sustained growth in its "deep inventory levels" over the past three months but stated that such buildup was necessary due to "management['s] belie[f]" that all of the inventory "is required to meet expected market demands, including the legalized recreational market." (*Id.*) During an earning conference call on that same day, defendant Linton told investors that "this is not a stockpiling exercise at all, and we're constantly looking at as the provinces are turning up more stores, we need to fill that warehouse." (*Id.* ¶ 116.)

Over the same period, Canopy's cannabis inventory increased significantly. On March 31, 2018, the company's inventory was valued at $101,607,000; by December 31, 2019, that amount grew to $622,575,000. (*Id.* ¶ 121.) Plaintiffs note that Canopy initially broke down the value of its inventory by dry cannabis, oils, and gelcaps, but for the first time, in its February 15, 2019 Q2 2019 report, Canopy only published the total value of inventory. (*Id.* ¶ 127.)

---

[12] The Form 40-F is an annual filing required of companies domiciled in Canada but which have securities registered in the United States. It is the rough equivalent of the Form 10-K, which is required of U.S.-based companies. SEC Form 40-F, Investopedia https://www.investopedia.com/terms/s/sec-form-40-f.asp.

[13] An MD&A is a "Management's Discussion and Analysis," a section of a public company's annual or quarterly reports which address the company's performance. Management Discussion and Analysis – MD&A, Investopedia, https://www.investopedia.com/terms/m/mdanalysis.asp.

### G. Partial Disclosures

On August 14, 2019, Canopy announced that it would be recording an $8 million revenue reversal charge against anticipated returns of oils and gelcaps. (*Id.* ¶ 128.) It explained that the return provision "reflects [its] assessment of the overall inventory levels versus rate of sale . . . [a]nd the precautionary step to account for that now because we think . . . [i]t has a probability coming in the future." (DE 67-15, Ex. M. to Motion to Dismiss, (Aug. 2019 Earnings Call Tr. at 24).) In an accompanying press release, Canopy stated that, after an evaluation of its falling sales of oils and gelcaps, "we believe that the risk of an over-supply of certain oil and softgel formats may exist in certain markets due, in part, to incomplete retail platforms in most provinces." (SAC ¶ 271.)

Canopy informed investors during an August 15, 2019 earnings call that its supply agreements with retailers in the provinces "allow for returns at any point in the future." (*Id.* ¶ 137.) This was the first time investors were ever informed of that fact. (*Id.* ¶ 276.) Investors asked the company why oil and gelcaps sales for the quarter were "essentially zero," and whether the $8 million charge for returns would be a "one-time event or is that something we could expect to have coming in future quarters." (*Id.* ¶ 9, 275.) Defendant Lee responded that "this is something that I wouldn't expect to move the P&L in the future." (*Id.* ¶ 275.) Defendant Kovacevic similarly assured another analyst that the returns were not "a cause [for] concern going forward." (*Id.* ¶ 277.) Analysts further noted that gelcaps and oils sales had "went essentially to zero" as opposed to "30 million or 35 million last quarter," and asked whether "there [were] any issues with production in getting those types of products out the door." Defendant Zekulin responded, "No it is not related to our production flow here, simply related to the product mix that we see demand for and ensuring that we allocate product appropriately to that mix." (*Id.* ¶ 278.) The analyst asked a follow-up question, inquiring why the company anticipated sales margins to return to prior levels "when those levels of gelcaps and oils were

10

probably too high to begin with"; defendant Zekulin responded that while "there actually have been returns, [that] provision reflects our assessment of the overall inventory levels versus rate of sale and precautionary step to account for that" and that "oils and softgels were always going to be a smaller part of that mix." (*Id.*)

On November 14, 2019, Canopy disclosed that it had recorded a restructuring charge of over $32 million for returns and price concessions for oils and gelcaps. That charge included price reductions and returns for discontinued or slow-moving product, as well as a $16 million write-off of excess or obsolete on-hand inventories. (*Id.* ¶¶ 11, 282; DE 67-7, Ex. E to Motion to Dismiss, (Nov. 2019 Earnings Call Tr. at 7–8).) The company explained that in its second quarter it "continued to see a disconnect between inventory levels and the rate of sale for certain products in the market." (DE 67-7, Ex. E to Motion to Dismiss (Nov. 2019 Earnings Call Tr. at 7).) As a result, it "modified [its] retail pricing architecture and [its] package assortment" and, "following the shift in this strategy, [it] reviewed all remaining inventories for both product on hand as well as product in the provinces." (*Id.*) The revenue reductions and inventory write-offs left the largest provinces with less than $2 million in inventory of oils and gelcaps and Canopy itself with less than $10 million in oils and gelcaps inventory, which, the company told investors, meant "this issue is fully behind us." (*Id* at 8.)

In an accompanying press release, defendant Zekulin was quoted as stating that the company "took the necessary steps to address inventory levels on our oils and softgels." (SAC ¶ 283.) In an accompanying MD&A, the company explained that "the risk of over-supply of certain oil and softgel formats existed in certain markets due, in part, to underdeveloped retail markets in several provinces," and stated that it had taken steps, including customer education and pricing approaches, in order to "lead to an appreciable reduction in provincial and territorial inventories," in addition to the acknowledged oversupplies which it incorporated in the restructuring charge.

11

(*Id.* ¶ 284.) The company explained that "overall demand for oils and softgels in the recreational cannabis market has not met our initial understandings and expectations at the time of launch," so "a risk exists that a portion of our inventory of certain recreational oil and softgel products may not be sold within a reasonable timeframe." (*Id.*) Defendant Zekulin stated that the Ontario government's "inability . . . to license retail stores . . . has resulted in half of the expected market in Canada simply not existing" which he noted had created "meaningful short-term problems." (DE 67-7, Ex. E to Motion to Dismiss (Nov. 2019 Earnings Call Tr. at 4).) He noted that "Ontario has made a commitment to move toward an open allocation of retail licenses" but stated that "cannot come soon enough . . . . until this happens, the cannabis sector cannot reach its full sales potential." (*Id.* at 5.)

During a question-and-answer period with analysts, defendant Kovacevic explained that "last year at the rollout of legalization, we had little to no data. We are looking at what U.S. markets had done but we had nothing within the Canadian regulatory context for recreational legalization while making production decisions." (SAC ¶ 288.) He further explained that "the big change that we've had over the last 12 months is we now have data . . . . we're seeing what is selling through the customers so that we could change our product portfolio and our mix . . . ." (*Id.*)

Three months later, during an earnings conference call on February 20, 2020, defendant Klein informed investors that Canopy was engaging in a "thorough strategic review of [its] footprint" in order to "align [its] resources and investments with the size and growth rate of the market as it exists today. We've begun taking steps designed to bring our inventory in balance with our supply demand understand." (*Id.* ¶¶ 13, 292.) Defendant Lee stated that the "balance of our inventory is really our bud inventory [(dry flower cannabis)] and we feel very good that we're balanced on high THC bud. We feel very good that we're balanced on low THC, high CBD bud. The mainstream bud which is the balance is what we call it. We're a little longer than what we'd like to be today.

12

And that's the piece that were continuing to work through." (*Id.* ¶ 246.) Defendant Lee stated during the same call that the company had "take[n] down some capacity at our Delta facility and British Columbia is one of our first steps to help bring supply and demand into balance." (*Id.* ¶ 266.)

Then, on March 4, 2020, defendant Klein announced that the company would record pre-tax charges between $700–800 million for its fourth quarter 2020 and full year 2020 results. (*Id.* ¶ 14.) Canopy announced it was closing the Aldergrove and Delta facilities, which constituted approximately 40% of its production space, and firing 500 employees. (*Id.* ¶¶ 14, 297.)

On May 29, 2020, Canopy announced its financial results for the full year and fourth quarter of fiscal year 2020, in which it recorded impairment and restructuring charges totaling $743 million. (*Id.* ¶ 17.) The company impaired $563 million in assets, primarily related to properties, plants, and equipment the company used for cultivation. (*Id.*) It also impaired $132 million in inventory via write-offs—primarily from cannabis which was going to be thrown away. (*Id.*)

On an earnings call in connection with the May 29, 2020 announcement, defendant Klein explained that "there's no denying that we overbuilt our facilities, and that while the 'dramatic[]' increase in inventory and facilities 'was a great talking point,' it 'came with great consequences.'" (*Id.* ¶ 18.)

The August 14, 2019, November 14, 2019, March 4, 2020, and May 29, 2020 disclosures all resulted in significant drops in Canopy's share price. (*Id.* ¶ 21.)

### H. Alleged False and Misleading Statements

Plaintiffs allege a number of false and misleading statements made by Canopy.

### 1. Oils and Gelcaps Inventory

Plaintiffs allege Canopy made a number of misleading statements regarding its oil and gelcaps inventory. Specifically, they cite a statement in

Canopy's June 27, 2018 press release accompanying a 6-K which stated that
"[i]nventories are continuing to be scaled to meet management's expectation of
market demands, including the legalized recreational market expected later in
calendar 2018." (*Id.* ¶ 147.) This statement, or closely similar variations of it,
was repeated in press releases issued on August 15, 2018 and November 14,
2018, accompanying Canopy's filed 6-Ks issued on the same date (*id.* ¶¶ 153,
160), as well as in MD&As filed on August 15, 2018, November 15, 2018, and
February 15, 2019. (*Id.* ¶¶ 154, 161, 170.) It was also repeated in statements
by defendant Saunders during scripted remarks on a November 14, 2018 call,
(*Id.* ¶ 162.)

During that same November 14, 2018 call, defendant Saunders stated in
scripted remarks that

> Management continues to believe that significant demand will
> develop for cannabis oil and in particular soft gels in the
> recreational market. As such, the company continues to increase
> inventories at extract grade dry cannabis, held for conversion, and
> increased the quantity of cannabis oil and soft gel caps that we
> have on hand.

(*Id.* ¶ 164.)

Canopy also filed a 2018 Annual Information Form ("AIF") with the SEC
on June 28, 2018 as an exhibit to its 2018 40-F Form, which contained a
section entitled "Risk Factors." (*Id.* ¶ 149.) That section did not contain any
reference to Canopy's oil and gelcap inventory buildup. (*Id.*) A later AIF filed on
June 26, 2019 contained the same section and did not mention any basis for
caution regarding inventory buildup. (*Id.* ¶ 180.)[14] "Risks and Uncertainties"
sections of MD&As filed on August 15, 2018, November 15, 2018, February 15,
2019, and August 14, 2019 similarly disclosed no risk factors concerning

---

[14] These AIFs were audited by Deloitte in 2018 and KPMG in 2019. (DE 67 at 5; *see,*
*e.g.,* DE 67-10, Ex. H to Motion to Dismiss (2019 Form 40-F at 1).)

14

inventory buildup in general or inventory buildup of gelcaps and oils specifically. (*Id.* ¶¶ 156, 166, 172, 188.)

On June 28, 2018, Canopy also filed with the SEC its consolidated financial statements for the years ended March 31, 2018 and 2017, which contained valuations of Canopy's inventory assets. (*Id.* ¶ 151.) Canopy valued its inventory as $101,607,000, consisting of $30,198,000 in Cannabis Oils, $2,768 in capsules, and $65,423,000 in inventory of Dry Cannabis. (*Id.*) Subsequent Consolidated Financial Statements filed with the SEC on August 15, 2018, November 15, 2018, February 15, 2019, June 26, 2019, and August 14, 2019 similarly represented Canopy's inventory assets without impairing its inventory value for oil or gelcap inventory excess. (*Id.* ¶ 158, 168, 174, 182, 186.) On February 15, 2019, Canopy recorded $83,048,000 in net revenue for the three months ended December 31, 2018 and $132,291,000 for the nine months ended December 31, 2018 without reserving revenue for returns or price concessions. (*Id.* ¶ 176.)

On the August 15, 2019 earnings call which accompanied Canopy's disclosure of the $8 million in returns of oils and gelcaps, Defendants were asked whether the returns were likely to be repeated in future quarters. (*Id.* ¶ 190.) Defendant Lee replied that "this is something I wouldn't expect to move the P&L in the future." (*Id.*) Defendant Kovacevic assured investors that the returns were not "a cause [for] concern going forward." (*Id.* ¶ 191.) Defendant Zekulin stated that the returns were "not related to our production flow here, simply related to the product mix that we see demand for." (*Id.* ¶ 192.)

### 2. Dry Flower Inventory Statements

Plaintiffs allege that defendants made false statements regarding their dry flower inventory as well. Many of these allegedly false statements are the same statements that were referenced in connection with the gel caps and oils above. (*See id.* ¶¶ 194, 200, 209 (6-K press releases); *id.* ¶¶ 196, 223 (AIF risk factor statements); *id.* ¶¶ 198, 205, 215, 221, 225, 227, 233 (valuation of inventory in consolidated financial statements); *id.* ¶¶ 201, 203, 210, 213, 217,

219, 229, 235, 242 (MD&A risk factor statements), *id.* ¶¶ 231–32 (Kovacevic and Zekulin comments regarding $8 million charge).) Essentially, plaintiffs fault Canopy for falsely stating that its inventory was scaled to expected market demand, failing to disclose that its inventory was a material risk, and for giving a valuation of its inventory without impairing it for obsolescence or expiration.

On the August 15, 2019 call, after the $8 million revenue reversal was announced, an analyst asked how confident Canopy executives were that they would not experience returns on their flower products as they had on oils and gelcaps. (*Id.* ¶ 207.) Defendant Zekulin responded that the Canopy was "very confident. I think part of our effort to push product out early and obtaining market share, wasn't strictly for the purpose of obtaining market share." (*Id.*) He went on to explain that he believed the customer loyalty the company developed through that initial push would help the company to continue to hold its market share. (*Id.*)

On a November 14, 2019 earnings call, an analyst asked whether Canopy would "have to start to write off inventory anyway" in reference to dry cannabis. (*Id.* ¶ 237.) Defendant Kovacevic denied that dry cannabis write-offs would be necessary, identifying "4 to 5 months inventory as the ideal length of period for dry flower to make sure we have continuity of availability" and stating that "we feel very happy with our inventory level today and that they're setting us up for success." (*Id.*) Another analyst asked if the company would have to "slow down your production? Do you have to shut down some facilities?" if Ontario did not permit stores to open quickly; defendant Zekulin responded "[w]e're waiting for stores, we cannot—to your point, if Ontario doesn't open stores for *another year*, we all have a problem. I don't think we can wait, you try to look that, but there is no reason to expect that will happen." (*Id.* ¶ 238.)

On February 14, 2020 Canopy's consolidated financial statements listed inventory assets valued at $622,575,000 as of June 30, 2019, compared to $262,105,000 as of March 31, 2019. (*Id.* ¶ 240.) That included $472,215,000 of

16

"work-in-progress" inventory. (*Id.*) Canopy's inventory valuation was roughly equal to that of nearly five of its main competitors combined. (*Id.*)

In its February 14, 2020 MD&A, Canopy stated that while it had recorded charges from excess inventory in the amount of $17 million and had made an $8 million revenue adjustment due to returns, "[t]hese charges did not recur to the same extent in the third quarter of fiscal 2020." (*Id.* ¶ 244.) Defendant Lee also stated that the company was "balanced" with respect to its dry flower inventory while acknowledged that it was "a little longer than what we'd like to be today." (*Id.* ¶ 246.)

### 3. Production Facilities

Plaintiffs also allege that Canopy made false and misleading statements regarding its production facilities. In the "Risk Factors" section of Canopy's 2018 AIF filed on June 28, 2018, the company did not disclose any risks associated with its expansion of its grow facilities, instead merely advising investors as follows:

> The Company's growth strategy contemplates outfitting its facilities with additional production resources. A variety of factors could cause these activities to not be achieved on time, on budget, or at all. As a result, there is a risk that the Company may not have product or sufficient product available to meet the anticipated demand or to meet future demand when it arrives.

(*Id.* ¶ 248.) The 2019 AIF filed on June 26, 2019 similarly did not disclose any risk factors relating to the company's expansion of its production facilities, but instead focused its discussion of risk factors solely on potential breaches of security. (*Id.* ¶ 258.) The August 15, 2018, November 15, 2018, February 15, 2019, August 14, 2019, and February 14, 2020 MD&A "Risk Factors" section similarly did not contain any caution regarding Canopy's expansion of its grow facilities. (*Id.* ¶¶ 250, 252, 254, 260, 264.)

During the February 15, 2019 call, Defendant Linton explained that the expansion of the company's grow facilities was "not a stockpiling exercise at all,

and we're constantly looking at as the provinces are turning up more stores, we need to fill that warehouse." (*Id.* ¶ 256.) Defendant Zekulin responded to an analyst's question on the November 14, 2019 earnings call asking if the company would have to "slow down your production" or "shut down some facilities" if stores in Ontario did not open more quickly by stating that the company would struggle if Ontario did not open stores for another year. (*Id.* ¶ 262.)

During the February 14, 2020 call, Defendant Lee explained that the company had reduced capacity at the Delta facility as "one of our first steps to help bring supply and demand into balance." (*Id.* ¶ 266.) During the same call, defendant Lee was asked whether the company would be required to "shut[] down some production capacity" and "what that could mean to near-term margins even if positive for the long-term." (*Id.* ¶ 268.) Defendant Lee replied that "shutting down facilities is really hard. So, we need to be very thoughtful about it, very mindful about it, and we're taking a strategic approach to say, 'Look, we want to make sure that we're designing our supply chain and our footprint for not just the realities of today, but the realities of the next year, two years, three years, as the size of the market develops, but also as the various categories of the market develops, and we know that the value category is here to stay.'" (*Id.*)

## I. Procedural History

Plaintiffs initiated this action via a complaint filed on November 20, 2019. (DE 1.) I appointed Sultan Group and Pendola and Lurie as lead plaintiff on February 10, 2020, pursuant to a stipulation among the plaintiffs. (DE 27.)

Plaintiffs requested leave to file an amended complaint on April 14, 2020, which I granted. (DE 49.) Plaintiffs filed that First Amended Complaint on June 4, 2020. (DE 52.)

Defendants filed their first motion to dismiss on August 4, 2020. (DE 55.) That motion to dismiss was rendered moot by a plaintiffs' filing of a Second

Amended Complaint on October 9, 2020 (DE 65), with leave of Magistrate
Judge Kiel (DE 66.).

Defendants filed the now-operative motion to dismiss on November 23,
2020 (DE 67); plaintiffs filed their opposition on January 7, 2021 (DE 68); and
defendants filed a reply brief on February 8, 2021 (DE 71.)

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a
complaint, in whole or in part, if it fails to state a claim upon which relief can
be granted. The moving party bears the burden of showing that no claim has
been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In
deciding a motion to dismiss under Rule 12(b)(6), a court must take all
allegations in the complaint as true and view them in the light most favorable
to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Phillips v. County
of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

To state a claim for securities fraud under Section 10(b) of the Exchange
Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or
omission; (2) scienter; (3) a connection between the misrepresentation or
omission and the purchase or sale of a security; (4) reliance upon the
misrepresentation or omission; (5) economic loss; and (6) loss causation. *City of
Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

A plaintiff asserting securities-fraud claims pursuant to Section 10(b) of
the Securities Exchange Act and Rule 10b-5 must meet the heightened
pleading standard as set forth in the Private Securities Litigation Reform Act of
1995 ("PSLRA"). 15 U.S.C. § 78u-4(b). Under the PSLRA, a complaint alleging a
false or misleading statement must: "(1) 'specify each statement alleged to have
been misleading [and] the reason or reasons why the statement is misleading,'
15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a
strong inference that the defendant acted with the required state of mind,' *Id.*
§ 78u-4(b)(2)." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013)
(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007))

(internal quotations omitted). The required state of mind is "scienter," which is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

That PSLRA "particularity" standard has elements in common with the pleading requirements for fraud set forth in Federal Rule of Civil Procedure 9(b). *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b), however, is both subsumed and supplemented by the requirements of Section 78u-4(b)(1) of the PSLRA. *Id.* (citing *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008)). Like Rule 9(b), the PSLRA requires that a plaintiff plead the "who, what, when, where and how." *Id.* Section 78u-4(b)(1) adds a specialized requirement, however, where "an allegation regarding [a defendant's] statement or omission is made on information or belief." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1). In such a case, plaintiff must "state with particularity all facts on which that belief is formed"; that is, the complaint must "describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey." *Id.*

The PSLRA also exceeds the requirements for pleading scienter contained in Rule 9(b), which permits such mental states to be alleged generally. *Id.* As interpreted by the Supreme Court, PSLRA's particularity requirement requires that the facts pled give rise to a "strong inference" of scienter. A court considering a motion to dismiss for failure to plead scienter must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). A "strong inference" of scienter must thus be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also id.* at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even

20

the most plausible of competing inferences." *Id.* at 324 (internal quotation marks omitted)). The pertinent question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23; *see also id.* at 325 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." *Id.* at 326.

Those PSLRA pleading requirements apply whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. *Avaya*, 564 F.3d at 253-54.  However, when an allegation involves a prediction, the Safe Harbor provision of the PSLRA immunizes from liability any forward-looking statement that "is identified as such and accompanied by meaningful cautionary language; or is immaterial; or [where] the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Id.* at 254; 15 U.S.C. § 78u-5(c).

The dispute between these parties centers on two elements: a material misrepresentation or omission (discussed in Section III, *infra*), and scienter (discussed in Section IV, *infra*).

## III.   DISCUSSION: FALSE OR MISLEADING STATEMENTS

Plaintiffs allege a variety of misstatements, which can be divided into five categories: (1) Canopy's numerous statements that their inventories were scaled to meet management's expectation of market demands; (2) Canopy's disclosure of "Risk Factors" in its AIFs and MD&As without cautions regarding inventory buildup or excess production facilities, and in general its failure to disclose that scaling inventory and production facilities posed a material risk to the company; (3) Canopy's valuation of its inventory on its financial statements without impairments for inventory excess; (4) Canopy's reporting of revenue without including reserves for returns or price concessions and without adequately disclosing the existence of absolute rights of return and the ability of contracting partners to essentially cancel the contracts at will; and (5)

21

numerous statements by the individual defendants. The fundamental alleged misrepresentation underlying the majority of these statements is that Canopy continually assured investors that its inventory levels were based on market demand, while in truth the company was brand building and covering up its inability to grow high-quality marijuana.

Defendants counter these allegations with a variety of defenses: that the statements were not misleading because they disclosed all of the relevant risks, that they were not required to disclose operational issues, that the allegations are not well pled, that the allegations relating to inventory are not actionable, and that many of the statements in question are protected under the PSLRA's safe harbor provisions.

First, I will eliminate those alleged misstatements to the extent that they are protected by the PSLRA Safe Harbor provision. (Section III.A). Second, I will consider Canopy's alleged misstatements regarding market demand and the risks posed by its inventory and production facility buildup. (Section III.B). Third, I will analyze the alleged misstatements in Canopy's consolidated financial statements relating to inventory valuations and revenue recognition, under the Supreme Court's decision in *Omnicare*. (Section III.C).

### A. PSLRA Safe Harbor

The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u-5(c)(1), provides in pertinent part:

(1) [A] person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that —

(A) the forward-looking statement is—

(i) identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

> (i) . . . was made with actual knowledge . . . that the
> statement was false or misleading . . . .

Because this provision is "written disjunctively," each "cautionary-language
prong provides a separate, independent 'inlet' of protection even where
plaintiffs can show (or, for purposes of Rule 12(b)(6), adequately allege)
defendants' knowledge of a statement's falsity." *In re Aetna, Inc. Sec. Litig.*, 617
F.3d 272, 259 (3d Cir. 2010); *see also OFI Asset Management v. Cooper Tire &
Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) (the "disjunctive statutory test
provides two distinct entrances to the safe harbor . . . . any forward-looking
statement is protected if it is *either* accompanied by 'substantive and tailored'
cautionary statements *or* if the plaintiff fails to show 'actual knowledge of
falsehood.'") (emphasis added); *De Vito v. Liquid Holdings Grp, Inc.*, 2018 WL
6891832 at *31 (D.N.J. Dec. 31, 2018).

Forward-looking statements include "projections of future performance,
plans and objectives for future operations, and assumptions underlying
statements about future financial, economic, or operational performance. *In re
Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 279 (3d Cir. 2010). "[A] mixed
present/future statement is not entitled to the safe harbor with respect to the
part of the statement that refers to the present." *Avaya*, 564 F.3d at 255
(quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir.
2008)).

## 1. Canopy's Statements Regarding Management's Expectation of Market Demands

Defendants assert that "over 18 statements concerning 'management's
expectation of market demands'" are protected by the PSLRA's safe harbor
because they were "plainly forecasts about future performance." (DE 71 at 11.)
Specifically, they identify the statements that "[i]nventories are continuing to be
scaled to meet management's expectation of market demands . . . ." (SAC ¶¶
114, 147, 153, 154, 160, 161, 162, 163, 164, 170, 194, 200, 201, 209–211,
217), and that "[m]anagement continues to believe that significant demand will

develop for cannabis oil and in particular soft gels," (*Id.* ¶ 164). They assert that these statements were accompanied by specific cautionary language which described the risks that may materialize related to future demand, noting that each statement was accompanied by "language identifying the statements as forward-looking subject to the PSLRA safe harbor." (DE 67 at 28 n.21.) Finally, defendants note that each investor call began with the defendants reminding investors of the potential risks and the safe-harbor limitations. (*See, e.g.,* DE 67-15, Ex. M to Motion to Dismiss (Aug. 2019 Earnings Call Tr. at 3).)

### i.   Are the Statements Forward Looking?

Plaintiffs respond that these statements are not forward looking, but actually "then-current statements of then-existing inventory and defendants' contemporaneous assessments of same and corresponding demand." (DE 68 at 34.) For example, they claim that the use of the word "continuing" in "inventories are continuing to be scaled to meet management's expectation of market demands" indicates "then-existing expectation of then-existing demand." (*Id.*) In a similar vein, they assert that the statement "management believes [inventory] is [all] required to meet expected market demands" is a present-tense statement of management's then-existing expectation of demand. (*Id.* at 35.)

I agree with defendants, but only to a point. Plaintiffs cannot circumvent the Safe Harbor provision simply by identifying any aspect of a statement which refers at all to the present time. Here, defendants' statements that inventories are scaled to "expectation[s] of market demand" or that they anticipate that such demand "will develop" in the future are plainly expressions of management's expectation that their current levels of inventory are appropriate for what they anticipate demand will be in the future. They are therefore forward-looking statements. *See Avaya*, 564 F.3d at 255 (statement is forward-looking where it "do[es] not justify . . . financial projects in terms of any particular aspect of the company's current situation" but rather "say[s]

24

only that, whatever that situation is, it makes the future projection attainable.").

Plaintiffs counter that Canopy's statements relate to "then-existing inventory." (DE 68 at 34.) They are nevertheless forward-looking statements. As Judge Wolfson explained in *National Junior Baseball League v. Pharmanet Development Group, Inc.*, forward-looking statements tied "to historical and present facts" are still protected under the Safe Harbor provision because that provision "extends not only to statements 'containing a projection of revenues' and 'of future economic performance,' but also to 'any statement of the assumptions underlying or relating to' such statements." 720 F. Supp. 2d 517, 533 (D.N.J. 2010) (quoting *Avaya*, 564 F.3d at 255). As Judge Wolfson noted, "future projections to some degree are" always "based on the historical and present financial situation of a company." *Id.* Here, Canopy's reference to its inventories simply says that they are scaled to meet future demand, which amounts to no more than the company's disclosure of assumptions underlying its prediction of what will be required for the future. These statements are, in general, forward-looking pursuant to the PSLRA Safe Harbor provision.[15] And they are protected.

An important caveat:  These future-oriented statements also, however, have a present component, which I discuss in Section III.B.3.iii**,** below. Plaintiffs are alleging that the company stated an opinion about future demand, it is true. But they are also alleging something else. Those statements, say plaintiffs, were a *pretext* to cover up a presently existing fact: the fact that the facilities were incapable of producing anything beyond low-grade product, even if there was a demand for high-grade product.

Suppose, for example, there is a disastrous fire in my factory. I make a public announcement that I am purposely curtailing production because I

---

[15]  Whether the production was skewed to low-grade cannabis because of the limitations of the manufacturing facilities, as opposed to predictions of demand, is a separate issue, and is discussed separately below.

expect candidate X to be elected next month, and candidate X's policies will be bad for business. Now it is true, of course, that predictions about the political environment are forward-looking, and hence protected. But my statement is also misleading with regard to presently existing facts. It is a pretext; I am not really concerned about candidate X's policies, and I am using that stated concern to conceal from investors that my factory is incapacitated. *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) ("Allegations based upon omissions of existing facts or circumstances do not constitute forward[-]looking statements protected by the safe harbor of the Securities Act"); *see also Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 486 n.9 (D.N.J. 1999) (plaintiffs' "claims are based upon 'omissions of existing facts and circumstances' at the time the statements were made, and do not constitute the forward-looking statements required by the aforementioned doctrines.'"). Similarly, here plaintiffs claim that Canopy told investors that it was scaling inventories to meet anticipated future demand, when in fact it was doing so because it had no choice. *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, (E.D. Pa. 2015) ("statements made by defendants are not afforded PSLRA's safe harbor protections insofar as they characterize 'past events or current events' or make reference to both future events and present events.") (cleaned up).

So there is a component of Canopy's statements with respect to the Aldergrove and Delta facilities that is not forward-looking for purposes of the PSRLA safe harbor. That component—the allegation that the company covered up the defective manufacturing capability of those facilities—merges with the separate analysis in Section III.B.3.iii**,** *infra.*

### ii.    Did Canopy Accompany its Statements with Meaningful Cautionary Language?

Plaintiffs further argue that to the extent the above statements were forward-looking, they were not accompanied by meaningful cautionary statements. The cautionary statements that Canopy did provide, they say, were

26

mere boilerplate. (DE 68 at 36–37.) "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projects, estimates or opinions in the [documents] which the plaintiffs challenge." *OFI*, 834 F.3d at 491 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)).

Canopy asserts that it made a number of cautionary statements. First, it notes that each challenged statement was accompanied by language identifying the statements as forward-looking and subject to the PSLRA's safe harbor. (DE 67 at 28 n.21 (citing February 2019 MD&A at 3).) That language read, for example:

> This MD&A contains certain "forward-looking statements" within the meaning of the [PSLRA] . . . including but not limited to statements relating to . . . . the expected number of users of recreational cannabis or the size of the legal recreational cannabis market in Canada and internationally . . . . the Company's expectations with respect to future performance . . . . product sales expectations . . . . inventory and production capacity expectations including discussions of plans or potential for expansion of capacity at existing or new facilities . . . .
>
> . . . .
>
> Forward-looking statements are based on the reasonable assumptions, estimates, internal and external analysis and opinions of management made considering its experience and perception of trends . . . as well as other factors that management believes to be relevant and reasonable at the date that such statements are made. Forward-looking statements involve known and unknown risks, uncertainties, assumptions and other factors that may cause actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements . . . . There can be no assurance that forward-looking statements will prove to be accurate, as actual results and future events could differ materially from those anticipated in such statements.

27

(DE 67-5 Ex. C to Motion to Dismiss, (February 2019 MD&A at 3).)

Additionally, at the beginning of each investor call, Canopy reminded investors of the potential that "certain matters discussed during today's conference call or answers that may be given to questions could constitute forward-looking statements. Actual results could differ materially from those anticipated. Risk factors that could affect results are detailed in the company's annual information form and other public filings that are made available on SEDAR." (*See, e.g.*, DE 67-15, Ex. M to Motion to Dismiss (Aug. 2019 Earnings Call Tr. at 3).) Thus, investors were directed to Canopy's written cautionary statements with respect to statements made during phone calls.

This disclosure might be too blanket or vague to constitute meaningful cautionary language. *See Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049 at *17 (D.N.J. Jan. 21, 2021) (citing *OFI Asset Mgmt.*, 834 F.3d at 491). While it does identify specific categories of statements as specifically forward-looking, such as "the expected number of users of recreational cannabis or the size of the legal recreational market in Canada and internationally," and "the Company's expectations with respect to future performance," "product sales expectations," and "inventory and production capacity expectations," the warnings provided are not particularly specific to those categories. (DE 67-5 (February 2019 MD&A at 3 (warning about 'known and unknown risks" and that there "can be no assurance that forward-looking statements will prove to be accurate".))

I need not reach that issue, however, because Canopy's general cautionary statement regarding safe harbor statements was accompanied by more specific cautionary statements tailored to the very risks at issue in this case. Those tailored cautionary statements are sufficient to invoke the safe harbor provision as to the portion of these statements which looked to the future.

Specifically, before cannabis was legalized in Canada, Canopy disclosed that it was required to "rely largely on our own market research and market

demand which may not materialize"; noted that the company had to use its "own market research to forecast sales as detailed forecasts are not generally obtainable from other sources at this early stage of the medical cannabis industry in Canada"; and disclosed that "market research relating to the adult-use cannabis industry is not yet available and as such, trends in the adult-use cannabis market can only be forecasted ahead of its anticipated legalization in the summer of 2018." (DE 67-6 at 48, Ex. D to Motion to Dismiss (June 2018 AIF at 34).) The company also disclosed that government actions, such as provincial regulations or federal legislation, might fail to "create the growth opportunities that we currently anticipate." (*Id.* at 49.)

After cannabis was legalized in Canada, Canopy included additional and revised cautionary language that because the cannabis market was "brand new," it would take time for the company to develop an "understanding and readiness for the real demand profile for regulated recreational cannabis products, including the type/strain and quantity of products." (DE 67-5 Ex. C to Motion to Dismiss (Feb. 2019 MD&A at 4).)[16]

Those statements are sufficiently specific to justify applying the Safe Harbor provision to the forward-looking portion of Canopy's statements. The cautionary provisions specifically note that before legalization, Canopy was relying on its own predictions and expectations regarding the development of a recreational cannabis market, and specifically warned that demand might not materialize because the government's legalization plan might not create the growth opportunities the company anticipated. After legalization, the company warned investors that the market was brand new and that both Canopy and its provincially authorized retailer customers were in the process of determining market demand, including, importantly for plaintiffs' allegations here, "*the*

---

[16] Canopy's precise words were "it will take some time for Licensed Producers ("LP"), including Tweed Inc. ("Tweed"), and provincial/territorial agencies to develop" such an understanding. (*Id.*) Tweed is a subsidiary of Canopy, *see* Brands, Canopy Growth Corporation https://www.canopygrowth.com/brands/; (SAC ¶ 59 (noting Canopy owned joint venture known as "BC Tweed" which it used to purchase the Aldergrove and Delta sites)).

*type/strain and quantity of products*" which might be supported by that demand. These cautionary statements are more than adequate to warn investors of the possibility that Canopy's market predictions might not come true. *Pharmanet*, 720 F. Supp. 2d at 536 (forward-looking provision need only mention "'important factors that could cause actual results to differ materially' without 'list[ing] every factor' or 'even the particular factor that ultimately causes the forward-looking statement not to come true.'") (quoting *Silverman v. Motorola, Inc.*, 2008 WL 4360648 at *12 (N.D. Ill. Sept. 23, 2008)).

This conclusion is supported by Judge Chesler's decision in *Tanaskovic v. Realogy Holdings Corporation*, 2021 WL 211049. In *Realogy*, the defendant real estate brokerage faced competitors who were offering higher commission percentages ("splits") to top sales agents. *Id.* at 1. Realogy increased its own commission splits to remain competitive, but told investors that it expected the need to increase splits to taper off eventually. *Id.* As it happened, however, the company had to continue increasing its splits to keep up with competitors. *Id.*

Judge Chesler considered the application of the Safe Harbor provision to Realogy's statements that it anticipated competition over commission splits to taper off. *Id.* at 15–16. He first noted Realogy's cautionary statement that the company would make forward-looking statements "from time to time" which were "based on various facts and derived utilizing numerous important assumptions" and thus were "subject to known and unknown risks, uncertainties, and other factors that may cause . . . actual results . . . to be materially different from any future results . . . implied by such forward-looking statements." *Id.* at 17. The Judge rejected those statements as too vague and boilerplate to adequately caution investors. *Id.*

Judge Chesler then turned to another category of statements in which Realogy specifically noted the risks of competitors encroaching on the company's profits, such as competition for productive sales agents, the development or implementation of new technologies, and the company's ability to leverage data analytics. *Id.* at 18. Judge Chesler concluded that these

30

disclosures were sufficiently tailored to the forward-looking statements in question, which had all been regarding pressure on commission splits that the company had claimed would eventually moderate. *Id.* Judge Chesler concluded that because the company specifically disclosed the risk of competition, the forward-looking statements were entitled to protection.

Similarly, the cautionary statements at issue here warned investors of the specific aspect of Canopy's statements that plaintiffs assert were misleading: namely, Canopy's market predictions. Canopy disclosed to investors that it faced a brand-new market and so there was little hard data on which the company's estimates could be based. It made clear that while it hoped that its inventory was pegged to demand, that was at best an educated guess. I conclude Defendants' cautionary statements bring the future-oriented portion of their statements about market expectation within the Safe Harbor provision. As I say, the components of these statements that relate to current circumstances are analyzed separately in Section III.C.

### iii.    Actual Knowledge

Last, plaintiffs assert that defendants had actual knowledge of the forward-looking portion of their market prediction statements' falsity. (DE 68 at 36.) Because I conclude the Safe Harbor provision applies under the "forward-looking and accompanied by cautionary statements" prong, I need not reach this issue.

### 2. Other Statements Claimed to Be Subject to the Safe Harbor Protection for Forward-Looking Statements

Defendants also assert that a number of other statements are protected by the Safe Harbor provision, including (1) a statement by defendant Lee that management "wouldn't expect [product returns] to move the P&L in the future," (SAC ¶ 190); (2) Defendant Linton's statement on the February 15, 2019 earnings call that the company's increase in facility capacity "is not a stockpiling exercise at all, and we're constantly looking at as the provinces are turning up more stores, we need to fill that warehouse," (*id.* ¶ 256); (3)

31

defendant Zekulin's statements on the August 15, 2019 earnings call that the $8 million charge against revenues was "not related to our production flow here" and that the company "remain[s] very confident" on dry flower inventory, (*Id.* ¶ 278); (4) Defendant Kovacevic's statement on the November 14, 2019 earnings call that the company "feel[s] very happy with our inventory level today and that they're setting us up for success," (*id.* ¶ 237); and (5) Defendant Zekulin's statement on the November 14, 2019 call in response to a question whether Canopy would "slow down production" or "shut down some facilities" that "there is no reason to expect that will happen," (*id.* ¶ 238, 262).[17]

Statements (1), (4), and (5) are all forward-looking statements; as explained in Section III.A.1, *supra*, those statements pertain to the company's future expectations regarding demand, inventory levels, revenue and production requirements. And they were accompanied by meaningful cautionary statements about the uncertainty inherent in its business, including that it faced a brand new market with an uncertain demand profile, and that its sales relied on the Canadian government enacting regulations which may not be forthcoming. (*See* SAC ¶ 190 (defendant Lee did not expect the P&L to be moved "*in the future*" by returns); *id.* ¶ 237 (defendant Kovacevic believed that inventory level is "*setting* [Canopy] *up*" for success); *id.* ¶ 238 (no reason to expect slowing down production or shutting down some facilities "*will happen*" unless "Ontario doesn't open stores for another year") (emphasis added)); *see also* Section III.A.1.ii, *supra*, (detailing cautionary statements). Plaintiffs' argument that these statements are not forward-looking because they concern existing inventory or revenue misconceives the forward-looking statement analysis, as explained previously.

---

[17] Plaintiffs assert that Defendant Lee's statement on the February 14, 2020 earnings call that the company "feel[s] very good that we're balanced on high THC bud" and "low THC, high CBD bud" but "a little longer than what we'd like to be today" on "mainstream bud," (*id.* ¶ 246), is not forward-looking. I agree, and defendants do not contest that characterization in their reply, so I will not consider that statement in this section.

I also conclude that Statement (2) is forward-looking when considered in context. Defendant Linton was responding to an analyst who asked:

> In terms of preparation for the edible ingestible derivative market and looking at the inventory balance at the quarter end, 65% of that balance is work in process inventory. How is the preparation for the products in that market being handled while balancing also validation in the Canadian channels as well as internationally?

(DE 67-23 Ex. U to Motion to Dismiss (FQ3 Earnings Call, Feb. 15, 2019 at 17).) Linton replied that the company was "working on accumulating oils" because "we find that oils are an extremely likely stabilized ingredient to fit into everything from beverages to edibles to vapes." (*Id.*) Defendant Saunders then added that the "operations group [is] constantly looking at supply-demand forecast, and allocating, what do we need the variety and formats." (*Id.*) Linton *then* said "Yes. And so this is not a stockpiling exercise at all. And we're constantly looking at as the provinces are turning up more stores, we need to fill that warehouse." (*Id.* at 18–19.)

In context, then, defendant Linton was explaining that the company was "working on accumulating oils" not as a "stockpiling exercise" but rather as "preparation for [placing] the products in" warehouses for "the edible ingestible derivative market," based on "supply-demand forecast[s] . . . [of] what [Canopy] need[s for] the variety and formats." His statement that the company was "looking at as the provinces are turning up more stores, we need to fill that warehouse," though phrased in the present tense, properly understood was describing the company's actions in preparation for future supply needs. *See In re Aetna, Inc. Securities Litig.*, 617 F.3d 272, 279–80 (3d Cir. 2010) (safe harbor applies to "forward-looking projects . . . described . . . in present-tense language" when present tense statements cannot "meaningfully be distinguished from the future projection of which they are a part") (quoting *Avaya*, 564 F.3d at 255). I thus conclude this is a forward-looking statement accompanied by adequate cautionary statements such as the disclosures

regarding the company's basis for its prediction of market demand detailed in Section III.A.1.ii, *supra*.

However, I conclude that Statement (3) is not forward-looking. In context, that statement was as follows:

> Analyst: [regarding] the sales mix, particular [sic] on the recreational side of things. Can you just give us a little more color as to why the oil and gel caps of this quarter went essentially to zero. I think you were in 30 million or 35 million last quarter. Was that a decision in terms of allocation or was there any issues with production in getting those types of products out the door[?] . . . .

> Defendant Zekulin: . . . . No it is not related to our production flow here, simply related to the product mix that we see demand for and ensuring that we allocate products appropriately to that mix . . . . [O]ur oils and softgel products remain exceptionally popular and an increasing share of our Canadian medical base and an increasing share of our global exports to medical market. So I think it is just an indication of properly seating the market with what customers are buying at the tail.

(SAC ¶ 278.) Defendant Zekulin's statement concerns the "product mix that [Canopy] *see*[s] *demand for*" and regards the company's oil and gel caps sales for the quarter. He was speaking about existing demand, not future demand, so this is not a forward-looking statement.

I thus conclude that Statement (3) is not protected by the Safe Harbor provision. I find Statements (1), (2), (4), and (5), however, are protected.

### 3. Immaterial Puffery

Defendants assert that some of their statements are mere puffery, and so cannot be considered actionable misstatements. They identify their statements that they: (1) "remain very confident" in their sales outlook over the next few quarters such that they did not expect to have to insert provisions for returns

on dry flower sales, (SAC ¶ 207)[18]; and (2) that "the balance of the inventory is really our bud inventory and we feel very good that we're balanced on high THC bud. We feel very good that we're balanced on low THC, high CBD bud. The mainstream bud which is the balance is what we call it. We're a little longer than what we'd like to be today," (*id.* ¶ 246).[19]

"[A]lthough questions of materiality have traditionally been viewed as particular appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010). "A representation is immaterial if the 'statement at issue is too vague to be actionable.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 (3d Cir. 1997)). Typically, such statements include "opinions, motives and intentions, or general statements of optimism." *Id.*

I cannot conclude that either of these statements are "obviously so unimportant that [I can] can rule them immaterial." *Aetna,* 617 F.3d at 283. In both instances, the statements were not "too vague to be actionable," but instead indicated that the company did not anticipate taking charges for returns on their dry flower product and that the company believed it was "a little long[]" on its inventory. Though the defendants phrased their statements in terms of feeling "very confident" or "very good," those statements of optimism were connected to factual assertions regarding sales prospects and inventory. A

---

[18] Canopy does not argue that this statement is forward-looking, but it appears to be, as it regards the company's opinion regarding its sales outlook for the future.

[19] Canopy also asserts that their statements that their facilities grow "top-quality" cannabis and that they were "Canada's and indeed the world's, largest, most reliable and most diversified producer and seller of high-quality regulated cannabis" are also puffery. (SAC ¶ 60.) These statements are indeed puffery, but plaintiffs do not appear to be asserting that these were false and misleading statements. *Kid Brands*, 736 F.3d at 242 (plaintiff must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading); (*see also* SAC ¶¶ 147–269 (setting out alleged false and misleading statements and omissions without including "top-quality" or "high quality" statements)).

reasonable investor could have relied on those statements, so I do not find they are immaterial puffery.

### B. Alleged Misstatements (Excluding Accounting Statements)

Having eliminated the statements covered by the PSLRA safe harbor provision (*see* Section III.A, *supra*), and leaving Canopy's accounting statements for the next section (*see* Section III.C, *infra*), I now turn to the remaining alleged misstatements in the Second Amended Complaint. They are:

- The aspect of Canopy's disclosures regarding expected market demand, to the extent they were allegedly mere pretexts for the company's increasing inventories due to production problems, *see supra* Section III.A.1.ii;
- The "Risk Factors" sections of many of Canopy's filings which omit cautions about inventory buildup or Canopy's expansion its facilities, (*see* SAC ¶¶ 149, 156, 172, 180, 188, 196, 203, 213, 219, 223, 229, 235, 242, 248, 250, 252, 254, 258, 260, 264);
- Defendant Zekulin's August 15, 2019 statement that the company's $8 million revenue reversal was "not related to our production flow here, simply related to the product mix that we see demand for" (*id.* ¶ 192);
- Canopy's statement in its February 14, 2020 MD&A that the $32 million charges related to revenue reversals and price concessions and the $16 million charge to inventory "did not recur to the same extent in the third quarter of fiscal 2020" (*id.* ¶ 244);
- Defendant Lee's statement during the February 14, 2020 earnings call that the "balance of [Canopy]'s inventory is really our bud inventory [*i.e.*, dry flower] and we feel very good that we're balanced on high THC bud. We feel very good that we're balanced on low THC, high CBD bud. The mainstream bud which is the balance is what we call it. We're a little longer than we'd like to be today. And that's the piece that we're continuing to work through" (*id.* ¶ 246);
- Defendant Lee's statement on the same call that "Gross margin in the quarter benefited from higher capacity utilization which is a trend that we've seen over the past few quarters. Operating costs related to underutilized facilities has continued to decrease from approximately CAD24 million in the fourth

quarter of fiscal '19 to under CAD8 million in the third." An analyst then asked why the company had lower kilograms harvested that quarter, and defendant Lee explained that in December, the company had taken "down some capacity at our Delta facility and British Columbia is one of our first steps to help bring supply and demand into balance" (*id.* ¶ 267);

- Defendant Lee's statement on the same call, in response to a question asking what effect shutting down production capacity could mean for near-term margins, that "shutting down facilities is really hard. So, we need to be very thoughtful about it, very mindful about it, and we're taking a strategic approach to say 'Look, we want to make sure that we're designing our supply chain and our footprint for not just the realities of today, but the realities of the next year, two years, three years, as the size of the market develops, but also as the various categories of the market develops, and we know that the value category is here to stay," (*id.* ¶ 268.)

Plaintiffs claim these statements were false and misleading because defendants did not disclose:

- That they had "no data" to support their inventory buildup;
- That they were increasing inventory for "brand building" reasons rather than in response to market demand;
- That Canopy was only producing so much extract grade cannabis because the Delta and Aldergrove sites were incapable of producing "bud"-grade cannabis;
- That their excess extract inventory and excess dry flower inventory buildup were material risks to the company;
- That their production capacity buildup was a material risk to the company.

(DE 68 at 15.)

"[F]or an omission . . . to be actionable under Section 10(b) it is not enough that the plaintiff identify the omission or misstatement. The omission or misstatement must also be material, *i.e.*, something that would alter the total mix of relevant information for a reasonable investor making an investment decision." *In re Amarin Corp. PLC Sec. Litig.*, 2021 U.S. Dist. LEXIS 59840 at *39 (D.N.J. Mar. 29, 2021) (quoting *In re Burlington Coat Factory*, 114

F.3d at 1425–26). If a defendant "disclosed the risk" in question in a timely manner, then plaintiff cannot maintain a claim. *Id.* at 49–50.

**1. Whether Canopy Disclosed That It Had "No Data" To Support its Inventory Build Up**

Plaintiffs assert throughout their complaint that Canopy failed to adequately disclose to investors that it had "no data" to support its assessment that its inventory was tethered to market demand. (*See, e.g.,* SAC ¶ 173(c).) That appears to be a misinterpretation of the company's statement. Furthermore, Canopy did more than once disclose to investors the basis for its prediction of market demand.

First, plaintiff supports its "no data" assertions with a misleading version of what Canopy actually said. Plaintiffs allege, for instance, that Canopy admitted on a November 2019 earnings call that it had "no data" for inventory or revenue expectations.[20] What Canopy actually said, through defendant Kovacevic, was this:

> [Rade Kovacevic] . . . <u>last year</u> [*i.e.,* 2018], at the rollout of legalization, <u>we had little to no data</u>. <u>We were looking at what U.S. markets had done, but we had nothing within the Canadian regulatory context for recreational legalization when making production decisions</u>. And so we looked at things such as softgels and oils, forecasted them to be about 15% of the market and pens at around 5%. <u>I think the big change that we've had over the past 12 months is we now have data</u>, right? It took us about 4 to 8 months for us to start getting provincial at-the-till data.

(DE 67-8, Ex. F to Motion to Dismiss (November 2019 Canopy Earnings Call Tr. at 14–15 (emphasis added)).) Even giving plaintiffs the benefit of every inference, all defendant Kovacevic actually said here was that the company had "little to no" data, not "no" data, at the *beginning* of the Canadian cannabis market in 2018; as of November 2019, said Kovacevic, the company "now ha[d]

---

[20]   Plaintiffs' theory wavers somewhat between the contentions that Canopy admitted it had no data, and concealed that it had no data.

data," and, indeed, possessed data as of a date approximately four-to-eight-months after cannabis was legalized in Canada.

Plaintiffs could claim that that defendant Kovacevic nevertheless admitted in this statement that the company had "no data" at the *beginning* of Canadian legalization. But that too is false; defendant Kovacevic explained that the company had no *Canadian* experience to draw on, but was relying on data from "U.S. markets." (*Id.*) In any event, Canopy made clear to investors at the outset of the cannabis market that it was "forecast[ing]" demand and that it had no market research on which to base its demand expectations:

> [M]arket research relating to the adult-use cannabis industry is not yet available and as such, trends in the adult-use cannabis market can only be forecast ahead of its anticipated legalization in the summer of 2018. A failure in the demand for its products to materialize as a result of competition, technological change or other factors could have a material adverse effect on our business, results of operations and financial conditions.

(DE 67-4 Ex. C to Motion to Dismiss (June 2018 AIF at 34.) Furthermore, in its February 2019 MD&A, the company disclosed that it had relied on the Canadian Imperial Bank of Commerce (CIBC) estimate that the recreational cannabis market in Canada could range from $5.0 to $10.0 billion per year. (DE 67-5 at 65, Ex. C to Motion to Dismiss, (February 14, 2019 MD&A at 9).)

Given those disclosures, I cannot conclude that plaintiffs have made out a plausible claim that Canopy had "no data" on which to base its market expectations, or alternatively that Canopy failed to disclose the data on which it relied. Plaintiffs offer no more than a manipulation of defendant Kovacevic's words. Kovacevic did not say that the company had "no data" to support its market expectations; rather, he essentially said the company lacked data from the Canadian market at the beginning[21] and was therefore forced to rely on

---

[21] Frankly, this fact was almost unnecessary to disclose. Cannabis had been illegal in Canada for more than 90 years before it was legalized in 2018. Daniel Schwartz, *Marijuana was criminalized in 1923, but why?*, Canadian Broadcasting Corporation, May 3, 2014, https://www.cbc.ca/news/health/marijuana-was-criminalized-in-1923-

U.S. market data. Subsequent disclosures explained that the company also relied on the CIBC's predictions. Plaintiffs do not dispute that the company disclosed those facts to investors in June 2018 and February 2019.

Plaintiffs also rely on a number of statements by two former Canopy employees, FE5 and FE6. FE5 was a "brand manager for Canopy's premium brands from 2016 through late 2019, stationed in Ontario," who allegedly "worked closely with Defendant Kovacevic" and "Defendant Linton." (SAC ¶ 101.) According to plaintiffs, FE5 "states that Canopy had no data at all to predict the cannabis market, or what products consumers would or would not want." (*Id.* ¶ 102.) FE6 was Canopy's Toronto-based brand manager, and then senior brand manager, from June 2018 to December 2019. (*Id.* ¶ 104.) FE6 was responsible "for marketing products and launching new product lines," and reported to a Vice President, who reported to Canopy's Chief Marketing Officer, who reported to defendant Kovacevic. (*Id.*) FE6 "states that the decision to overproduce oils and gelcaps was not rooted in consumer insights or data, and that Canopy never had any research indicating that consumers were interested in consumer softgels." (*Id.* ¶ 105.) FE6 says instead that consumers were unfamiliar with softgels and that Canopy pushed cannabis stores and provincial boards to purchase oils and gelcaps. (*Id.* ¶ 106.)

"[T]he plaintiff in a securities fraud action can support [the] complaint by using information attributed to confidential sources." *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 400 (D.N.J. 2010). Such information "can be used in only two situations: (1) if the complaint sets forth other factual allegations, such as documentary evidence that are nearly sufficient to support a fraud allegation, or (2) when the confidential sources are described in the complaint with such degree of particularity as to support the inference that the

---

but-why-1.2630436. It is hard to believe that a reasonable investor could have expected Canopy to have sales data for a market that had not existed in living memory. *See Amarin*, 2021 U.S. Dist. LEXIS 59840 at *39.

confidential source is a person in a position to possess the specific information alleged." *Id.* at 400–01 (cleaned up); *see also Chubb*, 394 F.3d at 146.

Plaintiffs have not set forth "other factual allegations" which are "nearly sufficient to support a fraud allegation," *id.*, so they must satisfy the second prong. The Third Circuit explained in *Chubb* that the plaintiffs may meet that prong by "providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs," and that courts should evaluate such pleadings based on an assessment of "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." 394 F.3d at 146.

I do not find that the reported statements of FE5 and FE6 pass the *Chubb* test. Crucially, the second amended complaint fails to plausibly allege facts indicating that FE5 or FE6 would have known what data the company had to predict the cannabis market. Plaintiffs provide no basis for the conclusion that brand managers—even ones who, plaintiffs allege in conclusory fashion, "worked closely" with defendants Kovacevic and Linton—would have had access to the company's market prediction data. That cannot be inferred from their job titles alone, and plaintiffs offer no supporting allegations—for example, that defendants Kovacevic or Linton told FE5 or FE6 about the company's data. Furthermore, FE5 and FE6 provide no detail as to how they obtained their claimed knowledge and there are no other corroborating facts for their claims. I do not say that such facts could not be alleged, but they are not alleged here.

Nor is there any meaningful explanation of how the alleged lack of data was misrepresented or concealed. It appears that Canopy did disclose the data (however sketchy, since cannabis had only recently been legalized) upon which it relied.

41

Plaintiffs do not provide any plausible allegations suggesting that Canopy had "no data," or concealed the lack of data from investors.

### 2. Whether Canopy Disclosed its "Brand Building" Plan

Plaintiffs assert that Canopy never disclosed that it scaled up its inventory not "strictly for the purpose of obtaining market share" but for "getting [its] brands out there." (SAC ¶ 163(c).) This omission, they say, was material in context, because Canopy had told investors that it had built its inventory in order to meet demand, rather than for branding purposes. (DE 68 at 31.)

First, plaintiffs mistakenly assert that Canopy made this statement in May of 2020 (DE 68 at 19), when in fact it did so on August 15, 2019 (DE 67-15, Ex. M to Motion to Dismiss (August 2019 Earnings Call Tr. at 26)). It was on that earlier date that Canopy allegedly disclosed that it had scaled its inventory to "get[ its] brands out there." The date discrepancy is legally consequential. Even assuming that Canopy had a brand-building plan, the company informed investors of that fact at the time of its first disclosure of revenue reversals, nearly a year before the end of the Class Period.

Second, it is not clear that Canopy admits that it increased its inventory for brand-building purposes. During the August 2019 earnings call, an analyst asked:

> [Regarding] the quality of the sales outlook, I guess, particularly around flower. So, I mean if you're being cynical, you could say share support to-date is being driven by essentially stuff in the channel . . . . [I]nitially . . . you were the leaders because you were the ones with the supply. But now others are coming online, you are seeing share pressure.
>
> So, I just wanted to kind of gauge what's the risk around this new flower that's coming online. You shared you'll see support; would you be able to push out as the retail stores need supply? But I mean how confident are you once you've kind of fill the channel in terms of that speaking kind of longer term over the next few quarters, I mean is there a risk there similar to what you've seen

42

> with the softgels and the oils now where you going to have to put
> in provisions for return on some of this flower?

Defendant Zekulin responded:

> No, we remain very confident. I think we have — part of our effort
> to push product out early and obtain market share wasn't strictly
> for the purpose of obtaining market share, it was for getting our
> brands out there and building that affinity that Rade was talking
> about, right? So, that – and even within those brands, supply
> limitations meant certain inconsistency that would undermine that
> effort.
>
> But, overall, there's been a huge push to make sure our brands are
> there, and they are reliable, and in some cases we provided brands
> in certain regions to ensure that continuity to build customer
> loyalty for each brand.

(DE 67-15 Ex. M to Motion to Dismiss, (August 2019 Earnings Tr. at 26).)
Plaintiffs conclude that defendant Zekulin's reference to "push[ing] product
out" refers to the company increasing its inventory levels. In fairness, neither
the question nor the answer is a picture of clarity. But in any event it is not at
all clear that plaintiffs are characterizing Zekulin's statement correctly.

   The analyst said that the company's current sales were being driven by
pre-existing orders and that, at least from a cynical point of view, Canopy's
market share was due to its being "the ones with the supply" in the beginning
of the cannabis market. Defendant Zekulin responded that the company had
"push[ed] product out early and obtain[ed] market share" to "get [its] brands
out there and build[] that affinity" which he predicted would result in customer
loyalty for the company's brands. He clarified, however, that the company had
nevertheless faced "supply limitations" which had "meant certain inconsistency
that would undermine that effort."

   In that context, it is at least as likely that defendant Zekulin meant by
"push[ing] product out" that the company was aggressive with its sales and

marketing in the early days of the cannabis market. The phrase "pushing product out," after all, is typically used to mean aggressive sales, not mere stockpiling of inventory for its own sake. Taken in conjunction with defendant Zekulin's admission that the company also faced "supply limitations" in the beginning of cannabis legalization, I read the "aggressive sales" interpretation as more likely, indeed much more likely, than the "increased inventory" interpretation. Inventory sitting in a warehouse, after all, does nothing to build market share or brand affinity—though it may set the scene for such an effort.

Even if defendant Zekulin's statement meant that Canopy had dramatically increased its inventory in the beginning of the cannabis market, however, I would still find that Canopy adequately disclosed that strategy to investors. Canopy disclosed in November 2018 that "strong brand recognition is, over time, essential to the company's successful market share acquisition strategy." (DE 67-11, Ex. I to Motion to Dismiss (Nov. 2018 Earnings Tr. at 7).) On June 2018, the company disclosed that it had concluded "[i]nventories on hand today . . . will determine early market share," (DE 67-6, Ex. D to Motion to Dismiss (June 2018 AIF at 8)), and that "building inventories . . . gives provinces now more comfort that they can roll out more and more stores," (DE 67-15, Ex. M to Motion to Dismiss (Aug. 2019 Earnings Tr. at 20).) The company made clear that its strategy was to aggressively increase inventories in the beginning of the cannabis market in order to gain "early market share." Indeed, the very statement of Zekulin upon which plaintiffs rely appears to be a public disclosure of the allegedly concealed strategy, even on plaintiffs' reading.

Since the company disclosed its intention of brand-building, i.e., obtaining market share by increasing inventories, early in the process, I conclude that its disclosure was adequate.

### 3. Whether Canopy Disclosed That the Aldergrove and Delta Production Facilities Could Only Grow Extraction-Grade Cannabis

Plaintiffs assert that Canopy was obligated to disclose that its Aldergrove and Delta growth facilities "had not been properly retrofitted and could *only*

44

produce low-quality cannabis." (DE 68 at 26.) They assert that the troubles at the Aldergrove and Delta facilities caused the company to overproduce extract-grade cannabis despite knowing consumers had no interest in it.

Plaintiffs' claim here, then, is that Canopy had undisclosed problems in its production facilities which were causing a surplus of oil and gelcap inventories, and that Canopy was obligated to inform investors of that fact. Viewed on its own terms, that claim is adequately supported by factual allegations.[22]

It is important to define the requisites of such a claim. As will be clear after reviewing the allegations below, plaintiffs have set forth an impressive array of allegations indicating that Canopy had production problems in its Aldergrove and Delta facilities, and that Canopy senior executives knew about those problems. That, however, is not enough to set forth a claim Canopy was not required to disclose every problem in its facilities; it only needed to disclose those problems which it (1) had an affirmative duty to disclose and (2) were material and, absent disclosure, would have the effect of misleading investors. *Winer Family Trust v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007) ("As a general matter, an affirmative duty [to disclose] arises only when there is insider

---

[22]   I say "on its own terms" because this aspect of plaintiffs' complaint is in some tension with the rest of its allegations. The assertion is that Canopy increased its extracts-based inventory such as oils and gelcaps, not based on strategy, but because low-grade cannabis was all it could grow. (*See, e.g.*, SAC ¶ 148(a).) Plaintiffs assert that Canopy would have produced "bud" grade cannabis for use as dry flower at Aldergrove and Delta if those facilities had been built correctly. (*See, e.g.*, SAC ¶ 157(b).) Canopy, they insist, should have admitted to investors that its production facilities were growing extract- rather than bud-grade dry flower only because that was all the facilities were capable of. (DE 68 at 25–28.)

But plaintiffs also assert, at the same time, that Canopy's *dry flower* inventory was *also* excessive, and thus not tailored to demand. (*See, e.g.*, SAC ¶ 197(c); *see also* Section III.B.4, *infra*.) So, one might wonder why the problems at Canopy's Aldergrove and Delta facilities mattered at all: if those facilities had produced high-grade cannabis, Canopy would have had an even greater surplus of dry flower inventory, which also would not have been tailored to demand. So, it does not appear that the failure to grow bud-grade cannabis at Aldergrove and Delta caused the company to have a discrepancy between its inventory and the available demand; at most, it shifted the allocation of that discrepancy as between oils/gelcaps and dry flower.

trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure"); *see also Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5"); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("undisclosed information is considered material if 'there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the total mix of information available to that investor'") (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996))). Thus, knowledge of a manufacturing problem is important, but plaintiffs must also adequately allege that Canopy was obligated to tell investors about the problem. I am convinced of the first, but less convinced of the second. But because any deficiencies regarding the obligation to disclose might be addressed by amendment, I discuss the issues at some length.

First, I consider whether plaintiffs have adequately alleged there was a problem in the facilities which led to an excess of extract-based cannabis products such as oils and gelcaps.

### i.  Plaintiffs' Allegations in Support of their Claim

Plaintiffs support their claim that Canopy had an excess of extract-grade cannabis due to production problems primarily via statements by confidential witnesses. FE4 was manager of finance operations for Canopy's Western Region from January 2018 to June 2019 and was Operations Manager for the Aldergrove facility from June 2019 to May 2020. (*Id.* ¶ 72.) FE4 states that Canopy intended the Aldergrove and Delta facilities to serve as major sources of "bud" grade cannabis, claiming that the company expected the entire harvest from those facilities to meet that standard. (*Id.* ¶ 74.) FE4 explains, however, that none of the cannabis grown in those facilities met that standard, but instead was only C or C-minus-grade product, which is only suitable for extract-quality products. (*Id.* ¶¶ 74–75.) FE4 explains that the facilities had humidity problems which caused bud rot and grey mold, and lighting problems which caused "larfy," or immature, cannabis plants. (*Id.* ¶¶ 80, 83.) FE4

46

further states that Canopy executives knew about the low quality of the plants grown at Aldergrove and Delta. (*Id.* ¶ 85.) FE4 recalled conversations with Mario Castillo, Canopy's VP of Canada Operations, who visited Aldergrove and Delta and told employees that Canopy had too much inventory of extract products. (*Id.* ¶ 99.)

FE3 was a compliance officer at Canopy's Aldergrove and Delta locations from July 2018 to April 2020. FE3's role was to audit the amount of live cannabis and dried cannabis, and produce inventory reports. (*Id.* ¶ 71.) FE3 states that Canopy's facilities were of a poor quality because Canopy retrofitted them from older greenhouses which had been used to grow peppers. (*Id.* ¶ 73.) FE3 explains that those greenhouses lacked the necessary lighting, humidifiers, and watering capabilities to grow cannabis properly, which resulted in the cannabis plants having "bud rot." (*Id.* ¶¶ 73, 83.) FE3 asserts that Canopy executives, including several individual defendants, visited the Aldergrove and Delta sites regularly. (*Id.* ¶ 85.)

According to FE3, defendant Linton visited the Aldergrove and Delta greenhouses multiple times in 2018 and 2019, including in the summer of 2018, before legal recreational sales had begun. (*Id.* ¶ 86.) During those visits, FE3 says, defendant Linton asked employees direct and detailed questions, and lower-level employees were "honest" about problems at the facilities— specifically, about the lighting issues leading to low-grade cannabis production. (*Id.*) FE3 states that Linton specifically asked the master grower about the low quality of plants, such as why they were so small, and the master grower told defendant Linton that lighting problems had played a role. (*Id.* ¶ 87.) FE3 also recalled discussing the low quality of Canopy's plants with Mario Castillo, Canopy's VP of Canada Operations. (*Id.* ¶ 99.)

FE1, the former Lead Director of Genetic Research at Canopy from December 2018 to January 2020, explains that just after New Year's Day in 2019, FE1 observed a storage vault with Canopy's cannabis products. The vault, which measured 40 feet by 40 feet with floor-to-ceiling shelving, was

47

stuffed with stacks of dry flower and pillowcase-sized bags of gelcaps. (*Id.* ¶ 67.)
FE1 believed that the amount of product in that vault in comparison to the
market for the products was akin to maintaining a Walmart distribution
warehouse for a few small grocery stores. (*Id.*) FE1 further explained that since
cannabis products expire one year from the date of production, FE1 concluded
that no one could honestly have believed that all of the product would be sold
before it expired. (*Id.* ¶¶ 66–67.) FE1 also said that this vault was just one of
many. (*Id.* ¶ 68.) FE1 confirmed FE3 and FE4's opinion that growing problems,
such as larfy cannabis, seeds mixed with flowers, and lower yield, resulted in
low-quality cannabis plants, which in turn led to even more extract production.
(*Id.* ¶¶ 77, 82.) FE1 also confirmed that Canopy's executives knew about the
problems, and recalled weekly meetings attended by defendant Kovacevic,
where attendees "regularly and sardonically made fun of the poor conditions of
the grow facilities and the low-grade product produced in these facilities." (*Id.* ¶
88.) FE1 also recalled budget meetings held in Canopy's Smith Falls, Ontario
headquarters, where FE1's supervisor, Jim Brandle, stated that he had
personally conveyed to defendant Linton the problems in Canopy's
greenhouses. (*Id.* ¶ 95.) FE1 believed that Linton knew about the problems
even before then, however, because Canopy had been discussing budgeting to
fix those problems. (*Id.* ¶ 96.) FE1 described frequent one-on-one conversations
with Brandle in which Brandle told FE1 that he would tell defendant Kovacevic
about inventory quality and facility problems every time he met with him. (*Id.* ¶
97.) FE1 also recalled Canopy's director of Botanical Research, Katya Boudko,
telling him that she had spoken multiple times with defendants Kovacevic and
Linton and told them about the grow site problems. (*Id.*)

FE6, who worked for Canopy from June 2018 through December 2019 as
a Toronto-based brand manager and later as senior brand manager, was
responsible for marketing products and launching new product lines. FE6
confirms that "the reason that oils and gelcaps were overproduced was because
Canopy's cannabis flower harvests were low quality, and not fit for use

anything other than distillates such as oils and gelcaps." (*Id.* ¶ 105.) FE6 claims the decision to overproduce those products was not rooted in consumer insights or data, and that by February 2019, Canopy had "already produced far more oils and gelcaps than the market was demanding." (*Id.* ¶ 106.) FE6 relays that he was told by his superior, Chief Marketing Officer Bigioni, that defendant Kovacevic had told Bigioni that Canopy had produced far more oils and softgels than it could sell sometime in January or February of 2019. (*Id.* ¶ 106.) FE6 participated in interdepartmental meetings also attended by Kovacevic, where Bigioni relayed Kovacevic's comments to FE6 and the sales analytics team. (*Id.*) FE6 also described how Bigioni and Kovacevic repeatedly discussed the need to move Canopy's inventory of oils and gelcaps. (*Id.*)

Setting aside these statements of confidential witnesses, plaintiffs allege that Canopy's disclosures in August and November 2019 and February, March, and May 2020, in which the company took the $8 million, $32.7 million, and $743 million charges, support their assertion that the company had an inventory oversupply. (*See, e.g.*, DE 68 at 30 (subsequent announcement of abandoning production space shortly after previous disclosure "leads to the reasonable inference that defendants were not coming clean with investors").) Essentially, they claim that Canopy should have disclosed these issues earlier, because it must have known about them earlier.

### ii.  Whether Any of Those Allegations Must be Discounted

As previously noted, confidential sources may be used to plead a securities fraud claim. In cases such as this, where plaintiffs have not provided much in the way of documentary evidence to support their claim, "the confidential sources [must be] described in the complaint with such degree of particularity as to support the inference that the confidential source is a person in a position to possess the specific information alleged." *Synchronoss*, 705 F. Supp. 2d at 400–01. In evaluating whether plaintiffs have alleged sufficient supporting information, I consider "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the

sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 146.

With those considerations in mind, a few of these allegations can be discounted quickly. FE1's conclusion that the company could not sell the amount of cannabis that FE1 witnessed in a single 40x40 vault, for instance, is not plausibly within FE1's knowledge as a director of genetic research. Plaintiffs allege nothing to indicate that FE1 would know how much cannabis the company could sell, or even FE1's personal knowledge of the amount of cannabis in the vault, apart from a general visual inspection.

Canopy also asserts that I should reject the confidential witnesses' discussion of conversations they overheard, or any assertions they make based on second-hand knowledge. For instance:

- FE4's recollection that Mario Castillo, Canopy's VP of Canada Operations, who visited the production facilities and told employees that Canopy had an excess of inventory of extract products;
- FE3's recollection that defendant Linton had discussions with employees and Canopy's master grower in which they discussed the problems at the facilities;[23]
- FE1's recollection that Jim Brandle told FE1 that Brandle had personally told defendants Linton and Kovacevic about the production problems, and FE1's recollection that Boudko had told FE1 that she had done the same;
- FE6's recollection that Bigioni told him Kovacevic had said the company had more oils than it could sell.

Defendants assert that these statements must be disregarded entirely because they are second-hand, and because plaintiffs do not disclose the particular dates on which the information was learned. (DE 67 at 47 (quoting *Synchronoss*, 705 F. Supp. 2d at 401).)

---

[23] FE3 does not explain whether he was present for said discussions or only heard about them secondhand.

It is true that some courts, depending on the context, have required plaintiffs to plead the "particular dates" on which a confidential source's information was acquired, *see, e.g.*, *Synchronoss*, 705 F. Supp. 2d at 401 (reading *Chubb* to require allegations detailing (1) the time period during which the confidential source worked at the defendant-company; (2) the particular dates on which the relevant information was required; and (3) the facts thoroughly detailing how the source obtained access to the information at issue). It is likewise true that other courts have strictly ruled out consideration of information which is second-hand or constitutes hearsay. *See Intelligroup*, 527 F. Supp. 2d 262, 361 (second-hand information and hearsay not probative); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1205–06 (D. Ore. Aug. 2006) (hearsay inadmissible to prove scienter)). I do not read the Third Circuit's case law, however, as imposing either as a rigid requirement. In both *California Public Employees' Retirement Systems v. Chubb Corp.* and *Institutional Investors Group v. Avaya, Inc.*, the Third Circuit directed courts to "consider the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Avaya*, 564 F.3d 242, 261 (3d Cir. 2009) (quoting *Chubb*, 394 F.3d at 148); *see also Martin v. GNC Holdings, Inc.*, 757 Fed. Appx. 151, 154 (3d Cir. 2018). Those courts did not, however, require plaintiffs to plead specific dates or categorically rule out allegations by confidential witnesses which relied on second-hand knowledge; the inquiry is a more holistic, multifactor assessment.

I certainly will take into account the secondhand nature of some of the information. I also consider, however, the fact that FE1, 3, 4, and 6 offered interlocking, corroborative accounts that senior management was aware of the inventory and production problems at the facilities. FE1 and FE3 separately relayed instances in which defendant Linton would have been warned about production issues; FE1 and FE6 relayed stories indicating that defendant

Kovacevic would have known about the production problems. Additionally, FE1, 3, and 6 state that the information flowed from a defendant to particular, identified persons: Brandle, Bigioni, and Boudko. These are very far from allegations in the nature of "the rumor was" or "everyone knew," which other courts have rejected. *See PharmaNet*, 720 F. Supp. 2d at 555 (rejecting "must have known" allegations where "not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants" related to the alleged fraud).[24]

All of that said, some of the allegations must nevertheless be discounted. FE4 does not give even a rough approximation of when Mario Castillo visited the Aldergrove and Delta facilities and said that there was excess inventory. While the failure to give a specific date is not necessarily fatal, in this particular instance it is impossible to tell whether Mr. Castillo said Canopy had an inventory oversupply before or after Canopy disclosed its excess inventories to the public in November 2019 or February, March, and May 2020. So the very relevance of the statement, in this context, depends on the date.[25]

Plaintiffs allege that Canopy must have committed fraud because, after disclosing inventory issues once, the company was later forced to disclose more serious inventory issues. Such "fraud by hindsight" allegations, without more, cannot be accepted as adequate. *See Pharmanet*, 720 F. Supp. 2d 517 ("Allegations that a company's later financial difficulties imply that earlier financial statements are misleading are 'fraud by hindsight' and do not state a claim.") (quoting *Suprema Specialities, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 647 (D.N.J. 2004)); *Hertz*, 2017 WL 1536223 at *17 (allegation that because

---

[24] There are other reasons to doubt FE6's statement in particular, but those concerns are better left for the "strong inference" analysis in the scienter section. *See infra*, Section IV.B. There, I evaluate the strength of plaintiffs' allegations, as opposed to whether they plausibly plead a claim.

[25]   Adding further uncertainty, this allegation identifies Mr. Castillo as VP of Canada Operations, a position which (according to Canopy) he attained only in October 2019, after the information was publicly disclosed. (SAC ¶ 99; DE 67 at 46 n.34.)

defendant subsequently admitted decision was a mistake, defendant must have known decision was a mistake at the time is fraud-by-hindsight); *see also California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("We have long rejected attempts to plead fraud by hindsight."). That a company takes a reserve charge, or must write down inventory, does not support a finding that the company's previous statements regarding those subjects were false when made. *In re Prudential Financial, Inc. Sec. Litig.*, 2020 WL 7706860 at *12 (D.N.J. Dec. 29, 2020) ("the fact that Prudential ultimately took a reserve charge after the annual review . . . . amounts to a quintessential 'fraud by hindsight' allegation" and so does not state a claim).

### iii. Whether Canopy Disclosed that the Facility Was Growing Only Extract-Quality Cannabis

The confidential witnesses nevertheless set forth a compelling allegation that the company began to experience its production problems early on, and that senior management was aware of the problems. For instance, defendant Linton was only co-CEO of the company until July 2019: if he visited the facilities in that capacity to discuss production issues, he must have done so before the first corrective disclosure in August 2019. Similarly, FE6's allegation that defendant Kovacevic stated that the company had an oversupply of oils and gelcaps inventory in January or February of 2019 indicates that the problems had already manifested themselves. And, of course, several of the confidential witnesses note that senior executives visited the facilities before recreational sales had even begun.

Canopy asserts that the Aldergrove and Delta facilities were always intended to grow extract quality cannabis. (DE 71 at 9.) FE4, however, asserts that the plan was for those locations to grow bud-grade cannabis. FE4 was the operations manager for the Aldergrove facility; one might reasonably assume that a person occupying FE4's position was privy to the facility's goal. Additionally, Canopy's claims that the company intended to grow extract-grade

cannabis are inconsistent with the plaintiffs' allegations that senior management repeatedly visited the facilities to resolve what it perceived to be quality issues and that there were numerous meetings with senior management where quality issues at the facilities were repeatedly discussed. If extract-grade cannabis was the plan all along, then presumably there would have been no quality issue to address.

Canopy argues in the alternative that, regardless of its plans, it told investors that the Aldergrove and Delta facilities were growing product for extraction. In its June 2019 AIF, the company stated that "[a]ll product produced at both the Delta Site and Aldergrove Site is shipped to the Smiths Falls facility for post-harvest, drying and extraction." (DE 67-10, Ex. H to Motion to Dismiss (June 2019 AIF at 20).) This sentence is ambiguous. Canopy reads it to mean that all product in Aldergrove and Delta was destined to undergo extraction. It could also be read, however, to disclose that all product was shipped to Smiths Falls, where it would undergo drying or extraction, or perhaps drying and extraction. On that second reading, "and" functions more like "or"; although that is not the typical use of the phrase, it is not unheard of in common parlance.[26]

Interpreting this phrase as I would a statute, I would find Canopy's interpretation more plausible. But in a suit for misstatements under the securities laws, the question is whether this disclosure would have put a reasonable investor on notice that the Delta and Aldergrove sites only produced extraction-grade cannabis. I cannot conclude that this disclosure was sufficient to inform a reasonable investor that "all product" was intended solely for "extraction."

---

[26] For instance, consider the phrase "all the children were running, swimming and jumping." One would not necessarily read that sentence to mean that all of the children were (or that each child was) simultaneously swimming, running, and jumping. "Or" would be less ambiguous, but "and" is sometimes used collectively in this way. On that reading, "drying and extraction" sets forth the range of processes to which some or all of the shipped product would be subject.

Similarly, Canopy points to its announcement that it was building an extraction facility on site at Aldergrove. This disclosure does not apply to the Delta site, however—and even as to Aldergrove, it does not inform a reasonable investor that *only* extract-quality products were being grown there.

Finally, Canopy asserts that defendant Kovacevic disclosed the quality of the cannabis by posting pictures of the relevant cannabis plants. That very small window into the quality of some plants does not tell investors much about their quality overall. It would likely strike the reasonable investor as an informal or promotional communication, not an actual disclosure.

More fundamentally, even if Canopy fully disclosed that Delta and Aldergrove were growing extract-grade cannabis, I still could not find they had disclosed the risks that plaintiffs identify. Plaintiffs' underlying complaint is that Canopy had excess inventory, which the company excused by telling investors that inventory levels were keyed to anticipated demand. The heart of plaintiffs' allegation is that the Delta and Aldergrove facilities produced a surplus of extraction-grade cannabis. That imbalance in inventory, plaintiffs allege, was a bug, not a feature; it was a result of failures in the production process, not a strategic assessment of market demand. Merely informing investors that a facility grows extract-grade product would not explain that inventory imbalance, or the true reasons for it.[27]

### iv. Whether the Allegations Establish that the Production Problems Created an Undisclosed Oversupply of Inventory

---

[27] Nor did Canopy disclose its inventory oversupply by disclosing the physical amount of cannabis it possessed. (DE 67 at 18.) In *Scott v. General Motors Co.*, the case which Canopy relies on for that proposition, the defendant disclosed that its inventory had increased by 30% but demand had increased by only 6%. 46 F. Supp. 3d 387, 396 (S.D.N.Y. 2014). Those disclosures together demonstrated what a disclosure of only inventory levels could not: that inventory had risen faster than demand had, creating an imbalance.

All of the foregoing establishes that Canopy had production problems at its facilities in early 2019 which the company did not disclose. It also establishes that senior management at Canopy knew about those production problems, and that defendant Kovacevic believed around January or February of 2019 that they had caused an oversupply problem. I find that the complaint adequately alleges that Canopy had an undisclosed inventory oversupply problem that it did not disclose to the public.

True, Canopy did disclose a "risk" of an oversupply of oils and gelcaps in August 2019. (SAC ¶ 271 (noting that after company had undergone an "assessment of the overall inventory levels versus rate of sale" it had identified "the risk of an oversupply of certain oils and softgel formats may exist in certain markets due, in part, to incomplete retail platforms in most provinces.").) At the same time, defendant Zekulin explained that the company took a returns charge based on Canopy's "assessment of the overall inventory levels versus rate of sale." (*Id.* ¶ 278.) Subsequently, the company disclosed a restructuring charge in November 2019 which included a $16 million write-off of excess or obsolete on-hand inventories. (*Id.* ¶¶ 11, 282.) At that point, the company "continued to see a disconnect between inventory levels and the rate of sale for certain products in the market." (DE 67-7, Ex. E to Motion to Dismiss, (Nov. 2019 Earnings Call Tr. at 7–8).) In February 2020, the company disclosed that it was undertaking a strategic review to bring its inventory into balance with its demand expectations, (*id.* ¶¶ 13, 292), and then in March it announced that it would take a $700–800 million charge and close Aldergrove and Delta; finally, in May 29, 2020, the company announced $132 million in inventory impairments, (*id.* ¶ 17.)

Plaintiffs counter that Canopy should have impaired its inventory in August, rather than November, 2019. (*Id.* ¶ 279.) They assert that though Canopy disclosed a *risk* of an oversupply of certain oils and softgels formats in August 2019, that disclosure was misleading, because the "risk" had already matured into a fully realized oversupply problem. (*Id.*) That conclusion is

56

buttressed by the statement of FE6 that defendant Kovacevic acknowledged the inventory oversupply as early as January 2019. If, as defendant Kovacevic allegedly admitted, the company had an actual oversupply problem at that point, its disclosure of a mere "risk" of oversupply might have been misleadingly grudging.[28]

There are reasons to doubt or discount FE6's statement. It does not quote defendant Kovacevic's precise words. It is secondhand, relaying information told to FE6 through Chief Marketing Officer Bigioni. Nor is it clear that defendant Kovacevic was speaking for the company; his opinion as (then) Vice President regarding inventory might have been a personal one. Nevertheless, on a motion to dismiss, I credit plaintiffs' well-pled factual assertions and draw every inference in their favor. As the Southern District of New York recently opined,

> Defendants demand more details about the Confidential Witness's communications with [individual defendant], . . . . But on a motion to dismiss, all that is necessary is that the Confidential Witness, by virtue of his position . . . and interaction[s] . . . ,, probably possessed the information underlying Plaintiffs' allegations . . . . [his] knowledge and credibility regarding the relevant information can be tested in discovery.

*Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018). Plaintiffs have alleged that much.[29]

---

[28] I find further support for FE6's statement in defendant Kovacevic's statement that Canopy did not "start getting provincial at-at-the-till data" until "4 to 8 months" after legalization, which would be consistent with the company developing data on demand at around February 2019 at the earliest. (DE 68 n.197; DE 67-7, Ex. E (Nov. 2019 Earnings Call Tr. at 14–15).)

[29] The focus here is on the adequacy of Canopy's disclosure of inventory surplus in August 2019. I do not find, however, any allegations making a plausible case that Canopy's November 2019 and February, March, and May 2020 disclosures were inadequate. Issues of loss causation or the dates of the Class Period, however, are not currently before the Court. *See Hall v. Johnson & Johnson*, 2019 WL 7207491 at *29 (D.N.J. Dec. 27, 2019) ("liability under the securities act is terminated when curative information is publicly announced or otherwise effectively disseminated") (quoting *In re Data Access Systems Securities Litigation*, 103 F.R.D. 130 (D.N.J. 1984)); *Lovallo v.*

### v. Whether Canopy Had a Duty to Disclose its Inventory Surplus to Investors

I conclude that plaintiffs have alleged a plausible case that Canopy had production problems which caused it to develop an undisclosed inventory surplus. Plaintiffs still, however, must allege that Canopy had a duty to disclose those problems and that surplus to investors. *Winter Family Trust*, 503 F.3d at 329; *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 390 (D.N.J. Aug. 21, 2018) (a "duty to disclose may arise . . . when there is . . . a corporate statement that, absent disclosure, would be inaccurate, incomplete, or misleading").

Plaintiffs' opposition and complaint center around the theory that Canopy "put in play" its inventory surplus by telling investors that its inventory was scaled to predicted market demand. (DE 68 at 21 ("By placing inventory and production capacity levels 'in play,' through repeated misstatements that Canopy's cannabis build-up, including of extracts, was scaled to meet actual demand, the defendants were required to disclose 'certain facts contradicting th[ose] representations.'") I concluded above that such statements, to the extent they involved future market demand, were forward-looking and so cannot give rise to liability. *See supra,* Section III.A; *see also* 15 U.S.C. § 78u-5(c)(1) ("in any private action . . . based on a untrue statement of fact or omission . . . a person . . . shall not be liable with respect to any forward-looking statement").

As also stated above, however, those statements had a present-focused component, in that they allegedly served as a pretext to conceal Canopy's current overproduction of inventory. *See* Section III.A.1.i. If Canopy issued

---

*Pacira Pharmaceuticals, Inc.*, 2015 WL 7300492 at *11 (D.N.J. Nov. 18, 2015) ("courts will assume that information is incorporated into the company's stock price the first time it is disclosed"); *see Payne v. DeLuca*, 433 F. Supp. 2d 547, 610 (W.D. Pa. 2006) (agreeing that "if the Court accepts Plaintiffs' allegation that the October 30, 2001 press release revealed the truth to Plaintiffs, that is the date on which the Class Period must end").

those statements in order to hide the real explanation for its inventory buildup, then they would've been required to disclose that fact to investors to avoid rendering the statements materially misleading. *Winer Family Trust*, 503 F.3d at 329. To that extent, then, Canopy had a duty to disclose the true facts concerning the production problems at the two manufacturing facilities.

Plaintiffs also rely on Canopy's "Risk Factor" sections in its MD&A, which did not disclose the inventory oversupply. *See supra,* Section III.B.[30] The parties have not briefed whether Canopy was obligated to disclose its surplus in those statements, *Cf. In re Prudential Financial, Inc. Sec. Litig.*, 2020 WL 7706860 at *12 (no general duty to disclose "any known trends or uncertainties that [a company] . . . expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"), though Canopy may not have needed a freestanding obligation to disclose in that section if it had issued misleading statements as a pretext, as previously discussed. Regardless, because I find that plaintiffs' claim will be dismissed on scienter grounds, I will not dwell on this issue except to note that it may need to be addressed in any amended complaint.

### 4. Whether Canopy Disclosed That It Had an Oversupply of Dry Flower Cannabis

Plaintiffs assert that Canopy never disclosed that it had a significant oversupply of dry cannabis. (DE 68 at 24.) They argue that investors reasonably understood Canopy's supply to be related to demand in the market,

---

[30]     Plaintiffs also claim that defendant Zekulin said on August 15, 2019 that the company's $8 million revenue reversal was "not related to our production flow here, simply related to the product mix that we see demand for," (DE 68 at 35; SAC ¶ 192). Further context reveals, however, that defendant Zekulin did not say that with respect to the company's revenue reversal, but rather to the company's sales figures for that period, and he was discussing the company's ability to get "products out the door" in its production process, not its inventory levels. (SAC ¶ 192.)

Additionally, in their Opposition, plaintiffs reference Canopy's statement that it grew "high-quality cannabis" and assert this put the inventory issues "in play." (DE 68 at 27.) This statement was not identified as a misleading statement in the complaint, (*see generally* SAC ¶¶ 147–269), and in any event is plainly puffery.

and that Canopy was obligated to disclose that its inventory was in fact in excess of market demand. (*Id.*)

These allegations largely mirror those regarding the oversupply of oils and gelcaps. (FE6's allegation regarding defendant Kovacevic's statement does not apply, however, Kovacevic only discussed oils and gelcaps. (*See* SAC ¶ 106 ("Chief Marketing Officer Bigioni informed FE6 that Defendant Kovacevic had told Bigioni that Canopy had produced far more *oils and softgels* than it could sell").) Plaintiffs thus have not adequately alleged facts supporting their theory that the company had a dry flower oversupply that it did not timely disclose. Their only allegations in support of an undisclosed problem are grounded in hindsight and as such do not state a claim.

### 5. Closures of Production Facilities

Like most of their other claims, plaintiffs' allegations regarding Canopy's production facilities fall short of stating a claim because, as previously noted, plaintiffs allege no facts indicating that Canopy knew its production facilities would need to be closed in advance of its announcement of the closures in February and March of 2020. The only allegations which support this claim are, as noted, grounded in fraud-by-hindsight.

### C. Allegedly Misleading Accounting Statements

The last group of alleged misleading statements relate to misstatements and omissions in defendants' financial statements. Specifically, plaintiffs identify as false (1) Canopy's valuation of its inventory assets, (2) its recognition of certain revenue, and (3) its failure to disclose provisions in its sales contracts which entitled Canadian provinces to return products and force price concessions essentially at will. They assert those valuations and revenue recognitions were misstatements because Canopy failed to impair its inventory for obsolescence and expiration, and failed to reserve revenue for returns or price concessions. (*See, e.g.*, SAC ¶ 151.) That failure to impair inventory allegedly resulted in the company's "[m]aterially overstat[ing] the value of [its] inventory," (*id.* ¶ 152(a)), as well as violating IAS 2 by failing to adequately

evaluate the net realizable value of its inventory and failing to disclose that its lack of data on which to base its decision to scale inventory was a material constraint on its ability to accurately understand the appropriate level of inventory (*id.* ¶ 152(d–e).) The failure to reserve revenue resulted in the company violating IFRS 15 by "materially overstat[ing] revenue, failing adequately to reserve revenue for returns . . . and price concessions," (*see, e.g., id.* ¶ 177(a)), and "recognizing material amounts of revenue when it was not 'highly probable' that a significant reversal of that revenue would not occur," (*id.* ¶ 177(b).) Finally, the omission of the return provisions allegedly violated IFRS 15 because it was a failure to "disclose quantitative and qualitative information about its contracts with customers and the significant judgments made." (*Id.* ¶ 177(e).)

Defendants respond that their representations regarding inventory and revenue in financial statements are statements of opinion, and so plaintiffs' claims are subject to the standard set forth in the United States Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Their position raises a number of questions, including whether *Omnicare* is applicable to Section 10(b) and 10b-5 claims, whether *Omnicare* applies to accounting statements, and finally whether Canopy's accounting statements in this case were false statements of opinion under *Omnicare*.

### 1. *Omnicare*

*Omnicare* concerned a claim under Section 11 of the Securities Act of 1933, which prohibits untrue statements of material fact, or omissions of material facts, made in connection with a registration statement filed with the Securities and Exchange Commission. 575 U.S. at 178; 15 U.S.C. § 77k(a). Omnicare filed a registration statement which essentially said that it believed its contractual agreements with healthcare providers and pharmaceutical manufacturers were legally valid. 575 U.S. at 179–80. Pension funds subsequently filed suit, claiming Omnicare had made "materially false" claims

61

about legal compliance because the federal government had later brought lawsuits against Omnicare for violating anti-kickback laws in its agreements. *Id.* at 180.

The Supreme Court rejected the plaintiffs' claims, concluding that statements of opinion, such as a statement that a company believes its contracts comply with the law, are only false under two circumstances: (1) where the statement falsely affirms that the speaker actually holds the stated belief, such as where a speaker who does not actually believe his company is complying with the law says that he does believe that to be the case; or (2) whether the statement contains embedded statements of fact which are false, such as where the speaker says that "I believe my company is in compliance with the law because the SEC has said we are," when the SEC had actually said no such thing. *Id.* at 184–85.

The Court also considered the possibility that a statement of opinion might be false where it omitted material facts. The Court concluded that an omission creates liability where it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" where those "facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 189. The court clarified that "[a]n opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts . . . . [a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Id.* at 190. Furthermore, the court noted that "an investor reads [statements in registration statements] in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* The court clarified that a complaint "cannot state claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion," and "the investor cannot just say that the issuer failed to reveal its basis," but must establish that "the issuer's failure to

include a material fact has rendered a published statement misleading," "and not merely by means of conclusory assertions." *Id.* at 194. The court was specific: "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.*

Before *Omnicare,* the Third Circuit found "[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (citing *In re Merck & Co, Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 166 (3d Cir. 2008)). So, to some extent, *Omnicare* is fairly similar to the Third Circuit's pre-existing rule on liability for opinion statements, although the *Edinburgh* rule may be considered "more restrictive." *Kanefsky v. Honeywell Int'l, Inc.*, 2020 WL 2520669 at *5 (D.N.J. May 18, 2020).

## 2. Whether *Omnicare* applies to Section 10(b) and 10b-5 Claims

The Third Circuit has "not considered whether *Omnicare* applies to claims brought under [Section 10(b)]," *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 n.16 (3d Cir. 2020), but district courts in this Circuit have found it to be "illuminat[ing]" on such issues, *In re Merck & Co, Inc. Sec., Derivatives & "ERISA" Litigation*, 2015 WL 2250472 at *20 (D.N.J. May 13, 2015); *see also id.* at 21 ("the *Omnicare* Court's analysis squares with the earlier holdings in this case, by both this Court and the Third Circuit, that Defendants' opinion . . . may constitute securities fraud if Defendants either subjectively disbelieved the opinion they asserted or lacked a reasonable basis for their expressed belief.").

Outside the Third Circuit, the majority view appears to be that *Omnicare* applies to 10(b) and 10b-5 cases. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) ("Although *Omnicare* concerned Section 11 claims, we conclude that the Supreme Court's

63

reasoning is equally applicable to Section 10(b) and Rule 10b-5 claims."); *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016); *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, __ F. Supp. 3d __, 2020 WL 6118605 at *15 (N.D. Ill. 2020) ("the court assumes that *Omnicare* applies" to Rule 10b-5 claims); *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 27 n.10 (D.D.C. 2017). Indeed, Section 11 of the Exchange Act, the provision at issue in *Omnicare*, imposes liability for "untrue statement[s] of . . . fact," while Rule 10b-5 contains a near identical limitation of liability to "untrue statement[s]" and omissions of "fact," 17 C.F.R. § 240.10b-5(b). I see no reason to apply a different rule to 10b-5 cases given the close similarity in the language of the two provisions.

### 3. Whether Inventory and Revenue Statements are Statements of Opinion Under *Omnicare*

One might initially think that nothing could be more straightforwardly a statement of "fact" than a company's statement of its inventory or revenue on a financial statement. After all, the amount of cannabis Canopy had to sell, or the amount that it sold in a previous quarter, are real-world facts; the company either did or did not possess or sell the claimed amount of cannabis during the relevant period. Still, accountancy, contrary to slang, consists of more than counting beans, or leaves. The governing accounting principles which applied to Canopy make clear that *valuations* of inventory or revenue are plainly "not matters of objective fact" but rather "are inherently subjective and involve management's opinion." *City of Dearborn Heights*, 856 F.3d at 613 (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)). I conclude that Canopy's statements of revenue and inventory, in this instance, are "opinions" under *Omnicare*.

The parties do not cite, and research has not uncovered, any Third Circuit opinion directly on point. The Second and Ninth Circuits, however, have held that certain accounting evaluations are statements of opinion, rather than "objective fact," when they depend on management's application of judgment

64

and subjective evaluation. *Id.* In both *City of Dearborn* and *Fait*, for example, those Courts considered management's valuation of business goodwill. "Goodwill" is an accounting term which applies, for example, when a company purchases or merges with another company. If, say, Company X purchases Company Y for $180 million, Company X must record $180 million in assets from the purchase. The fair value of Company Y's net assets, however, might be only $135 million. Company X would thus record the assets received from the purchase of Company Y as $135 million, and additionally record an asset of $45 million which it would call "goodwill." *See Fait*, 655 F.3d at 110.[31]

There is, however, typically no objective measure of what constitutes the "fair value" of Company Y's assets. *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) ("There is no universally infallible index of fair market value. There may be a range of prices with reasonable claims to being fair market value."); *see also Rhodes v. Amoco Oil Co.*, 143 F.3d 1369, 1372 (10th Cir. 1998)). In some instances, there might be quoted market prices which could help evaluate the value of a business's assets, Statement of Financial Accounting Standards No. 142 ¶ 23 ("Quoted market prices in active markets are the best evidence of fair value and shall be used as the basis for the measurement, if available), but even those are not infallible, and in any event they are frequently not available for some or all of a business's assets, *id.* ¶ 24 ("If quoted market prices are not available, the estimate of fair value shall be based on the best information available, including prices for similar assets and liabilities and the results of using other valuation techniques"). Goodwill determinations are therefore, according to the Ninth and Second Circuits, "subjective" rather than "objective factual matters." *Fait*, 655 F.3d at 111; *City of Dearborn*, 856 F.3d at 613.

---

[31]  That goodwill figure is not merely whatever amount is required to make column A equal column B. Assuming an arm's length transaction, the going-concern value of company Y, apart from its more readily identifiable tangible assets, would account for the $45 million. Were it not so (or believed to be so), company X would not be willing to pay the $180 million purchase price.

65

No case in the District of New Jersey has considered inventory and revenue statements in particular, but in *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223 at *11 (D.N.J. Apr. 27, 2017), Judge Arleo considered statements by a defendant in its Form 10-Ks that its financial statements were in compliance with Generally Applicable Accounting Principles ("GAAP"). She concluded that such statements were statements of opinion, noting that the defendant's 10-K made clear that "preparation of the GAAP-compliant financial statements 'requir[ed] management to make *estimates and judgments* that affect' the valuation of things like loan loss reserves or assets and liabilities, and that 'actual results could differ materially from those estimates.'" *Id.*

There is a difference between the statements in *Hertz*, which were essentially "I believe I am complying with GAAP," a clear statement of opinion, and the statements in this case, which were essentially "our inventory is worth X amount." But Judge Arleo's reasoning is instructive; as she explained, "GAAP standards are often subjective. They involve a range of possible treatments instead of a single set of calculations" and that such evaluations "are not matters of objective fact." *Id.* (citing *Shapiro v. UJBC Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) (noting that there is "no single method of evaluating and setting loan loss reserves, perhaps because no method has proven foolproof.")). Judge Arleo noted that "certain GAAP rules have objective application such that compliance would be a statement of fact," but concluded that those rules were not implicated in *Hertz*, where the defendants were accused of making misleading statements because they misidentified "estimated recoveries from third parties" and receivables with "significantly different credit risk profiles." *Id.* Judge Arleo concluded that "[a]n estimation of an amount, or a determination that two profiles are not just different, but significantly different, are inherently subjective tasks that vary depending on circumstances," and thus a statement that one has complied with GAAP by estimating or determining in such circumstances must be an opinion. *Id.*

66

Similarly, in *In re Prudential Financial Sec. Litig.*, 2020 WL 7706860 at *8 (D.N.J. Dec. 29, 2020), Judge Chesler considered Prudential's statements that its reserves were adequate, which he treated as statements of opinion. *Id.* at 9. He also concluded that Prudential's representation that it had complied with certain processes and methods to set and update reserves constituted an opinion because it was "inherently subjective." *Id.* at 13.

The case perhaps most directly on point is *In re Amtrust Fin. Servs., Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 153297 (S.D.N.Y. Sept. 9, 2019). There, the plaintiffs alleged that the defendants had, among other things, misstated certain numbers and results, such as net income, in the company's consolidated financial statements. *Id.* at 31. The court noted that the financial data "allegedly was false or misleading because of the accounting treatment applied to certain underlying metrics. It is the accounting treatment that plaintiffs contend was erroneous and thus resulted in a false or misleading number . . . on the financial statements." *Id.* at 33. The court, turning to reported net income, reasoned that "[i]f the numbers underlying [reported income] consist only of figures that were then presently known, fixed, or definite — e.g., the price of widgets and number of widgets sold in a previous month — then any resulting data would be a statement of fact . . . . [or] if the relevant provision of GAAP . . . applied to produce the data called only for the application of or evaluation under objective criteria, then the resulting data would be a statement of fact." *Id.* at 39. Crucially, however, the court reasoned that if "the relevant accounting guidance called for the exercise of judgment, then the resulting data would be a statement of opinion." *Id.* Thus, the court concluded, to establish that a defendant's accounting statement was a statement of fact, as opposed to a statement of opinion, plaintiffs were required to plead that a specific accounting rule (1) "objectively was the *only* correct guidance to apply" and that "Defendants did not apply that guidance and did not disclose either the particular guidance that they were applying, or that they had chosen not to apply the section that a reasonable investor would assume

applied to the transactions," *id.* at 43, or (2) that the defendant "applied [the relevant principle] in a manner that was objectively wrong," *Id.* at 60; *see also Sjunde AP-Fonden v. GE*, 417 F. Supp. 3d 379, 404 (S.D.N.Y. 2019) (valuation of "contract assets," which are recognized-but-not-yet-received revenues, are statements of opinion because they are "a reflection of 'management's opinion or judgment' as to how 'a variety of predictable and unpredictable circumstances' will play out.").

Applying the standards of those cases, I conclude that Canopy's valuation of inventory and revenue in its financial statements constitutes a statement of opinion. I come to that conclusion based on my review of the statements which plaintiffs challenge as false or misleading. Plaintiffs do not claim that defendants, for example, lied factually about how much cannabis was in inventory. Rather, they claim that defendants' valuations of inventory and recognized revenue contravened governing accounting standards, particularly International Accounting Standard ("IAS") 2, and International Financial Reporting Standard ("IFRS") 15.

IAS 2, *Inventories*, states:

Inventories shall be measured at the lower of cost and net realisable value.

IAS ¶ 9. It defines "net realisable value" as:

[T]he *estimated* selling price in the *ordinary course of business* less the *estimated* costs of completion and the *estimated* costs necessary to make the sale.

IAS ¶ 6 (emphasis added). It goes on to state that:

Estimates of net realisable value are based on the most reliable evidence available at the time the estimates are made, of the amount the inventories are expected to realise. These estimates take into consideration fluctuations of price or cost directly relating to events occurring after the end of the period to the extent that such events confirm conditions existing at the end of the period.

68

*Id.* ¶ 30. Estimates must also "take into consideration the purpose for which the inventory is held." For example, inventory being held to satisfy a confirmed sales contract should be valued at the contract price, rather than according to some different method of valuation. *Id.* ¶ 31.

IFRS 15, *Revenue from Contracts with Customers*, applies to reporting information about the nature, amount, timing and uncertainty of revenue and cashflows from a customer contract. (SAC ¶ 130.) To recognize revenue pursuant to IFRS 15, an entity must first identify the contract, which requires concluding that "it is probable that the entity will collect the consideration to which it will be entitled in exchange for the goods or services," which in turn requires considering "the customer's ability and intention to pay that amount of consideration," (DE 67-20 at 4–5 (IFRS 15)). The entity must then identify "performance obligations" (*id.* at 8), determine the "transaction price," which is the amount the entity expects to receive (*id.* at 14), allocate the price to each performance obligation in the contract (*id.* at 20), and then recognize revenue.

Under IFRS 15, a contract's consideration amount may vary due to price concessions, rights of return, or other similar items. (*Id.* at 15.) This is known as "variable consideration." The contracts which formed the basis for plaintiffs' allegations regarding revenue recognition and Canopy's disclosure obligations had variable consideration based on their rates of return. (SAC ¶ 286.)

In variable consideration contracts, the entity recognizing revenue must "estimate the amount of consideration to which the entity will be entitled." (DE 67-20 at 15.) Estimation must be done by using *either* "the expected value," which is "the sum of probability-weighted amounts in a range of possible consideration amounts," or "[t]he most likely amount" which is "the single most likely amount in a range of possible consideration amounts." (*Id.* at 16.) Furthermore, to prevent improper revenue recognition, estimation of variable consideration must be constrained except to the extent that it is "highly probable that a significant reversal in the amount of cumulative revenue recogni[z]ed will not occur when the uncertainty associated with the variable

69

consideration is subsequently resolved." (*Id.* at 17.) To determine if such a reversal is "highly probable," IFRS 15 directs entities to consider a variety of possibilities, including the risk of obsolescence of the promised good or service, the entity's limited experience with similar types of contracts, whether the entity has a practice of offering concessions or changing payment terms in similar circumstances, and if the contract itself has a broad range of possible consideration amounts. (*Id.*) Furthermore, when a contract includes a right to return products, revenue "should not be recognized" but rather the expected refund should be recorded as a refund liability and the returned products as an asset. (*Id.* at 16.)

IFRS 15 further requires entities to disclose sufficient information to enable users to understand the uncertainty of revenue and cash flows arising from consumer contracts, including qualitative and quantitative information such as whether the consideration in question contains a variable component, whether the estimate of the variable component was constrained, and whether the contract contains obligations for returns, refunds, or other obligations. (DE 67-20 at 28, 30.) It also requires entities to disclose qualitative and quantitative information about significant judgments and changes in judgments made in applying IFRS to contracts. (*Id.* at 31–32.)

The foregoing makes clear the extent to which inventory valuation and revenue recognition require an entity to exercise a significant amount of judgment. Inventory valuations under IAS 2 require management to estimate selling price in the "ordinary course of business" based on "the most reliable evidence available at the time" of the "amount the inventories are expected to reali[z]e." IAS 2 ¶¶ 6, 9. There is no fixed standard by which the "ordinary course of business" or the "most reliable evidence" can be judged; management must use some subjective measure of evaluation to come to any conclusions, and in most circumstances a range of conclusions would be acceptable. I conclude that Canopy's statements of inventory value were statements of opinion.

Similarly, revenue recognition under IFRS 15 requires management to assess the probability that it "will collect the consideration to which it will be entitled," based on its evaluation of the "customer's ability and intention to pay that amount of consideration," as well as to determine the transaction price, based on what the entity expects to receive. (DE 67-20 at 4–5, 14.) That, in turn, depends on management's evaluation of the likelihood that its contracting partner will be able to invoke price concessions or rights of return, as well as the rate at which the contracting partner would do so. (*Id.* at 15.) And that in turn requires a consideration of "the sum of probability weighted amounts in a range of possible consideration" or "the single most likely amount," while at the same time constraining estimates to those values which are "highly probable" that they will not be reversed. (*Id.* at 15–17.) Finally, management must take into consideration the risk of spoilage or obsolescence. (*Id.* at 17.) While historical data might be informative as to, say, the frequency with which a contracting partner invokes concessions or rights of return, any estimate will require the application of management's judgment. Similarly, management's determination of the risk of obsolescence involves predictions regarding demand, the rate of deterioration of product, and other considerations, each of which is a matter of judgment.

I thus conclude that Canopy's statements of its revenue were opinions.

### 4. Application

I nevertheless conclude that plaintiffs have pled claims under *Omnicare*. Plaintiffs allege the following:

> (Claim 1) Canopy failed to impair its inventory for problems caused by oversupply, thus inflating its value;

> (Claim 2) Canopy recognized revenue which was likely to be reversed, and

> (Claim 3) Canopy failed to disclose key terms in its contracts which injected uncertainty that such revenue would in fact be recognized.

71

I find plaintiffs have adequately pled claims (1) and (3).

Plaintiffs provide the following allegations in support of its claims:

(1) Canopy had "no data" upon which to determine whether it could recognize inflated revenue and value inflated inventory as it did;

(2) Canopy took an $8 million revenue charge on oil and gelcap returns but did not adjust its inventory valuation;

(3) Canopy took a $32.7 million charge for returns, return provisions, and pricing allowances, and an inventory charge of $15.9 million on November 14, 2019;

(4) Canopy closed approximately 40% of its production space and wrote down hundreds of millions of dollars of inventory and production assets in May 2020;

(5) Canopy stopped disclosing its cannabis inventory by product category;

(6) Canopy built up 2.5 years of inventory and had unproductive facilities.

(DE 68 at 42.) Additionally, plaintiffs assert that Canopy omitted to state

(1) That it inflated its inventory to get its "brands out there," not in response to consumer demand;

(2) That its grow facilities had produced poor quality cannabis only suitable for extract products;

(3) That its supply contracts "contained generous, near absolute 'rights to return product' and 'extract significant price concessions.'"

(DE 68 at 39, 41.)

I have already rejected the majority of these allegations. The claims that Canopy had "no data" or that it had embarked on an undisclosed brand building exercise are unsupported. *See* Section III.B.1–2, *supra*. The allegations related to Canopy's disclosures in August and November of 2019 and February, March, and May of 2020 are all fraud-by-hindsight allegations. *See* Section III.B.1.ii, *supra*. For similar reasons, they do not support a finding of accounting misrepresentations, either.

Claim 1, *i.e.*, that Canopy did not believe certain of its inventory statements when they were made, is adequately alleged. In particular, the alleged statements of FE6 support an inference that Canopy's inventory

statements in June 26, 2019 and August 14, 2019 were not believed when made. As previously noted in Section III.B.3, as it appears defendant Kovacevic believed the company's inventory could not be sold and thus should have been written down.

Claim 2, *i.e.,* that Canopy did not believe certain revenue statements when made, is not adequately alleged. Plaintiffs simply provide no evidence at all that Canopy did not believe its revenue statements. They merely allege that Canopy "must have" doubted its statements because it ultimately had to reverse some of the revenue it recognized, and repackage their rejected assertions that Canopy had "no data" or a secret brand building plan. Those allegations of fraud-by-hindsight are insufficient.

Claim 3, *i.e.,* that that Canopy failed to disclose that its contracts gave customers in the Canadian provinces an absolute right of return and the ability to extract significant price concessions, is adequately alleged. The complaint alleges that Canopy did not disclose until August 15, 2019 that its supply agreements with the provinces "allow for returns at any point in the future," and did not disclose until June 1, 2020 that its supply agreements "are subject to terms that allow for renegotiation of sale prices and termination at the election of the applicable cannabis control authority." (SAC ¶¶ 137–38.) The latter provision gave provincial purchasers significant leverage over price concessions because they could cancel a supply contract at any time.

An opinion is only misleading under an *Omnicare*-based omissions theory "if the speaker 'omits material facts' about its 'inquiry into or knowledge concerning a statement of opinion' that 'conflict with what a reasonable investor would take from the statement itself.'" *Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 112 (3d Cir. 2018) (quoting *Omnicare*, 135 S. Ct. at 1329). Not every omission related to a speaker's knowledge is misleading, however, because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; . . . [a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Id.* at 113

73

(quoting *Omnicare*, 135 S. Ct. at 1329). Thus, plaintiffs must "identify particular (and material) facts . . . facts about the inquiry the speaker did or did not conduct or the knowledge it did or did not have . . . whose omission makes the opinion statement at issue misleading to a reasonable person." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332).

Plaintiffs' claim here can be interpreted as one that Canopy rendered an opinion about recognition of revenue, but failed to disclose facts that undercut that opinion: specifically, contractual provisions that made that revenue much less likely to be recognized. Under that theory, Canopy was obligated to inform investors that it had decided to recognize the revenue despite that uncertainty.

Canopy responds that it disclosed the following:

- That products "could be subject to . . . recall or return . . . for a variety of reasons. If a product recall or return should happen, the Company could be required to incur unexpected expenses . . . .," (DE 67-6, Ex. D to Motion to Dismiss (June 2018 MD&A at 47));
- That Canopy "recognizes revenue in an amount that reflects the consideration that the Company expects to receive taking into account any variation that may result from rights of return," (SAC ¶ 143 n.19);
- That it had adjusted its inventory value to reflect "anticipated price changes," (DE 67-6 Ex. D to Motion to Dismiss (June 2018 Financials at 17));
- That its consideration was variable and so "[i]t is possible that material changes could occur that may adversely affect management's estimate of the recoverable amount for any agreement the Company enters into," (DE 67-10, Ex. H to Motion to Dismiss (June 2019 MD&A at 59).)

Those statements, however, are boilerplate disclosures that the company had variable consideration agreements and that its products, like any product, could be subject to return "for a variety of reasons." They did not disclose to investors that the company had built into its contracts absolute rights of return and the near-unilateral ability to renegotiate contracts.

74

I conclude that plaintiffs have stated a claim that Canopy omitted a material fact by failing to disclose these contractual provisions. Those omissions made Canopy's disclosures misleading. The existence of those provisions is plausibly a material fact which should have been disclosed under IFRS 15, because investors needed to know about them in order to appreciate the uncertainty of Canopy's revenue. Canopy could have concluded that its revenue was reliable despite those provisions, but its failure to inform investors of them prevented investors from fully understanding the basis for Canopy's opinion. *Omnicare*, 575 U.S. at 194.

## IV.   DISCUSSION: SCIENTER

The PSLRA requires that a defendant have "scienter," which is the intent to deceive, manipulate, or defraud investors. *Hertz*, 2017 WL 1536223 at 15. The plaintiff must allege "with respect to each act or omission alleged to violate this title" the "particular facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

To evaluate whether a complaint adequately pleads scienter, a court must consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. A "strong" inference, required to plead scienter, is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent . . . . The inference . . . need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 314, 324. The Court must consider the complaint as a whole, rather than individual allegation by individual allegation. *Id.*

Scienter may be demonstrated by strong circumstantial evidence of either conscious misbehavior or recklessness. *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000). Recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so

75

obvious that the actor must have been aware of it." *Infinity Grp.*, 212 F.3d at 192. To support an inference of scienter from circumstantial evidence, plaintiffs "must support their allegations by detailing, with particularity, 'the who, what, when, where and how'" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind. *Intelligroup*, 527 F. Supp. 2d at 285 (citing *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)).

"[S]cienter must 'not rest on a bare inference that a defendant must have had knowledge of the facts.'" *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)). Rather, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 286.

A "strong inference" of scienter may be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004).

Plaintiffs have pled sufficient facts to establish that defendants made materially false or misleading statements because they: (1) failed to disclose an oversupply of inventory which constituted a material risk to the company; (2) issued financial statements containing material misstatements regarding their inventory valuations; and (3) failed to disclose that their contracts were subject to absolute rights of return and subject to renegotiation at provinces' sole discretion, thus creating a significant risk of price concessions. Thus, in order to conclude that plaintiffs have adequately pled a claim, I must find that plaintiffs plead scienter with particularity with respect to each of those misstatements and that those allegations give rise to a "strong inference" of scienter.

Plaintiffs do not allege any facts indicating that the defendants had a particular, non-generic motive to misrepresent. "[T]heir complaint will only

survive the motion to dismiss . . . if they allege specific facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *GSC Partners*, 368 F.3d at 238.

## A. Pleading With Particularity

I do find that plaintiffs have pled particularized allegations supporting "the 'who, what, when, where and how'" required for scienter. *Intelligroup*, 527 F. Supp. 2d at 285. Specifically, with respect to the allegations that Canopy issued inventory valuation statements that it did not believe, the "who" is defendant Kovacevic,[32] and the "what" is that he believed Canopy had an inventory oversupply which they could not sell but did not disclose. The "when" is as early as January or February of 2019, well before the defendants disclosed any inventory surplus to the public; August 2019, when the company disclosed only a risk of oversupply; and November 2019, when the company finally disclosed its inventory was improperly valued. The "how" is via both failures to disclose the oversupply to the public and the failure to adjust inventory valuations in response to the oversupply.

Plaintiffs must also plead scienter regarding their allegation that Canopy failed to disclose the absolute rights of return and opportunity for price concessions that inhered in their contracts with the provinces.[33] "[I]n a non-disclosure situation, any required element of scienter is satisfied where . . . the defendant had actual knowledge of the material information," or where the

---

[32] Defendant Kovacevic's knowledge of the company's oversupply, and thus that its valuations (which were not adjusted down for oversupply) were incorrect, is imputed to Canopy via the doctrine of *respondeat superior*. *Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506 at *9 (D.N.J. June 12, 2020).

[33] *Omnicare* concerned a claim under Section 11 of the Securities Act, which establishes a strict-liability offense for which scienter need not be established, 15 U.S.C. § 77k(a), so the *Omnicare* Court did not discuss the interaction between its decision and the scienter requirement. The statute creating liability for Section 10(b) claims requires proof of scienter, however, so I will require that proof here. *See In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669 at *18 (D.N.J. Mar. 29, 2021) (rejecting argument that scienter need not be proven for *Omnicare*-related claims in Section 10(b) context.)

omission "presents a danger of misleading buyers or sellers that is . . . so obvious the actor must have been aware of it," *GSC Partners*, 368 F.3d at 239 (quoting *In re Advanta*, 180 F.3d at 535). "[I]t is not enough," however, "for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." *Id.* However, if plaintiffs offer "reasons *why* [defendant] should have known" that make out a plausible case, courts will find scienter adequately pled. *Kennedy v. Am. Airlines Inc.*, 760 Fed. Appx. 136, 140 (3d Cir. 2019).

I find that plaintiffs have alleged particular facts setting out knowledge here. Canopy's contracts with provincial stores contained absolute rights of return and the ability for a province to cancel the contract at any time— provisions which are quite favorable to the provinces and give them powerful leverage over Canopy. These provisions were in all of Canopy's contracts; it is inconceivable that the company did not know about them. *See Avaya*, 564 F.3d at 269–72 (not plausible that executives were unaware of issues involving "core matters" of company). These provisions created a significant likelihood that the company's revenue figures could prove illusory, because it would be subject to renegotiation on its contracts or take significant returns. It is therefore quite plausible that the company was aware of the provisions and understood their significance, and thus was at least reckless in declining to disclose their existence.

**B. Strong Inference**

Whether a "strong inference" is warranted "involves a comparative inquiry that evaluates how likely is one conclusion as compared to others, in light of the pleaded facts." *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 388 (D.N.J. 2018); *see also Tellabs*, 551 U.S. at 323 ("The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"). However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S.

78

at 324. "[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Avaya*, 564 F.3d at 272–73. Scienter will not lie, however, if plaintiffs' theory "does not make sense on the facts alleged," or "alone present a cogent or compelling" theory of scienter. *In re Adolor Corp.*, 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009). Ultimately, the plaintiffs' burden is to establish that the inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Because this is a comparative exercise, I first consider the strongest innocent explanation of Canopy's behavior. Canopy explains, as it told investors from the outset, that it sought to "position itself as an early leader in terms of cannabis and cannabis oil production, (DE 67-14, Ex. L, June 27, (2018 Form 6-K at 4–5)), and so based on its forecast of cannabis demand, ramped up its production facilities, (DE 67 at 8.). Though cannabis was legalized by Canada's federal government in June 2018, the federal government devolved regulation of sales to the provinces. (DE 67 at 7.) The provinces undertook two decisions which served to slow the rollout of cannabis as a retail market. The first was that Ontario decided that cannabis sales would be handled by government-run retail stores, which Canopy noted would be a less profitable business model than private retail. (SAC ¶ 49; DE 68 at 5.) Second, after Ontario elected a new provincial government, it announced on August 13, 2018 that it would permit certain private retail stores, but not before April 1, 2019. (SAC ¶ 52.) Because Ontario is Canada's largest province, containing some 37% of the country's population, those decisions significantly hampered the development of the Canadian cannabis market.

At some point between February and June of 2019, Canopy began to receive "at-the-till" sales data. (DE 67 at 13–14; DE 68 at 41 n.197.) In its first quarterly disclosure covering that time period, in August 2019, the company disclosed the "risk" that its inventory was not matched to demand, and informed investors that it would have to reverse recognized revenue as a result

of product returns. (DE 67 at 11–12.) In its next quarterly disclosure, in November 2019, the company disclosed that it had undertaken a review of inventory and demand levels and had identified an oversupply of oil and gelcap products. As a result, the company said, it had reversed recognized revenue, written down inventory as obsolete, and taken a reserve for expected price concessions. (DE 67 at 13–14.) The company warned that the government's "inability . . . to license retail stores . . . has resulted in half of the expected market in Canada simply not existing," and warned that new stores could not "come soon enough . . . and until this happens, the cannabis sector cannot reach its full sales potential." (DE 67 at 13.)

Then, in February 2020, the company informed investors that the cannabis market had "taken longer to develop . . . than was originally . . . expected," and that the company could not continue operating at its current scale. (DE 67 at 14.) It then closed the Aldergrove and Delta facilities and wrote down significant amounts of assets, including production facility assets and obsolete or expired inventory.

Thus, the innocent explanation of Canopy's inventory issues would be that it entered the market with the intention of being an early leader, but faced setback after setback due to Canadian government actions which caused the cannabis market to develop more slowly than expected. Once the company began to get the first "at-the-till" facts about demand for its products between February and June of 2019, it disclosed the emerging risks to its investors, first by identifying a "risk" of oversupply in August 2019, and then by informing investors in November 2019 that, based on its review of demand, it had concluded that there was an oversupply in fact. While the company remained optimistic that the market for its products would eventually develop, the continued slow roll-out by the Canadian federal government, along with a slow growth in demand, eventually convinced the company that a more significant reckoning with its inventory and production facilities was needed in

February 2020, and it began pulling back in March and May of 2020 by closing major facilities and writing down significant amounts of inventory.

Plaintiffs' contrary, less benign explanation is that Canopy became aware of its oversupply in January or February of 2019, but failed to disclose that fact in a timely fashion. The support for their version of events boils down to FE6's recollection of being told by Chief Marketing Officer Bigioni that Kovacevic had said in January or February of 2019 that the company had an oil and gelcap oversupply.[34] But there are numerous reasons to discount this evidence, as outlined above. First, FE6 does not offer an actual quotation of what defendant Kovacevic said, beyond the bare statement that there was an oversupply. FE6's barebones account is thus consistent with a number of possibilities, including that defendant Kovacevic had simply expressed his personal doubts about the company's inventory to Bigioni, or had said that he suspected the company had, or might develop, an oversupply. This ambiguity is important; the somewhat subtle alleged falsehood is that the company delayed for a period of months in reporting that what it called a risk had ripened into an actuality. Defendant Kovacevic's mere suspicion, or a developing opinion, would not have been enough to require Canopy to announce an oversupply or write down its inventory valuation in August 2019. Under that scenario, the company's course of action, which involved disclosing the "risk" of an oversupply in conjunction with an investigatory review of its inventory levels, might well have been enough. *Slayton v. American Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.") (quoting *Higginbotham v. Baxtern Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007)); *see also In re Northern Telecom Ltd., Sec. Litig.*, 116 F. Supp. 2d 446, (S.D.N.Y. 2008) ("we do not suggest that

---

[34] As noted throughout Section III.B, though plaintiffs offer a number of other allegations in support of their claims, but those allegations are either unsupported, rely on a fraud-by-hindsight theory, or do not relate to an inventory oversupply.

material facts must be disclosed immediately; the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC") (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 850 n.12 (2d Cir. 1968)).

Second, FE6 only relays what he heard secondhand. FE6 does not claim to have heard defendant Kovacevic's statement directly, but says that he heard about if from Chief Marketing Officer Bigioni. *Intelligroup*, 527 F. Supp. 2d at 361 (second-hand information and hearsay not probative); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1205–06 (D. Ore. Aug. 2006) (hearsay inadmissible to prove scienter)). Such statements are generally considered less reliable; they presuppose not only the truthfulness and reliability of Bigioni and FE6 as witnesses, but also the accuracy of a report of an oral statement that passed through two intermediaries.

These defects count strongly against FE6's statement; they undermine its reliability as a representation of defendant Kovacevic's contemporaneous beliefs. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013) (if an anonymous source's basis of knowledge and reliability is "found wanting . . . [courts] must discount them steeply.") (quoting *Avaya*, 564 F.3d at 263). Given the "omissions and ambiguities" in FE6's statement, it makes a weak case for scienter. *Id.* ("omissions and ambiguities count against inferring scienter under PSLRA's particularity requirements").

Setting aside the circumstances of FE6's statement, there are reasons to discount its substance. Although defendant Kovacevic ultimately became President of Canopy in June 2019, he was only a vice president at the time of his alleged statement to Bigioni, and his statement did not necessarily reflect the views of management. And even if it did, Canopy's ability to sell its product at all depended on provincial decisions regarding how many stores to open, an issue still up in the air in January or February of 2019. Any conclusion about how much cannabis the company could sell would have been premature at the

82

time Kovacevic made his statement—another reason that Canopy's disclosure, confined to a "risk" of oversupply, might have been judged appropriate at the time.

Canopy also correctly notes that plaintiffs have not established any convincing motive for Canopy's alleged misbehavior. It would have been economically irrational, they say, to knowingly and needlessly produce perishable inventory and expand facilities for no anticipated benefit. The lack of a convincing motive is not fatal to plaintiffs' claims, but it may raise the threshold of persuasion regarding conscious disregard or recklessness. *GSC Partners*, 368 F.3d at 238 (lack of motive may require that quantum of other proof "be correspondingly greater.").

Furthermore, an independent auditor evaluated Canopy's financial statements and approved of them. That circumstance, in itself, weighs heavily against scienter. *Roofer's Pension Fund v. Papa*, 2018 WL 3601229 at *20 (D.N.J. July 27, 2018) ("the approval of an independent auditor is strongly probative of a lack of scienter"); *In re Iconix Brand Grp. Inc.*, 2017 WL 4898228 at *19 (S.D.N.Y. Oct. 25, 2017) ("while 'an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness, the fact that [an auditor] did not detect, observe, or otherwise note any improprieties in Iconix's financial accounting—over three consecutive audit years—is significant"); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (clean audit "is highly probative of an absence of scienter").

In light of the foregoing, I conclude that plaintiffs' allegations fail to establish a "strong inference" of scienter. A statement by a confidential witness relaying secondhand the gist of a statement by a then-vice president, given the other contrary evidence, is not sufficient.[35]

---

[35]    Canopy argues that defendant Kovacevic posted cannabis plants on Twitter and so the company lacked scienter. Such arguments are hard to take seriously. Kovacevic's choice of a few select plants to show the public in a social media post does

As for Canopy's failure to disclose the provisions in its agreements regarding price concessions and rights of return, I similarly find that plaintiffs have failed to allege a "strong inference" of scienter. Lacking here is even anything akin to FE6's allegation regarding defendant Kovacevic's statement.

Furthermore, plaintiffs offer no counterargument to the fact that Canopy's independent auditors, after reviewing its financial statements, concluded that the company was not obligated to disclose those provisions to investors. While a clean audit does not rule out the possibility of finding scienter, *Papa*, 2018 WL 3601229 at *19, it is difficult to conclude that plaintiffs behaved recklessly in omitting to inform investors facts when trained financial professionals investigating the company did not conclude that such a disclosure was necessary. And there is no further independent evidence of Canopy's knowledge or recklessness.

Finally, plaintiffs claim that they should enjoy the benefit of a strong inference of scienter because the production and inventory issues at Canopy concerned "core matters" of central importance to the company. (DE 68 at 52 (quoting *Avaya*, 564 F.3d at 269).) In *Avaya*, however, the court only concluded that it was not plausible that the defendants were unaware of problems in particularly important segments of the company. 564 F.3d at 269–72. Here, however, there is no realistic dispute that Canopy's executives were aware of production and inventory issues. Plaintiffs have plausibly alleged that they were. The sole issue here is a judgment call about the point at which those issues, which were under investigation, instantiated themselves as problems which the company was required to disclose. I find that plaintiffs have not pled

---

not indicate that Canopy was open with the public about the quality of its plants. Nor would any reasonable investor rely on such photos as indications of product quality.

Canopy also cites a video which was available for public viewing which showed the quality of the plants at Aldergrove and Delta, claiming the existence of that video put investors on notice of the production problems. Canopy omits to mention, however, that the video in question was leaked. Canopy cannot prove a lack of scienter based on disclosures which occurred against its will.

sufficient facts to indicate that Canopy, possessing scienter, failed to disclose any of the alleged production or inventory problems in a timely manner.

## V.     SECTION 20(a) ALLEGATIONS

Since plaintiffs fail to adequately state Section 10(b) and Rule 10b-5 claims, I dismiss the Section 20(a) claims against the individual defendants. Liability under Section 20(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t-1(a); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999). Claims under Section 20(a), therefore, are "derivative—requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 474 (D.N.J. 2000). Plaintiffs have failed to plausibly allege a predicate violation of Section 10(b) or Rule 10b-5, so I will dismiss their 20(a) claims.

## VI.     CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted, without prejudice to the filing of a proposed Third Amended Complaint within 30 days. An appropriate order accompanies this opinion.

Dated: May 17, 2021

/s/ Kevin McNulty
_____
**KEVIN MCNULTY**
**United States District Judge**