Jeremy A. Lieberman
Brian Calandra
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
bcalandra@pomlaw.com

Steve W. Berman
Shayne C. Stevenson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Ave., Suite 2000
Telephone: (206) 268-9340
Facsimile: (206) 623-0594
steve@hbsslaw.com
shaynes@hbsslaw.com

Lead Counsel for Plaintiff Class
(*additional counsel on signature page*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDUARDO ORTIZ, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>   v.<br><br>CANOPY GROWTH CORPORATION, BRUCE LINTON, MARK ZEKULIN, MIKE LEE, TIM SAUNDERS, DAVID KLEIN, and RADE KOVACEVIC,<br><br>                Defendants. | Case No. 2:19-cv-20543-KM-ESK<br><br>**Oral Argument Requested**<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT....................................... 1

II.  FACTUAL BACKGROUND.......................................... 4

III. ARGUMENT.................................................... 7

A.   The TAC adequately pleads falsity and scienter for Defendants' failure to disclose customers' right to return product and extract price concessions......... 7

B.   False and misleading statements in Canopy's risk factors discussion in its several SEC filings are actionable........................................ 10

C.   The TAC pleads a strong inference of scienter....... 13

1.   Linton's and Zekulin's suspicious trades demonstrate their motive to commit fraud....... 13

2.   Kovacevic knew of oversupply by early 2019..... 26

3.   The TAC alleges Defendants' scienter for statements regarding Canopy's risk factors, overstated inventory, and failure to disclose contractual rights of return................... 27

4.   The TAC alleges a strong inference of scienter more compelling than any competing inference... 29

D.   The TAC sufficiently alleges claims under §20(a).... 30

IV.  REQUEST FOR LEAVE TO AMEND................................. 30

V.   CONCLUSION................................................. 30

## Table of Authorities

**Page(s)**

**Cases**

*Batwin v. Occam Networks, Inc.,*
   *2008 WL 2676364, at \*14 (C.D.Cal. Jul. 1, 2008)* ............21

*City of Hialeah Emps' Ret. Sys. & Laborers Pension Tr.*
   *Funds for N. California v. Toll Bros.,*
   2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ...................17

*De Vito v. Liquid Holdings Grp., Inc.,*
   2018 WL 6891832 (D.N.J. Dec. 31, 2018) ..................18, 28

*Fergus v. Immunomedics, Inc.,*
   2020 WL 2832565 (D.N.J. June 1, 2020),
   reconsideration denied,
   2021 WL 1171636 (D.N.J. Mar. 29, 2021) ....................28

*Heller v. Goldin Restructuring Fund, L.P.,*
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) .........................8

*Hutchins v. NBTY, Inc.,*
   2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ..................24

*In re Acuity Brands, Inc. Sec. Litig.,*
   2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) .................22

*In re Advanta Corp. Sec. Litig.,*
   180 F.3d 525 (3d Cir. 1999) ................................19

*In re Alpharma Inc. Sec. Litig.,*
   372 F.3d 137 (3d Cir. 2004) ................................26

*In re Cabletron Sys., Inc.,*
   311 F.3d 11 (1st Cir. 2002) ................................11

*In re Cendant Corp.,*
   60 F. Supp. 2d 354 (D.N.J. 1999) ...........................28

*In re City of Philadelphia Litig.,*
   158 F.3d 711 (3d Cir. 1998) ................................11

*In re Cognizant Tech. Sols. Corp. Sec. Litig.,*
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ......................30

*In re Emerson Radio Corp. Sec. Litig.*,
   2005 WL 8131267 (D.N.J. Dec. 20, 2005) ......................26

*In re: Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015) ...................14, 15

*In re Gentiva Sec. Litig.*,
   971 F. Supp. 2d 305 (E.D.N.Y. 2013) .........................18

*In re Hertz Glob. Holdings Inc*,
   905 F.3d 106 (3d Cir. 2018) .................................21

*In re KeySpan Corp.*,
   2003 WL 21981806 (E.D.N.Y. July 30, 2003) ..................24

*In re Mylan N.V. Sec. Litig.*,
   379 F. Supp. 3d 198 (S.D.N.Y. 2019) .........................11

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ............................10, 12

*In re Orbital Scis. Corp. Sec. Litig.*,
   58 F. Supp. 2d 682 (E.D. Va. 1999) .........................23

*In re Oxford Health Plans, Inc., Secs. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ..........................15, 18

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) .......................17, 18

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ................21, 22

*In re Silver Wheaton Corp. Sec. Litig.*,
   2016 WL 3226004 (C.D. Cal. June 6, 2016) ...................7, 8

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) .........................25

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
   124 F. Supp. 2d 527 (S.D. Ohio 2000) ........................18

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .............................*passim*

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ..................24, 30

iv

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ....................15, 25

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) .................................27

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ................................19

*Levy v. Gutierrez*,
   2017 WL 2191592 (D.N.H. May 4, 2017) .......................22

*Local 731 I.B. of T. Excavators & Pavers Pension Tr.
   Fund v. Swanson*,
   2011 WL 2444675 (D. Del. June 14, 2011) ...................16

*Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008) ................................14

*No. 84 Emp.- Teamster Joint Council Pension Tr. Fund
   v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...............................22

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir.2000) .................................11

*Ortiz v. Canopy Growth Corp.*,
   2021 WL 1851933 (D.N.J. May 7, 2021) ..................*passim*

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D.Cal. 2008) .............................20

*Pennsylvania Dep't of Hum. Servs. v. United States*,
   897 F.3d 497 (3d Cir. 2018) ................................20

*Rahman v. Kid Brands*,
   736 F.3d 237 (3d Cir. 2013) ................................29

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...............................22

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ..............8, 28, 29

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27
   (2011) .....................................................11

v

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d Cir. 1999) .................................14

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) .........................29

*Victaulic Co. v. Tieman*,
   499 F.3d 227 (3d Cir. 2007) .................................19

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) .................................11

## **Statutes**

Exchange Act §20(a)..........................................30

## **Rules**

Rule 10b-5...................................................30

## I. PRELIMINARY STATEMENT

In dismissing the Second Amended Complaint ("SAC"), this Court found numerous false statements adequately pleaded, but held that even though the SAC's scienter allegations were sufficiently particularized, they fell short of the strong inference required, including for lack of a non-generic motive. Plaintiffs' Third Amended Complaint ("TAC") addresses the Court's reservations, and Defendant's Motion should be denied.[1]

The Court found that the SAC "set forth an impressive array of allegations indicating that Canopy had production problems in its facilities at Delta and Aldergrove, and that Canopy senior executives knew about those problems" based on "interlocking, corroborative accounts" by multiple former employees ("FEs").[2] The Court found sufficient allegations of falsity that Canopy (i) failed to disclose an oversupply of cannabis oils and gelcaps inventory constituting a material risk to the Company—an oversupply created only because its purportedly state-of-the-art facilities produced low-quality cannabis that could only be used to produce extracts, rather than because of any expectation of demand; (ii) issued materially false and misleading financial

_____

[1] References to "TAC" are to Plaintiffs' Third Amended Complaint. Dkt. 77. References to "Motion" or "Mot." are to Defendants' motion to dismiss the TAC. Dkt. 80.

[2] *Ortiz v. Canopy Growth Corp.*, 2021 WL 1851933, at *24-27(D.N.J. May 7, 2021) ("Order"). In all citations, emphasis is added and quotations and citations omitted unless otherwise indicated.

1

statements failing to impair inventory to account for its overproduction of extract products; and (iii) issued materially false and misleading financial statements and failed to disclose the risk that customers had an absolute right of return and to extract substantial price concessions.

The Court further found that the SAC alleged circumstantial evidence of Defendants' scienter, holding that "there is no realistic dispute that Canopy's executives were aware of production and inventory issues," and that Defendants knew, or were reckless in not knowing, about the inventory overvaluation and failure to disclose rights of return and price concessions.

The TAC's allegations address the Court's reservations and sufficiently allege a motive for Linton's and Zekulin's fraud. The TAC alleges that in June 2019——just before Linton was fired and the Company took an $8 million charge for returned oils and gelcaps and disclosed both the oversupply of extracts and right to return product——Linton and Zekulin sold the majority of their available shares. Earlier, in September 2018, shortly after seeing first-hand the production problems at Delta and Aldergrove, and despite assuring investors that inventories were being scaled to meet market demand, Linton and Zekulin sold hundreds of thousands of their shares.

Further, the TAC details that Kovacevic confirmed the oversupply long before it was disclosed. The TAC alleges with

2

particularity that in a late 2018 or early 2019 meeting, an FE heard Kovacevic say Canopy could not fix the problems at Delta and Aldergrove. This corroborates allegations from another FE that in a January or February 2019 leadership meeting, Kovacevic said Canopy had more extracts than it could sell.

Defendants argue that the TAC fails to plead that Linton's and Zekulin's stock sales were suspicious in timing or scope, and that the new Kovacevic allegations are meaningless——but Defendants are wrong. First, the timing of Linton's and Zekulin's trades are suspicious——executed within *weeks* after misrepresentations or before corrective disclosures——and their scope is unusual, as they sold large percentages of available shares for profits dwarfing their ordinary compensation.

Second, Defendants disregard the Kovacevic allegations and ignore the proper totality standard for evaluating scienter. Considered holistically, the TAC's allegations establish a strong inference that Defendants (1) knew they were growing low-quality cannabis that could only be used for extracts; (2) knew, before February 2019, that they could never hope to sell this inventory; (3) knew that even if they succeeded in selling large amounts of extracts to the provinces, those provinces could return them or extract price concessions; and (d) knew that the Company would announce the return of material amounts of oils

3

and gelcaps in August 2019. This is why Linton and Zekulin sold volumes of stock before the value dropped.

## II.    FACTUAL BACKGROUND[3]

The TAC alleges Linton's and Zekulin's (and thus Canopy's) scienter by alleging a specific motive——they made suspiciously timed trades of large amounts of Canopy shares for unusually large profits during the Class Period. These suspicious sales occurred in the *Toronto* stock market, so an investor in Canopy's shares sold on the NYSE would have no idea these trades occurred by searching the SEC website or Canopy's SEC filings.[4]

Linton's first suspicious trade occurred on September 27, 2018, after learning that Delta and Aldergrove could not produce high-quality cannabis. With Canopy's share price inflated by multiple misstatements,[5] Linton sold 307,845 Canopy shares that he owned indirectly through his Company HBAM Holding Inc. ("HBAM") for $19.9 million.[6] Then, in June 2019, Linton reaped windfall profits again when he sold shares less than a week before he was fired, and less than two months before investors learned, for the first time, that Canopy had massively

_____

[3] Plaintiffs state facts relevant to this Motion. The TAC preserves and reasserts the SAC's claims and allegations. TAC at 2 n.1. Plaintiffs incorporate by reference their opposition to Defendants' motion to dismiss the SAC. Dkt. 68.

[4] ¶¶ 119, 130.

[5] ¶¶ 86–87; 162–74, 265–66.

[6] ¶ 121.

overproduced oils and softgels and that provinces had the contractual right to return products.[7] Specifically, on June 26, 2019, Linton exercised options on 347,736 shares for a one-day profit of $15.8 million.[8] The June 26, 2019 sales constituted 59% of the shares Linton directly held in Canopy, and 12.1%[9] of his shares owned directly or indirectly through HBAM.[10]

Linton's Class Period sales and profits far outpace his activity and profits in a period of the same length immediately preceding the Class Period.[11] In total, Linton reaped approximately $30.5 million in profit from sales of Canopy stock during the Class Period, a *200% increase* in profits from the 10.1 million in profits he made (from a single sale) during the period of the same length directly preceding the Class Period.[12]

The TAC further alleges that Zekulin, Linton's co-CEO,[13] likewise engaged in unusual and suspicious sales in September 2018 and June 2019. Zekulin knew of the problems at Delta and Aldergrove, and on September 27, 2018, sold 536,095 shares for

---

[7] ¶¶ 120–23.

[8] ¶ 120.

[9] Due to a scrivener's error, the TAC alleges that Linton sold 14.3% of the shares he owned directly or indirectly on June 26, 2019. The correct percentage is 12.1%.

[10] *Id.*

[11] ¶ 123.

[12] ¶¶ 122–23.

[13] ¶ 31.

5

$33.1 million in profits.[14] From June 26-28, 2019, Zekulin sold 100% of his directly and indirectly owned shares for profits of approximately $21.9 million.[15] These Class Period sales and profits far outpaced Zekulin's pre-Class Period activity and profits.[16] In fact, Zekulin reaped approximately *$55 million* in profits from Class Period sales, a *1,000% increase* over profits from trades in the same length of time pre-Class Period.[17]

The TAC also adds allegations of Kovacevic's knowledge of the extract oversupply. The TAC adds statements from FE1, who attended weekly meetings with Kovacevic in late 2018 and early 2019[18] and heard first-hand Kovacevic say that Canopy did not have the ability to fix the failure to grow high-quality cannabis at Delta and Aldergrove because of the conditions at those facilities.[19] The TAC also states that during a January or February 2019 leadership meeting, attended by both Kovacevic and Bigioni, Kovacevic told Bigioni that the Company had produced far more oils and gelcaps than it could sell.[20]

---

[14] ¶ 127.

[15] ¶¶ 125-26.

[16] ¶ 129.

[17] ¶¶ 128-29.

[18] ¶ 88.

[19] *Id.*

[20] ¶ 106.

## III.  ARGUMENT[21]

**A.    The TAC adequately pleads falsity and scienter for Defendants' failure to disclose customers' right to return product and extract price concessions.**

This Court previously found sufficient the allegations that Canopy's failure to disclose customers' absolute right to return before August 15, 2019, or to extract significant price concessions until November 14, 2019, violated a duty to disclose. The Court held that the TAC plausibly alleged that Canopy violated IFRS 15,[22] rendering Canopy's disclosures misleading because in the absence of disclosure investors were unable to appreciate the uncertainty of Canopy's revenue.[23]

The Court nevertheless held scienter not adequately pleaded because the TAC failed to allege when Defendants knew that customers would return oils and gelcaps.[24] The TAC, however, sufficiently alleges scienter for Defendants' failure to disclose rights to return and to extract price concessions.

---

[21] The Order, at *10-11, lays out the applicable legal standards.

[22] IFRS 15 requires Canopy to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts. ¶¶ 20, 147, 156-59. *See, e.g., In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *7-10 (C.D. Cal. June 6, 2016). Importantly, the Court in *Silver Wheaton* held that the defendants had breached a duty to disclose a potential tax liability under IFRS 15 regardless of whether Canadian courts would ever rule the Company had a tax liability. *See id.*

[23] Order at *44.

[24] *Id.*

7

Although the Court noted that Canopy's independent auditor issued a clean audit letter, this does not rule out the possibility of scienter,[25] and the June 2019 audit letter that Canopy received only applied to the Company's "consolidated financial statements," *i.e.*, it *did not address Defendants' failure to disclose customer rights of return or price concessions* in the Company's 2019 AIF or MD&A.[26]

Further, the Court agreed "it is inconceivable that the company did not know" that their customer contracts contained rights to return products and to extract price concessions.[27] Allegations that defendants knew facts or had access to information suggesting that their public statements were not accurate are sufficient to plead a strong inference of scienter under the conscious misbehavior or recklessness prong.[28] Thus, even in the absence of Defendants taking a charge for returned product, or knowing with some certainty that returns would occur at some specific time, as in *Silver Wheaton*, their failure to carry out their duty to disclose, by itself, establishes scienter at this stage.

---

[25] *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*19 (D.N.J. July 27, 2018).

[26] Calandra Cert. Ex. 11 at 4.

[27] Order at \*41.

[28] *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621-22 (S.D.N.Y. 2008).

The TAC's allegations, considered holistically, establish Defendants' scienter. The TAC establishes that Defendants knew about the overproduction of oils and gelcaps caused by their growing problems.[29] Further, the FEs confirm that Defendants were overproducing oils and softgels because they had no choice and were pushing those products on provinces because they were overproducing them, not because of any expectation of demand.[30] This renders likely a materialization of the risk that they failed to disclose——*i.e.*, that provinces would return products or extract price concessions. The TAC adds that Kovacevic himself, who was involved in the day-to-day decision-making as Canopy's Senior Vice President of Sales and Operations, and Managing Director,[31] knew by early 2019 at the latest that Canopy would never be able to sell its enormous oils and gelcaps inventory.[32] It is more than plausible that he knew that customers would likely return products. Finally, it is inconceivable that co-CEOs Linton and Zekulin, who also knew the reasons for the overproduction of oils and gelcaps, did not know well before August 2019 that returns were imminent, much less possible. Their stock sales in June 2019, in advance of returns

---

[29] Order at *29, 44.

[30] ¶¶ 105–06; Order at *30–31.

[31] ¶ 35.

[32] ¶ 106.

9

and the price drops they knew were coming, it can be reasonably inferred, were driven by the bad returns Canopy was going to have to disclose in August 2019, and evidence scienter.

Finally, though Defendants expressly advised investors that Canopy adhered to IFRS's revenue recognition rules in the June 28, 2018 AIF ("2018 AIF") and June 26, 2019 Annual Information Report ("2019 AIF"),[33] before and during the Class Period Defendants never disclosed the risk that customers would return products. After the Class Period, however, in Canopy's 2020 10-K, filed in June 2020, Defendants *specifically warned*—too late——about the risk to revenues from returns and price concessions,[34] evidencing Defendants' scienter.

Considered holistically, the TAC adequately pleads Defendants' scienter for failing to disclose customers' right of return and price concessions to investors.

**B.    False and misleading statements in Canopy's risk factors discussion in its several SEC filings are actionable.**

The Court's determinations of sufficiency regarding misleading statements throughout the Class Period[35] are "law of

---

[33] Calandra Cert. Ex. 2 at 76, Ex. 3 at 107; *see* ¶¶ 152–53.

[34] ¶¶ 20 n.6, 153; Calandra Cert. Ex. 1 at 41. The Court may take judicial notice of Canopy's 2020 10-K. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

[35] Order at *31, 37. Defendants' Motion does not dispute that Plaintiffs have adequately pleaded falsity.

the case."[36] The Court left unresolved, however, whether the risk factors in Canopy's annual and quarterly financial reports were false and misleading for failing to disclose risks associated with Canopy's buildup of gelcaps and oils and expansion of its grow facilities.[37] Defendants had a legal duty to disclose these risks to make their statements not misleading, and Canopy's failure to disclose them is actionable.

A duty to disclose arises, *inter alia*, when a statute or regulation requires disclosure.[38] Risk factors can be misleading when they describe as *hypothetical* risks that have already come to pass.[39] To that end, allegations of efforts "to keep the house of cards standing," are evidence that a risk has materialized.[40] The TAC alleges that risk factors in Canopy's 2018 and 2019 AIFs, which were incorporated by reference into the Company's

---

[36] *See In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998); *see also* Mot. at 16.

[37] Order at *31. Defendants elected not to address this in their Motion and thus have waived the issue. *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 n.9 (S.D.N.Y. 2019).

[38] *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000).

[39] *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (risks actionable that warned "of product liability claims in the abstract, with no indication that the risk may already have come to fruition"), *aff'd*, 563 U.S. 27 (2011); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) ("a company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition").

[40] *In re Cabletron Sys., Inc.*, 311 F.3d 11, 24 (1st Cir. 2002) (efforts to conceal inventory problems are evidence that risk had materialized).

11

quarterly disclosures during the Class Period, warned that "[a]dverse changes or developments affecting any [Canopy] facility . . . could have a material and adverse effect on our business, financial condition and prospects."[41] In addition, the 2018 AIF cautioned that "[t]he Company's growth strategy contemplates outfitting its facilities with additional production resources. A variety of factors could cause these activities to not be achieved on time, on budget, or at all."[42]

These warnings of potential, future problems at Canopy's facilities were misleading because those problems had already materialized,[43] at the latest, by December 2018 or January 2019 as Kovacevic confirmed then that the problems at Delta and Aldergrove were irreparable.[44] The TAC further alleges that these risks had materialized by alleging Defendants' frantic efforts to keep Canopy's house of cards standing by overproducing extracts instead of writing down inventory, pushing government retail shops into purchasing the extracts, creating a desperate

---

[41] *See* ¶ 263 & Calandra Cert. Ex. 2 at 44; ¶ 265 & Calandra Cert. Ex. 4 at 38; ¶ 267 & Calandra Cert. Ex. 5 at 39, ¶ 269 & Calandra Cert. Ex. 6 at 50; ¶ 273 & Calandra Cert. Ex. 3 at 68, ¶ 275 & Calandra Cert. Ex. 7 at 50, ¶ 277 & Calandra Cert. Ex. 8 at 63; ¶ 279 & Calandra Cert. Ex. 9 at 64. The Court can take judicial notice of these SEC filings, which are explicitly referenced in the TAC. *See NAHC*, 306 F.3d at 1331.

[42] ¶ 263, Calandra Cert. Ex. 2 at 122.

[43] ¶¶ 72–107.

[44] ¶ 88.

12

"Valentine's Day" marijuana promotion, and abruptly changing how it reported its inventory to prevent investors from noticing the oversupply of extracts.[45]

For these reasons, Canopy's statements regarding risk factors are adequately alleged as false and misleading.

**C.    The TAC pleads a strong inference of scienter.**

### 1.    Linton's and Zekulin's suspicious trades demonstrate their motive to commit fraud.

The TAC pleads motive, alleging that Linton and Zekulin reaped tens of millions of dollars in profits by selling massive amounts of Canopy stock during the Class Period while knowing that eventual disclosures to investors would lower the value of their holdings.[46] Stock sales unusual in scope or timing may support an inference of scienter.[47] "Whether a sale is unusual in scope depends on factors such as the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved," and "whether the sales were normal and routine, and whether the profits were substantial relative to the seller's ordinary compensation."[48]

---

[45] ¶¶ 105–06, 141.

[46] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference").

[47] *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006).

[48] *Id.*

The TAC alleges that Linton's September 2018 sales were suspiciously timed, occurring shortly after he learned negative information about Canopy and made misrepresentations to investors.[49] The TAC alleges Linton visited Delta and Aldergrove multiple times in the summer of 2018, and personally observed both low-quality plants and problems with the facilities' infrastructure.[50] Employees confirmed the problems when Linton asked them directly.[51] Nevertheless, in August 2018, Canopy falsely assured investors that inventories were being "scaled to meet market demand," failing to disclose the risks associated with Canopy's failure to grow high-quality cannabis at its inadequate facilities.[52] With Canopy's share price inflated by these and other misstatements, on September 27, 2018, Linton sold 307,845 shares of Canopy stock he owned indirectly through HBAM for a profit of *$19.9 million*.[53] This massive profit dwarfed

---

[49] *See id.* (Scienter alleged where insider sales came shortly after misstatements that artificially inflated stock price); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85–86 (2d Cir. 1999) (same); *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *19 (D.N.J. Dec. 15, 2015) (same); *see also Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 81-82, 92-93 (1st Cir. 2008) (insider sales two months after misrepresentations evidence scienter).

[50] ¶ 86.

[51] ¶¶ 86–87.

[52] ¶¶ 168–74, 265–66.

[53] ¶ 121.

14

Linton's ordinary compensation of $431,845 in fiscal 2017, $2.3 million in fiscal 2018, and $771,568 in fiscal 2019.[54]

Linton's June 2019 sales were similarly unusual in timing and scope. On June 26, 2019, less than a week before he was fired[55] and less than two months before investors learned, for the first time, that Canopy had massively overproduced oils and softgels and that the provinces had the contractual right to return product,[56] Linton exercised options on 347,736 shares for a one-day profit of *$15.8 million*. Linton's sales constituted 59% of the shares he directly held in Canopy and 12.1% of his shares owned directly and indirectly through HBAM.[57] Linton's approximately $30.5 million Class Period profit from sales of

---

[54] Canopy's fiscal year runs from April 1 to March 31. Muscato Cert. Ex. F at 21, 28. Defendants' statement that Linton's fiscal 2019 compensation was $9.3 million is misleading because it includes hundreds of thousands of stock options that would not vest (*i.e.*, he could not exercise) until long after fiscal 2019. *See id.* at 28. In addition, since Linton sold shares he owned indirectly, the sales were not considered part of his compensation. *See id.* Accordingly, Linton's actual compensation was $771,568 in fiscal 2019. *Id.* Regardless, in the Third Circuit, "profit from stock sales which is double the amount of average compensation is unusual." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 n.5 (E.D. Pa. 2015).

[55] ¶¶ 118–20; *see Suprema*, 438 F.3d at 277 (trades six weeks before executives resigned were suspicious in timing).

[56] *In re Oxford Health Plans, Inc., Secs. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (motive alleged where sales occurred "two months before the devastating October 27, 1997 press release").

[57] ¶¶ 120–23. *Suprema*, 438 F.3d at 278 ("over 30 percent" of holdings suspicious); *Enzymotec*, 2015 WL 8784065, at *17 (sales of "35% and 42%" suspicious).

Canopy stock was 200% higher than his profits from trades made, in the same number of months before the Class Period, from his one sale of Canopy shares.[58] Linton did not trade Canopy shares again after corrective disclosures and through the end of the Class Period, further supporting an inference that the timing of his trades was suspicious.[59]

Zekulin, Linton's co-CEO, likewise engaged in unusual sales in September 2018 and June 2019, making no additional trades from June 2019 to the end of the Class Period. On September 27, 2018, Zekulin, who knew of the problems at Delta and Aldergrove,[60] sold 536,095 shares for *$33.1 million* in profits, over *six times* his ordinary compensation of $5 million in fiscal 2019.[61] In addition, from June 26–28, 2019, Zekulin sold 100% of his directly and indirectly owned shares for profits of approximately *$21.9 million*, or more than four times larger than his fiscal 2019 compensation.[62] Zekulin reaped approximately $55 million in profits from his sales during the Class Period, a

---

[58] *Id.*

[59] *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011). (holding that "[f]ollowing this burst of sales, Defendants did not make any trades . . . until the end of the Class Period" was evidence of the defendants' scienter).

[60] As the Court found, "there is no realistic dispute that Canopy's executives were aware of production and inventory problems." Order at *44.

[61] ¶ 127; Muscato Cert. Ex. F at 31.

[62] ¶¶ 125–26; Muscato Cert. Ex. F at 31.

*1,000%* increase in profits over his trading profits in the same length of time preceding the Class Period.[63]

The suspicious timing and massive profits from their trades are powerful evidence of Linton and Zekulin's motive for fraud.[64]

> **a.   Defendants' argument that the timing of Linton's and Zekulin's trades was not unusual fails.**

Arguing that Linton and Zekulin's trades were not suspiciously timed, Defendants ask the Court to ignore the obvious——that Linton and Zekulin made massive trades of shares just after Defendants misrepresented Canopy's inventories to investors and before a corrective disclosure partially revealing those misrepresentations. Defendants' argument is meritless.[65]

Defendants misrepresent the TAC, arguing that it alleges Linton's and Zekulin's trades were suspicious because they followed routine "public announcements."[66] The TAC alleges that

---

[63] ¶¶ 128–29.

[64] *City of Hialeah Emps' Ret. Sys. & Laborers Pension Tr. Funds for N. California v. Toll Bros.*, 2008 WL 4058690, at *5 (E.D. Pa. Aug. 29, 2008) (stock sales unusual in scope and timing "give rise to a *powerful and cogent inference of scienter*").

[65] Defendants' claim that the TAC does not allege that Linton and Zekulin possessed undisclosed information when they traded, Mot. at 25, is a non-starter. The Court found that "there is no realistic dispute that Canopy's executives were aware of production and inventory issues. Plaintiffs have plausibly alleged that they were." Order at *44.

[66] Mot. at 23 (citing *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 300, 310-11 (D.N.J. 2001)). *Party City* is inapposite. Unlike the TAC, the *Party City* complaint did not identify any false statements preceding the trades at issue, and thus the

17

their September 2018 trades occurred shortly *after* Defendants knowingly misrepresented Canopy's inventory of oils and softgels, which is typical evidence of fraud.[67]

Defendants' argument that the timing of Linton's and Zekulin's June 2019 trades was not suspicious fails. Those trades occurred one week before Linton's firing and less than two months before the August 2019 corrective disclosure, a timeframe that Courts routinely consider suspicious.[68] In *De Vito* this Court found scienter adequately pleaded where, as here, the complaint alleged that defendants knew facts that contradicted their public statements, and "[t]he timing [of the allegedly suspicious sale] is somewhat suspect."[69]

---

court could not determine whether the defendants had traded to profit from false statements. *Id.* at 300.

[67] ¶¶ 86–87; 168–74, 265–66; *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 326 (E.D.N.Y. 2013), on reconsideration in part (Dec. 10, 2013) ("timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations"); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 & n.3 (S.D. Ohio 2000) ("The important timing issue is the proximity of the sales to the false statements because this relationship supports an inference of fraud").

[68] *E.g., Suprema*, 438 F.3d at 277; *Oxford*, 187 F.R.D. at 139.

[69] *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *33–37 (D.N.J. Dec. 31, 2018). Defendants incorrectly assert that *De Vito* supports dismissing the TAC. Mot. at 22. But in *De Vito*, this Court factored sales of less than 5% of stock into its scienter analysis. *See id.* at *36 (citing Mem. of Brian Ferdinand, *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-cv-6969-KM-JBC, Dkt. 210-1, at 38–39). Here, the TAC alleges that

18

Next, Defendants improperly ask this Court to judicially notice statements in a copy of Canopy's insider trading policy and records from Canada's System for Electronic Disclosure by Insiders ("SEDI") and consider them for their truth.[70] The Court should disregard these documents, as Defendants may not create an alternative universe of facts "to defeat what would otherwise constitute adequately stated claims at the pleading stage [on] a motion to dismiss."[71]

Judicial notice of Canopy's insider trading policy is improper.[72] Notice of the SEDI documents as to how many shares Linton and Zekulin sold or held is proper,[73] but taking judicial notice of informal statements about the length of blackout periods for their truth, or to create issues of material fact is

_____

both Linton and Zekulin sold *much larger* percentages of their holdings. *See* Section III.C.1, *supra*.

[70] *See* Mot. at 27.

[71] *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). In *Khoja*, the Ninth Circuit warned that "[i]f defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently "plausible" claim for relief." *Id.* at 999.

[72] *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), as amended (Nov. 20, 2007) (private corporate websites "generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned' that our judicial notice rule contemplates").

[73] *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540–41 (3d Cir. 1999) (considering equivalent of SEDI disclosure as evidence of stock sales and holdings).

19

not.[74] In any case, while Defendants ask the Court to accept as true that Defendants were blacked out from January to September 2018 and from February to June 2019,[75] the documents Defendants proffer imply Defendants were *not* blacked out for parts of that period.[76]

Even if the Court were to notice these documents——which it should not——they render the timing of Linton and Zekulin's trades *more suspicious*. If Linton or Zekulin were blacked out from the August 2018 disclosures until the September 2018 trades, their trades occurred on the first possible trading day after they made their misstatements. Similarly, the June 2019 trades were on the last and second-to-last trading days before the August 2019 disclosures.[77] Trades a day after a misstatement or two days pre-corrective disclosure are plainly suspicious.

---

[74] *See Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) (Courts may take judicial notice of the content of the SEC Forms 4, the U.S. equivalent of SEDI filings and the fact that they were filed, but "[t]he truth of the content, *and the inferences properly drawn from them*, however, is not a proper subject of judicial notice"); *see also Pennsylvania Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 514 (3d Cir. 2018)(affirming district court's declining to judicially notice document where the contents of the document raise issues of material fact).

[75] *E.g.,* Muscato Cert. Ex. Q at 4–7, 11–12.

[76] Muscato Cert. Ex. H at 6–7. According to Canopy's insider trading policy, insiders may only trade from the end of the second business day after an earnings release until the end of the next fiscal reporting period. *Id.* Linton and Zekulin thus presumptively were *not* blacked out from August 16, 2018 to September 30, 2018, and February 20, 2019 to March 31, 2019.

[77] *Compare* ¶¶ 120–27 *with* Muscato Cert. Ex. H at 6.

20

Finally, Defendants' argument that the 23-month Class Period diminishes the inference of scienter created by the September 2018 and June 2019 trades is wrong.[78] Trades associated with a specific misrepresentation or corrective disclosure, even during lengthy class periods, support an inference of scienter.[79] Here, Linton and Zekulin conspicuously traded *just after* they learned of the growing problems at Delta and Aldergrove, and *just before* the August 2019 disclosures.[80]

> **b.    Defendants' arguments regarding the scope of suspicious trades also fail.**

Contrary to Defendants' argument that "Plaintiffs' reliance on the amount of alleged profit generated from the sales is misplaced,"[81] the Third Circuit has held that outsized profit is indeed a key indicator of suspicious trades.[82]

Defendants' complaint that the TAC does not compare the number of shares Linton traded in the Class Period to a *longer*

---

[78] Mot. at 24.

[79] *Compare In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 120 (3d Cir. 2018) (allegations did *not* suggest that defendants "timed their trades to improperly benefit from any particular disclosure") *with In re Questcor Secs. Litig.*, 2013 WL 5486762, at *15 (C.D. Cal. Oct. 1, 2013) (class period length "suggests not that Plaintiffs are grasping at straws to build their case, but rather that Defendants were able to ride the wave of their misleading marketing for the entire Class Period"); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14 (C.D.Cal. Jul. 1, 2008) (suspicious sales supported for 3.5-year Class Period).

[80] *See* ¶¶ 120-29.

[81] Mot. at 37.

[82] *E.g., Suprema*, 438 F.3d at 277.

21

pre-Class Period is similarly baseless.[83] The TAC compares Linton's trades in the 23-month Class Period to his trades in an identical 23-month pre-Class Period (*i.e.*, July 27, 2016, to June 26, 2018).[84] Courts typically compare trades in a Class Period to a period of equal length prior to the Class Period.[85]

Defendants also claim the TAC misrepresents the percentage of shares Linton and Zekulin sold—but it is Defendants who artificially suppress those percentages by improperly considering options that could not be sold because they *had not vested*.[86] Though Defendants claim Linton held 500,000 options on June 28, 2017, only 166,667 of those options had vested by June 26, 2019.[87] Accordingly, in June 2019 Linton only could sell 588,902 shares and vested options that he held.[88] Thus by selling

---

[83] Mot. at 29. Notably, Defendants do not raise this argument as to Zekulin.

[84] ¶¶ 1, 123.

[85] *E.g., No. 84 Emp.– Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941 (9th Cir. 2003); *In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *26 (N.D. Ga. Aug. 12, 2019); *Levy v. Gutierrez*, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017); *In re Questcor Sec. Litig.*, 2013 WL 5486762 (C.D. Cal. Oct. 01, 2013).

[86] *See* Mot. at 29; *Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001) (Stock options should be considered in percentage of shares sold "*unless the insider could not have exercised them*").

[87] See Mot. at 30–31.

[88] *See id.*

22

347,736 shares, he sold 59% of the shares and vested options that he directly owned.[89]

Similarly, Defendants' calculation that Linton sold 5.8% of his direct and indirect holdings during the Class Period is wrong because it includes shares that had not vested or that vested *after he was fired*, and thus are irrelevant. At the start of the Class Period, Linton held 70,800 shares directly, 2,566,225 shares indirectly through HBAM, and 416,667 in vested options (250,000 vested options awarded February 29, 2016 and 166,667 vested options awarded June 28, 2017), for a total of 3,053,692 shares.[90] When Linton was fired on July 2, 2019, he only held 2,666,213 shares (241,166 shares held directly, 2,258,380, held indirectly, and 166,667 options vested June 28, 2019).[91] Thus, when Linton was an insider during the Class Period, the shares he held declined by at least 12.7%, or more than *double* Defendants' calculation.[92]

Similarly, Defendants' calculations of Zekulin's Class Period sales are inaccurate because they include unvested

---

[89] ¶ 120.

[90] *See* Muscato Cert. Ex. Q.

[91] *See id.*

[92] *See* Mot. at 31. *See In re Orbital Scis. Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 685–86 (E.D. Va. 1999) (scienter alleged where defendant sold 15% of his shares during the Class Period).

23

options.[93] Even using Defendants' faulty calculations, Zekulin sold 59% of his holdings, an amount courts hold to be unusual.[94]

Linton's and Zekulin's profits in September 2018 and June 2019 were so large in comparison to their prior sales that they demonstrate their scienter, even if the Court finds that they had substantial Canopy holdings after the Class Period.[95]

Defendants' argument that these sales were simply an intended part of executive compensation also fails. First, Defendants' characterization of the Company's "intentions" creates a factual dispute not suitable for resolution on a motion to dismiss.[96] Indeed, they recall Defendants' self-serving *ex post* claim that Delta and Aldergrove were *never* intended to produce high quality cannabis, which this Court rejected out of hand.[97] Second, Defendants' argument is implausible—Linton's September 2018 sales were more than double his fiscal 2018 compensation even including the estimated value of stock options

---

[93] *See* Mot. at 34. Defendants do not dispute Zekulin's profits from sales were 1,000% higher than his pre-Class Period profits.

[94] *E.g.*, *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *2 (E.D.N.Y. Mar. 30, 2012) (sales of 9.4% of holdings for $21.2 million and 50.9% for $29.5 million unusual).

[95] *E.g.*, *Suprema*, 438 F.3d at 278 (sales suspicious even though defendants maintained large holdings); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *15 (D.N.J. Dec. 6, 2018) (scienter pled from sales when percentages were not large).

[96] *See In re KeySpan Corp.*, 2003 WL 21981806, at *16 (E.D.N.Y. July 30, 2003) (factual issues created by alternative explanations do not negate scienter).

[97] Order at *28.

24

he could not yet exercise.[98] Similarly, Zekulin's $33.1 million in profits in September 2018 were five-and-a-half times his fiscal 2019 compensation (including unvested stock options) of approximately $6 million.[99] Third, the timing of the trades evidences that Linton and Zekulin were capitalizing on inside information, not cashing in their compensation.[100] Even if the Court accepts Defendants' incorrect representation that Linton's and Zekulin's Class Period sales were part of their compensation, courts find such outsized profits unusual in scope even when defendants claim that stock options are intended as compensation.[101] Fourth, that the other Defendants are not alleged to have made suspicious sales does not defeat an inference of scienter when considered together with the unusual timing and scope of Linton and Zekulin's trades.[102] Lastly, the

---

[98] *See* note 54 *supra*.

[99] *Compare* ¶¶ 121, 127 *with* Muscato Cert. Ex. F at 31. Defendants' claim that Zekulin's unexercised stock options were worth approximately $33 million omits that this figure includes unvested options. *See* Muscato Cert. Ex. F at 31.

[100] Linton exercised options and sold shares in late December 2017, when he would be expected to trade to increase his annual compensation, but his trades in September 2018 and June 2019, not at the end of a calendar or fiscal year, suggest that he was trying to capitalize on inside information.

[101] *Urban Outfitters*, 103 F. Supp. 3d at 654 n.5 (inferring scienter where defendant claimed he took salary of $1.00 and was to be compensated solely from stock sales).

[102] *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) ("While the absence of sales by Andrews undermines the claim of scienter against him, that does not

25

fact that Canopy's largest shareholder did not sell any shares during the Class Period does not defeat the strong inference of scienter because that entity is not a named defendant in this action, nor is it alleged to have participated in the fraud.[103]

### 2.    Kovacevic knew of oversupply by early 2019.

The TAC's new allegations specifically address Kovacevic's knowledge of the oversupply of cannabis extracts. The TAC adds statements from FE1, who attended weekly meetings with Kovacevic in late 2018 and early 2019.[104] There he heard Kovacevic say that Canopy could not fix the failure to grow high-quality cannabis at Delta and Aldergrove.[105] The TAC adds statements from FE6 clarifying that Kovacevic told Bigioni during a January or February 2019 leadership meeting that the Company had produced far more oils and gelcaps than it could sell.[106]

These allegations, considered holistically with other allegations in the TAC, allege a strong inference of scienter. For example, at approximately the time Kovacevic made his

---

exculpate Sallie Mae or Lord"); *In re Emerson Radio Corp. Sec. Litig.*, 2005 WL 8131267, at *15 (D.N.J. Dec. 20, 2005) (sales suspicious where two of four individual defendants sold shares).

[103] *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (lack of sales by largest shareholder relevant because he "failed to benefit from the fraudulent scheme *of which he is alleged to have been a major participant*").

[104] ¶ 88.

[105] *Id.*

[106] ¶ 106.

statements in meetings with FE1 and Bigioni, the Company abruptly *stopped* reporting separately the value of its inventory of cannabis extracts,[107] strongly suggesting that Kovacevic was relaying to FE1 and FE6 what all Defendants knew, *i.e.*, that Canopy's inventory of oils and softgels was massively inflated.

Defendants disaggregate Plaintiffs' allegations to argue that not one satisfies the Court's ruling. But "[t]he pertinent question is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation" meets that standard.[108] Considered holistically, the TAC alleges Kovacevic's scienter, which the Court has imputed to Canopy.[109]

### 3. The TAC alleges Defendants' scienter for statements regarding Canopy's risk factors, overstated inventory, and failure to disclose contractual rights of return.

The TAC's allegations also allege scienter for Defendants' misleading risk factors, overvaluation of inventory, and failure to disclose customers' rights of return and price concessions.

This Court has already found sufficiently alleged that Defendants knew, or were reckless in not knowing, of the inventory overvaluation and failure to disclose rights of return

---

[107] ¶¶ 141–42.

[108] *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267–68 (3d Cir. 2009).

[109] *Id.* at *40 n.32.

27

and price concessions.[110] Kovacevic's statement that the problems at Delta and Aldergrove were not reparable shows that Defendants knew by December 2018 or January 2019, at the latest, that risks of oversupply of oil and softgel inventory, and problems at facilities, had materialized.[111] When considered along with the suspicious trading allegations, the TAC sufficiently alleges a strong inference of Defendants' scienter for these statements.[112]

Defendants incorrectly argue that Plaintiffs have failed to overcome an independent auditor's approval of Canopy's financial statements.[113] But "a clean audit opinion does not categorically insulate a defendant from liability" and Canopy's February 2019 change in extract inventory reporting suggests a lack of transparency with auditors.[114] In fact, Canopy switched auditors between the 2018 and 2019 letters, thus its new 2019 auditor *never opined on separate valuations of oils and softgels inventory*.[115] Finally, the June 27, 2018 and June 26, 2019, Class Period audit letters only applied to Canopy's "consolidated

---

[110] *Id.* at *41, 44.

[111] ¶ 88.

[112] *Fergus v. Immunomedics, Inc.*, 2020 WL 2832565, at *5 (D.N.J. June 1, 2020), reconsideration denied, 2021 WL 1171636 (D.N.J. Mar. 29, 2021) (knowledge and insider trades allege scienter); *De Vito*, 2018 WL 6891832, at *33 (same); *In re Cendant Corp.*, 60 F. Supp. 2d 354, 370 (D.N.J. 1999) (same).

[113] Mot. at 20.

[114] *See* ¶¶141–42; *Roofer's*, 2018 WL 3601229, at *19

[115] *See* Calandra Cert. Ex. 11 at 4.

28

financial statements."[116] They thus *did not address* statements about risk in Canopy's 2018 or 2019 AIFs or MD&As or Defendants' failures to disclose customer returns or price concessions.

### 4.    The TAC alleges a strong inference of scienter more compelling than any competing inference.

Considered holistically, the TAC's allegations, together with the Court's finding of Defendants' actual knowledge,[117] sufficiently allege a strong inference of scienter: (a) Linton and Zekulin's suspicious trades,[118] (b) FE1 and FE6's additional statements of Kovacevic's knowledge of the oversupply,[119] (c) Canopy's abrupt reporting change in February 2019 concealing its inventory of oils and softgels,[120] (d) Linton's termination on July 2, 2019, just before the August 2019 disclosure,[121] (e) the core operations doctrine,[122] and (f) Defendants' SOX certifications.[123] At a minimum, these allegations are sufficient to plead "corporate or collective scienter" against Canopy.[124]

---

[116] *Id.* Ex. 10 at 4, 11 at 4.

[117] Order at *44.

[118] *See* Section III. C.1 *supra*.

[119] ¶¶ 120–29.

[120] ¶¶ 86–88.

[121] ¶¶ 31, 317; *see Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013).

[122] *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019).

[123] *Roofer's*, 2018 WL 3601229, at *16.

[124] *See Rahman v. Kid Brands*, 736 F.3d 237, 246 (3d Cir. 2013).

29

By contrast, Canopy's proffered "innocent explanation of its inventory issues" is implausible given Defendants' knowledge of the overproduction of oils and softgels, Kovacevic's statements at meetings, Canopy's abrupt change in its financial reporting, and Linton and Zekulin's massive trades after learning of problems and before corrective disclosures.

**D.    The TAC sufficiently alleges claims under §20(a).**

Since the TAC sufficiently alleges a predicate violation of §10(b) and Rule 10b-5, it sufficiently alleges claims under §20(a) against the Individual Defendants.[125] Though Defendants contend that control allegations for the first half of the Class Period are not pled with sufficient particularity against Kovacevic, substantively similar control allegations to those in the TAC have been found sufficient at the pleading stage.[126]

## IV.   REQUEST FOR LEAVE TO AMEND

Should the Court grant the Motion in full or in part, Plaintiffs respectfully request leave to amend.[127]

## V. CONCLUSION

Plaintiffs respectfully request that the Motion be denied.

---

[125] *Toronto-Dominion*, 2018 WL 6381882, at *20-21.

[126] *Id.*

[127] *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *35 (D.N.J. Aug. 8, 2018).

Dated: October 12, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Brian Calandra
Jeremy Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
bcalandra@pomlaw.com

and

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Steve W. Berman*
Steve W. Berman
Shayne C. Stevenson
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 268-9340
Fax: (206) 623-0594
Email: steve@hbsslaw.com
shaynes@hbsslaw.com

and

Reed R. Kathrein
Lucas E. Gilmore
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Fax: (510) 725-3001
Email: reed@hbsslaw.com
lucasg@hbsslaw.com

31

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Dresher, PA 19046
Tel: (215) 600-2817
Fax: (973) 833-0399
Email: jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

*Co-Lead Counsel for Lead
Plaintiffs and the Class*

32

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2021, I caused to be filed electronically the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Third Amended Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.


/s/ Brian Calandra
Brian Calandra