# EXHIBIT 2

10/8/21, 4:30 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 2 of 125 PageID: 6061
cgc-40f_20180331.htm

40-F 1 cgc-40f_20180331.htm 40-F

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## FORM 40-F

☐  **Registration statement pursuant to Section 12 of the Securities Exchange Act of 1934**

or

☒  **Annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934**

**For the fiscal year ended <u>March 31, 2018</u>**               **Commission File Number <u>001-38496</u>**

# Canopy Growth Corporation

**(Exact name of Registrant as specified in its charter)**

| **Canada** | **2833** | **N/A** |
|---|---|---|
| (Province or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**1 Hershey Drive**
**Smith Falls, Ontario K7A 0A8**
**Canada**
<u>**(855) 558-9333**</u>
(Address and telephone number of Registrant's principal executive offices)

**CT Corporation System**
**1015 15th Street N.W., Suite 1000**
**Washington DC 20005**
<u>**(202) 572-3100**</u>
(Name, address (including zip code) and telephone number (including area code) of agent for service in the United States)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Shares, no par value** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act:  None.**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:  None**

☒ **Annual information form**                    ☒ **Audited annual financial statements**

Indicate the number of outstanding shares of each of the registrant's classes of capital or common stock as of the close of the period covered by the annual report: 200,989,264

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.  ☐ Yes  ☒  No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).  ☐ Yes  ☐  No

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 12b-2 of the Exchange Act.

Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act.  ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

10/8/21, 1:47 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 3 of 125 PageID:
cgc-40f_20180331.htm
6062

4820-0982-2571\4

## EXPLANATORY NOTE

Canopy Growth Corporation (the "Company" or the "Registrant") is a Canadian issuer that is permitted, under the multijurisdictional disclosure system adopted in the United States, to prepare this annual report on Form 40-F (this "Annual Report") pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in accordance with Canadian disclosure requirements, which are different from those of the United States. The Company is a "foreign private issuer" as defined in Rule 3b-4 under the Exchange Act and Rule 405 under the Securities Act of 1933, as amended. Equity securities of the Company are accordingly exempt from Sections 14(a), 14(b), 14(c), 14(f) and 16 of the Exchange Act pursuant to Rule 3a12-3 thereunder.

## FORWARD LOOKING STATEMENTS

The Exhibits incorporated by reference into this Annual Report contain forward-looking statements and forward-looking information (collectively, "forward-looking statements") within the meaning of the United States Private Securities Litigation Reform Act of 1995 and within the meaning of applicable Canadian securities legislation, respectively. Often, but not always, forward-looking statements can be identified by the use of words such as "plan", "expect", "is expected", "intend", "believe", "anticipate", "estimate", or variations of such words and phrases (including negative and grammatical variations) or state that certain actions, events, or results "may", "could", "would", "might", or "will" be taken, occur, or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of the Company to differ materially from those anticipated in the forward-looking statements. By their nature, forward-looking statements involve numerous assumptions, known and unknown risks and uncertainties, both general and specific, that contribute to the possibility that the predictions, forecasts, projections and other forward-looking statements will not occur. Such forward-looking statements in the Exhibits incorporated by reference into this Annual Report speak only as of the respective dates set forth in such Exhibits. Forward-looking statements in the Exhibits incorporated by reference into this Annual Report include, but are not limited to, statements with respect to:

- our expectations in connection with the production and expansion plans at our facilities and the capacity thereof;
- our expectations regarding the timing of construction, development and production of our expansion projects for both existing facility expansion and new facilities;
- advancement of our international projects and targeting other opportunities as the laws and regulations governing cannabis evolve internationally;
- the performance of our business and operations;
- our ability to obtain additional licenses or renewal of existing licenses;
- the legalization of cannabis for recreational use in Canada and our ability to participate in such market, when it is legalized;
- the legalization of cannabis for recreational and/or medical use in jurisdictions outside of Canada and our ability to participate in any such markets, if and when such use is legalized;
- the effect of government regulations (or changes thereto) with respect to the restrictions on production, sale, consumption, export controls, income taxes, expropriation of property, repatriation of profits, environmental legislation, land use, water use and receipt of necessary permits;
- future liquidity and financial capacity;
- our expectations regarding revenues and expenses;
- expectations regarding our ability to raise capital;
- the competitive landscape in which we operate;
- our investments in community relations, cannabis health and safety, educational programming in the locations where we operate and the further development of our social responsibility programs;
- our future product offerings;
- the payment of any future dividends;
- the outcome of any current or pending litigation against us; and
- treatment under government regulatory and taxation regimes.

2

4820-0982-2571\4

With respect to the forward-looking statements contained in the Exhibits incorporated by reference into this Annual Report, we have made assumptions regarding, among other things: (i) our ability to generate cash flow from operations and obtain necessary financing on acceptable terms; (ii) general economic, financial market, regulatory and political conditions in which we operate; (iii) the yield from the growing operations of the Company's licensed producers; (iv) consumer interest in our products; (v) competition; (vi) anticipated and unanticipated costs; (vii) government regulation of our activities and products and in the areas of taxation and environmental protection; (viii) the timely receipt of any required regulatory approvals; (ix) our ability to obtain qualified staff, equipment and services in a timely and cost efficient manner; (x) our ability to conduct operations in a safe, efficient and effective manner; and (xi) our construction plans and timeframe for completion of such plans.

Some of the risks and other factors which could cause actual results to differ materially from those expressed in the forward-looking statements contained in the Exhibits incorporated by reference into this Annual Report include, but are not limited to, the risk factors set forth in the Exhibits incorporated by reference into this Annual Report, such as: continued listing requirements of the Toronto Stock Exchange (the "TSX") and the New York Stock Exchange (the "NYSE") and increased price volatility; changes in laws, regulations and guidelines; risks inherent in strategic alliances; difficulty of forecasting the medical marijuana and recreational marijuana industries; exchange restrictions on business; risks relating to the *Access to Cannabis for Medical Purposes Regulations* (Canada) issued pursuant to the *Controlled Drugs and Substances Act* (Canada); risks relating to our expansion into foreign jurisdictions; political and other risks in emerging markets; risks of corruption and fraud in emerging markets; inflation risks in emerging markets; foreign ownership or control restrictions; risks relating to international advisors and consultants; increased operational, regulatory and other risks; our limited operating history; reliance on licenses; reliance on certain facilities; reliance on management; reliance on key inputs; dependence on suppliers and skilled labor; risks inherent in an agricultural business; vulnerability to rising energy costs; transportation risks; operating risk and insurance coverage; environmental and employee health and safety regulations; product liability risks; risks of product recalls; unfavorable publicity or consumer perception; risks relating to client acquisitions; growth-related risks; our history of net losses, and risks relating in incurring significant net losses in the future and not being able to achieve or maintain profitability; risks relating to additional financing; risks relating to conflicts of interest; risks relating to competition from other companies; and reputational risk to third parties, as well as those risk factors discussed herein or in documents incorporated by reference. Readers are cautioned not to place undue reliance on forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by applicable law.

## NOTE TO UNITED STATES READERS - DIFFERENCES IN UNITED STATES AND CANADIAN REPORTING PRACTICES

The Registrant is permitted, under a multijurisdictional disclosure system adopted by the United States Securities and Exchange Commission (the "SEC"), to prepare this Annual Report in accordance with Canadian disclosure requirements, which are different from those of the United States. The Registrant prepares its financial statements, which are filed with this Annual Report in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board, and which are not comparable to financial statements of United States companies.

### CURRENCY

Unless otherwise indicated, all dollar amounts in this Annual Report on Form 40-F are in Canadian dollars. The exchange rate of Canadian dollars into United States dollars, on March 29, 2018 based upon the daily exchange rate as quoted by the Bank of Canada was U.S.$1.00 = Cdn.$1.2894.

### ANNUAL INFORMATION FORM

The AIF for the fiscal year ended March 31, 2018 is filed as Exhibit 99.1 to this Annual Report and is incorporated by reference herein.

3

4820-0982-2571\4

## AUDITED ANNUAL FINANCIAL STATEMENTS

The audited consolidated financial statements of the Company for the years ended March 31, 2018 and 2017, including the report of the independent auditor thereon, are filed as <u>Exhibit 99.2</u> to this Annual Report, and are incorporated by reference herein.

## MANAGEMENT'S DISCUSSION AND ANALYSIS

The Company's MD&A for the year ended March 31, 2018 is filed as <u>Exhibit 99.3</u> to this Annual Report, and is incorporated by reference herein.

## TAX MATTERS

Purchasing, holding, or disposing of the Company's securities may have tax consequences under the laws of the United States and Canada that are not described in this Annual Report.

## CONTROLS AND PROCEDURES

*Disclosure Controls and Procedures*

As of the end of the period covered by this Annual Report, the Company carried out an evaluation, under the supervision of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act). Based upon that evaluation, the Company's CEO and CFO have concluded that, as of the end of the period covered by this Annual Report, because of the material weakness in our internal control over financial reporting described below, our disclosure controls were not effective as at March 31, 2018.

*Internal Control Over Financial Reporting*

In connection with the Company's reporting obligations in Canada, management, under the supervision and with the participation of its CEO and CFO, conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of March 31, 2018, using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (2013) (the "COSO 2013 Framework"). Based on this evaluation management concluded that a material weakness existed as of March 31, 2018, as described below.

As of March 31, 2018, the Company did not maintain effective internal controls over Company-wide end user computing ("EUC") spreadsheets and the accounting complexities encountered in the financial reporting relies on equally complex spreadsheets. Spreadsheets are inherently prone to error due to their manual nature. The Company's controls related to spreadsheets did not address all risks associated with updating assumptions, manual entry into spreadsheets, completeness of data entry, nor evidence of review of completed spreadsheets.

Because of the material weakness described above, management concluded that the Company's internal controls over financial reporting were not effective as at March 31, 2018. Accordingly, a reasonable possibility exists that material misstatements in the Company's financial statements will not be prevented or detected on a timely basis.

The Company's management, with the participation of its CEO and CFO, has limited the scope of the design of the Company's disclosure controls and procedures and internal controls over financial reporting to exclude controls, policies and procedures and internal controls over financial reporting of the recently acquired operations of Tweed Grasslands Cannabis Inc. (acquired May 1, 2017), Spot Thrapeutics Inc (acquired on August 28, 2017), Grow House JA Limited (acquired 49% on September 6, 2017), Spectrum Cannabis Denmark ApS (acquired control on September 20, 2017), Les Serres Vert Cannabis (acquired 66.7% interest on December 18, 2017) and BC Tweed Joint Venture Inc (acquired 66.7% interest on October 10, 2017). The operations of Tweed Grasslands Cannabis

4

4820-0982-2571\4

Inc., Spot Therapeutics Inc.,Grow House JA Limited, Spectrum Cannabis Denmark ApS , Les Serres Vert Cannabis and BC Tweed Joint Venture Inc combined, represent approximately 12% of the Company's assets (approximately 1% of current assets and 21% of non-current assets); they also represent approximately 26% of current liabilities and 6% of long-term liabilities, 0% of the Company's revenues and 7% of operating expenses for the year ended March 31, 2018 and 0% of the Company's revenues and 24% of operating expenses for the three months ended March 31, 2018.

*Management's Annual Report on Internal Control over Financial Reporting*

This Annual Report does not include a report of management's assessment regarding internal control over financial reporting due to a transition period established by rules of the SEC for newly public companies.

*Attestation Report of the Registered Public Accounting Firm*

This Annual Report does not include an attestation report of the Company's registered public accounting firm due to a transition period established by rules of the SEC for newly public companies.

*Changes in Internal Control over Financial Reporting*

Reliance on End User Computing

Throughout fiscal 2018 management continued to strengthen and improve controls related to the remaining material weaknesses related to EUC in the following ways:

1. Continued engagement of third party resources to assist the Company in its risk assessment process and in completing the design and implementation of certain internal controls over financial reporting pursuant to the COSO 2013 Framework;
2. Inventoried EUC spreadsheets in use and associated control and implementation of several IT supported systems to reduce reliance on EUC tools. Further IT support initiatives are underway to reduce the use of EUC tools; and
3. A cross-functional business transformation process, enabled by a new end to end Enterprise Resource Planning ("ERP") system was launched in June 2017 to standardize and automate business processes and controls across the organization domestically and internationally. The project is a major initiative that is utilizing third party consultants and will expand the depth and breadth of the finance and information technology organizations. The project, named Project Summit, will enable continuous improvement and scalability.

The material weakness related to reliance on EUC has not been fully remediated as at March 31, 2018. Remediation is expected to be completed in fiscal 2019 with the implementation of the ERP system.

IT General Controls

Management previously concluded that, as of March 31, 2017, the Company's IT general controls, specifically user access and change management processes, were determined to be a material weakness in the Company's internal control over financial reporting. Management implemented process improvements in both the areas of user access and change management. A revalidation of information technology user access and refresher training was undertaken. Additionally, tools to allow for tighter management of user access were implemented on key systems. Management considers the previously identified material weakness related to IT General Controls to be remediated as at March 31, 2018.

Other than those described above, there have been no changes in the Company's internal control over financial reporting during the period covered by this Annual Report that have materially affected, or are likely to materially affect, the Company's internal control over financial reporting.

5

4820-0982-2571\4

## CORPORATE GOVERNANCE

The Company's Board of Directors (the "Board of Directors") is responsible for the Company's corporate governance and has a separately designated standing Corporate Governance, Compensation and Nominating Committee, and Audit Committee. The Board of Directors has determined that all the members of the Audit Committee are independent, based on the criteria for independence prescribed by Section 303A.02 of the NYSE Listed Company Manual. Under the same criteria, the Board of Directors has determined that three of the four members of the Corporate Governance, Compensation and Nominating Committee (John K. Bell (Chair), Peter Stringham and Chris Schnarr) are independent.

### Corporate Governance, Compensation and Nominating Committee

Compensation of the Company's CEO and all other executive officers is recommended to the Board of Directors for determination by the Corporate Governance, Compensation and Nominating Committee. Nominees for the election to the Board of Directors are selected, or recommended to the Board of Directors for selection, by the Corporate Governance, Compensation and Nominating Committee. The Company's Corporate Governance, Compensation and Nominating Committee is comprised of John K. Bell (Chair), Peter Stringham, Murray Goldman and Chris Schnarr.

The Corporate Governance, Compensation and Nominating Committee is responsible for, among other things: reviewing and approving corporate goals and objectives relevant to the Company's CEO's compensation and evaluating the Company's CEO's performance in light of such corporate goals and objectives; reviewing and making recommendations to the Company's Board of Directors with respect to the compensation level of the Company's CEO and other executives, including bonuses; reviewing and approving the actual compensation to be paid to the Company's CEO and executives; reviewing and determining the remuneration paid by the Company to its directors; monitoring, reviewing and recommending to the Company's Board of Directors the Company's compensation and benefit programs; reviewing executive compensation disclosure prior to its public disclosure by the Company; establishing and monitoring the terms and conditions of the Company's equity-based plans; identifying individuals qualified to become members of the Board of Directors; selecting, or recommending to the Board of Directors for selection, director nominees for annual meetings of shareholders; developing and recommending to the Board of Directors a set of corporate governance guidelines applicable to the Company; and overseeing the evaluation of the Board of Directors and management of the Company. The Company's Corporate Governance, Compensation and Nominating Committee Charter is available on the Company's website at www.canopygrowth.com.

## AUDIT COMMITTEE

The Board of Directors has a separately designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Exchange Act and Section 303A.06 of the NYSE Listed Company Manual. The Company's Audit Committee is comprised of Chris Schnarr (Chair), John K. Bell and Peter Stringham, all of whom, in the opinion of the Company's Board of Directors, are independent (as determined under Rule 10A-3 of the Exchange Act and Section 303A.02 of the NYSE Listed Company Manual). All three members of the Audit Committee are financially literate, meaning they are able to read and understand the Company's financial statements and to understand the breadth and level of complexity of the issues that can reasonably be expected to be raised by the Company's financial statements. The Audit Committee meets the composition requirements set forth by Section 303A.07 of the NYSE Listed Company Manual.

The members of the Audit Committee are appointed by the Company's Board of Directors annually. Each member of the Audit Committee will remain on the committee until the next annual meeting of shareholders after his or her appointment, unless otherwise removed or replaced by the Board of Directors at any time.

The full text of the Audit Committee Charter is available on the Company's website at www.canopygrowth.com and is attached as Schedule "A" to the AIF, which is filed as Exhibit 99.1 to this Annual Report.

6

4820-0982-2571\4

10/8/21, 1:45 PM    Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 9 of 125 PageID:
cgc-40f_20180331.htm
6068

*Audit Committee Financial Expert*

The Board of Directors has determined that John K. Bell qualifies as a financial expert (as defined in Item 407 (d)(5)(ii) of Regulation S-K under the Exchange Act), has financial management expertise (pursuant to section 303A.07 of the NYSE Listed Company Manual) and is independent (as determined under Exchange Act Rule 10A-3 and section 303A.02 of the NYSE Listed Company Manual).

## PRE-APPROVAL OF AUDIT AND NON-AUDIT SERVICES PROVIDED BY INDEPENDENT AUDITOR

The Audit Committee Charter sets out responsibilities regarding the provision of non-audit services by the Company's external auditors and requires the Audit Committee to pre-approve all permitted non-audit services to be provided by the Company's external auditors, in accordance with applicable law.

## PRINCIPAL ACCOUNTANT FEES AND SERVICES – INDEPENDENT AUDITOR

The following table shows the aggregate fees for services rendered to the Company by Deloitte LLP and its affiliates, Chartered Professional Accountants, the Company's independent auditor, in each of the last two years.

|  | 2017 | 2018 |
|---|---|---|
| Audit Fees | $ 747,500 | $ 1,670,867 |
| Audit-Related Fees [1] | 0 | 360,820 |
| Tax Fees [2] | 340,000 | 434,925 |
| All Other Fees | 0 | 0 |
| Total | $ 1,087,500 | $ 2,466,612 |

[1]    "Audit-Related Fees" refers to the aggregate audit related fees billed for assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements and are not reported as "Audit Fees"

[2]    "Tax Fees" refers to the aggregate tax fees billed for tax compliance, advice, planning and assistance with the preparation of tax returns.

## OFF-BALANCE SHEET ARRANGEMENTS

The Company does not have any off-balance sheet arrangements.

## CODE OF ETHICS

The Company has adopted a Code of Business Conduct and Ethics that applies to directors, officers and employees of, and consultants and contractors to, the Company (the "Code"). The Code has been posted on the Company's website at www.canopygrowth.com. The Code meets the requirements for a "code of ethics" within the meaning of that term in General Instruction 9(b) of the Form 40-F.

All waivers of the Code with respect to any of the employees, officers or directors covered by it will be promptly disclosed as required by applicable securities rules and regulations. During the fiscal year ended March 31, 2018, the Company did not waive or implicitly waive any provision of the Code with respect to any of the Company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.

7

4820-0982-2571\4

## TABULAR DISCLOSURE OF CONTRACTUAL OBLIGATIONS

The following table lists, as of March 31, 2018, information with respect to the Company's known contractual obligations (in thousands):

| Contractual Obligations | Total | Payments due by period | | | |
| | | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| Accounts payable and accrued liabilities | $89,571 | $89,571 | $- | $- | $- |
| Finance lease payments | 344 | 217 | 117 | 7 | 3 |
| Minimum lease and royalty payments | 190,138 | 21,767 | 42,729 | 40,442 | 85,200 |
| Long-term debt | 8,078 | 1,330 | 4,468 | 1,844 | 436 |
| **Total** | $288,131 | $112,885 | $47,314 | $42,293 | $85,639 |

## NOTICES PURSUANT TO REGULATION BTR

There were no notices required by Rule 104 of Regulation BTR that the Company sent during the year ended December 31, 2017 concerning any equity security subject to a blackout period under Rule 101 of Regulation BTR.

## NYSE CORPORATE GOVERNANCE

The Company complies with corporate governance requirements of both the TSX and the NYSE. As a foreign private issuer the Company is not required to comply with all of the corporate governance requirements of the NYSE; however, the Company adopts best practices consistent with domestic NYSE listed companies when appropriate to its circumstances.

The Company has reviewed the NYSE corporate governance requirements and confirms that except as described below, the Company is in compliance with the NYSE corporate governance standards in all significant respects:

*Shareholder Meeting Quorum Requirement*: The NYSE is of the opinion that the quorum required for any meeting of shareholders should be sufficiently high to insure a representative vote. The Company's quorum requirement is set forth in its Bylaws. A quorum for a meeting of shareholders of the Company is present if at least two shareholders are present in person or represented by proxy.

*Proxy Delivery Requirement*: The NYSE requires the solicitation of proxies and delivery of proxy statements for all shareholder meetings, and requires that these proxies shall be solicited pursuant to a proxy statement that conforms to SEC proxy rules. The Company is a "foreign private issuer" as defined in Rule 3b-4 under the Exchange Act, and the equity securities of the Company are accordingly exempt from the proxy rules set forth in Sections 14(a), 14(b), 14(c) and 14(f) of the Exchange Act. The Company solicits proxies in accordance with applicable rules and regulations in Canada.

The foregoing are consistent with the laws, customs and practices in Canada.

## MINE SAFETY DISCLOSURE

Not applicable.

8

4820-0982-2571\4

## UNDERTAKING

The Company undertakes to make available, in person or by telephone, representatives to respond to inquiries made by the Commission staff, and to furnish promptly, when requested to do so by the Commission staff, information relating to: the securities registered pursuant to Form 40-F; the securities in relation to which the obligation to file an annual report on Form 40-F arises; or transactions in said securities.

## CONSENT TO SERVICE OF PROCESS

The Company has previously filed with the SEC a written consent to service of process on Form F-X. Any change to the name or address of the Company's agent for service shall be communicated promptly to the SEC by amendment to the Form F-X referencing the file number of the Company.

9

4820-0982-2571\4

## SIGNATURES

Pursuant to the requirements of the Exchange Act, the Registrant certifies that it meets all of the requirements for filing on Form 40-F and has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CANOPY GROWTH CORPORATION**

|  |  |
|---|---|
| By: | /s/ Tim Saunders |
| Name: | Tim Saunders |
| Title: | Executive Vice President and Chief Financial Officer |

Date: June 28, 2018

2

4820-0982-2571\4

**EXHIBIT INDEX**

The following documents are being filed with the Commission as Exhibits to this Annual Report:

| Exhibit | Description |
| --- | --- |
| 99.1 | Annual Information Form dated June 27, 2018 |
| 99.2 | Audited Annual Consolidated Financial Statements and notes thereto as at and for the years ended March 31, 2018 and March 31, 2017, together with the report thereon of the independent auditor |
| 99.3 | Management's Discussion and Analysis for the year ended March 31, 2018 |
| 99.4 | Certificate of Chief Executive Officer Pursuant to Rule 13a-14(a) of the Exchange Act |
| 99.5 | Certificate of Chief Financial Officer Pursuant to Rule 13a-14(a) of the Exchange Act |
| 99.6 | Certificate of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.7 | Certificate of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 99.8 | Consent of Deloitte LLP |
| 101.INS | XBRL Instance |
| 101.SCH | XBRL Taxonomy Extension Schema |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase |

3

4820-0982-2571\4

10/8/21, 1:48 PM   Case 2:19-cv-20543-MCA-MAH   Document 83-3   Filed 10/12/21   Page 14 of 125
PageID: 6073
cgc-ex991_131.htm

EX-99.1 2 cgc-ex991_131.htm EX-99.1

**Exhibit 99.1**

# CANOPY GROWTH CORPORATION

**ANNUAL INFORMATION FORM**

**FOR THE PERIOD ENDED MARCH 31, 2018**

**DATED: JUNE 27, 2018**

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 _ Filed 10/12/21 Page 15 of 125
cgc-ex991_131.htm
PageID: 6074

## TABLE OF CONTENTS

| | |
|---|---|
| **ANNUAL INFORMATION FORM** | **1** |
| **FORWARD LOOKING INFORMATION** | **1** |
| **GLOSSARY OF CERTAIN TERMS** | **2** |
| **CORPORATE STRUCTURE** | **3** |
| **THREE YEAR HISTORY OF THE BUSINESS** | **5** |
| **GENERAL DEVELOPMENT OF THE BUSINESS** | **8** |
| Summary Description of the Business | 8 |
| Licensed Producers | 9 |
| Additional Initiatives | 15 |
| **REGULATORY OVERVIEW** | **18** |
| Summary of the ACMPR | 18 |
| Summary of the Cannabis Act and the Proposed Regulations | 19 |
| Activities Outside Canada | 21 |
| Sales and Distribution Strategy | 24 |
| Business Strategy | 26 |
| Protection of Intellectual Property | 27 |
| Competitive Environment | 27 |
| Risk Factors | 28 |
| **DIVIDENDS** | **43** |
| **CAPITAL STRUCTURE** | **43** |
| **MARKET FOR SECURITIES** | **44** |
| Stock Options | 44 |
| Warrants | 45 |
| **ESCROWED SECURITIES AND SECURITIES SUBJECT TO RESTRICTION ON TRANSFER** | **45** |
| **DIRECTORS AND EXECUTIVE OFFICERS** | **45** |
| **LEGAL PROCEEDINGS AND REGULATORY ACTIONS** | **50** |
| **INTERESTS OF MANAGEMENT IN MATERIAL TRANSACTIONS** | **51** |
| **TRANSFER AGENT AND REGISTRAR** | **52** |
| **MATERIAL CONTRACTS** | **52** |
| **AUDIT COMMITTEE INFORMATION** | **53** |
| **INTERESTS OF EXPERTS** | **54** |
| **ADDITIONAL INFORMATION** | **54** |
| **SCHEDULE "A"** | **55** |

# ANNUAL INFORMATION FORM

In this annual information form ("**Annual Information Form**"), unless otherwise noted or the context indicates otherwise, the "**Corporation**", "we", "us" and "our" refer to Canopy Growth Corporation and its subsidiaries and affiliates; "**Canopy Growth**" refers to Canopy Growth Corporation on a stand-alone basis; "**Tweed**" refers to Canopy Growth's wholly-owned subsidiary Tweed Inc.; "**Tweed Farms**" refers to Canopy Growth's wholly-owned subsidiary Tweed Farms Inc.; "**Bedrocan**" refers to Canopy Growth's wholly-owned subsidiary Bedrocan Canada Inc., "**Spectrum**" refers to Canopy Growth's wholly-owned subsidiary Spectrum Cannabis Canada Ltd.; "**Tweed Grasslands**" refers to Canopy Growth's wholly-owned subsidiary Tweed Grasslands Cannabis Inc.; and **"Vert"** refers to Canopy Growth's wholly-owned subsidiary Vert Cannabis Inc.

All financial information in this Annual Information Form is reported in Canadian dollars and using International Financial Reporting Standards as issued by the International Accounting Standards Board. The information contained herein is dated as of March 31, 2018, unless otherwise stated.

# FORWARD LOOKING INFORMATION

Certain statements in this Annual Information Form contain forward-looking statements and forward-looking information (collectively, "**forward-looking statements**") within the meaning of the United States Private Securities Litigation Reform Act of 1995 and within the meaning of applicable Canadian securities legislation respectively. Often, but not always, forward-looking statements can be identified by the use of words such as "plan", "expect", "is expected", "intend", "believe", "anticipate", "estimate", or variations of such words and phrases (including negative and grammatical variations) or state that certain actions, events, or results "may", "could", "would", "might", or "will" be taken, occur, or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of the Corporation to differ materially from those anticipated in the forward-looking statements. By their nature, forward-looking statements involve numerous assumptions, known and unknown risks and uncertainties, both general and specific, that contribute to the possibility that the predictions, forecasts, projections and other forward-looking statements will not occur. Such forward-looking statements in this Annual Information Form speak only as of the date of this Annual Information Form. Forward-looking statements in this Annual Information Form include, but are not limited to, statements with respect to:

- our expectations in connection with the production and expansion plans at our facilities and the capacity thereof;
- our expectations regarding the timing of construction, development and production of our expansion projects for both existing facility expansion and new facilities;
- advancement of our international projects and targeting other opportunities as the laws and regulations governing cannabis evolve internationally;
- the performance of our business and operations;
- our ability to obtain additional licenses or renewal of existing licenses;
- the legalization of cannabis for recreational use in Canada and our ability to participate in such market when it is legalized;
- the legalization of cannabis for recreational and/or medical use in jurisdictions outside of Canada and our ability to participate in any such markets, if and when such use is legalized;
- the effect of government regulations (or changes thereto) with respect to the restrictions on production, sale, consumption, export controls, income taxes, expropriation of property, repatriation of profits, environmental legislation, land use, water use and receipt of necessary permits;

1

- future liquidity and financial capacity;
- our expectations regarding revenues and expenses;
- expectations regarding our ability to raise capital;
- the competitive landscape in which we operate;
- our investments in community relations, cannabis health and safety, educational programming in the locations where we operate and the further development of our social responsibility programs;
- our future product offerings;
- the payment of any future dividends;
- the outcome of any current or pending litigation against us; and
- treatment under government regulatory and taxation regimes.

With respect to the forward-looking statements contained in this Annual Information Form, we have made assumptions regarding, among other things: (i) our ability to generate cash flow from operations and obtain necessary financing on acceptable terms; (ii) general economic, financial market, regulatory and political conditions in which we operate; (iii) the yield from the growing operations of the Corporation's Licensed Producers; (iv) consumer interest in our products; (v) competition; (vi) anticipated and unanticipated costs; (vii) government regulation of our activities and products and in the areas of taxation and environmental protection; (viii) the timely receipt of any required regulatory approvals; (ix) our ability to obtain qualified staff, equipment and services in a timely and cost efficient manner; (x) our ability to conduct operations in a safe, efficient and effective manner; and (xi) our construction plans and timeframe for completion of such plans.

Some of the risks and other factors which could cause actual results to differ materially from those expressed in the forward-looking statements contained in this Annual Information Form include, but are not limited to, the factors included under "*Risk Factors*", such as: continued listing requirements of the TSX and NYSE and increased price volatility; changes in laws, regulations and guidelines; risks inherent in strategic alliances; difficulty of forecasting the medical marijuana and recreational marijuana industries; exchange restrictions on business; risks relating to the ACMPR; risks relating to our expansion into foreign jurisdictions; political and other risks in emerging markets; risks of corruption and fraud in emerging markets; inflation risks in emerging markets; foreign ownership or control restrictions; risks relating to international advisors and consultants; increased operational, regulatory and other risks; our limited operating history; reliance on licenses; reliance on certain facilities; reliance on management; reliance on key inputs; dependence on suppliers and skilled labor; risks inherent in an agricultural business; vulnerability to rising energy costs; transportation risks; operating risk and insurance coverage; environmental and employee health and safety regulations; product liability risks; risks of product recalls; unfavorable publicity or consumer perception; risks relating to client acquisitions; growth-related risks; our history of net losses, and risks relating in incurring significant net losses in the future and not being able to achieve or maintain profitability; risks relating to additional financing; risks relating to conflicts of interest; risks relating to competition from other companies; and reputational risk to third parties, as well as those risk factors discussed herein or in documents incorporated by reference. Readers are cautioned not to place undue reliance on forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by applicable law.

## GLOSSARY OF CERTAIN TERMS

*The following technical terms are used in this document:*

"**Acquired Companies**" means Bedrocan, MCA, MedCann GmbH, Spectrum, Spot Therapeutics Inc., Tweed Farms, Tweed Grasslands, and Vert;

2

10/8/21, 1:48 PM  Case 2:19-cv-20543-MCA-MAH  Document 83-3  Filed 10/12/21  Page 18 of 125
cgc-ex991_131.htm
PageID: 6077

"**ACMPR**" means the *Access to Cannabis for Medical Purposes Regulations* (Canada) issued pursuant to the *Controlled Drugs and Substances Act* (Canada);

"**bought deal**" means a securities offering where an investment bank commits to buy the entire offering from the issuing company;

"**cannabis**" has the meaning given to such term in the ACMPR;

"**cannabis oil**" has the meaning given to such term in the ACMPR;

"**CBD**" means cannabidiol;

"**CDSA**" means the *Controlled Drugs and Substances Act (Canada)*;

"**Common Shares**" means the Common Shares of Canopy Growth;

"**Dealers Licence**" means the license issued to Tweed pursuant to the CDSA to conduct research and possess cannabis and cannabis derivatives in forms that are not currently covered by the ACMPR;

"**dried marijuana**" has the meaning given to such term in the ACMPR;

"**industrial hemp**" has the meaning given to such term in the *Industrial Hemp Regulations* (Canada);

"**licence**" means the licenses issued to each of the Corporation's Licensed Producers, as provided in the table of Licensed Producers under the Business of Canopy Growth;

"**Licensed Producer**" has the meaning given to such term in the ACMPR;

"**marijuana**" has the meaning given to the term "marihuana" in the ACMPR;

"**Minister**" means the Federal Minister of Health;

"**MMPR**" means the *Marihuana for Medical Purposes Regulations* (Canada) issued pursuant to the *Controlled Drugs and Substances Act* (Canada);

"**NCR**" means the *Narcotic Control Regulations* (Canada);

"**private placement**" means the sale of securities to a small number of investors as a way of raising capital;

"**THC**" means delta-9-tetrahydrocannabinol;

## CORPORATE STRUCTURE

Canopy Growth, formerly Tweed Marijuana Inc., is Canada's first publicly traded medical marijuana company and the first geographically diversified medical marijuana producer with its licences under the ACMPR. Canopy Growth operates eleven production facilities in Canada and currently distributes marijuana across the country to Canadian patients managing a host of medical conditions.

3

Canopy Growth was incorporated pursuant to the provisions of the *Canada Business Corporations Act* on August 5, 2009 under the name "LW Capital Pool Inc." We changed our name to Tweed Marijuana Inc. on March 26, 2014 and later to Canopy Growth Corporation on September 17, 2015. Prior to completing our qualifying transaction on April 3, 2014, Canopy Growth was a "capital pool company" under Policy 2.4 of the TSX Venture Exchange Corporate Finance Manual. As a capital pool company, Canopy Growth had no assets other than cash and did not carry on any operations. On September 17, 2015, the Corporation changed its name from Tweed Marijuana Inc. to Canopy Growth Corporation and made a corresponding change to its trading symbol on the TSX Venture Exchange ("**TSXV**") from "TWD" to "CGC". On July 26, 2016, the Corporation graduated to the TSX. On February 1, 2017, the Corporation's trading symbol was changed to "WEED" and on March 10, 2017, the Corporation was the first cannabis company to be added to the S&P/TSX Composite Index. On May 24, 2018, the Corporation was the first Canadian cannabis producer to be listed on the New York Stock Exchange (**"NYSE"**) with the trading symbol "CGC."

Our head office is located at 1 Hershey Drive, Smiths Falls, ON, K7A 0A8 and our registered office is located at 515 Legget Drive, Suite 800, Ottawa, ON, K2K 3G4. Our telephone number is 1-855-558-9333 and our corporate website is www.canopygrowth.com. The information contained on our website is not incorporated by reference into this Annual Information Form.

As of March 31, 2018, there were 1,033 full-time employees in the Corporation as compared to 546 full-time employees at March 31, 2017.

We conduct our business through our various subsidiaries. The following chart illustrates, as at the date of this Annual Information Form, our material subsidiaries, including their respective jurisdiction of incorporation and percentage of voting securities of each that are held by Canopy Growth either directly or indirectly:

*Controlled or Jointly Controlled Subsidiaries*

| Company Name | Ownership Interest by Canopy | Classification (Subsidiary, associate, other) | Jurisdiction of Incorporation |
|---|---|---|---|
| **Canadian operations** | | | |
| Tweed Inc. | 100% | Subsidiary | Canada |
| Tweed Farms Inc. | 100% | Subsidiary | Canada |
| Bedrocan Canada Inc. | 100% | Subsidiary | Ontario |
| Bedrocan Canada (106) Inc. | 100% | Subsidiary | Ontario |
| Spectrum Health Corp. | 100% | Subsidiary | Ontario |
| 2344823 Ontario Inc. d/b/a Bodystream | 100% | Subsidiary | Ontario |
| Apollo Applied Research Inc. | 100% | Subsidiary | Canada |
| Apollo CRO Inc. | 100% | Subsidiary | Canada |
| Mettrum Hempworks Inc. | 100% | Subsidiary | Ontario |
| Spectrum Cannabis Canada Ltd. (Formerly Mettrum Ltd.) | 100% | Subsidiary | Ontario |
| Tweed Grasslands Cannabis Inc. | 100% | Subsidiary | Saskatchewan |
| Groupe H.E.M.P.CA/H.E.M.P.CA | 75% | Subsidiary | Quebec |
| Vert Cannabis Inc. | 100% | Subsidiary | Canada |

4

| | | | |
|---|---|---|---|
| Spot Therapeutics Inc. | 100% | Subsidiary | New Brunswick |
| Canopy Rivers Corporation | 89.1% Voting 31.5% Economic | Subsidiary | Canada |
| Canopy Hemp Corporation | 100% | Subsidiary | Canada |
| Les Serres Vert Cannabis | 66.70% | Subsidiary | Quebec |
| BC Tweed Joint Venture Inc. | 66.70% | Joint Operation | Canada |
| 10007705 Manitoba Ltd. | 50% | Subsidiary | Manitoba |
| 10252832 Canada Inc. | 100% | Subsidiary | Canada |
| 80694 Newfoundland and Labrador Inc. | 100% | Subsidiary | Newfoundland |
| 10663824 Canada Inc. | 100% | Subsidiary | Canada |
| 9388036 Canada Inc. | 100% | Subsidiary | Canada |
| 2532461 Ontario Inc. | 100% | Subsidiary | Ontario |
| **International operations** | | | |
| Spektrum Cannabis GmbH | 100% | Subsidiary | Germany |
| Spectrum Chile SpA | 85% | Subsidiary | Chile |
| Spectrum Cannabis Australia PTY Ltd. | 100% | Subsidiary | Australia |
| Spectrum Cannabis Italia srl | 100% | Subsidiary | Italy |
| Spectrum Cannabis Netherlands BV | 100% | Subsidiary | Netherlands |
| Grow House JA Limited | 49% | Subsidiary | Jamaica |
| Spectrum Cannabis Denmark Aps | 62% | Subsidiary | Denmark |
| Spectrum Polska Sp. Z 0.0. | 100% | Subsidiary | Poland |
| 7218737 Delaware Inc. | 100% | Subsidiary | Delaware, USA |
| Spectrum Southern Africa (Pty) Ltd. | 100% | Subsidiary | South Africa |
| Daddy Cann (Lesotho) (Pty) Ltd. | 100% | Subsidiary | Lesotho, South Africa |
| Annabis Medical s.r.o. | 100% | Subsidiary | Czech Republic |
| Canopy LATAM Corporation | 100% | Subsidiary | Canada |

# THREE YEAR HISTORY OF THE BUSINESS

*Fiscal 2016 (April 1, 2015 to March 31, 2016)*

During Fiscal 2016, the Corporation completed two acquisitions (Bedrocan and MedCannAccess) and issued a total of 7,012,700 Common Shares for aggregate gross proceeds of approximately $14 million pursuant to an offering on a bought deal basis.

In addition,

- Tweed received authorization from Health Canada to begin the production of cannabis extracts

- Tweed and DNA Genetics announced a partnership to enable Tweed to begin its own breeding program

5

- Tweed entered into a license agreement with LBC Holdings, Inc. ("**LBC**"), a Corporation related to the artist known as Snoop Dogg

- Health Canada granted Tweed its licence to sell cannabis oil products

*Fiscal 2017 (April 1, 2016 to March 31, 2017)*

During Fiscal 2017, the Corporation completed three acquisitions (MedCann GmbH, Spectrum and Vert) and issued a total of 20,117,500 Common Shares for aggregate gross proceeds of approximately $106,026,400 million pursuant to an offering on a bought deal basis.

In addition,

- Health Canada granted Bedrocan its licence to sell cannabis oil products

- Bedrocan Canada, Bedrocan International BV ("**Bedrocan International**") and local Brazilian partners entered into a partnership to create a new company called Bedrocan Brasil

- Tweed received necessary approvals in Canada and Germany to begin export of medical cannabis for sale to German pharmacies

- Canopy Growth closed a $5.5 million financing with a commercial lending institution

- Tweed and Snoop Dogg announced that Leafs By Snoop would be available in Canada, exclusively to customers registered with Tweed

- Canopy Growth acquired ownership of Vert Médical

- Canopy Growth entered into a Memorandum of Understanding with the Goldman Group to expand Canopy Growth's cannabis production capacity and geographic footprint

- Canopy Growth announced the formation of the cannabis research incubator, Canopy Health Innovations Inc. ("**Canopy Health**")

- Tweed received its Dealers Licence pursuant to the provisions of the CDSA

- Canopy Growth acquired the property at 1 Hershey Drive in Smiths Falls, Ontario that currently houses Canopy Growth's headquarters and Tweed production facilities

- Canopy Growth issued a statement regarding possible Class Action related to the Mettrum Ltd. recall. (see "*Legal Proceedings*")

- Canopy Growth issued a total of 2,500,000 Common Shares for aggregate gross proceeds of approximately $24,250,000 million pursuant to a private placement with a single investor

6

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 22 of 125
cgc-ex991_131.htm
PageID: 6081

*Fiscal 2018 (April 1, 2017 to March 31, 2018)*

During Fiscal 2018, the Corporation completed two acquisitions (Tweed Grasslands and Spot Therapeutics Inc.) and issued a total of 5,800,000 Common Shares for aggregate gross proceeds of approximately $175,076,000 million pursuant to an offering on a bought deal basis.

In addition,

- Canopy Growth announced the launch of Tweed's curated CraftGrow line (see "*Other Initiatives - Craft Grow*")

- Canopy Growth committed $20 million in seed capital funding for Canopy Rivers Corporation ("**Canopy Rivers**"), a joint venture that will provide financial support to ACMPR applicants and existing Licensed Producers

- Canopy Growth issued a total of 3,105,590 Common Shares for aggregate gross proceeds of approximately $24,999,999.50 million pursuant to a private placement with a single investor

- Tweed Farms purchased of a parcel of land adjacent to its current facility in Niagara-on-the-Lake, ON

- Canopy Growth and the Province of New Brunswick entered into a Memorandum of Understanding (MOU) for a two-year supply agreement

- Canopy Growth entered into a joint venture with Danish Cannabis ApS ("**Danish Cannabis**") called Spectrum Denmark ApS ("**Spectrum Denmark**")

- Canopy Growth entered into a definitive agreement to form a new company, BC Tweed Joint Venture Inc. together with a large-scale greenhouse operator to develop 1.3 million square feet of greenhouse growing capacity in British Columbia

- Canopy Growth completed the transaction with Constellation Brands whereby Constellation Brands invested CDN $245 million in exchange for 9.9% equity upon the issuance of 18,876,901 Common Shares and 18,876,901 warrants to an affiliate of Constellation Brands, Greenstar Holdings (see "*Strategic Relationship with Greenstar Holdings*")

- Canopy Growth and Canopy Rivers, along with funds advised by JW Asset Management LLC (collectively referred to as the "Investors") entered into subscription agreements with TerrAscend Corp. ("**TerrAscend**") pursuant to which the Investors will acquire 47,727,273 units of TerrAscend

- Canopy Growth, through a joint venture with Green House Holdings North America Inc. ("**Green House Seeds**"), its affiliate in the Netherlands, GHSC Trading B.V., National Concessions Group Inc. ("**Organa Brands**"), allocated 40% and 20%, respectively, of ownership in ACMPR licensed Agripharm Corp. (previously Spectrum Health Corp.) ("**Agripharm**")

- Canopy Growth entered into a supply agreement with the Province of Newfoundland and Labrador

- Canopy Growth and Canopy Rivers formed a new company, Les Serres Vert Cannabis Inc. ("**Vert Mirabel**"), together with Les Serres Stéphane Bertrand Inc. ("**Bertrand**")

- Canopy Growth and the Province of Prince Edward Island entered a supply Memorandum of Understanding

- Spectrum Denmark's facility was issued a cannabis production licence by Denmark's Medicines Agency

- Canopy Growth acquired certain intellectual property assets and know-how for total proceeds of $5,325,250 of which $3,132,500 was paid on closing by issuing 117,253 Common Shares and the remaining consideration of $2,192,750 will be paid over a series of milestones in Common Shares

7

- Canopy Growth signed a letter of intent with the Société des alcools du Québec to provide the Quebec market with 12,000 kilograms of cannabis annually

- Canopy Growth announced that it had been conditionally selected by the Government of Manitoba to operate cannabis retail stores in the province, along with its partner Delta 9 Cannabis Inc

Following the end of Fiscal 2018, on June 20, 2018, the Corporation closed its offering of C$500 million aggregate principal amount of its 4.25% convertible senior notes due 2023 (the "Initial Notes"). The initial conversion rate for the Initial Notes is 20.7577 Common Shares per C$1,000 principal amount of the Initial Notes, equivalent to an initial conversion price of approximately C$48.18 per share. On June 22, 2018, the Corporation closed an additional C$100 million aggregate principal amount of its Initial Notes (the "Over-Allotment Notes" and collectively with the Initial Notes, the "Notes") pursuant to the exercise in full of the over-allotment option granted to the initial purchasers. The Over-Allotment Notes have the same terms as the Initial Notes. The Corporation intends to use the net proceeds from the sale of the Notes for supporting expansion initiatives and general corporate purposes.

### *Anticipated Changes for Fiscal 2019*

On June 18, 2018, the Federal Government of Canada passed legislation legalizing the recreational use of cannabis in Canada (see "*Summary of the Cannabis Act and the Proposed Regulations*"), with an opening of the legal recreational cannabis market set for October 17, 2018.  In anticipation of this, the Corporation will continue efforts to increase its inventory of finished cannabis ready for sale as well as complete the development and licensing of expanded cannabis cultivation, processing and distribution infrastructure. The Corporation expects to have the majority of its planned 5.6 million square feet operations licensed by the end of calendar 2018.

In Fiscal 2019 (April 1, 2018 to March 31, 2019), the Corporation expects that it will export increasing amounts of cannabis to Germany and that it could begin exporting cannabis to additional countries around the world (see "*Activities Outside of Canada*"). The Corporation believes that it will continue to enter into business partnerships or acquire businesses as a means of establishing operations in additional countries.

In addition, the federal government has indicated that the sale of value-added recreational cannabis products will be permitted within one year of the start of the recreational cannabis market in Canada. The Corporation will continue to conduct product research, development and marketing activities and submit products for approval to Health Canada to prepare for this market.

## GENERAL DEVELOPMENT OF THE BUSINESS

### Summary Description of the Business

Canopy Growth was an early mover in the Canadian medical cannabis market and is a multi-brand cannabis company. We believe that our strong focus on, and investment in, brand, market and product differentiation, increased cannabis supply through our cannabis production platforms and education, to help citizens safely, effectively and responsibly use cannabis, will create a dominant global business with the potential to generate a significant and sustained return on invested capital over the long-term.

8

In Canada, through our Licensed Producers as outlined below, we are in the business of producing and selling medical cannabis in accordance with the ACMPR. We operate eleven cannabis production facilities, three pursuant to joint ventures, seven of which are authorized to produce and sell cannabis and one of which is solely authorized to produce cannabis. In accordance with the ACMPR, customers with a medical document from an authorized healthcare practitioner can register with us. Customers can order cannabis directly from us, including over the phone or via the *Tweed Main Street* online platform, and we then ship products directly to our customers. We also operate medical cannabis patient assistance networks and offer in-person client services through a network of *Tweed Main Street Community Engagement Centers* (see *"Other Initiatives – Tweed Main Street"*).

## Licensed Producers

The following table lists our Licensed Producers and the material terms of each licence held:

| Entity | Initial Licensing | Date of Renewal | Licensed Production | Province | Facility | Details | License Type (Plants/ Dried) | License Type (Fresh/ Oil) |
|---|---|---|---|---|---|---|---|---|
| Agripharm Corp. | December 11, 2014 | December 13, 2019 | 15,000 square feet | ON | Indoor | Up to $31,250,000 worth of product | Cultivation and Sale | Production and Sale |
| Bedrocan Canada Inc. | December 16, 2013 | December 3, 2019 | N/A | ON | Indoor | Sales licence limited to the sale of bulk product to other Licensed Producers. | Sale | N/A |
| Bedrocan Canada Inc. (second site) | February 17, 2015 | February 18, 2020 | 50,000 square feet | ON | Indoor | Up to $31,250,000 worth of product. | Cultivation and Sale | Production and Sale |
| BC Tweed Joint Venture Inc. | February 16, 2018 | February 16, 2021 | 840,000 square feet | BC | GH | Sales licence limited to the sale of bulk product to other Licensed Producers | Cultivation | N/A |
| BC Tweed Joint Venture Inc. (second site) | April 13, 2018 | April 13, 2021 | 900,000 square feet | BC | GH | Sales licence limited to the sale of bulk product to other Licensed Producers | Cultivation | N/A |
| Spectrum Cannabis Canada Ltd. | December 16, 2015 | November 1, 2019 | 75,000 square feet | ON | Indoor | Up to $31,250,000 worth of product. | Cultivation and Sale | Production and Sale |
| Tweed Farms Inc. | August 8, 2014 | January 14, 2020 | 350,000 square feet | ON | GH | Sales licence limited to the sale of bulk product to other Licensed Producers. | Cultivation and Sale | N/A |
| Tweed Grasslands Cannabis Inc. | June 16, 2017 | June 16, 2020 | 60,000 square feet | SK | Indoor | Sales licence limited to the sale of bulk product to other Licensed Producers. | Cultivation and Sale | N/A |
| Tweed Inc. (Commercial) | November 18, 2013 | January 20, 2020 | 168,000 square feet | ON | Indoor | Up to $150,000,000 worth of product. | Cultivation and Sale | Production and Sale |
| Tweed Inc. (Dealer) | December 9, 2016 | December 31, 2018 | N/A | ON | Indoor | Dealers Licence limited to testing, research and development related to cannabis | N/A | N/A |
| Vert Cannabis Inc. | December 21, 2017 | December 21, 2020 | 10,000 square feet | QC | Indoor | Sales licence limited to the sale of bulk product to other Licensed Producers | Cultivation | N/A |
| Vert Mirabel | May 25, 2018 | May 25, 2021 | 70,000 square feet | QC | GH | Sales licence limited to the sale of bulk product to other Licensed Producers | Cultivation | N/A |

At the end of each term of their respective licences, each of Agripharm, BC Tweed Joint Venture Inc. ("**BC Tweed**"), Bedrocan, Tweed Grasslands, Spectrum, Tweed, Tweed Farms and Vert must submit an application for renewal to Health Canada containing information prescribed by the ACMPR. Further details with respect to each Licensed Producer and their respective facilities and business developments are set out below.

9

10/8/21, 1:48 PM  Case 2:19-cv-20543-MCA-MAH  Document 83-3  Filed 10/12/21  Page 25 of 125
cgc-ex991_131.htm
PageID: 6084

*Tweed*

Our wholly-owned subsidiary Tweed is based in Smiths Falls, Ontario, and has a present built-out GMP- certified production capacity of 168,000 square feet consisting of climate controlled indoor growing rooms and the related vegetation, nutrient delivery and production infrastructure as is required to support the 24-room configuration and cannabis inputs from other production facilities in a hub and spoke model. Additionally, an in-house laboratory and R&D area, cannabis oil extraction infrastructure, breeding facility and a high-level security vault exist within the Smiths Falls facility.

On December 9, 2016, Tweed was issued the Dealers Licence by Health Canada pursuant to the CDSA and began operating the area built to GMP specifications at the facility in Smiths Falls, Ontario. Licensed activities occur in a distinct area of the facility focused on strategic projects beyond Tweed's operational scope. The licence allows Tweed to conduct research and possess cannabis and cannabis derivatives in forms that are not currently covered by the ACMPR. Tweed can also begin development of innovative products for future market opportunities, and with necessary approvals undertake the export of non-dried form of cannabis to other jurisdictions.

On January 15, 2017, Tweed acquired the property at 1 Hershey Drive, in Smiths Falls, Ontario, thereby terminating the lease agreement dated December 27, 2013 between Tweed and the landlord, Tweed Hershey Drive Inc. (the "**Tweed Lease Agreement**"). The facility was acquired for $6.6 million, of which $823,980 was settled with the issuance of 94,397 Common Shares of the Corporation, with the remainder paid in cash on closing. Bruce Linton, as an officer, director, and shareholder of Tweed Hershey Drive Inc. received 70,800 of the 94,397 shares issued, which were subject to a 4-month lockup. The acquisition was considered a "related party transaction" within the meaning of Multilateral Instrument 61-101 — *Protection of Minority Security Holders in Special Transactions* ("**MI 61-101**") because Bruce Linton, a director and officer of Canopy Growth is also a shareholder of the vendor Tweed Hershey Drive Inc. Canopy Growth relied on an exemption available pursuant to MI 61-101 from the formal valuation and minority approval requirements since neither the fair market value of the property acquired, nor the fair market value of the purchase price for the acquisition of the property exceeded 25% of Canopy Growth's market capitalization at the time of the transaction. This 42-acre site at 1 Hershey Drive has the potential to house hundreds of thousands of square feet of additional production and processing space.

In fiscal 2018, the Corporation began construction of new infrastructure in the approximately 300,000 square feet unlicensed portion of the original 472,000 square feet building. New facilities being constructed include additional indoor growing rooms, post-harvest processing, security vault and a visitors centre. In addition, the Corporation also began the construction of new building footprints and the redevelopment of existing buildings that together will add over 300,000 square feet to the Smiths Falls facility. The additional footprint will include storage, an advanced manufacturing building built to GMP specifications and a dedicated distribution centre. The distribution centre has been designed to significantly increase the capability and flexibility of the Corporation's fulfillment resources in an effort to better and more efficiently serve the demands of the Canadian medicinal cannabis market, expected demands of the Canadian recreational cannabis market and anticipated increase in cannabis exports to federally legal markets around the world.  Construction is expected to be completed in calendar 2018.

A key focus of Tweed, since its inception, has been the development of its brand. From the name, logo and design aesthetic, to the approachable tone and light-hearted copy, unlike industry participants that have positioned themselves as pharmaceutical companies, Tweed is positioned to attract strong appeal and recognition across value and premium product segments in the medical marijuana market and upcoming recreational market in Canada. Tweed is intent on using creative marketing strategies to further increase public awareness of the Tweed brand. The objective is to make the Tweed brand top-of-mind as medical patients and future recreational users consider making their first legal marijuana purchase, while still ensuring we are onside all regulatory requirements with respect to promotion.

10

*Partner Brands*

Tweed has entered into partnership agreements with certain third parties in connection with the production and distribution of its products, including the following:

In October 2015, Tweed and DNA Holding LLC ("**DNA Genetics**" or "**DNA**") announced a partnership that would see Tweed leverage DNA's expertise in cannabis breeding to bring exclusive DNA certified strains to Tweed customers. Working with DNA, Tweed breeds new strains for customers that have been personally bred, phenotyped & inspected by DNA Genetics. On September 15, 2016, Tweed launched Lemon Skunk, the first strain certified by DNA Genetics and selected through phenotyping by DNA Genetics.

On February 11, 2016 Tweed entered into a license agreement with LBC Holdings, Inc. ("**LBC**"), a Corporation related to the artist known as Snoop Dogg. Under the LBC License Agreement, Snoop Dogg, through LBC, and Tweed have partnered on curated content and brand strategy exclusively in Canada. On October 27, 2016, Tweed began selling three *Leafs By Snoop* varieties.

On April 20, 2017, Tweed and Praxis Holdings Inc., a Corporation related to the cannabis product line known as Foria, announced a partnership that would expand Tweed's product offerings with the inclusion of a proprietary blend of Foria specifically for Tweed customers.

*Tweed Farms*

Canopy Growth acquired Tweed Farms in Niagara-on-the-Lake, Ontario, Canada on June 18, 2014 when Tweed Farms was in the process of obtaining its licence to produce under the MMPR. We estimate that, when in full production, the existing 350,000 square foot greenhouse can support the production of up to 15,000 kilograms of cannabis per year. Following completion of the previously announced expansion, Tweed Farms will be home to over 1,000,000 square feet of greenhouse space, including the recently acquired and adjacent greenhouse property, plus post-harvest facilities including 10,000 square feet of recently renovated space for new drying rooms and an upgraded laboratory.

On September 8, 2017, the Corporation announced that Tweed Farms had finalized the purchase of a parcel of land adjacent to its current facility in Niagara-on-the-Lake, ON including an operational 458,000 square feet greenhouse. In addition to the newly acquired asset, the Company announced that construction had commenced on an additional 212,000 square feet of state-of-the-art greenhouse to be located on the current Tweed Farms property.

*Spectrum*

The Corporation acquired Spectrum Health Corp. (formerly Mettrum Health Corp.), including its subsidiaries 2344823 Ontario Inc. d/b/a Bodystream, Apollo Applied Research Inc. (and its subsidiary, Apollo CRO Inc.), Spectrum Hempworks Inc., Spectrum (and its subsidiary, Agripharm, of which Spectrum owns 40%) (collectively with Spectrum, the "**Spectrum Canada Group**"), on January 31, 2017 pursuant to an arrangement agreement dated November 30, 2016, as amended, for which Spectrum Canada Group shareholders received 0.7132 Common Shares for each Spectrum Canada Group common share held immediately prior to the closing.

Spectrum was incorporated on March 29, 2011 under the name Cinaport Acquisition Corp. and completed its initial public offering as a capital pool Corporation on October 24, 2011 (the "**Offering**"). The Offering consisted of 2,260,000 common shares of Spectrum ("**Spectrum Common Shares**") at a price

11

10/8/21, 1:48 PM    Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 27 of 125
cgc-ex991_131.htm
PageID: 6086

of $0.10 per Common Share for gross proceeds of $226,000. The Spectrum Common Shares began trading on the TSXV as a capital pool Corporation on November 1, 2011 under the symbol "CPQ.P". Spectrum completed its qualifying transaction on September 30, 2014 (the "**Spectrum Qualifying Transaction**"). As part of the Spectrum Qualifying Transaction, Spectrum consolidated its shares on a 14.5625 to 1 basis.

Prior to Spectrum's acquisition by the Corporation, Spectrum acquired Apollo Applied Research Inc., and Apollo CRO Inc. (together "**Apollo**") and 2344823 Ontario Inc., operating as Bodystream ("**Bodystream**") in two separate transactions. Under the provisions of the respective share purchase agreements, additional Spectrum shares would have been issued to former shareholders of Apollo and Bodystream over the five years following the acquisition if certain performance targets were met and the shareholders remained as employees. As a result of the acquisition of Spectrum, the obligation for this share-based compensation was assumed by the Corporation. The maximum number of Canopy Growth shares that would be issued with respect to the Apollo and Bodystream agreements is 1,111,702 and 1,073,595 shares, respectively.

Spectrum is a Toronto-based company and began production of medical cannabis at its first production facility in Bowmanville, Ontario. The licence covers approximately 75,000 square feet and includes 13 growing rooms as well as necessary vegetation, nutrient delivery and plant destruction infrastructure. The facility sits on a 7-acre site and we are currently planning a 100,000 square foot expansion of this location. In addition, on October 6, 2017, we acquired an adjacent parcel of land to add approximately 33 acres for future expansion.

Prior to December 1, 2017 Agripharm was a wholly owned subsidiary of the Corporation. On December 1, 2017, our interest in Agripharm was diluted from 100% to 40% under a collaborative agreement whereby in exchange for the issuance of shares, Green House Seeds and Organa Brands provided an exclusive, royalty-free license in Canada to certain proprietary technology, trademarks, genetics, know-how and other intellectual property. Green House Seeds oversees day-to-day operations, bringing their own expertise into cultivation, while Organa Brands implements world-class extraction functions as new and novel value-add products become part of the regulatory environment.

On September 20, 2016, Spectrum announced that it entered into an agreement with Cannabis Care Canada Inc. ("**CCC**") to sell its facility and associated licence known as Spectrum Bennett North, which closed on September 14, 2017. As per the terms of the agreement, CCC paid $7 million in cash to acquire Spectrum Bennett North and entered into a three-year Supply Agreement that is expected to generate up to $40 million in revenue for Spectrum over the next three years. As part of the transaction, CCC will also assume all outstanding obligations associated with Spectrum Bennett North.

*Bedrocan*

Bedrocan was formed in February 2012 (under its predecessor name, 2318171 Ontario Inc.) by its founding shareholders for the purpose of entering into an exclusive licensing arrangement with Bedrocan International and making an application to Health Canada to become a Licensed Producer under the MMPR framework.

On December 16, 2013, Bedrocan received its initial licence to operate as a Licensed Producer of medical marijuana under the MMPR, with the authority to import, package and sell medical marijuana. On February 21, 2014, Bedrocan entered into an exclusive license agreement with Bedrocan International, for an indefinite term, to use certain Bedrocan International intellectual property for the cultivation, processing, marketing, sale and other commercialization of cannabis in Canada (the "**BV License Agreement**"). Material terms of the BV License Agreement include a performance guarantee and certain specified standards in respect of the licensed product, the payment of an annual license fee based on product sales and certain assignment and confidentiality restrictions.

12

On August 28, 2015, the Corporation acquired Bedrocan Cannabis Inc. ("**Bedrocan Cannabis**") pursuant to a definitive plan of arrangement, in which the Corporation acquired all of the issued and outstanding securities of Bedrocan Cannabis. The transaction closed on August 28, 2015 following approval by Bedrocan Cannabis shareholders and the TSX Venture Exchange and completion of conditions precedent to closing. In connection with the Arrangement, Bedrocan and Bedrocan International entered into a second amended and restated license and distribution agreement on August 28, 2015 (the "**SARLD Agreement**"). The effect of the Arrangement is that Bedrocan Cannabis continued as a wholly-owned subsidiary of Canopy, and Bedrocan was a wholly-owned subsidiary of Bedrocan Cannabis, Bedrocan Cannabis and Bedrocan later amalgamated. Under the terms of the Arrangement, Bedrocan Cannabis shareholders received 0.4650 Common Shares for each common share of Bedrocan held. The Corporation issued a total of 35,202,818 Common Shares on closing of the Arrangement.

Bedrocan's 52,000 square feet production facility in Toronto, Ontario is fully-licensed, and includes 34 vegetative and growing rooms, three dispensing rooms, the building's two-floor high security level vault, and the ability to dispose of cannabis refuse via composting. This site is leased from a related company of Murray Goldman, a director of Canopy Growth. On August 28, 2015, Bedrocan amended its existing lease agreements with its landlord to extend the initial term, ending August 31, 2024, to August 31, 2029 (the "**Amended Bedrocan 16 Upton Lease**").

On June 7, 2018, the Corporation and Bedrocan International reached an agreement in the previously announced arbitration proceedings with respect to the SARLD that were commenced in July 2017. Under the terms of the agreement, Bedrocan will decrease, and then end, the production and sale of Bedrocan products within the calendar year. The Corporation will retain the licensed production facility ("**16 Upton Road**"), licensed sales facility ("**43 Upton Road**"), and all associated licences owned and operated by Bedrocan. Management will redeploy these facilities, free of the current royalty structure and fixed production practices, to develop new premium branded cannabis offerings.

### Tweed Grasslands

On May 1, 2017, the Corporation acquired rTrees Producers Limited ("**Tweed Grasslands**"), a late-stage ACMPR applicant based in Yorkton, Saskatchewan. Tweed Grasslands brings a 90,000 square feet indoor growing facility that is presently 20% built-out. It is estimated that the Tweed Grasslands facility can expand to over 300,000 square feet in the future. On June 16, 2017, Tweed Grasslands received its cultivation licence from Health Canada. Upon closing of the acquisition, the Corporation issued 698,901 Common Shares and up to another 2,795,604 Common Shares will be issued if, and when, specific licensing and capacity expansion related milestones are achieved.

### Vert

On November 1, 2016, Canopy Growth acquired Vert Médical, a Quebec-based ACMPR applicant. Canopy Growth has also acquired the lease and the right to acquire 90 acres of land and a 7,000 square foot indoor growing and office facility located in Saint-Lucien, Quebec. On December 21, 2017, Vert received its licence from Health Canada. In consideration for the acquired shares in Vert, Canopy Growth issued debt of approximately $500,000. In addition, Canopy Growth will issue up to 294,900 Common Shares, if and when specific licensing and capacity expansion related milestones are achieved, except for 58,978 Common Shares which were issued on closing.

On December 17, 2017, the Corporation entered into a joint venture, Vert Mirabel, with Bertrand. Bertrand currently produces tomatoes and other vegetables under 700,000 square feet of modern greenhouse, a portion of which is certified for organic production and most of which was built in 2015.

13

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 29 of 125
cgc-ex991_131.htm
PageID: 6088

The entire greenhouse is expected to be upgraded and retrofitted for cannabis production. Under the terms of the joint venture, Vert Mirabel leases the greenhouse facility from Bertrand with an option to acquire the property. On May 25, 2018, Vert Mirabel received its cultivation licence from Health Canada, licensing a portion of the total production facility.

In conjunction with the Vert acquisition, Canopy Growth acquired majority ownership of Quebec-based Groupe H.E.M.P.CA Inc. ("**Groupe Hemp**"). Groupe Hemp is licensed by Health Canada to cultivate hemp and extract oil from hemp seeds. Groupe Hemp has developed a variety of brands, digital properties, and industrial hemp products, ranging from skincare to pet care. In consideration for the acquired shares in Groupe Hemp, Canopy Growth issued 258,037 Common Shares of which 50% were issued on closing and the remainder released on April 1, 2017. In addition, the Corporation paid $300,000 on closing and assumed debt of approximately $276,000 which was due on April 1, 2017.

### BC Tweed

Canopy Growth entered into a definitive joint venture agreement on October 11, 2017, to form a new company, BC Tweed, together with a large-scale greenhouse operator to develop a greenhouse in Aldergrove, British Columbia (the "**Aldergrove Site**"), with an exclusive option to develop a further 1.7 million square feet of existing greenhouse infrastructure at a second location in British Columbia (the "**Delta Site**"). The Aldergrove Site includes the first and second stage licensing of 840,000 square feet of growing space, allowing vegetative growth so that the mature plants can be spread into the full 1.3 million square feet for flowering and harvesting. The Aldergrove Site received its licence from Health Canada on February 16, 2018. The Delta Site, which we believe to be the largest federally licensed cannabis site anywhere in the world, includes the initial licensing of 900,000 square feet of growing space, granted on April 13, 2018, allowing vegetative growth so that the mature plants can be spread into the full 1.7 million square feet for flowering and harvesting.

On May 14, 2018, Canopy Growth announced that it entered into a non-binding agreement to purchase, subject to certain conditions, the remaining 33% stake of BC Tweed currently owned by a large-scale greenhouse operator. Upon closing of the transaction, the Corporation will issue up to $374 million Common Shares, subject to the satisfaction of certain conditions, to the minority shareholders of BC Tweed (the "**Operators**"), over the next four years. The Operators will continue to manage BC Tweed operations for a period of five years.

### Licence Applications

In addition to the Licensed Producers above, we have applied for licences under the ACMPR for two additional cannabis production facilities in the Provinces of Alberta and New Brunswick.

We have submitted an ACMPR application, through our wholly-owned subsidiary, 10252832 Canada Inc., for a producer's licence in Edmonton, Alberta. In addition, on August 28, 2017, we announced that we acquired Spot Therapeutics Inc. ("**Spot**"), an ACMPR applicant based in Fredericton, New Brunswick. Additionally, Canopy Rivers (see "*Other Initiatives - Canopy Rivers*") purchased the industrial building and property where our Fredericton-based production and distribution platform is being established and is leasing the facility to Spot with an option, in favor of Spot, to acquire the property.

14

**Industrial Hemp-Based Products**

We have taken steps to diversify our cannabis-related business into the development, production and sale of industrial hemp-based medical, regulated adult-use and industrial products. Hemp and cannabis come from the *cannabis sativa L specie*, but are genetically distinct and are further distinguished by use, chemical makeup and cultivation methods. Industrial hemp is a renewable raw material used in thousands of products including health foods, body care, clothing, construction materials, biofuels and plastic composites. We believe that entry into the regulated industrial hemp market, whose regulations allow for more robust consumer-facing brand marketing, advertising and retail channels, will serve to strengthen our consumer facing brands in the future.

On November 27, 2017, we announced a definitive agreement to acquire Green Hemp Industries Ltd.'s ("**Green Hemp**") farm operations and associated assets, equipment, genetic stock, and other property in Saskatchewan (the "**Green Transaction**"). On January 25, 2018, we closed the Green Transaction. Should the regulations change in accordance with Health Canada's Proposed Approach to the Regulation of Cannabis discussion paper, material collected at Green could be processed for cannabinoid extraction at the Tweed Grasslands facility in Saskatchewan. Management believes by building the amount of CBD under our operations, we will be able to expand our offering of cannabinoid-based product offerings.

## Additional Initiatives

### *CraftGrow Collection*

CraftGrow is the brand developed for the Corporation's partner program that gives Licensed Producers access to the Corporation's platform including the quality assurance program, online market place, customer care and call centre capabilities, as well as customer base. Access to the Corporation's platform can be expected to significantly reduce the resources that new entrants are required to invest to enter the market and help get them to market much faster to the benefit of all medical cannabis patients. The CraftGrow program benefits our customers by bringing a variety of cannabis cultivated by different Licensed Producers to the Corporation's online marketplace.

### *Tweed Main Street*

On October 1, 2015 Canopy Growth acquired all of the issued and outstanding shares of several companies, which collectively operated as "MedCannAccess" ("**MCA**"), by way of an amalgamation with 9421653 Canada Inc., a wholly-owned subsidiary of Canopy Growth, pursuant to an amalgamation agreement dated September 3, 2015 (the "**MCA Amalgamation Agreement**"). MCA operations were re-branded in the first quarter of fiscal 2017, as Tweed Main Street. Tweed offers in-person client services through Tweed Main Street's network of community engagement centres in Ontario, making Tweed the first Licensed Producer in Canada to offer in-person services in the medical marijuana industry.

The Corporation has established Tweed Main Street as the brand for its core customer engagement vehicles, both online and physical locations. Through the Tweed Main Street online market place, registered customers can purchase all dried, oil and soft gel cannabis products available from the Corporation including varieties from Tweed, Tweed Farms, Bedrocan, Spectrum, DNA Genetics and *Leafs By Snoop*. Tweed Main Street provides tools and information to help patients search for cannabis products based on cannabinoids, form and time of use. In addition, Tweed Main Street provides a "Spectrum" tool, originally developed by Spectrum, that allows customers to categorize strains according to THC potency, as well as CBD levels, using a straight forward colour code system. Product availability in Tweed Main Street is subject to multiple factors including customer demand, cultivation schedule and the time required for post-harvest processing, quality assurance testing and regulatory approval.

15

Further engagement between the Tweed brand and customers is facilitated by the Corporation's expanding network of Tweed Main Street Community Engagement Centers. These physical locations throughout Ontario provide an opportunity for individuals to learn about medical cannabis in a helpful, supportive and consumer-friendly environment. The Corporation is actively seeking partners to expand the network of Tweed Main Street locations, through licensing partnerships, to strategic locations across Canada.

**Canopy Rivers**

On April 27, 2017, Canopy Growth announced the commitment of $20 million in seed capital funding for a complementary but distinct Corporation that will provide financial and strategic support to ACMPR applicants and existing Licensed Producers. Specifically, Canopy Rivers operates as a joint venture with Canopy Growth. Each potential partner will be evaluated separately, and individual streaming and support service contracts entered by Canopy Rivers will be priced and structured consistently with the risks, value proposition, and requirements of our counterparties. Capital invested in each partner may involve an upfront payment, may include additional license or production-based milestones payments, and may also involve equity or and/or equity linked securities. This strategic agreement provides Canopy Growth with a secure and predictable source of incremental cannabis supply and increased diversification of its products available for sale.

On June 16, 2017, Canopy Rivers closed an offering to raise aggregate gross proceeds of $36,230,484.60. On January 10, 2018, Canopy Rivers closed a second offering to raise gross proceeds of approximately $26,000,000.00, to which Canopy Growth subscribed for 4,673,938 Class B common shares for $5,141,331.80. These offerings increased the cash resources available for Canopy Rivers to provide growth capital and strategic support within the regulated cannabis industry.

On May 30, 2018, Canopy Rivers and AIM2 Ventures Inc. ("**AIM2**") entered into a binding letter of intent, which outlines the terms and conditions pursuant to which AIM2 and Canopy Rivers will complete a transaction that will result in a reverse take-over of AIM2 by Canopy Rivers, which will constitute AIM2's Qualifying Transaction. In addition, Canopy Rivers entered into an engagement letter with CIBC Capital Markets and GMP Securities L.P., as joint book runners and together with Eight Capital as co-lead agents, on behalf of a syndicate of agents pursuant to which Canopy Rivers proposes to issue and sell, on a private placement basis, subscription receipts (the "**Subscription Receipts**") at a price of $3.50 per Subscription Receipt (the "Issue Price") for aggregate gross proceeds of up to $104,125,000.00 (the "**Offering**"). The Offering is expected to close on or about July 5, 2018.

**Canopy Health**

The Corporation established the cannabis research incubator, Canopy Health, to develop and research clinically ready cannabis drug formulations and dose delivery systems. Canopy Growth is the preferred commercialization partner for intellectual property ("**IP**") developed by Canopy Health. On December 9, 2016, Canopy Growth announced the closing of an offering of Canopy Health shares for aggregate gross proceeds of approximately $7,000,000.00 to reduce Canopy Growth's interest to 46.15% of Canopy Health common shares.

Canopy Health operates as a research incubator and focuses on creating an IP portfolio that can be built into commercial opportunities for the Corporation. Pursuant to agreements entered into between Canopy Health and Canopy Growth, Canopy Growth will act as a primary supplier of cannabis products for clinical research through its subsidiary Tweed. The Dealers Licence will allow it to, among other things, possess cannabis and cannabis by-products for the purposes of analytical testing, and in the commercialization of IP created by Canopy Health.

16

On September 27, 2017, Canopy Health announced that it has filed nine provisional patents pertaining to the applications of cannabis and cannabinoid-based therapeutics in sleep and related nervous system disorders. Canopy Health announced that it had closed additional funding through sales of common shares bringing total funds raised to date for Canopy Health to over CDN $15.8 million. Capital was secured through new and existing shareholders, including $4 million from Canopy Growth.

On May 15, 2018, Canopy Growth and Canopy Health announced, along with Canopy Health's subsidiary Canopy Animal Health Inc. ("**Canopy Animal Health**"), they entered into a definitive arrangement agreement pursuant to which Canopy Growth will acquire all of its unowned interest in Canopy Health and Canopy Animal Health. Pursuant to the arrangement agreement, shareholders of Canopy Health, other than Canopy Growth, will receive 0.3790 Common Shares for each common share of Canopy Health held. In addition, Canopy Growth will issue options to purchase Common Shares in exchange for options previously issued by Canopy Health and Canopy Animal Health. In aggregate, the Corporation will issue 3,037,771 Common Shares, having a value of $91,573,637, along with options having the aggregate "in the money" value of $9,688,193. The transaction is anticipated to close on or before July 31, 2018.

### Strategic Relationship with Greenstar Holdings

On November 2, 2017, the Corporation entered into a strategic relationship with an affiliate of Constellation Brands Inc. ("**Greenstar Holdings**"). As part of the strategic relationship (the "**Constellation Transaction**"), the Corporation issued 18,876,901 common shares to Greenstar Holdings at a price per common share of $12.9783 for aggregate gross proceeds of approximately $245 million, representing approximately 9.9% of the issued and outstanding common shares. In addition, the Corporation issued 18,876,901 warrants to Greenstar Holdings, subject to certain restrictions, expiring 30 months from November 2, 2017. The warrants are exercisable at an exercise price per common share of $12.9783 in two equal tranches, with the first exercisable tranche date being August 1, 2018 and the second exercisable tranche date being February 1, 2019. Pursuant to the Constellation Transaction, Greenstar Holdings will provide the Corporation with broad support in the areas of consumer analytics, market trending, marketing and brand development. In addition, we and Greenstar Holdings intend to collaborate to develop and market cannabis-based beverages that can be marketed as regulated recreational products in markets where and when such products are federally legal.

As part of the Constellation Transaction, we and Greenstar Holdings entered into an investor rights agreement (the "**Investor Rights Agreement**") whereby we granted certain pre-emptive rights to Greenstar Holdings to maintain its pro rata ownership in us, subject to certain exceptions, which is currently approximately 9.81%.

### Corporate Social Responsibility

Since the founding of Tweed, the Corporation has provided a variety of support to patients and doctors in order to improve knowledge with respect to marijuana for medical purposes. Some of these initiatives include:
- support to the Canadian AIDS Society ("**CAS**") in the form of an unrestricted grant to CAS for the development of a patient-focused series that explains the science of cannabis as a therapy, the rules and regulations surrounding access and different ways to consume cannabis for safer use and better health
- research partnerships in place with researchers from the University of Ottawa, Ryerson University and the University of British Columbia
- funding for education to the Chronic Pain Association of Canada

17

- acting as the sole Licensed Producer supporter across Canada of the Primary Care Updates reaching thousands of doctors to improve the understanding of marijuana for medical purposes through a team of detailers visiting doctors throughout Ontario
- funding a national campaign to raise awareness of impairment in relation to operating a motor vehicle under the influence of cannabis, in connection with the Canadian Drug Policy Coalition (CDPC) and Mothers Against Drunk Driving (MADD Canada)
- partnering with Canabo Medical Corporation to conduct scientific and medical research through its network of healthcare practitioners at its medical clinics. This research data will be used to clarify the role of cannabis in various chronic conditions, including the management of chronic pain
- having an accredited M1 continuing medical education program to assist doctors, and in partnership with Bedrocan, one other Licensed Producer and the Collège des médecins du Québec, contribute startup funding for the creation of a registry for medical cannabis patients in the Province of Quebec, which will gather information on the demographic profiles of patients who use medical cannabis, the medical purpose for which they use it, and at what dosage, while tracking the effectiveness and safety of cannabis used in the management of symptoms associated with particular health conditions
- entering into a strategic partnership with Niagara College to create new experience-based learning opportunities for college students and graduates, while also providing job opportunities and joint research and community engagement opportunities
- providing a grant to Canadian Students for Sensible Drug Policy ("**CSSDP**") which has compiled a comprehensive cannabis education toolkit aimed at youth
- donating to local cultural and health-based initiative, and sponsoring youth cannabis education programs

In addition, on April 20, 2018, Tweed announced the creation and funding of the Tweed Collective (the "**Tweed Collective**"). Over the next four years, the Tweed Collective will invest $20 million in social, responsible initiatives that will support the health and development of communities. The Tweed Collective will work with local artists, creators, builders and partners to help support communities in meaningful ways.

## REGULATORY OVERVIEW

### Summary of the ACMPR

The ACMPR are the current governing regulations in respect of the production, sale and distribution of medical cannabis and related oil extracts in Canada. The ACMPR provides for three possible alternatives for Canadian patients to access cannabis for medical purposes:

(a)  access quality-controlled cannabis by registering with Licensed Producers;
(b)  register with Health Canada to produce a limited amount of cannabis for their own medical purposes; or
(c)  designate an individual who is registered with Health Canada to produce cannabis on behalf of another individual for personal medical purposes.

With respect to (b) and (c), starting materials, such as plants or seeds, must be obtained from Licensed Producers.

18

## Summary of the *Cannabis Act* and the Proposed Regulations

On June 18, 2018, the Canadian Federal Government passed legislation, the *Cannabis Act*, outlining the framework for the legalization of adult-use cannabis, as well as laws to address drug-impaired driving, protect public health and safety and prevent youth access to cannabis. The Federal Government has announced that the *Cannabis Act* is intended to come into effect October 17, 2018.

Pursuant to the *Cannabis Act*, individuals over the age of 18 will be able to purchase fresh cannabis, dried cannabis, cannabis oil, and cannabis plants or seeds and will be able to possess 30 grams of dried cannabis, or the equivalent amount in fresh cannabis or cannabis oil. The *Cannabis Act* also permits households to grow a maximum of four plants. This limit applies regardless of the number of adults that reside in the household. In addition, the *Cannabis Act* provides provincial and municipal governments the authority to prescribe regulations regarding retail and distribution, as well as the ability to alter some of the existing baseline requirements, such as increasing the minimum age for purchase and consumption.

In connection with the new framework for regulating cannabis in Canada, the Federal Government has introduced new penalties under the *Criminal Code* (Canada), including penalties for the illegal sale of cannabis, possession of cannabis over the prescribed limit, production of cannabis beyond personal cultivation limits, taking cannabis across the Canadian border, giving or selling cannabis to a youth and involving a youth to commit a cannabis-related offence.

Provincial and territorial governments in Canada have made varying announcements on the proposed regulatory regimes for the distribution and sale of cannabis for adult-use purposes. For example, Ontario, Québec, Manitoba, New Brunswick, Nova Scotia, Prince Edward Island and the Northwest Territories have chosen the government-regulated model for distribution, whereas Saskatchewan and Newfoundland & Labrador have opted for a private sector approach. Alberta and British Columbia have announced plans to pursue a hybrid approach of public and private sale and distribution.

On November 21, 2017, Health Canada released a consultation paper entitled "Proposed Approach to the Regulation of Cannabis" (the "**Proposed Federal Regulations**"). Recognizing the Canadian Federal Government's commitment to bringing the *Cannabis Act* into force, the Proposed Federal Regulations, among other things, solicited stakeholder input and views on the appropriate regulatory approach to an adult-use cannabis market by building upon established regulatory requirements that are currently in place for medical cannabis.

The Proposed Federal Regulations contemplate cultivation licenses for standard cultivation, micro-cultivation, industrial hemp cultivation and nursery cultivation, standard and micro-processing licenses as well as sales licenses for medical or non-medical use. Licenses to sell for non-medical use will be limited to provinces where local distribution models have not been implemented. In addition, the proposal includes generally less cumbersome personnel and physical security obligations than currently contemplated under the ACMPR. In addition, the Proposed Federal Regulations call for all cannabis products to be packaged in a tamper-evident and child-resistant manner and for product labels to contain specified product information, such as the name of the processor who packaged the products, product lot number, and THC/CBD content. The *Cannabis Act* itself prohibits testimonials, lifestyle branding and packaging that is appealing to youth.

On March 19, 2018, Health Canada released a report to summarize the feedback received from the consultation (the "**Report**"). In general, Health Canada reported that Canadians support the Proposed Federal Regulations. The Report, among other things, provided additional details on the requirements for packaging and labeling of cannabis products, noting that these requirements are aimed to minimize the

19

appeal to children and youth, protect against accidental consumption and ensure consumers are informed of the potential risks and harms of cannabis. Specifically, the Report clarified that the labeling and branding requirements would require "plain packaging", including a standardized cannabis symbol on every label; mandatory health warning messages (including specifics regarding size, placement and appearance); only one brand element can be displayed, aside from the Licensed Producer's brand name; no other image or graphic is permitted to be displayed; backgrounds need to be a single, uniform color; use of fluorescent or metallic colors is prohibited; labels and packaging cannot have any coating or embossing; and no inserts can be included.

The impact of these regulatory changes on our business is unknown, and the proposed regulatory changes may not be implemented at all.  See "*Risk Factors*".

### *Provincial Initiatives for the Upcoming Recreational Market*

On September 15, 2017, the Corporation announced that we had entered into a memorandum of understanding with the New Brunswick provincial authority for the supply of cannabis products into New Brunswick's retail stores for a period of two years (the "**New Brunswick Supply Agreement**"). Pursuant to the terms of the New Brunswick Supply Agreement, we will supply 4,000 kg of cannabis and cannabis derivative products for the first year.

On December 8, 2017, the Corporation announced that we had entered into a supply and production agreement with the Province of Newfoundland and Labrador (the "**Newfoundland Supply Agreement**"). Under the terms of the Newfoundland Supply Agreement, we will provide 8,000 kg of cannabis products for the province annually for the first two years of the term of the agreement. In addition, on May 7, 2018, the Corporation, along with the Government of Newfoundland and Labrador, announced the locations of the Corporation's new production facility and first four retail locations in the province. The production facility is anticipated to produce up to 12,000 kg of cannabis per year and serve as the hub for local research and development funded by a $500,000 investment from the Corporation over the next five years.

On January 16, 2018, the Corporation announced that we had entered a supply memorandum of understanding (the "**PEI MOU**") to supply Prince Edward Island's retail and online stores.  Under the terms of the PEI MOU, we will allocate a minimum supply of 1,000 kg of cannabis for the first year of the agreement to ensure that Prince Edward Island has access to a wide variety of cannabis products. The two-year supply agreement will renew for a third-year upon our mutual agreement with the province.

On February 14, 2018, the Corporation announced that we had entered into a letter of intent (the "**Quebec LOI**") with the Société des alcools du Québec ("**SAQ**") to supply 12,000 kg of cannabis annually. The Quebec LOI with the SAQ represents our fourth and largest supply agreement to-date, and we are the only cannabis Corporation to secure supply agreements with each announcing provincial entity.

On April 18, 2018, the Corporation announced that we had entered into an agreement (the "**Yukon Agreement**") with the Yukon Liquor Corporation to supply up to 900,000 grams of cannabis annually for the next three years. The Yukon Agreement represents our fifth supply agreement to-date, and we are the only cannabis company to secure supply agreements with each announcing provincial entity.

The Corporation has been conditionally selected by the Government of Manitoba to build and operate cannabis retail stores with our partner, Delta 9 Cannabis Inc. ("**Delta 9**"). The license, contingent on the signing of a formal agreement with the provincial government, is one of only four issued by the province and would authorize us, in partnership with Delta 9, to build and operate a chain of retail stores throughout the Province of Manitoba. In addition, we have committed to establishing a new production facility in Newfoundland and Labrador, and will be eligible to receive up to four retail licenses to operate retail stores in the province.

20

On June 1, 2018, the Corporation announced it had been selected to apply for five cannabis retail permits by the Saskatchewan Liquor and Gaming Authority ("**SLGA**"). The five retail sites will be located in Humboldt, Meadow Lake, the Rural Municipality of Corman Park, Melville, and Fort Qu'Appelle.

## Activities Outside Canada

We only conduct business in jurisdictions outside of Canada where such operations are legally permissible in accordance with all of the laws of the foreign jurisdiction, the laws of Canada and its regulatory obligations with the TSX and NYSE. The legal and regulatory requirements in the foreign countries in which we operate with respect to the cultivation and sale of cannabis, as well as local business culture and practices are different from those in Canada. Prior to commencing operations in a new country, in partnership with our local legal counsel, consultants and partners, we conduct legal and commercial due diligence in order to ensure that we and our officers and directors gain a sufficient understanding of the legal, political and commercial framework and specific risks associated with operating in such jurisdiction. Where possible, we seek to work with respected and experienced local partners who can help us to understand and navigate the local business and operating environment, language and cultural differences.  In consultation with our advisors, we take steps we deem appropriate in light of the level of activity and investment we expect to have in each country to ensure the management of risks and the implementation of necessary internal controls.

### Germany

As of March 2017, the German government enacted the "cannabis as medicine" law, which allows for the medical use of the cannabis plant, Cannabis sativa. In Germany, the Federal Institute for Drugs and Medical Devices (the "**BfArM**") has oversight over the prescription, distribution and import of medical cannabis. The BfArM issues permits for the import of medical cannabis for distribution through pharmacies.  With the legalization of cannabis, the BfArM established a cannabis agency to organize and control the cultivation of cannabis for medical use.

Our German subsidiary, renamed Spektrum Cannabis GmbH (formerly MedCann GmbH Pharma and Nutraceuticals ("**Spektrum GmbH**") is licensed through BfArM to import and distribute cannabis and has distributed cannabis products to over 400 pharmacies across Germany.

### Denmark

As of January 1, 2018, the Danish government initiated a trial permitting doctors to prescribe medical cannabis to a defined patient group. The trial will continue for the next four years and is supported by federal funding. The Danish Medicines Agency issues licenses to import "primary" (starter) cannabis products and to cultivate and produce approved forms of medical cannabis for wholesale distribution within Denmark. All medical cannabis production facilities and products are subject to inspection by the Danish Medicines Agency. Regulations for the export of medical cannabis from Denmark remain to be developed.

Spectrum Denmark is our partnership with Danish Cannabis which will serve the needs of Danish medical cannabis patients, and potentially the Scandinavian market, with Spectrum Denmark's products. A principal in Danish Cannabis, Moellerup Estate, has for years been one of the largest hemp producers in Europe. Moellerup Brands include a wide range of hemp food products from gin, beer, granola, oil, to flour, cosmetics and hemp for CBD oil production. As part of the arrangement, we committed to an initial capital contribution of $10 million to be released in tranches. In addition, we will issue up to 1,906,214

21

common shares, subject to meeting defined milestones. We initially had a 65% ownership in Spectrum Denmark but now expect to own 100% of Spectrum Denmark once all milestones are completed. Spectrum Denmark holds a license for cannabis production issued by the Danish Medicines Agency.

### Czech Republic

In 2013, the government of the Czech Republic amended the Penal Code to permit the legal purchase and use of medical cannabis for patients from licensed domestic sources. The amendments came into force in March 2014 and although no licenses for domestic production have been issued, the legislation permits the importation of medical cannabis from abroad.

On April 15, 2018, we announced that we acquired Annabis Medical s.r.o. ("**Annabis Medical**"), the leader in the Czech Republic's medical cannabis industry. Annabis Medical has, through its affiliates, held licenses to import and distribute medical cannabis products pursuant to federal Czech licenses since 2014, with distribution commencing in 2015 through pharmacy channels across the Czech Republic.

### Jamaica

The Cannabis Licensing Authority (the "**CLA**") was established in Jamaica in 2015 under the *Dangerous Drugs Act*, with powers to make and oversee the implementation of regulations for licenses, permits and other authorizations for the cultivation, processing, distribution, sale and transportation of cannabis for medicinal, scientific and therapeutic purposes. Currently the regulations do not allow for the import or export of medical cannabis. Medical cannabis is available to patients with a prescription written by a medical practitioner registered with the Medical Council of Jamaica. Licenses, permits and other authorizations are required for the cultivation, processing, distribution, sale and transportation of medical cannabis. License applications are subjected to a rigorous review process and licensees are subject to pre- and post-license inspection and reporting requirements. Once an applicant completes its post production building, the CLA inspects for final and full license approval.

On October 25, 2017, we announced that we had launched a strategic partnership in the Jamaican cannabis market as part of our ongoing international expansion. Grow House JA Limited, to operate as Tweed Limited JA ("**Tweed JA**"), will serve the needs of the Jamaican medical cannabis market. We hold 49% of the share capital of Tweed JA, which, with conditional license approvals already in place, has already begun construction of its facility. We believe that the production and formulation model we have built in Canada, combined with the strength of the existing team in Jamaica, made up of experienced entrepreneurs with substantial cannabis cultivation experience, will drive the national conversation around cannabis forward, and promote Jamaica's well-established and renowned ganja, oils and other cannabis products on a global level.

### Brazil

On March 18, 2016, the Brazilian Health Surveillance Agency, Agência Nacional de Vigilância Sanitária, ("**ANVISA**"), enacted Collegiate Board Resolution No. 66 (Resolução da Diretoria Colegiada – RDC No. 66 de 18 de Março, D.O.U. No. 54, de 21 de Março de 2016), which allows for the prescription and the import of products containing the substances CBD and THC in their formation. ANVISA has indicated that it is preparing regulations for the cultivation and limited sale of medical cannabis in Brazil. In the interim ANVISA has authorized a limited number of companies to conduct research and development of cannabis-based therapeutics using imported cannabis.

22

We have identified various Latin American markets as targets for expansion and are currently active in Chile and Brazil. We own 85% of Spectrum Chile S.A. and are conducting research and development activities in Santiago. In Brazil, we own approximately 39% of Bedrocan Brazil S.A., which facilitates the importation of cannabis into the Brazilian market, and approximately 38% of Entourage Partiçipaões, which is conducting research and development activities in Sao Paulo, Brazil.

### South Africa

On May 30, 2018, the Corporation announced the acquisition of Daddy Cann Lesotho PTY Ltd., trading as Highlands ("**Highlands**"). Based in the Kingdom of Lesotho, Highlands holds a license to cultivate, manufacture, supply, hold, import, export, and transport cannabis and its resin. Under the terms of the agreement, the Corporation issued 666,362 Common Shares to the sole shareholder of Highlands on closing, and subject to meeting certain milestones, the Corporation will issue up to an additional 333,281 Common Shares to the sole shareholder of Highlands, for a total of 999,643 Common Shares at a price of $28.763.

### Australia

On May 9, 2016, the Corporation announced a partnership with AusCann Group Holdings Ltd. ("**AusCann**"). Through this partnership, Canopy Growth will offer its expertise in a number of areas including production, quality assurance and operations, and provide strategic advisory services to AusCann in exchange for an 11% ownership stake in the Corporation, as well as further options. AusCann and Canopy Growth will also aim to work together in Australian and international markets in a preferential but nonexclusive arrangement, subject to regulatory approval.

On April 25, 2018, the Corporation along with the Victoria State Government, announced the launch of Spectrum Cannabis Australia ("**Spectrum Australia**"). The Corporation will invest up to $16 million Australian dollars in the State of Victoria over the next four years to establish Spectrum Australia's headquarters and research and development facility.

### Spain

On September 17, 2017, the Corporation, along with its wholly-owned subsidiary Spektrum GmbH announced a supply license agreement with Alcaliber, a leading player in the international pharmaceutical industry based in Spain. Alcaliber has been granted a license to cultivate, produce, manufacture, export, import, and commercialize cannabis for medical and scientific purposes by the Spanish Agency of Medicinal Products and Medical Devices.  As a result of the agreement, Canopy Growth and Spektrum GmbH will grant Alcaliber a license to use certain strains and seeds to be grown and cultivated at Alcaliber's facilities for sale worldwide. On March 19, 2018, the Corporation completed a transfer of 1,500 cannabis clones to Alcaliber.

### Restrictions on Business Activities Outside Canada

On January 4, 2018, U.S. Attorney General Jeff Sessions issued a memorandum to U.S. district attorneys which rescinded previous guidance from the U.S. Department of Justice specific to cannabis enforcement in the U.S., including the August 2013 memorandum authored by then Deputy Attorney General James Cole (the "**Cole Memorandum**") indicating that the U.S. Department of Justice would not prioritize the prosecution of cannabis-related violations of U.S. federal law in jurisdictions that had enacted laws legalizing cannabis in some form and that had also implemented strong and effective regulatory and enforcement systems. With the Cole Memorandum rescinded, U.S. federal prosecutors can exercise their discretion in determining whether to prosecute cannabis-related violations of U.S. federal law.

23

In addition, on October 16, 2017, the TSX provided clarity regarding the application of Sections 306 (Minimum Listing Requirements) and 325 (Management) and Part VII (Halting of Trading, Suspension and Delisting of Securities) of the TSX Company Manual (collectively, the "**Requirements**") to applicants and TSX-listed issuers with business activities in the cannabis sector. In TSX Staff Notice 2017-0009, the TSX notes that issuers with ongoing business activities that violate U.S. federal law regarding cannabis are not in compliance with the Requirements. These business activities may include (i) direct or indirect ownership of, or investment in, entities engaging in activities related to the cultivation, distribution or possession of cannabis in the U.S., (ii) commercial interests or arrangements with such entities, (iii) providing services or products specifically targeted to such entities, or (iv) commercial interests or arrangements with entities engaging in providing services or products to U.S. cannabis companies. The TSX reminded issuers that, among other things, should the TSX find that a listed issuer is engaging in activities contrary to the Requirements, the TSX has the discretion to initiate a delisting review.

We do not engage in any U.S. cannabis-related activities as defined in Canadian Securities Administrators Staff Notice 51-352. We only conduct business in jurisdictions outside of Canada where such operations are legally permissible in accordance with all of the laws of the foreign jurisdiction, the laws of Canada and our regulatory obligations with the TSX. While we have a number of partnerships with U.S.-based companies that may themselves participate in the U.S. cannabis market, these relationships are licensing relationships that see intellectual property developed in the U.S. brought into Canada, and in no manner, involve us in any U.S. activities respecting cannabis. Additionally, the market price of the common shares may be affected by regulatory changes and developments that affect the cannabis industry generally.

## Sales and Distribution Strategy

### Distribution

The distribution model for medical cannabis is prescribed by the ACMPR. Currently, Licensed Producers are only able to distribute medical cannabis through the mail to registered customers. Through our e-commerce platform, Tweed Main Street (see "*Other Initiatives – Tweed Main Street*"), customers who have successfully registered with Tweed are able to purchase our products online and have them shipped directly to the address indicated on their registration document. Customers are subject to order limits for ever 30-day window as prescribed by the ACMPR. For the upcoming recreational market, additional distribution channels will be available to Licensed Producers (see "*Summary of the Cannabis Act and the Proposed Regulations*")**.**

### Operations

As of the date of this Annual Information Form, Canopy Growth's business is conducted entirely through its various subsidiaries. Substantially all of the Corporation's revenue is derived from the sale of medical marijuana by Tweed, Tweed Farms, Bedrocan, Spectrum, BC Tweed, Tweed Grasslands and Vert. Tweed, Bedrocan, Spectrum, Tweed Grasslands and Vert grow marijuana indoors for the purposes of sale and distribution of finished product in accordance with the ACMPR, whereas Tweed Farms and BC Tweed grows marijuana in a greenhouse.

The facilities are required to be in compliance with the ACMPR and any directives issued by Health Canada, which includes, strict security measures, equipment required to manage production, HVAC systems, odour control systems and laboratory equipment or outsourcing arrangements to monitor and test product quality.

24

Health Canada conducts unscheduled site inspections of Licensed Producers. Our Licensed Producers have experienced these inspections multiple times at their respective locations. While Health Canada routinely identifies aspects of the operations for improvement, our Licensed Producers respond to and comply with all requests from Health Canada within the time frames indicated in such requests and there are no outstanding inspection issues with Health Canada beyond the day-to-day adjustments that may occur in order to ensure ongoing compliance. As of the date of this Annual Information Form, only Mettrum Ltd., prior to being acquired by the Corporation, has voluntarily recalled distributed product. On November 2, 2016 Mettrum Ltd. conducted a Type III product recall, defined by Health Canada as a situation in which the use of, or exposure to, a product is not likely to cause any adverse health consequences. All patients who were potentially impacted were notified, corrective actions were put in place, and existing product and procedures re-tested and examined.

A primary specialized skill unique to the medical marijuana industry is with respect to the growing of product. While a background in the growing of marijuana specifically may be helpful, the nature of growing marijuana does not differ substantially from the nature of growing any other greenhouse product.

The Corporation also requires client care staff, which will grow as its business grows. Customer care staff is a skillset that is also generally available in the market.

Differentiation in the strains of medical marijuana is primarily achieved through the procurement of seeds. Obtaining seeds for growing medical marijuana must be done in accordance with the ACMPR. Seeds must be obtained from a legal source which includes seeds acquired from Health Canada, seeds imported from a jurisdiction allowed to export seeds or seeds acquired from another Licensed Producer. An authorization from Health Canada may be required to conduct such a transaction depending on its nature.

Equipment used is specialized but is readily available and not specific to the cultivation of medical marijuana. Subject to available funding, the Corporation does not anticipate any difficulty in obtaining equipment as needed.

In November 2013, Tweed received a notice from the Ontario Ministry of the Environment indicating that in order to be in compliance with the *Environmental Protection Act* and related regulations, Canopy Growth must obtain an Environmental Compliance Approval under Section 9 of the *Environmental Protection Act* for its Smiths Falls, Ontario facility. Canopy Growth filed an application for an Environmental Compliance Approval within the time required by the Ontario Ministry of the Environment. On May 8, 2017, Canopy Growth received notice that the Ministry has begun their technical review of the application and this review is still in progress as of the date of this Annual Information Form. At this time, it is unclear to the Corporation what requirements the Ministry will impose in connection with the Environmental Compliance Approval.

### Products

The Corporation sells cannabis in multiple formats, including dried, oil and softgel capsules.

On May 5, 2014, Tweed made its first shipment of products to customers. Tweed sells its dried cannabis at prices ranging from $6 per gram, for value strains, to up to $12 per gram for premium strains. Typically, growth time, strain yield and market comparatives determine a strain's price. Very particular strains may be priced higher, but this would be the exception. Tweed does not offer volume discounts to end users, but has developed an income-tested Compassionate Pricing Promise whereby eligible low-income patients may obtain a 20% discount off regular prices

25

In 2016, Tweed began selling cannabis oil made with GMO-free, organic sunflower oil. Starting with popular offerings, as determined by Tweed's prior sales, of Argyle, Princeton and Highlands, Tweed introduces new strain-specific cannabis oils on an ongoing basis. Each 10 ml of cannabis oil contains the equivalent of 1 gram of the corresponding Tweed dried-flower variety. Spectrum currently produces approximately sixteen strains, chosen from a genetic library of over sixty strains. These strains are incorporated into "The Spectrum", a classification system designed to foster an easy to understand product selection discussion between clients, health care practitioners, and Spectrum. We also offer additional dried cannabis and cannabis oil products through Bedrocan, our Partner Brands, and our CraftGrow collection.

In 2017, the Corporation launched the first-to-market easy to consume softgel capsules. In addition, in June 2018, we launched Spectrum softgels, which combines the Spectrum classification system, which is based on the cannabinoid content of the strain with our easy to consume softgels.

## Business Strategy

### *Market Plans and Strategies*

The cornerstone of the Corporation's market strategy is to create visibility and awareness in the nascent market for commercially grown medical marijuana. The Corporation believes that its success in this market will be achieved by offering a broad range of quality products at competitive prices and delivered through outstanding client service under a well identified brand. Each strain of medical marijuana is unique and the Corporation believes that carrying a wide variety of strains is essential to its long-term success. See below under the headings "*Risk Factors – Unfavourable Publicity or Consumer Perception*", "*Risk Factors – Change in Laws, Regulations and Guidelines*" and "*Risk Factors – Competition*" for further information.

Licensed Producers are not allowed to advertise their products to the public. On June 30, 2014 Health Canada circulated an advertising bulletin to all Licensed Producers outlining their concerns regarding the use of promotional materials and advertisements. On November 25, 2014 Health Canada issued warning letters to 20 Licensed Producers regarding their advertising practices. Tweed and Bedrocan were among the Licensed Producers who received warning letters and came into compliance with the marketing restrictions by January 12, 2015 and November 30, 2014 respectively, both within the required date indicated by Health Canada in the warning letter. Tweed, Bedrocan and Spectrum worked closely with Health Canada to address their concerns and came into compliance with the marketing restriction. None of our Licensed Producers have not been subject to any sanctions or penalties in connection with the marketing restrictions.

Although the Corporation is not allowed to advertise its products to the public, it is able to promote its products to doctors. A key focus for the Corporation has been to develop a multifaceted approach to reach doctors through direct and indirect outreach. The Corporation has established a presence at certain major physician focused conferences, and an exclusive presence at certain accredited physician education events. The Corporation has established a medical advisory board with several key opinion leaders which acts as a valuable resource for the medical outreach team who will interface directly with physicians at a rate of approximately 15,000 office calls per year throughout Ontario annually.

In its effort at promoting brand recognition without advertising its products directly to the public, the Corporation continues to hold community events (to the extent allowable within its regulatory environment) in order to build relationships and visibility for the brand.

26

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 42 of 125
cgc-ex991_131.htm
PageID: 6101

In a given year, the Corporation will continue to invest in attending and participating in events in the medical community, including medical conferences, and reaching approximately 2000 unique physicians. Additionally, the Corporation expects to invest in local continuing medical education events to identify key strategic patient organizations with which to align. The Corporation has a number of medical advisors in place and continues to seek leaders to join its Advisory Committee.

## Protection of Intellectual Property

On December 18, 2014 Canopy Growth entered into a Cannabis Production Pilot Agreement (the "**Pilot Agreement**") with Indoor Harvest Corp. ("**Indoor Harvest**"), pursuant to which the parties partnered in a pilot project to test the production of medical marijuana using an aeroponic system designed by Indoor Harvest. Upon completion of the pilot project, Tweed will have the right to jointly apply for patents with Indoor Harvest for any technology developed under the Pilot Agreement. Tweed will receive the exclusive right to use the technology developed under the Pilot Agreement to cultivate medical marijuana in Canada and any jurisdiction outside of the United States on a royalty free basis, including the right to assign or sublicense any such rights. The research and testing of the aeroponic system is almost complete and both parties are ready to move on to the commercialization stage.

The proprietary nature of, and protection for, the Corporation's products, technologies, processes, and know-how are a key aspect to our business. To establish and protect our intellectual property in Canada, we have made various trademark and patent applications. We rely on a combination of patents, trademarks and contractual restrictions to establish and protect our IP. We have established and continue to build proprietary positions in all key aspects of our business. The Corporation has retained legal counsel to analyze its unregistered intellectual property, and continually seeks out new opportunities for enhancing its intellectual property portfolio.

## Competitive Environment

### *Competition*

As of the date of this Annual Information Form, Health Canada has a total of 105 companies on its list of Licensed Producers, which includes duplicate sites for one Licensed Producer. Of these Licensed Producers, 50 (including Tweed, Tweed Farms, Bedrocan, Spectrum, Tweed Grasslands, and Agripharm) are fully authorized to sell finished product to registered customers.

There are also a number of existing growers of medical marijuana who have or will seek to obtain Licensed Producer status under the ACMPR. The Corporation believes that the stringent application and compliance requirements of the ACMPR may prove too onerous for some of those existing producers. In addition, the ACMPR allows individuals who have received the proper documentation from their doctors and who have registered with a Licensed Producer, to grow up to four marijuana plants at home.

In addition, there are illegal growers operating in the black market that, while operating illegally, still act as competitors to the Corporation by either diverting customers away due to product choice or price point of our products, or for those individuals who choose to continue to purchase their cannabis from the black market as it is more convenient, and they have grown accustomed to the quality and supply of their product.

27

The Corporation believes that its leadership team, brand strategy, commitment to high quality competitively priced strains, outstanding client service and a properly capitalized operation will enable the Corporation to establish and retain a leadership position in the market. The Corporation competes aggressively in terms of product quality, variety and price to differentiate its products, and maintains a focus on client services to retain a solid and sustainable position in the market. See below under the heading "*Risk Factors – Competition*" for further information.

## Risk Factors

There are a number of risk factors that could cause future results to differ materially from those described herein. The risks and uncertainties described herein are not the only ones the Corporation faces. Additional risks and uncertainties, including those that the Corporation does not know about now or that it currently deems immaterial, may also adversely affect the Corporation's business. If any of the following risks actually occur, the Corporation's business may be harmed, and its financial condition and results of operations may suffer significantly.

***We operate in a highly regulated business and we may not always succeed in complying fully with applicable regulatory requirements in all jurisdictions in which we operate.***

The laws, regulations and guidelines generally applicable to the cannabis industry domestically and internationally may change in ways currently unforeseen. Our operations are subject to a variety of laws, regulations and guidelines relating to the manufacture, management, transportation, storage, sale, health and safety and disposal of cannabis, including the ACMPR.

Health Canada inspectors routinely assess our facilities against ACMPR regulations and provide us with follow up reports noting observed deficiencies. We are continuously reviewing and enhancing our operational procedures and facilities both proactively and in response to routine inspections. We follow all regulatory requirements in response to inspections in a timely manner.

We currently incur and will continue to incur ongoing costs and obligations related to regulatory compliance. A failure on our part to comply with regulations may result in additional costs for corrective measures, penalties or in restrictions on our operations. In addition, changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to our operations, increased compliance costs or give rise to material liabilities, which could have a material adverse effect our business, results of operations and financial condition.

***The laws and regulations governing medical cannabis are still developing, including in ways that we may not foresee.***

Our ability to achieve our business objectives is contingent, in part, upon our compliance with regulatory requirements enacted by governmental authorities and our obtaining all regulatory approvals, where necessary, for the sale of our products. We cannot predict the impact of the compliance regime Health Canada is implementing for the Canadian medical cannabis industry. Similarly, we cannot predict how long it will take to secure all appropriate regulatory approvals for our products, or the extent of testing and documentation that may be required by governmental authorities. The impact of Health Canada's compliance regime, any delays in obtaining, or failure to obtain regulatory approvals may significantly delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on our business, results of operations and financial condition. Any amendment to or replacement of existing laws may cause adverse effects to our operations. The risks to our business represented by subsequent regulatory changes could reduce the addressable market for our products and could materially and adversely affect our business, financial condition and results of operations.

28

*We and our subsidiaries have limited operating history, and accordingly, we are subject to many of the risks of early stage enterprises.*

Tweed was incorporated in 2010, began carrying on business in 2013 and did not generate revenue from the sale of products until its first shipment of product on May 5, 2014. Tweed Farms was incorporated in 2012, began carrying on business in 2014 and had its first harvest in the quarter-ended December 31, 2014. Bedrocan Canada was incorporated in 2012, began carrying on business in 2013 and did not generate revenue from the sale of products until its first shipment on February 12, 2014. Spectrum Cannabis was incorporated in 2011, began carrying on business in 2013 and did not generate revenue from the sale of its products until 2014.

We are therefore subject to many of the risks common to early-stage enterprises, including under-capitalization, cash shortages, limitations with respect to personnel, financial, and other resources and lack of revenues. There is no assurance that we will be successful in achieving a return on shareholders' investment and the likelihood of success must be considered in light of the early stage of operations.

*We are reliant on our licences for our ability to grow, store and sell medical cannabis and other products derived therefrom and such licences are subject to ongoing compliance, reporting and renewal requirements.*

Our ability to grow, store and sell medical cannabis in Canada is dependent on the licences.  The licences are subject to ongoing compliance and reporting requirements. Failure to comply with the requirements of the licences or any failure to maintain the licences would have a material adverse impact on our business, financial condition and operating results.

Although we believe that we will meet the requirements of the ACMPR for future extensions or renewals of the licenses, there can be no guarantee that Health Canada will extend or renew these licences or, if extended or renewed, that they will be extended or renewed on the same or similar terms. Should Health Canada not extend or renew the licences, or should they renew the licences on different terms, our business, financial condition and results of the operation would be materially adversely affected.

*We are reliant on a small number of facilities*

The licences held by Tweed, Tweed Farms, BC Tweed, Tweed Grasslands, Bedrocan, Spectrum, Vert and Agripharm are specific to those facilities. Adverse changes or developments affecting any facility, including but not limited to a breach of security, could have a material and adverse effect on our business, financial condition and prospects.  Any breach of the security measures and other facility requirements, including any failure to comply with recommendations or requirements arising from inspections by Health Canada, could also have an impact on our ability to continue operating under its licences or the prospect of renewing its licences.

All facilities continue to operate with routine maintenance. We will bear many, if not all, of the costs of maintenance and upkeep of the facilities, including replacement of components over time. Our operations and financial performance may be adversely affected if we are unable to keep up with maintenance requirements.

Certain contemplated capital expenditures, including the construction of additional growing rooms and expanding our cannabis oil extraction capacity, will require Health Canada approval. There is no guarantee that Health Canada will approve the contemplated expansion and/or renovation, which could adversely affect our business, financial condition and results of operations.

29

10/8/21, 1:48 PM  Case 2:19-cv-20543-MCA-MAH     Document 83-3     Filed 10/12/21     Page 45 of 125
cgc-ex991_131.htm
PageID: 6104

*We are highly dependent on our senior management.*

Our success is dependent upon the ability, expertise, judgment, discretion and good faith of our senior management. While employment agreements are customarily used as a primary method of retaining the services of key employees, these agreements cannot assure the continued services of such employees. Any loss of the services of such individuals could have a material adverse effect on our business, operating results or financial condition.

*We are reliant on a number of key inputs, and we are vulnerable to increases in price of those inputs.*

Our business is dependent on a number of key inputs and their related costs, including raw materials and supplies related to its growing operations, as well as electricity, water and other utilities.  Our medical cannabis growing operations consume considerable energy, making us vulnerable to rising energy costs. Any significant interruption or negative change in the availability or economics of the supply chain for key inputs could materially impact our financial condition and operating results. Any inability to secure required supplies and services or to do so on appropriate terms could have a materially adverse impact on our business, financial condition and operating results.

*We are dependent on our suppliers and on access to, and our ability to retain, skilled labor.*

Our ability to compete and grow will be dependent on having access, at a reasonable cost and in a timely manner, to skilled labor, equipment, parts and components.  No assurances can be given that we will be successful in maintaining our required supply of skilled labor, equipment, parts and components. It is also possible that the final costs of the major equipment contemplated by our capital expenditure program may be significantly greater than anticipated by our management, and may be greater than funds available to us, in which circumstance we may curtail, or extend the timeframes for completing, our capital expenditure plans. This could have an adverse effect on our financial results.

*Our medical cannabis growing operations are subject to risks inherent in an agricultural business.*

Our business involves the growing of medical cannabis, an agricultural product. As such, the business is subject to the risks inherent in the agricultural business, such as insects, plant diseases and similar agricultural risks. Although many of our operations grow their products indoors under climate- controlled conditions, at Tweed Farms and BC Tweed our products grow in a greenhouse environment and while all growing conditions are carefully monitored with trained personnel, there can be no assurance that natural elements will not have a material adverse effect on the production of our products.

*We are reliant on third parties to transport our products to our customers.*

Due to our direct to client shipping model, we depend on fast and efficient courier services to distribute our product. Any prolonged disruption of this courier service could have an adverse effect on our financial condition and results of operations. Rising costs associated with the courier services we use to ship our products may also adversely impact our business and ability to operate profitably.

Due to the nature of our products, security of the product during transportation to and from our facilities is of the utmost concern. A breach of security during transport or delivery could have a material and adverse effect on our business, financial condition and prospects. Any breach of the security measures during transport or delivery, including any failure to comply with recommendations or requirements of Health Canada, could also have an impact on our ability to continue operating under our licences or the prospect of renewing our licences.

30

*Premiums for our insurance coverage may not continue to be commercially justifiable, and our insurance coverage may have limitations and other exclusions and may not be sufficient to cover our potential liabilities.*

We have insurance to protect our assets, operations and employees. While we believe our insurance coverage addresses all material risks to which we are exposed and is adequate and customary in our current state of operations, such insurance is subject to coverage limits and exclusions and may not be available for the risks and hazards to which we are exposed. In addition, no assurance can be given that such insurance will be adequate to cover our liabilities or will be generally available in the future or, if available, that premiums will be commercially justifiable. If we were to incur substantial liability and such damages were not covered by insurance or were in excess of policy limits, or if we were to incur such liability at a time when we are not able to obtain liability insurance, our business, results of operations and financial condition could be materially adversely affected.

### We are required to comply with safety, health and environmental regulations

Our operations are subject to environmental and safety laws and regulations concerning, among other things, emissions and discharges to water, air and land, the handling and disposal of hazardous and non-hazardous materials and wastes, and employee health and safety. We have received a notice from the Ontario Ministry of the Environment indicating that in order to be in compliance with the Environmental Protection Act and related regulations, we must obtain an Environmental Compliance Approval under Section 9 of the Environmental Protection Act. We filed an application for an Environmental Compliance Approval within the time required by the Ontario Ministry. On May 8, 2017, we received notice that the Ministry has begun their technical review of the application and as of the date of this Annual Information Form, it is still under review.

We will incur ongoing costs and obligations related to compliance with environmental and employee health and safety matters. Failure to obtain an Environmental Compliance Approval or otherwise comply with environmental and safety laws and regulations may result in additional costs for corrective measures, penalties or in restrictions on our manufacturing operations. In addition, changes in environmental, employee health and safety or other laws, more vigorous enforcement thereof or other unanticipated events could require extensive changes to our operations or give rise to material liabilities, which could have a material adverse effect on our business, results of operations and financial condition.

### We may be subject to product liability claims.

As a manufacturer and distributor of products designed to be ingested by humans, we face an inherent risk of exposure to product liability claims, regulatory action and litigation if our products are alleged to have caused significant loss or injury. In addition, the manufacture and sale of cannabis products involve the risk of injury to consumers due to tampering by unauthorized third parties or product contamination. Previously unknown adverse reactions resulting from human consumption of cannabis products alone or in combination with other medications or substances could occur. We may be subject to various product liability claims, including, among others, that the products we produced caused injury or illness, include inadequate instructions for use or include inadequate warnings concerning possible side effects or interactions with other substances.

A product liability claim or regulatory action against us could result in increased costs, could adversely affect our reputation with our clients and consumers generally, and could have a material adverse effect on our results of operations and financial condition. There can be no assurances that we will be able to obtain or maintain product liability insurance on acceptable terms or with adequate coverage against

31

potential liabilities. Such insurance is expensive and may not be available in the future on acceptable terms, or at all. The inability to obtain sufficient insurance coverage on reasonable terms or to otherwise protect against potential product liability claims could prevent or inhibit the commercialization of products.

***Our products may be subject to recalls.***

Manufacturers and distributors of products are sometimes subject to the recall or return of their products for a variety of reasons, including product defects, such as contamination, unintended harmful side effects or interactions with other substances, packaging safety and inadequate or inaccurate labeling disclosure. If any of the products we produce are recalled due to an alleged product defect or for any other reason, we could be required to incur the unexpected expense of the recall and any legal proceedings that might arise in connection with the recall. All patients who are potentially impacted are notified, corrective actions are put in place, and existing product and procedures re-tested and examined. We may also lose a significant amount of sales and may not be able to replace those sales at an acceptable margin or at all. In addition, a product recall may require significant management attention. Although we have detailed procedures in place for testing finished products, there can be no assurance that any quality, potency or contamination problems will be detected in time to avoid unforeseen product recalls, regulatory action or lawsuits. Additionally, if one of the products we produce were subject to recall, our image and the image of that product could be harmed. A recall for any of the foregoing reasons could lead to decreased demand for products we produce and could have a material adverse effect on our results of operations and financial condition. Additionally, product recalls may lead to increased scrutiny of our operations by Health Canada or other regulatory agencies, requiring further management attention and potential legal fees and other expenses.

***The medical cannabis industry may receive unfavorable publicity or become subject to negative consumer perceptions.***

We believe the medical cannabis industry is highly dependent upon consumer perception regarding the safety, efficacy and quality of the medical cannabis produced. Consumer perception of our products can be significantly influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of medical cannabis products. There can be no assurance that future scientific research, findings, regulatory proceedings, litigation, media attention or other research findings or publicity will be favorable to the medical cannabis market or any particular product, or consistent with earlier publicity. Future research reports, findings, regulatory proceedings, litigation, media attention or other publicity that are perceived as less favorable than, or that question, earlier research reports, findings or publicity could have a material adverse effect on the demand for our products and our business, results of operations, financial condition and cash flows. Our dependence upon consumer perceptions means that adverse scientific research reports, findings, regulatory proceedings, litigation, media attention or other publicity, whether or not accurate or with merit, could have a material adverse effect on us, the demand for products, and our business, results of operations, financial condition and cash flows. Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of medical cannabis in general, or our products specifically, or associating the consumption of medical cannabis with illness or other negative effects or events, could have such a material adverse effect. Such adverse publicity reports or other media attention could arise even if the adverse effects associated with such products resulted from consumers' failure to consume such products legally, appropriately or as directed.

32

*We may not be able to attract or retain clients.*

Our success depends on our ability to attract and retain clients.  There are many factors which could impact our ability to attract and retain clients, including but not limited to our ability to continually produce desirable and effective product, the successful implementation of our client-acquisition plan and the continued growth in the aggregate number of patients selecting medical cannabis as a treatment option. Our failure to acquire and retain patients as clients would have a material adverse effect on our business, operating results and financial condition.

*We may not be able to successfully manage our growth.*

We may be subject to growth-related risks including capacity constraints and pressure on our internal systems and controls. Our ability to manage growth effectively will require us to continue to implement and improve our operational and financial systems and to expand, train and manage our employee base. Our inability to deal with this growth may have a material adverse effect on our business, financial condition, results of operations and prospects.

*We have a history of operating losses.*

We have a history of net losses, may incur significant net losses in the future and may not achieve or maintain profitability. We have incurred losses in recent periods. We may not be able to achieve or maintain profitability and may continue to incur significant losses in the future. In addition, we expect to continue to increase operating expenses as we implement initiatives to continue to grow our business. If our revenues do not increase to offset these expected increases in costs and operating expenses, we will not be profitable. There is no assurance that future revenues will be sufficient to generate the funds required to continue operations without external funding.

*The development and operation of our business may require additional financing, which we may not be able to secure.*

There is no guarantee that we will be able to achieve our business objectives. Our continued development may require additional financing. The failure to raise such capital could result in the delay or indefinite postponement of current business objectives or our going out of business. There can be no assurance that additional capital or other types of financing will be available if needed or that, if available, the terms of such financing will be favorable to us. If additional funds are raised through issuances of equity or convertible debt securities, existing shareholders could suffer significant dilution, and any new equity securities issued could have rights, preferences and privileges superior to those of holders of common shares. In addition, from time to time, we may enter into transactions to acquire assets or the shares of other corporations. These transactions may be financed wholly or partially with debt, which may temporarily increase our debt levels above industry standards. Any debt financing secured in the future could involve restrictive covenants relating to capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential acquisitions. We had negative operating cash flow for the fiscal years ending March 31, 2015, March 31, 2016, and March 31, 2017. If we continue to have negative cash flow into the future, we may need to allocate additional financing proceeds to funding this negative cash flow in addition to our operational expenses. We may require additional financing to fund our operations to the point where we are generating positive cash flows.  Continued negative cash flow may restrict our ability to pursue our business objectives.

33

***We must rely largely on our own market research and market demand which may not materialize.***

We must rely largely on our own market research to forecast sales as detailed forecasts are not generally obtainable from other sources at this early stage of the medical cannabis industry in Canada. In addition, market research relating to the adult-use cannabis industry is not yet available and as such, trends in the adult-use cannabis market can only be forecasted ahead of its anticipated legalization in the summer of 2018. A failure in the demand for its products to materialize as a result of competition, technological change or other factors could have a material adverse effect on our business, results of operations and financial condition.

***Conflicts of interest may arise between us and our directors and officers.***

We may be subject to various potential conflicts of interest because of the fact that some of our officers and directors may be engaged in a range of business activities. In addition, our executive officers and directors may devote time to their outside business interests, so long as such activities do not materially or adversely interfere with their duties to us. In some cases, our executive officers and directors may have fiduciary obligations associated with these business interests that interfere with their ability to devote time to our business and affairs and that could adversely affect our operations. These business interests could require significant time and attention of our executive officers and directors.

In addition, we may also become involved in other transactions which conflict with the interests of our directors and officers who may from time to time deal with persons, firms, institutions or corporations with which we may be dealing, or which may be seeking investments similar to those we desire. The interests of these persons could conflict with our interests. In addition, from time to time, these persons may be competing with us for available investment opportunities. Conflicts of interest, if any, will be subject to the procedures and remedies provided under applicable laws. In particular, in the event that such a conflict of interest arises at a meeting of our directors, a director who has such a conflict will abstain from voting for or against the approval of such participation or such terms. In accordance with applicable laws, our directors are required to act honestly, in good faith and in our best interests.

***From time to time we are involved in legal proceedings arising in the ordinary course of business.***

We may become party to litigation from time to time in the ordinary course of business which could adversely affect our business. Should any litigation in which we become involved be determined against us such a decision could adversely affect our ability to continue operating and the market price for the common shares and could use significant resources. Even if we are involved in litigation and win, litigation can redirect significant resources. Litigation may also create a negative perception of our brand. See below under "–*Legal Proceedings and Regulatory Actions*" for further information.

***We compete for market share with a number of competitors and expect even more competitors to enter our market upon the Cannabis Act coming into effect, and many of our current and future competitors may have longer operating histories, more financial resources and lower costs than us.***

While it is understood that Licensed Producers will continue to operate under the medical and adult-use regimes, the retail and distribution model in each province and territory in Canada will have an impact on our operations. The number of Licensed Producers is set to increase to meet the demand of the adult-use market, which could negatively impact our market share and demand for products.

34

The introduction of an adult-use model for cannabis production and distribution may impact the medical cannabis market. The impact of this potential development may be negative for us and could result in increased levels of competition in its existing medical market and/or the entry of new competitors in the overall cannabis market in which we operate.

There is potential that we will face intense competition from other companies, some of which can be expected to have longer operating histories and more financial resources and manufacturing and marketing experience than us. Increased competition by larger and better financed competitors could materially and adversely affect our business, financial condition and results of operations.

We also face competition from illegal cannabis dispensaries that are selling cannabis to individuals despite not having a valid licence under the ACMPR. Many illegal dispensaries are still in operation, providing us with additional competition.

If the number of users of cannabis in Canada increases, the demand for products will increase and we expect that competition will become more intense, as current and future competitors begin to offer an increasing number of diversified products. To remain competitive, we will require a continued high level of investment in research and development, marketing, sales and client support. We may not have sufficient resources to maintain research and development, marketing, sales and client support efforts on a competitive basis which could materially and adversely affect our business, financial condition and results of operations.

As well, the legal landscape for medical and adult-use cannabis is changing internationally. More countries have passed laws that allow for the production and distribution of medical cannabis in some form or another. We have some international partnerships in place, which may be affected if more countries legalize medical cannabis. Increased international competition might lower the demand for our products on a global scale. In particular, production in countries such as Colombia and Mexico might drive commoditization of cannabis, due to lower labor costs and climates more conducive to the cannabis growing without capital-intensive greenhouse facilities, which in turn would decrease prices and profitability and could have a material adverse effect on us.

***The legislative framework pertaining to the Canadian adult-use cannabis market is uncertain.***

The *Cannabis Act* is not yet in force, and the regulations to the *Cannabis Act* have not yet been published, although Proposed Federal Regulations were published for public comment on November 21, 2017 and, on March 19, 2018, Health Canada published a summary of the comments received on the Proposed Federal Regulations as well as some proposed additions to the regulatory proposal. The *Cannabis Act* prohibits testimonials, lifestyle branding and packaging that is appealing to youth. The restrictions on advertising, marketing and the use of logos and brand names could have a material adverse impact on our business, financial condition and results of operation. The legislative framework pertaining to the Canadian adult-use cannabis market is uncertain.

In addition, the governments of every Canadian province and territory have, to varying degrees, announced proposed regulatory regimes for the distribution and sale of cannabis for adult-use purposes within those jurisdictions. There is no guarantee that provincial legislation regulating the distribution and sale of cannabis for adult-use purposes will be enacted according to all the terms announced by such provinces and territories, or at all, or that any such legislation, if enacted, will create the growth opportunities that we currently anticipate. While the impact of any new legislative framework for the regulation of the Canadian adult-use cannabis market is uncertain, any of the foregoing could result in a material adverse effect on our business, financial condition and results of operation.

35

***Third parties with whom we do business may perceive themselves as being exposed to reputational risk by virtue of their relationship with us and may ultimately elect not to do business with us.***

The parties with which we do business may perceive that they are exposed to reputational risk as a result of our cannabis business activities. For example, we received a notification from our prior principal banker advising us that they would no longer continue a banking relationship with us or any others in the cannabis industry. While we have other banking relationships and believe that the services can be procured from other institutions, we may in the future have difficulty establishing or maintaining bank accounts or other business relationships. Failure to establish or maintain business relationships could have a material adverse effect on us.

***We are subject to restrictions from the TSX which may constrain our ability to expand our business internationally.***

On July 22, 2016, we cleared all conditions and received final approval from the TSX to list on the TSX. Our common shares commenced trading on July 26, 2016. Being listed on the TSX creates exposure for us at a higher level than what we experienced under the TSXV, despite the unprecedented level of openness we were required to maintain. We must comply with the TSX guidelines when conducting business, especially when pursuing international opportunities.

On October 16, 2017, the TSX provided clarity regarding the application of the Requirements (as defined below) to TSX-listed issuers with business activities in the cannabis sector. In TSX Staff Notice 2017-0009, the TSX notes that issuers with ongoing business activities that violate U.S. federal law regarding cannabis are not in compliance with the Requirements. The TSX reminded issuers that, among other things, should the TSX find that a listed issuer is engaging in activities contrary to the Requirements, the TSX has the discretion to initiate a delisting review. Failure to comply with the Requirements could have an adverse effect on our business.

***We operate as a holding company and depend on our subsidiaries for cash to satisfy the obligations of the holding company.***

We are a holding company and essentially all of our assets are the capital stock of our material subsidiaries. We conduct substantially all of our business through our subsidiaries, which generate substantially all of our revenues. Consequently, our cash flows and ability to complete current or desirable future enhancement opportunities are dependent on the earnings of our subsidiaries and the distribution of those earnings to us. The ability of these entities to pay dividends and other distributions will depend on their operating results and will be subject to applicable laws and regulations which require that solvency and capital standards be maintained by such companies and contractual restrictions contained in the instruments governing their debt. In the event of a bankruptcy, liquidation or reorganization of any of our material subsidiaries, holders of indebtedness and trade creditors may be entitled to payment of their claims from the assets of those subsidiaries before us.

***Our due diligence may not have revealed all material issues relating to our acquisitions.***

While we conducted substantial due diligence in connection with the companies we have acquired, there are risks inherent in any acquisition. Specifically, there could be unknown or undisclosed risks or liabilities of such companies for which we are not sufficiently indemnified. Any such unknown or undisclosed risks or liabilities could materially and adversely affect our financial performance and results of operations. We currently anticipate that our acquisitions will be accretive; however, this expectation may materially change. We could encounter additional transaction and integration related costs or other factors such as the failure to realize all of the benefits from the acquisitions. All of these factors could cause dilution to our earnings per share or decrease or delay the anticipated accretive effect of the acquisition and cause a decrease in the market price of our common shares.

36

***We may not be successful in the integration of the companies we have acquired into our business.***

The success of our acquisitions will depend, in part, on our ability to realize the anticipated benefits and synergies from integrating those companies into our businesses.

We may not be able to successfully integrate and combine the operations, personnel and technology infrastructure of the Acquired Companies with our existing operations. If integration is not managed successfully, we may experience interruptions in our business activities, deterioration in our employee and customer relationships, increased costs of integration and harm to our reputation, all of which could have a material adverse effect on our business, financial condition and results of operations. We may experience difficulties in combining corporate cultures, maintaining employee morale and retaining key employees. The integration of the Acquired Companies may also impose substantial demands on management. There is no assurance that these acquisitions will be successfully integrated in a timely manner. The challenges involved in our integration of the Acquired Companies may include, among other things, the following:

- the necessity of coordinating both geographically disparate and geographically overlapping organizations;
- retaining key personnel, including addressing the uncertainties of key employees regarding their future;
- integrating the Acquired Companies into our accounting system and adjusting our internal control environment to cover the operations of the Acquired Companies;
- integration of information technology systems and resources;
- performance shortfalls relative to expectations at one or both of the businesses as a result of the diversion of management's attention to the integration of the Acquired Companies; and
- unplanned costs required to integrate the Acquired Companies with our existing business.

***We may be unable to successfully achieve the objectives of our strategic alliances.***

We currently have, and may in the future enter into further, strategic alliances with third parties that we believe will complement or augment our existing business. Our ability to complete strategic alliances is dependent upon, and may be limited by, the availability of suitable candidates and capital. In addition, strategic alliances could present unforeseen integration obstacles or costs, may not enhance our business, and may involve risks that could adversely affect us, including significant amounts of management time that may be diverted from operations to pursue and complete such transactions or maintain such strategic alliances. Future strategic alliances could result in the incurrence of additional debt, costs and contingent liabilities, and there can be no assurance that future strategic alliances will achieve, or that the existing strategic alliances will continue to achieve, the expected benefits to our business or that we will be able to consummate future strategic alliances on satisfactory terms, or at all. Any of the foregoing risks and uncertainties could have a material adverse effect on our business, financial condition and results of operations.

***Our operations are subject to increased risk as a result of international expansion.***

Our expansion into jurisdictions outside of Canada is subject to additional business risks, including whether any market for our products will develop or be maintained. We may face new or unexpected risks or significantly increase our exposure to one or more existing risk factors, including economic instability, changes in laws and regulations, and the effects of competition. These factors may limit our ability to successfully expand our operations into such jurisdictions and may have a material adverse effect on our business, financial condition and results of operations.

37

*We may encounter political and other risks in emerging markets.*

We have operations in various emerging markets and may have operations in additional emerging markets in the future. Such operations expose us to the socioeconomic conditions as well as the laws governing the cannabis industry in such countries. Inherent risks with conducting foreign operations include, but are not limited to: high rates of inflation; extreme fluctuations in currency exchange rates; military repression; war or civil war; social and labor unrest; organized crime; hostage taking; terrorism; violent crime; expropriation and nationalization; renegotiation or nullification of existing licenses, approvals, permits and contracts; changes in taxation policies; restrictions on foreign exchange and repatriation; and changing political norms, currency controls and governmental regulations that favor or require us to award contracts in, employ citizens of, or purchase supplies from, the jurisdiction.

Governments in certain foreign jurisdictions intervene in their economies, sometimes frequently, and occasionally make significant changes in policies and regulations. Changes, if any, in cannabis industry or investment policies or shifts in political attitude in the countries in which we operate may adversely affect our operations or profitability. Operations may be affected in varying degrees by government regulations with respect to, but not limited to, restrictions on production, price controls, export controls, currency remittance, importation of product and supplies, income and other taxes, royalties, the repatriation of profits, expropriation of property, foreign investment, maintenance of licenses, approvals and permits, environmental matters, land use, land claims of local people, water use and workplace safety. Failure to comply strictly with applicable laws, regulations and local practices could result in loss, reduction or expropriation of licenses, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests.

We continue to monitor developments and policies in the emerging markets in which we operate and assess the impact thereof on our operations; however, such developments cannot be accurately predicted and could have an adverse effect on our operations or profitability.

*There may be a risk of corruption and fraud in the emerging markets in which we operate.*

There are uncertainties, corruption and fraud relating to title ownership of real property in certain emerging markets in which we operate or may operate. Property disputes over title ownership are frequent in emerging markets, and, as a result, there is a risk that errors, fraud or challenges could adversely affect our ability to operate in such jurisdictions. Any of the foregoing risks and uncertainties could have a material adverse effect on our business, financial condition and results of operations.

*Our operational in emerging international markets may posed an increased inflation risk on our business.*

In the past, high levels of inflation have adversely affected emerging economies and financial markets, and the ability of government to create conditions that stimulate or maintain economic growth. Moreover, governmental measures to curb inflation and speculation about possible future governmental measures have contributed to the negative economic impact of inflation and have created general economic uncertainty. The emerging markets in which we operate or may operate may experience high levels of inflation in the future. Inflationary pressures may weaken investor confidence in such countries and lead to further government intervention in the economy. If countries in which we operate experience high levels of inflation in the future and/or price controls are imposed, we may not be able to adjust the rates we charge customers to fully offset the impact of inflation on our cost structures, which could adversely affect our results of operations or financial condition.

38

***Foreign jurisdiction may impose ownership or control restrictions that could adversely impact our international operations.***

Non-resident individuals and non-domiciled foreign legal entities may be subject to restrictions on the acquisition or lease of properties in certain emerging markets. Limitations also apply to legal entities domiciled in such countries which are controlled by foreign investors, such as the entities through which we operate in certain countries. Accordingly, our current and future operations may be impaired as a result of such restrictions on the acquisition or use of property, and our ownership or access rights in respect of any property we own or lease in such jurisdictions may be subject to legal challenges, all of which could result in a material adverse effect on our business, results of operations, financial condition and cash flows.

***We rely on international advisors and consultants in order to keep abreast of material legal, regulatory and government developments that impact our business and operations in the jurisdictions in which we operate.***

The legal and regulatory requirements in the foreign countries in which we operate with respect to the cultivation and sale of cannabis, banking systems and controls, as well as local business culture and practices are different from those in Canada. Our officers and directors must rely, to a great extent, on local legal counsel and consultants in order to keep abreast of material legal, regulatory and governmental developments as they pertain to and affect our business operations, and to assist with governmental relations. We must rely, to some extent, on those members of management and the board of directors who have previous experience working and conducting business in these countries, if any, in order to enhance our understanding of and appreciation for the local business culture and practices. We also rely on the advice of local experts and professionals in connection with current and new regulations that develop in respect of the cultivation and sale of cannabis as well as in respect of banking, financing, labor, litigation and tax matters in these jurisdictions. Any developments or changes in such legal, regulatory or governmental requirements or in local business practices are beyond our control. The impact of any such changes may adversely affect our business.

***International operations will result in increased operational, regulatory and other risks.***

We may in the future expand into other geographic areas, which could increase our operational, regulatory, compliance, reputational and foreign exchange rate risks. The failure of our operating infrastructure to support such expansion could result in operational failures and regulatory fines or sanctions. Future international expansion could require us to incur a number of up-front expenses, including those associated with obtaining regulatory approvals, as well as additional ongoing expenses, including those associated with infrastructure, staff and regulatory compliance. We may not be able to successfully identify suitable acquisition and expansion opportunities or integrate such operations successfully with our existing operations.

***Canadian laws impose prohibitions on corruption and bribery that may be violated by employees or other agents without our knowledge and despite our policies and procedures.***

Our business is subject to Canadian laws which generally prohibit companies and employees from engaging in bribery or other prohibited payments to foreign officials for the purpose of obtaining or retaining business. In addition, we are subject to the anti-bribery laws of any other countries in which we conduct business. Our employees or other agents may, without our knowledge and despite our efforts, engage in prohibited conduct under our policies and procedures and anti-bribery laws for which we may be held responsible. Our policies mandate compliance with these anti-corruption and anti-bribery laws. However, there can be no assurance that internal control policies and procedures will always protect us

39

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 55 of 125
cgc-ex991_131.htm
PageID: 6114

from recklessness, fraudulent behavior, dishonesty or other inappropriate acts committed by affiliates, employees, contractors or agents. If our employees or other agents are found to have engaged in such practices, we could suffer severe penalties and other consequences that may have a material adverse effect on our business, financial condition and results of operations.

*Future sales or issuances of equity securities could decrease the value of our common shares, dilute investors' voting power and reduce our earnings per share.*

We may sell additional equity securities in subsequent offerings (including through the sale of securities convertible into equity securities). We cannot predict the size of future issuances of equity securities or the size and terms of future issuances of debt instruments or other securities convertible into equity securities or the effect, if any, that future issuances and sales of our securities will have on the market price of the common shares.

Additional issuances of our securities may involve the issuance of a significant number of common shares at prices less than the current market price for the common shares. Issuances of substantial numbers of common shares, or the perception that such issuances could occur, may adversely affect prevailing market prices of the common shares. Any transaction involving the issuance of previously authorized but unissued common shares, or securities convertible into common shares, would result in dilution, possibly substantial, to security holders.

Sales of substantial amounts of our securities by us or our existing shareholders, or the availability of such securities for sale, could adversely affect the prevailing market prices for our securities and dilute investors' earnings per share. Exercises of presently outstanding share options or warrants may also result in dilution to security holders. A decline in the market prices of our securities could impair our ability to raise additional capital through the sale of securities should we desire to do so.

*Our common share price has experienced volatility and may be subject to fluctuation in the future based on market conditions.*

The market price for our common shares may be volatile and subject to wide fluctuations in response to numerous factors, many of which are beyond our control, including the following:
- actual or anticipated fluctuations in our quarterly results of operations;
- recommendations by securities research analysts;
- changes in the economic performance or market valuations of companies in the industry in which we operate;
- addition or departure of our executive officers and other key personnel;
- release or expiration of transfer restrictions on outstanding common shares;
- sales or perceived sales of additional common shares;
- operating and financial performance that vary from the expectations of management, securities analysts and investors;
- regulatory changes affecting our industry generally and our business and operations;
- announcements of developments and other material events by us or our competitors;
- fluctuations to the costs of vital production materials and services;
- changes in global financial markets and global economies and general market conditions, such as interest rates and pharmaceutical product price volatility;
- significant acquisitions or business combinations, strategic partnerships, joint ventures or capital commitments by or involving us or our competitors;
- operating and share price performance of other companies that investors deem comparable to us or from a lack of market comparable companies; and
- news reports relating to trends, concerns, technological or competitive developments, regulatory changes and other related issues in our industry or target markets.

40

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 56 of 125
cgc-ex991_131.htm
PageID: 6115

Financial markets have recently experienced significant price and volume fluctuations that have particularly affected the market prices of equity securities of companies and that have often been unrelated to the operating performance, underlying asset values or prospects of such companies. Accordingly, the market price of our common shares may decline even if our operating results, underlying asset values or prospects have not changed. Additionally, these factors, as well as other related factors, may cause decreases in asset values that are deemed to be other than temporary, which may result in impairment losses. There can be no assurance that continuing fluctuations in price and volume will not occur. If such increased levels of volatility and market turmoil continue, our operations could be adversely impacted, and the trading price of our common shares may be materially adversely affected.

***The listing on the TSX and NYSE may increase the volatility in the price of our common shares.***

Our listing on both the TSX and NYSE may increase price volatility due to various factors, including the ability to buy or sell common shares, different market conditions in different capital markets and different trading volumes. In addition, low trading volume may increase the price volatility of our common shares.

***We may not pay dividends in the future.***

We have never declared nor paid any dividends on our common shares and we have no plans to pay dividends for the foreseeable future. Our directors will determine if and when dividends should be declared and paid in the future based on our financial position at the relevant time and such other factors as they may deem relevant. As a result, investors may not receive any return on an investment in the common shares unless they are able to sell their shares of the Corporation for a price greater than that which such investors paid for them.

***There is no assurance of a sufficient liquid trading market for our common shares in the future.***

Our shareholders may be unable to sell significant quantities of common shares into the public trading markets without a significant reduction in the price of their common shares, or at all. There can be no assurance that there will be sufficient liquidity of our common shares on the trading market, and that we will continue to meet the listing requirements of the TSX or the NYSE or achieve listing on any other public listing exchange.

***There is no assurance we will continue to meet the listing requirements of the TSX and NYSE.***

We must meet continuing listing requirements to maintain the listing of our common shares on the TSX and NYSE. The inability to meet the continuing listing requirements could adversely affect our results of operations or financial condition.

***A significant number of our common shares are owned by Greenstar Holdings.***

Greenstar Holdings owns a substantial number of the outstanding common shares (on a fully diluted basis) and, through its pre-emptive rights, has the ability to maintain its ownership level. As such, Greenstar Holdings is in a position to exercise significant influence over matters requiring shareholder approval, including the election of directors and the determination of significant corporate actions. As well, Greenstar Holdings could delay or prevent a change in control that could otherwise be beneficial to our shareholders.

41

*We may lose our status as a foreign private issuer.*

In order to maintain our status as a foreign private issuer, a majority of our common shares must be either directly or indirectly owned by non-residents of the U.S. unless we also satisfy one of the additional requirements necessary to preserve this status. We may in the future lose our foreign private issuer status if a majority of our common shares are held in the United States and if we fail to meet the additional requirements necessary to avoid loss of our foreign private issuer status. The regulatory and compliance costs under U.S. federal securities laws as a U.S. domestic issuer may be significantly more than the costs incurred as a Canadian foreign private issuer eligible to use the multijurisdictional disclosure system ("**MJDS**"). If we are not a foreign private issuer, we would not be eligible to use the MJDS or other foreign issuer forms and would be required to file periodic and current reports and registration statements on U.S. domestic issuer forms with the SEC, which are more detailed and extensive than the forms available to a foreign private issuer. In addition, we may lose the ability to rely upon exemptions from NYSE corporate governance requirements that are available to foreign private issuers.

*We have substantial obligations as a public company.*

The Corporation's business is subject to evolving corporate governance and public disclosure regulations that may from time to time increase both the Corporation's compliance costs and the risk of non-compliance, which could adversely impact the price of the Common Shares.

The Corporation is subject to changing rules and regulations promulgated by a number of governmental and self-regulated organizations, including, but not limited to, the Canadian Securities Administrators, the TSX, and the International Accounting Standards Board, the U.S. Securities and Exchange Commission (the "SEC") and the NYSE. These rules and regulations continue to evolve in scope and complexity creating many new requirements.

The Corporation is also subject to corporate governance standards that apply to us as a foreign issuer listed on the NYSE and registered with the SEC in the United States. Although we substantially comply with NYSE's corporate governance guidelines, we are exempt from certain NYSE requirements because we are subject to Canadian corporate governance requirements. We may from time to time seek other relief from corporate governance and exchange requirements and securities laws from the NYSE and other regulators. We anticipate that for the fiscal year ending March 31, 2020, the Corporation will be required to document and test its internal control procedures to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act ("SOX"). SOX requires management to do an annual assessment of our internal controls over financial reporting and our external auditors to conduct an independent assessment of the effectiveness of the Corporation's controls. Internal controls over financial reporting may not be adequate, or we may not be able to maintain them as required by SOX. The Corporation may not be able to maintain effective internal controls over financial reporting on an ongoing basis, if standards are modified, supplemented or amended from time to time. If we do not satisfy the SOX requirements on an ongoing and timely basis, investors could lose confidence in the reliability of our financial statements, and this could harm our business and have a negative effect on the trading price or market value of securities of the Corporation.

If we do not implement new or improved controls, or experience difficulties in implementing them, it could harm our operating results, or we may not be able to meet our reporting obligations. There is no assurance that we will be able to remediate material weaknesses, if any are identified in future periods, or maintain all of the necessary controls to ensure continued compliance. There is also no assurance that we will be able to retain personnel who have the necessary finance and accounting skills because of the increased demand for qualified personnel among publicly traded companies. Acquisitions can pose challenges in implementing the required processes, procedures and controls in the new operations.

42

10/8/21, 1:48 PM    Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 58 of 125
cgc-ex991_131.htm
PageID: 6117

Companies that we acquire may not have disclosure controls and procedures or internal controls over financial reporting that are as thorough or effective as those required by the securities laws that currently apply to us. If any of our staff fail to disclose material information that is otherwise required to be reported, no evaluation can provide complete assurance that our internal controls over financial reporting will detect this. The effectiveness of our controls and procedures may also be limited by simple errors or faulty judgments. Continually enhancing our internal controls is important, especially as we expand, and the challenges involved in implementing appropriate internal controls over financial reporting will increase. Although we intend to devote substantial time to ongoing compliance with this, including incurring the necessary costs associated with therewith, we cannot be certain that we will be successful in complying with section 404 of SOX.

## DIVIDENDS

As of the date hereof, the Corporation has not paid any dividends on its outstanding Common Shares and has no current intention to declare dividends on its Common Shares in the foreseeable future. Any decision to pay dividends on its Common Shares in the future will be at the discretion of Canopy Growth's board of directors and will depend on, among other things, the Corporation's results of operations, current and anticipated cash requirements and surplus, financial condition, any future contractual restrictions and financing agreement covenants, solvency tests imposed by corporate law and other factors that the board of directors may deem relevant.

## CAPITAL STRUCTURE

The authorized capital of the Corporation consists of an unlimited number of Common Shares. As of the date of this Annual Information Form, there are 201,084,905 Common Shares issued and outstanding. The holders of the Common Shares are entitled to one vote per share at all meetings of the shareholders of the Corporation. The holders of Common Shares are also entitled to dividends, if and when declared by the directors of the Corporation and the distribution of the residual assets of the Corporation in the event of a liquidation, dissolution or winding up of the Corporation.

At the Corporation's Annual General Meeting, held in September 2017, the shareholders voted in favour of the adoption of an Omnibus Incentive Plan (the "**Incentive Plan**") to replace the existing stock option plan. Pursuant to the Incentive Plan, the Corporation is able to issue share-based long-term incentives. All directors, officers, employees and independent contractors of the Corporation and/or its affiliates ("**Canopy Personnel")** are eligible to receive awards of common share purchase options ("**Options**") restricted share units ("**RSUs**"), deferred share units ("**DSUs**"), stock appreciation rights ("**Stock Appreciation Rights**"), restricted stock ("**Restricted Stock**"), performance awards ("**Performance Awards**") or other stock-based awards (collectively, the "**Awards**"), under the Incentive Plan. All Awards granted under the Incentive Plan are non-transferable.

In addition, at the Corporation's Annual General Meeting, the shareholders voted in favour of the adoption of the Employee Stock Purchase Plan of the Corporation (the "**Purchase Plan**"). Under the Purchase Plan, active employees regularly employed by the Corporation or any of its subsidiaries who have been employed for at least three months, may contribute up to 5% of their total salary to purchase Common Shares. All regular full-time employees of the Corporation and its participating subsidiaries, but not nonexecutive members of the Board, may participate in the Purchase Plan. The rights of participants under the Purchase Plan are not transferable.

Copies of both the full Incentive Plan and the full Purchase Plan can be found in the Corporation's Management Information Circular 2017 filed on SEDAR.

43

## MARKET FOR SECURITIES

Our Common Shares are listed and posted for trading on the TSX under the trading symbol "WEED". The following table sets forth the price range per share and trading volume for the Common Shares on the TSX between April 1, 2017 and March 31, 2018.

| Period | High Trading Price ($) | Low Trading Price ($) | Volume (#) |
|---|---|---|---|
| March 2018 | $34.71 | $26.99 | 115,318,900 |
| February 2018 | $31.77 | $20.85 | 114,638,000 |
| January 2018 | $44.00 | $29.07 | 186,714,000 |
| December 2017 | $33.09 | $17.91 | 110,421,600 |
| November 2017 | $21.72 | $15.89 | 170,877,000 |
| October 2017 | $17.07 | $10.75 | 106,310,600 |
| September 2017 | $10.89 | $8.91 | 31,958,700 |
| August 2017 | $9.21 | $8.36 | 15,799,400 |
| July 2017 | $9.53 | $7.73 | 19,035,600 |
| June 2017 | $8.81 | $6.58 | 30,794,900 |
| May 2017 | $9.34 | $7.37 | 31,351,900 |
| April 2017 | $11.14 | $8.86 | 58,444,800 |

### Stock Options

The following table summarizes details of the stock and compensation options issued under the Corporation's Omnibus Incentive Plan that were outstanding and exercisable as at March 31, 2018:

| Options Outstanding | | | | Options Exercisable | |
|---|---|---|---|---|---|
| Number Outstanding at March 31, 2018 | Weighted Average Remaining Contractual Life (years) | Range of Exercise Prices | | Number Exercisable at March 31, 2018 | Range of Exercise Prices |
| 3,471,904 | 3.41 | $0.56 - $3.78 | | 1,569,274 | $0.56 - $3.78 |
| 5,731,691 | 5.13 | $3.79 - $8.51 | | 577,665 | $3.79 - $8.51 |
| 2,712,240 | 4.91 | $8.52 - $11.76 | | 536,254 | $8.52 - $11.76 |
| 1,540,000 | 5.67 | $11.77 - $27.94 | | 16,667 | $11.77 - $27.94 |
| 3,790,000 | 5.88 | $27.95 - $33.66 | | - | $27.95 - $33.66 |

As of the date hereof, there are 17,006,079 options outstanding pursuant to Canopy Growth's stock option plan and no agent's options outstanding.

44

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 60 of 125
cgc-ex991_131.htm
PageID: 6119

**Warrants**

In connection with the Constellation Transaction, Canopy Growth issued a total of 18,876,901 replacement warrants to Greenstar Holdings, subject to certain restrictions, expiring 30 months from November 2, 2017. Such warrants are non-transferrable without the prior written consent of Canopy Growth. All previously held rTrees warrants, as disclosed in last year's Annual Information Form, were exercised or expired by April 30, 2018.

# ESCROWED SECURITIES AND SECURITIES SUBJECT TO RESTRICTION ON TRANSFER

The following table summarizes details of the Corporation's securities of each class held, to the Corporation's knowledge, in escrow or that are subject to a contractual restriction on transfer as of the date of this Annual Information Form:

| Designation of Class | Number of securities held in escrow | Percentage of class[1] |
|---|---|---|
| Common Shares | 229,952 [2][3][4] | 0.001% |

Notes:
(1) Based on 201,084,905 Common Shares issued and outstanding as of the date of this Annual Information Form.
(2) Pursuant to the License Agreement, LBC Holdings, Inc. will receive a combination of Common Shares, royalties, and monetary compensation, released over the course of the agreement. The share consideration is comprised of Common Shares totaling 386,100, of which 250,965 Common Shares were deposited into escrow with LaBarge Weinstein LLP, as escrow agent, for release, subject to meeting certain service criteria, over the initial three years of the term. As of the date hereof, 232,142 Common Shares have been released and 18,823 Common Shares are escrowed for release pursuant to the terms of the License Agreement.
(3) Pursuant to the Medcann GmbH Acquisition Agreement, Medcann GmbH will receive a total of 1,165,272 Common Shares, of which 674,631 Common Shares were issued on December 12, 2016, 367,981 Commons Shares were issued on November 23, 2017, in connection with the 18-month anniversary of obtaining an Import and Distribution License from the German Health Minister and the remaining 122,660 Common Shares will be (i) released from escrow upon achieving certain other milestones within two years of closing the transaction, or (ii) released to the Corporation for cancellation.
(4) Pursuant to the Vert Médical Acquisition Agreement, the former shareholders of Vert Médical will receive a total of 294,900 Common Shares, of which 58,978 Common Shares were issued on November 1, 2016 and 147,453 Common Shares were issued on January 5, 2018, with the remaining 88,469 Common Shares are (i) escrowed for release to former Vert Medical shareholders, subject to meeting certain licensing and capacity milestones, or (ii) released to the Corporation for cancellation.

# DIRECTORS AND EXECUTIVE OFFICERS

Set out below are the names, committee memberships (as at the date hereof), province or state and Country of residence, principal occupations and periods of service of the directors and executive officers of the Corporation.

| Name and Province or State and Country of Residence | Period or periods during which each proposed director has served as a director of Canopy Growth | Position with the Corporation | Number and Percent of Common Shares Held[10] |
|---|---|---|---|
| Bruce Linton<br>Ottawa, Ontario, Canada | March 25, 2014 – Current | Director, Chief Executive Officer and Chair | 2,742,511[1] (1.4%) |
| John K. Bell[7][9]<br>Cambridge, Ontario, Canada | October 28, 2014 – Current | Lead Director | 100,000[2] (0.04%) |

45

| Name and Province or State and Country of Residence | Period or periods during which each proposed director has served as a director of Canopy Growth | Position with the Corporation | Number and Percent of Common Shares Held[10] |
|---|---|---|---|
| Chris Schnarr, ICD.D. (6)(8) Mississauga, Ontario, Canada | March 26, 2014 – Current | Director | Nil |
| Murray Goldman(6) Toronto, Ontario, Canada | August 28, 2015 – Current | Director | 4,407,268(3) (2.2%) |
| Peter E. Stringham(7) New York, USA | September 15, 2016 – Current | Director | 7,500 (0.004%) |
| Mark Zekulin Ottawa, Ontario, Canada | N/A | President of Canopy Growth | 283,876(4) (0.14%) |
| Tim Saunders Ottawa, Ontario, Canada | N/A | Senior Vice President and Chief Financial Officer | Nil |
| Deborah Weinstein Ottawa, Ontario, Canada | N/A | Secretary | 185,561(5) (0.09%) |

Notes:
(1)     2,566,225 of these Common Shares are held by HBAM Holdings Inc., a corporation controlled by Mr. Linton and 105,486 of these Common Shares are held by GMP Securities L.P. in trust for Mr. Linton.
(2)     63,650 of these Common Shares are held by Onbelay Capital of which John K. Bell is the principal.
(3)     Held by Goldamp Holdings Ltd. of which Murray Goldman is the principal.
(4)     49,461 of these Common Shares are held by GMP Securities L.P. in trust for Mr. Zekulin.
(5)     85,561 of such shares are owned by Deborah Weinstein Professional Corporation, a corporation controlled by Ms. Weinstein.
(6)     Chair of the Audit Committee.
(7)     Member of the Audit Committee.
(8)     Member of Compensation and Governance Committee.
(9)     Chair of Compensation and Governance Committee.
(10)    Based on 201,084,905 Common Shares issued and outstanding as at the date of this Annual Information Form.

The term of each director of Canopy Growth will expire on the date of the next annual meeting of shareholders of Canopy Growth. As of the date hereof, the directors and senior officers of Canopy Growth as a group beneficially own, directly or indirectly, or over which control or direction is exercised, 7,726,716 of the issued and outstanding Common Shares, representing approximately 3.84% of the total votes attaching to all of the outstanding voting securities of Canopy Growth (or 11,181,467 Common Shares representing 5.6% of the total outstanding voting securities of Canopy Growth assuming exercise of options held).

The following sets out additional information with respect to the education, experience and employment history of each of the directors and officers referred to above during the past five years.

*Bruce Linton*

Mr. Linton is the founder of Canopy Growth Corporation (CGC) and co-founder of Tweed Marijuana Incorporated and has been the Chief Executive Officer since 2014. Canopy Growth was the first cannabis producing Corporation in North America to be listed on a major stock exchange (TSX, July 2016), included on a major stock index (S&P/TSX Composite Index, March 2017) and to be listed on the NYSE (May 2018). Bruce's primary focus has been to position cannabis brands in a competitive market and to raise the capital necessary to fund such operations. Bruce's experience as a founder, CEO, and Board

46

member across a wide variety of enterprises has influenced the positive start of Canopy Growth, which to date has enjoyed market support for capital raises of over $200 million. Bruce has led six M&A transactions valued over $500 million total since founding CGC.

In addition to his leadership responsibility at Canopy Growth, since 2007 Bruce has been the President of HBAM Holdings Inc. and since 2013, Bruce has been the CEO of communications company Martello Technologies. After beginning his career at Newbridge Networks Corporation, he has since held positions that include General Manager and Re-Founder of Computerland.ca, President and Co-Founder of webHancer Corp, and part of the establishing team at CrossKeys Systems Corporation. He was also part of the leadership team for the NASDAQ/TSX initial public offering at CrossKeys. He is the past Chairman of the Ottawa Community Loan Foundation, past Board Member on World Bank Water and Sanitation Program Council, past Board Member and Treasurer of Canada World Youth, past Board of Governor for Carleton University, past President of the Nepean Skating Club, and past President of Carleton University Students Association.

*John K. Bell, FCA, FCPA, ICD.D*

Mr. Bell founded Shred-Tech and grew it into a global giant in the mobile document shredding and recycling industry. After selling Shred-Tech in 1995, he purchased Polymer Technologies and grew it from a local plastics manufacturer to a global auto parts company before exiting in 2007. John also served as interim CEO and director of ATS Automation (TSX), which operates 24 global manufacturing facilities, has 4,000 employees and $700 million in sales during a time of management and board renewal in 2007. John was the lead investor and Chairman of BSM Wireless (TSX-V). First investing in 2006, he led board and management renewal leading to substantial and profitable growth before successfully exiting in 2014. John sits on the Board of Strongco Corp, traded on the Toronto Stock Exchange as SQP and DelMar Pharmaceuticals, which is traded on NASDAQ as DMPI and since 2009, has been on the Board of The Royal Canadian Mint, a $3 Billion Crown Corporation. Since 2005, Mr. Bell has acted as the Chairman and CEO Onbelay Capital Inc. an investment management and holding corporation.

*Chris Schnarr, ICD.D*

Mr. Schnarr is the Managing Director of Lorian Group Inc., a capital markets consultancy. Mr. Schnarr has over 25 years of experience founding, managing, and advising growth companies, including strategy, corporate finance, capital markets, corporate development, M&A, financial reporting, and governance. His functional experience across executive positions spans Treasurer, Executive Vice President, Chief Financial Officer, President, and Chief Executive Officer. From May 2014 to November 2016, Mr. Schnarr acted as President and CFO of Delivra Inc. a Corporation involved in the development and sale of transdermal products and technologies and from August 2011 to August 2013, he acted as CEO and Director of BioExx Specialty Proteins Ltd. His broad industry experience includes technology (hardware, software, and services), communications, agriculture, food processing and food ingredients, financial services, health care, and sustainability. Mr. Schnarr has over 20 years of public Corporation Board experience across TSX:V and TSX listed companies, as well as extensive committee experience. He is also a Director and Chair of the Compensation & Governance Committee and a member of the Audit Committee of VitalHub Corp. (TSX:V).

Mr. Schnarr holds a Masters in Business Administration (finance) from University of British Columbia (1990), and a Bachelor of Business Administration degree with a Minor in Economics, from Wilfrid Laurier University (1989). He is a member of the Institute of Corporate Directors, a graduate of the Directors Education Program at the Rotman School of Business at the University of Toronto, and holds the ICD.D designation.

47

*Murray Goldman*

Mr. Goldman, is the former Chairman of Bedrocan Canada Inc. and joined the Board of Directors when Bedrocan was successfully acquired by Canopy Growth. Mr. Goldman is the founder and Chairman of The Goldman Group, a fully integrated real estate development Corporation that has developed and built in Canada, the United States and Israel for over 50 years. The Corporation has a history of innovative and original mixed-use developments that have established precedent- setting neighbourhoods in the Greater Toronto Area. In 2010, Mr. Goldman received the NAIOP lifetime achievement award acknowledging his leadership in this field. Mr. Goldman continues to serve as a director of a number of prominent organizations and is a major investor and founder of a number of innovative medical and scientific research companies.

*Peter Stringham*

Mr. Peter E. Stringham retired in 2016 as Chairman and Chief Executive Officer of The Young & Rubicam Group Of Companies. Mr. Stringham served as the Chief Executive Officer of Young & Rubicam Brands at Young & Rubicam, Inc. since March 2, 2007. Mr. Stringham served as Group General Manager of Marketing of HSBC Holdings PLC. and HSBC Bank plc. since 2001. He served as Head of Global Marketing for HSBC Holdings plc. until March 2007. He joined HSBC in 2001 and served for 6 years, where he was instrumental in positioning it as the 'world's local bank' in a series of local advertising and marketing campaigns, and has helped build HSBC into one of the world's most recognized brands. He consolidated HSBC's advertising and marketing duties with a single lead worldwide marketing services group. He served with WPP Group to cover HSBC's operations in 76 countries and territories.

*Mark Zekulin*

Since 2015, Mark has been the President of Canopy Growth, previously acting as the President of Tweed, Officer, Vice President and General Counsel of Canopy Growth. He ensures that patients and healthcare practitioners choose Canopy Growth, through its subsidiaries as Licensed Producers, as their trusted supplier of marijuana for medical purposes. This includes overseeing the Corporation's medical and patient outreach strategy, driving operations and advancing the Corporation's market strategy.

A graduate from the University of Waterloo in Mathematics, the University of Ottawa in Law, and the University of Cambridge in International Law, Mark has previously provided legal, political and strategic advice to high-profile local and international corporate clients, most recently as Counsel at the Ottawa-Washington international trade law firm of Cassidy Levy Kent. Previously, Mark has also served as a Senior Advisor to the Honourable Dwight Duncan, the Ontario Minister of Finance, and has worked internationally at the Business and Industry Advisory Committee to the Organization for Economic Co-operation and Development (OECD) as Acting Senior Policy Manager.

*Tim Saunders*

Tim has been the Chief Financial Officer of Canopy Growth since 2005. Tim is a finance executive experienced with large international public companies and private equity-backed start-ups, having worked both in Canada and Europe. His leadership style focuses on business transformation and forward thinking to advance business capability and the business model. Tim joined Canopy Growth in summer 2015 after gaining executive and leadership experience across a number of sectors including mobile, telecom, semiconductors, manufacturing and clean tech. Tim most recently led Black Canvas Consulting with assignments such as Strategic Advisor to the President's Office of Export Development Canada. Tim was previously a senior finance executive with Vodafone, Oskar Mobil, Mitel and Zarlink Semiconductor and CFO at Plasco Energy Group where he was instrumental in raising $360 million in capital during the early start-up of the Corporation until 2013.

48

Tim earned his CPA, CA with PricewaterhouseCoopers and is a graduate of Bishop's University (Quebec) where he obtained his BBA. Tim also earned an executive certificate from the Ivey School of Business at the University of Western Ontario.

*Deborah Weinstein*

Deborah Weinstein is the Secretary of Canopy Growth. Ms. Weinstein does not work full time for the Corporation, but devotes such time as is required in connection with her duties. Ms. Weinstein currently serves as a director of OpenText Corporation and Dynex Power Inc., as well as secretary of Thermal Energy International Inc. Ms. Weinstein holds a law degree from Osgoode Hall Law School at York University. Ms. Weinstein is called to the bar of Ontario as a member of the Law Society of Upper Canada.

**Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

Except as disclosed below, no director or executive officer of Canopy Growth is, as at the date of this Annual Information Form, or has been, within 10 years before the date of this Annual Information Form, a director, chief executive officer or chief financial officer of any Corporation (including Canopy Growth) that was subject to a cease trade or similar order or an order that denied the relevant Corporation access to any exemption under securities legislation that was (i) in effect for a period of more than 30 consecutive days, (ii) issued while the director or executive officer was acting in that capacity, or (iii) issued after that person ceased to act in that capacity but which resulted from an event that occurred while that person was acting in that capacity.

Except as disclosed below, no director or executive officer of Canopy Growth or, to the knowledge of Canopy Growth, any shareholder holding a sufficient number of securities of Canopy Growth to affect materially the control of Canopy Growth:

(a)  is, as of the date of this Annual Information Form, or has been within 10 years before the date of this Annual Information Form, a director or executive officer of any Corporation (including Canopy Growth) that, while that person was acting in that capacity, or within a year of ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets; or

(b)  has, within 10 years before the date of this Annual Information Form, become bankrupt or made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold his assets.

Chris Schnarr was a director and an officer of BioExx Specialty Proteins Ltd. and its subsidiaries ("**BioExx**") which was a reporting issuer listed on the TSX. Mr. Schnarr resigned from the board of directors and as an officer of BioExx and its subsidiaries on August 28, 2013. On October 1, 2013, BioExx commenced proceedings under the *Companies' Creditors Arrangement Act* (Canada). On the same date, the trading of BioExx's shares on the TSX was halted and on November 6, 2013 the shares of BioExx were delisted from the TSX.

49

In December 2010, while Bruce Linton was a director of Sitebrand Inc. ("**Sitebrand**") its wholly owned subsidiary, Sitebrand.com Inc., filed a Notice of Intention to make a proposal to its creditors and obtained protection from its creditors under the provisions of the *Bankruptcy and Insolvency Act* and in February 2011 Sitebrand.com Inc. made an assignment in bankruptcy under the provisions of the *Bankruptcy and Insolvency Act*. While Bruce Linton was a director of Sitebrand, Sitebrand was subject to a cease trade order issued by the Ontario Securities Commission on April 4, 2011 and British Columbia Securities Commission on April 7, 2011 for failure to file required audited annual financial statements and interim financial statements in the prescribed time. This cease trade order was revoked on August 5, 2011.

No director or executive officer of the Corporation or, to the knowledge of the Corporation, shareholder holding a sufficient number of securities of the Corporation to affect materially the control of the Corporation, has been subject to: (a) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or (b) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor in making an investment decision.

### Conflicts of Interest

We may from time to time become involved in transactions which conflict with the interests of our directors and the officers.  The interests of these persons could conflict with those of the Corporation. Conflicts of interest, if any, will be subject to the procedures and remedies provided under applicable laws.  In particular, in the event that such a conflict of interest arises at a meeting of our directors, a director who has such a conflict will abstain from voting for or against the approval of such participation or such terms. In accordance with applicable laws, the directors of the Corporation are required to act honestly, in good faith and in the best interests of the Corporation.

See below under the heading "*Interests of Management in Material Transactions*" for ongoing transactions in which a director or officer of the Corporation has an interest.

### Promoters

Bruce Linton, the Chief Executive Officer and a director of the Corporation, is a promoter of the Corporation. Mr. Linton is compensated pursuant to a consulting agreement with the Corporation and is awarded stock-based awards based on performance and in accordance with the direction of the Compensation and Governance Committee. As of the date hereof, Mr. Linton beneficially owns, controls or directs, directly or indirectly, 2,742,511 Common Shares, comprising 1.4% of the issued and outstanding Common Shares.

## LEGAL PROCEEDINGS AND REGULATORY ACTIONS

Other than those disclosed in this document, we are not aware of: (a) any legal proceedings to which we are a party, or by which any of our property is subject, which would be material to us and are not aware of any such proceedings being contemplated, (b) any penalties or sanctions imposed by a court relating to securities legislation, or other penalties or sanctions imposed by a court or regulatory body against us that would likely be considered important to a reasonable investor making an investment decision and (c) any settlement agreements that we have entered into before a court relating to securities legislation or with a securities regulatory authority.

50

The following is a brief summary of certain ongoing litigation matters that the Corporation is aware of:

On November 2, 2016 Mettrum Ltd. conducted a Type III product recall ("**Mettrum Recall**"), defined by Health Canada as a situation in which the use of, or exposure to, a product is not likely to cause any adverse health consequences. In March 2017, two separate class action lawsuits relating to the Mettrum Recall, one in the Ontario Court of Justice and the other in the Supreme Court of Nova Scotia, were initiated naming Mettrum Ltd., and Canopy Growth Corporation, Mettrum Health Corp. and Mettrum Ltd. as respondent, respectively. The Ontario action seeks damages for the proposed class of individuals who purchased the products affected by the recall. The plaintiff is seeking $100,000,000 in general damages, $10,000,000 in punitive damages, medical monitoring funding, and certain other relief. The plaintiff served its certification record on or about May 4, 2018. The Corporation's responding certification is due on July 7, 2018. The Corporation and its insurers are contesting the litigation. The litigation process will continue into the foreseeable future before the class action suit is certified by the court and unless settled out of court. The proposed Nova Scotia action is stayed pending a determination in the Ontario action.

# INTERESTS OF MANAGEMENT IN MATERIAL TRANSACTIONS

Bedrocan leases its operating facility at 16 Upton Road, Toronto, Ontario and 43 Upton Road Toronto, Ontario from Goldman (16 Upton) Limited and Goldman (Upton) Ltd., respectively. Murray Goldman, a director of Canopy Growth, is an officer, director and holds a majority interest in Goldman Holdings Ltd., which is an affiliate of Goldman (16 Upton) Limited and Goldman (Upton) Ltd. Furthermore, and pursuant to its amended lease agreement, there is a $2,000,000 loan to Bedrocan in connection with the construction of the Bedrocan manufacturing facility, which carries an interest rate of 10% per annum and is payable to Bedrocan's landlord over a period ending July 1, 2024 (the "**Goldman Loan**"). The Goldman Loan is payable over the initial term of the amended lease by way of additional monthly rent of approximately $27,100. In connection with the Arrangement, Canopy Growth entered into an indemnification agreement with Goldman (16 Upton) Limited and Goldman (Upton) Ltd. pursuant to which Canopy Growth will indemnify Bedrocan's obligations under leases for its operating facilities.

On November 1, 2016, Canopy Growth entered into a Memorandum of Understanding with the Goldman Group to expand Canopy Growth's cannabis production capacity and geographic footprint. Murray Goldman, a director of Canopy Growth is also the founder of The Goldman Group. The Goldman Group will acquire new properties across Canada for the design and/or build of new Canopy Growth production facilities. Subject to the Corporation's approval, these facilities will be constructed to Canopy Growth's proprietary specifications as they are defined by established production methods for each of its subsidiaries and leased back to the Corporation. The Goldman Group through its affiliates owns approximately 1.2% of the outstanding shares of Canopy Growth and is already the landlord of the Corporation's Bedrocan Canada Inc. properties. In connection with the Memorandum of Understanding, 10252832 Canada Inc., a subsidiary of the Corporation, entered into a lease agreement on August 15, 2017, with The Goldman Group, for the building and land at 4103 84 Avenue, Edmonton (the "**Edmonton Facility**"). The Corporation has submitted an application to become a Licensed Producer under the ACMPR at the Edmonton Facility.

On January 15, 2017, the Tweed acquired the property at 1 Hershey Drive, in Smiths Falls, Ontario, thereby terminating the Tweed Lease Agreement dated December 27, 2013 between Tweed and the landlord, Tweed Hershey Drive Inc. Bruce Linton, Chairman, Chief Executive Officer and director of Canopy Growth, is an officer, director and holds a majority interest in Tweed Hershey Drive Inc. The entire 472,000 square feet facility could almost triple current production and processing capacity, and the 42-acre site could house hundreds of thousands of square feet of additional production and processing

51

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 67 of 125
PageID: 6126
cgc-ex991_131.htm

space. The facility was acquired for $6.6 million, of which $823,980 was settled with the issuance of 94,397 common shares of the Corporation, with the remainder paid in cash on closing. Bruce Linton, as an officer, director, and shareholder of Tweed Hershey Drive Inc. received 70,800 of the 94,397 shares issued, which are subject to a 4-month lockup.  See above under "*Business of Canopy Growth – Tweed Inc.*" for further information.

Vert leases a facility at 5052, 4e Rang, Saint-Lucien (Quebec) J0C 1N0 from Dany Lefebvre. Mr. Lefebvre is a director of Vert.

## TRANSFER AGENT AND REGISTRAR

The Transfer Agent and Registrar for Canopy Growth's Common Shares is Computershare Trust Corporation of Canada Inc. at 100 University Ave, 11th Floor, South Tower Toronto, ON M5J 2Y1.

## MATERIAL CONTRACTS

Except for contracts entered into in the ordinary course of business, the only contracts entered into by the Corporation during the 12-month period ending March 31, 2018 which are material or entered into before the 12-month period ending March 31, 2018 but are still in effect and which are required to be filed with Canadian securities regulatory authorities in accordance with Section 12.2 of National Instrument 51-102 – *Continuous Disclosure Obligations* are the following.

a) the Agreement Amending Lease between Bedrocan and Goldman (Upton) Limited dated August 28, 2015 amending the lease agreement between Bedrocan and Goldman (Upton) Limited dated October 15, 2013 pursuant to which Goldman (Upton) Limited leases to Bedrocan the lands and premises known municipally as 43 Upton Road, Toronto;

b) the Amended Bedrocan 16 Upton Lease between Bedrocan and Goldman (16 Upton) Limited dated August 28, 2015 (see "*Licensed Producers – Bedrocan*");

c) the Lease Agreement with The Goldman Group, for the building and land at 4103 84 Avenue, Edmonton, Alberta;

d) the Subscription Agreement dated October 27, 2017, and the Investor Rights Agreement dated November 2, 2017 between Canopy Growth Corporation and Greenstar Holdings, an affiliate of Constellation Brands on November 2, 2017, whereby Constellation Brands invested CDN $245 million in exchange for 9.9% equity in the Corporation, through the issuance of 18,876,901 Common Shares and 18,876,901 warrants to an affiliate of Constellation Brands.

e) the underwriting agreement dated January 17, 2018, as amended on January 18, 2018, between Canopy Growth, GMP Securities L.P., and BMO Capital Markets, and including Canaccord Genuity Corp., Eight Capital, Beacon Securities Limited, and PI Financial Corp., pursuant to which, among other things, Canopy Growth agreed to sell up to 5,800,000 common shares at a price of $34.60, resulting in aggregate gross proceeds to Canopy Growth of $200,680,000.

Copies of these material contracts are available under our profile on the SEDAR website at www.sedar.com.  The above summaries are qualified in their entirety by reference to the terms of the material contract.

52

# AUDIT COMMITTEE INFORMATION

The Audit Committee's mandate is attached hereto as Schedule "A".

As of March 31, 2018, the Audit Committee of the Corporation was composed of three (3) members. The current members are John K. Bell, Chris Schnarr, and Peter Stringham. Mr. Schnarr chairs the Audit Committee and Mr. Bell and Mr. Stringham are non-employee members of our board of directors.

The Board of Directors believes that the composition of the Audit Committee reflects financial literacy and expertise. Currently, the three members have been determined by the Board to be "independent" and "financially literate" as such terms are defined under *National Instrument 52-110 – Audit Committees* ("**NI 52-110**"). The Board has made these determinations based on the education as well as breadth and depth of experience of each member of the Committee. The following is a brief summary of the education and experience of each member of the Committee that is relevant to the performance of his or her responsibilities as an Audit Committee member:

All the members of the Audit Committee have the education and/or practical experience required to understand and evaluate financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the Corporation's financial statements. The following is a brief summary of the education and experience of each member of the Committee that is relevant to the performance of his or her responsibilities as an Audit Committee member:

*Chris Schnarr, ICD.D*

Chris Schnarr is a Director and Chair of the Audit Committee. Mr. Schnarr does not work full time for the Corporation, but devotes such time as is required in connection with his duties. Mr. Schnarr has 25 years of experience founding, managing, and advising growth companies, including strategy, corporate finance, capital markets, corporate development, M&A, financial reporting, and governance. His functional experience across executive positions spans Treasurer, Executive Vice President, Chief Financial Officer, President, and Chief Executive Officer. Mr. Schnarr has over 20 years of public Corporation Board experience across TSXV and TSX listed companies, as well as extensive committee experience. He is also a Director and Chair of the Compensation & Governance Committee and a member of the Audit Committee of VitalHub Corp. (TSX:V). He is a member of the Institute of Corporate Directors, a graduate of the Directors Education Program at the Rotman School of Business at the University of Toronto and holds the ICD.D designation.

*John K. Bell, CPA, FCA, ICD.D*

John K. Bell is a Lead Director and a member of the Audit Committee. Mr. Bell does not work full time for the Corporation, but devotes such time as is required in connection with his duties. Mr. Bell founded Shred-Tech and grew it into a global giant in the mobile document shredding and recycling industry. After selling Shred-Tech in 1995, he purchased Polymer Technologies and grew it from a local plastics manufacturer to a global auto parts Corporation before exiting in 2007. John also served as interim CEO and director of ATS Automation (TSX), which operates 24 global manufacturing facilities, has 4,000 employees and $700 million in sales during a time of management and board renewal in 2007. John was the lead investor and Chairman of BSM Wireless (TSX-V). First investing in 2006, he led board and management renewal leading to substantial and profitable growth before successfully exiting in 2014. John sits on the Board of Strongco Corp,

53

traded on the Toronto Stock Exchange as SQP and DelMar Pharmaceuticals, which is traded on OTCQX as DMPI and is Vice-Chair of the Audit Committee and on the Board of The Royal Canadian Mint, a $3 Billion Crown Corporation.

*Peter Stringham*

Peter E. Stringham is a member of the Audit Committee and does not work full time for the Corporation but devotes as much time as is required in connection with his duties. Mr. Stringham retired in 2016 as Chairman and Chief Executive Officer of The Young & Rubicam Group Of Companies. Mr. Stringham served as the Chief Executive Officer of Young & Rubicam Brands at Young & Rubicam, Inc. since March 2, 2007. Mr. Stringham served as Group General Manager of Marketing of HSBC Holdings PLC. and HSBC Bank plc. since 2001. He served as Head of Global Marketing for HSBC Holdings plc. until March 2007. He joined HSBC in 2001 and served for 6 years, where he was instrumental in positioning it as the 'world's local bank' in a series of local advertising and marketing campaigns and has helped build HSBC into one of the world's most recognized brands. He consolidated HSBC's advertising and marketing duties with a single lead worldwide marketing services group. He served with WPP Group to cover HSBC's operations in 76 countries and territories.

Pursuant to the terms of the Audit Committee Mandate, the Audit Committee shall pre-approve all non-audit services to be provided to the Corporation or its subsidiaries by the external auditor.

The following table sets forth, by category, the fees for all services rendered by the Corporation's external auditors, Deloitte LLP, for the financial years ending March 31, 2017 and March 31, 2018.

| Financial Year Ending | Audit Fees | Audit Related Fees[1] | Tax Fees[2] | Other Fees |
|---|---|---|---|---|
| March 31, 2017 | $747,500 | Nil | $340,000 | Nil |
| March 31, 2018 | $1,670,867 | $360,820 | $434,925 | Nil |

Notes:
(1) Aggregate audit related fees billed for assurance and related services that are reasonably related to the performance of the audit or review of Canopy Growth's financial statements and are not reported as "Audit fees."
(2) Aggregate tax fees billed for tax compliance, advice, planning and assistance with preparation of tax returns.

# INTERESTS OF EXPERTS

Deloitte LLP is the independent auditor of the Corporation and is independent within the meaning of the Rules of Professional Conduct of the Chartered Professional Accountants of Ontario.

# ADDITIONAL INFORMATION

Additional information relating to the Corporation may be found on SEDAR at www.sedar.com.

Additional information including directors' and executive officers' remuneration and indebtedness, principal holders of the Corporation's securities and options to purchase securities, where applicable, is contained in the management information circular prepared by the Corporation in connection with its annual general and special meeting of shareholders which is expected to be held on September 15, 2017. Additional financial information is provided in our audited consolidated financial statements and management's discussion and analysis for our most recently completed financial year, each of which and is available under the Corporation profile at www.sedar.com.

54

# SCHEDULE "A"
## CANOPY GROWTH CORPORATION
### (the "Corporation")

**AUDIT COMMITTEE MANDATE**

Purpose

The Board of Directors (the "**Board**") of Canopy Growth Corporation ("**CGC**") has established the Audit Committee (the "**Committee**") as a standing committee of the Board for the purposes of overseeing the audit and financial reporting process, ensuring the adequacy and effectiveness of CGC's internal controls and procedures for financial reporting and ensuring the adequacy and effectiveness of CGC's risk management program. The Committee is hereby constituted with all the powers and duties conferred on it by the laws governing CGC and such powers and duties as may be conferred on it from time to time by resolution of the Board.

Member Qualifications, Appointment and Removal

The members of the Committee (the "**Members**"), and from amongst those Members, the Chairperson of the Committee, are appointed annually by the Board. The Board will appoint not less than three directors as Members.

No director who is an officer or employee of CGC (or any related entity of CGC) may be a Member. The Committee and each Member must meet the independence and audit committee composition requirements promulgated by all governmental and regulatory bodies exercising control over CGC as may be in effect from time to time, including Rule 10A-3 of the United States Securities Exchange Act of 1934, as amended, Section 303A.02 of the NYSE Listed Company Manual (the "**NYSE Manual**") and relevant rules of any other stock exchanges on which CGC's shares are listed. In general, each Member must be free of any relationship with CGC that could or could reasonably be perceived to, in the opinion of the Board, interfere with the exercise of that director's judgment as a Member.

All Members must be able to read and understand fundamental financial statements including CGC's balance sheet, income statement and cash flow statement. At least one Member must have a professional accounting certification (or equivalent) or comparable experience and background that results in that Member's financial sophistication. At least one Member must satisfy the definition of "financial expert" as set out in Item 407 of Regulation S-K under the United States Securities Act of 1933, as amended.

Any Member may be removed or replaced at any time by the Board as needed. A Member shall cease to be a Member upon ceasing to be a CGC director. The Board will fill vacancies on the Committee by the appointment of other qualified directors.

Duties and Responsibilities

In general, the Committee performs a number of roles including (i) assisting directors to meet their responsibilities, (ii) providing better communication between directors and CGC's external auditors, (iii) monitoring the independence and performance of the external auditors, (iv) increasing the credibility and objectivity of financial reports, (v) strengthening the role of the directors by facilitating in-depth discussions amongst directors, management and the external auditors, (vi) overseeing CGC's compliance with legal and regulatory requirements, and (vii) overseeing the performance of CGC's internal audit function. The Committee will have the specific duties and responsibilities set out below, as well as other such duties that are, in the opinion of the Board, in line with the purpose of the Committee as stated above.

55

10/8/21, 1:48 PM  Case 2:19-cv-20543-MCA-MAH    Document 83-3  Filed 10/12/21    Page 71 of 125
cgc-ex991_131.htm
PageID: 6130

*Relationship with Auditors*

The Committee is responsible for managing, on behalf of CGC's shareholders, the relationship between CGC and its external auditors. In furtherance of this responsibility, as delegated by the Board, the Committee shall:

a. be directly responsible for recommending the selection and determining the compensation of the external auditor;

b. oversee the work of the external auditor engaged for the purpose of preparing or issuing an auditor's report or performing other audit, review or attest services for CGC;

c. establish procedures to monitor the independence of the external auditor and take necessary actions to eliminate all factors that might impair or be perceived to impair the independence of the external auditor;

d. annually require the external auditors to identify the relationships that may affect its independence;

e. establish procedures for review and approval of all audit and permitted non-audit services provided by external auditors;

f. pre-approve all non-audit services to be provided to CGC or its subsidiaries by the external auditor, which pre-approval may be delegated to any Member;

g. provide the external auditor with the opportunity to meet with the Committee or the Board without management present at each regularly scheduled meeting of the Committee or the Board; and

h. review with the external auditor any audit problems or difficulties and management's response.

*Audit and Financial Reporting*

The Committee is responsible for overseeing the audit and financial reporting process. In furtherance of this responsibility, as delegated by the Board, the Committee shall:

a. review, establish and monitor each annual audit of the external auditor with a written audit plan, including scope, fees and schedule;

b. review with both management and the external auditor the appropriateness and acceptability of CGC's critical accounting policies and any proposed changes thereto;

c. review with management and the external auditor the presentation and impact of significant risks and uncertainties associated with CGC's business, all alternative treatments of financial information with IFRS that have been discussed with management, the material assumptions made by management relating to them and their effect on CGC's financial statements;

d. question management and the external auditor regarding financial reporting issues discussed during the fiscal period;

e. review any problems experienced by the external auditors in performing audits;

f. review and discuss the audited annual financial statements in conjunction with the external auditor and review with management all significant variances between comparative reporting periods;

g. review and discuss the external auditor's report with the external auditor and management;

h. review all material written communications between the external auditor and management, including post audit or management letters containing recommendations of the external auditors, management's response and follow up with respect to the identified weaknesses;

i. review with management and with the external auditors, as appropriate, CGC's financial statements, MD&A and annual and interim earnings press releases prior to their public dissemination;

56

j.  satisfy itself that adequate procedures are in place for the review of CGC's public disclosure of financial information extracted or derived from CGC's financial statements, other than the public dissemination referred to in (i) above;

k.  review with management CGC's relationship with the regulators and the quality of its filings with the regulators;

l.  discuss CGC's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and

m.  review with the General Counsel ("**GC**") any current or anticipated litigation or legal activity that could have a material effect on CGC's financial position.

*Internal Controls and Procedures*

The Committee is responsible for overseeing the design, implementation and on-going effectiveness of a system of internal controls. In furtherance of this responsibility, as delegated by the Board, the Committee shall:

a.  establish, monitor and review policies and procedures for internal accounting, financial control and management information ("**Internal Controls**");

b.  establish procedures for: (i) the receipt, retention and treatment of complaints received by CGC regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by CGC employees of concerns regarding questionable accounting or auditing matters;

c.  monitor compliance with CGC's Whistleblower Protection Policy and coordinate and review all investigations undertaken thereunder;

d.  consult with the external auditor regarding the adequacy of the Internal Controls and review with the external auditor its report on the Internal Controls;

e.  address, on a regular basis, any perceived shortcomings in the Internal Controls;

f.  review the involvement of officers and directors in any matter related to business ethics or potential conflict of interest and advise the Board on the appropriate course of action;

g.  review and approve CGC's hiring policies regarding partners, employees and former partners and employees of the present and former external auditor;

h.  prior to CGC entering into any Related Transaction, review the Related Transaction and recommend its approval or rejection. For the purposes of this Mandate, a "**Related Transaction**" means a business transaction or contract between CGC and a party in which a CGC director or officer has a direct or indirect interest. This direct or indirect interest could exist by virtue of the following: (i) the party is the director or officer; (ii) the director or officer, or their relative or spouse, is on the board of directors or is an officer of the party entering into such a business transaction with CGC; or (iii) the director or officer, or their relative or spouse, has a financial interest in the party entering into such a business transaction with CGC;

i.  annually, review any ongoing Related Transactions and report to the Board; and

j.  obtain from management adequate assurances that all statutory payments and withholdings have been in compliance with relevant laws and regulations.

*Internal Audit Functions*

The Committee is responsible for overseeing the performance of CGC's internal audit function.

57

*Risk Management*

The Committee is responsible for overseeing the process by which CGC assesses and manages risk. In furtherance of this responsibility, as delegated by the Board, the Committee shall:

   a. identify risks inherent in CGC's business ("**Risks**");
   b. maintain policies and procedures that address the Risks on a reasonable, cost- effective basis;
   c. in conjunction with management, review, on an annual basis, all aspects of CGC's risk management program, including all significant policies and procedures relating to insurance coverage, foreign exchange exposures and investments (including CGC's use of financial risk management instruments);
   d. monitor compliance with environmental codes of conduct and legislation; and
   e. monitor compliance with safety codes of conduct and legislation.

*Other*

In furtherance of its duties, the Committee shall:

   a. meet regularly with management to discuss any areas of concern to the Committee or management;
   b. consider whether the quality of employees involved in the audit and financial reporting process and the processes described herein meets an acceptable standard;
   c. annually review this Mandate and any other documents used by the Committee in fulfilling its duties and responsibilities;
   d. annually obtain and review a report by the external auditor describing: CGC's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of CGC, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by CGC, and any steps taken to deal with any such issues; and
   e. annually evaluate the performance of the Committee.

Meetings, Structure and Reporting

The Committee meets as required, but at least quarterly, typically, the day before the full Board to allow ample time for discussion. A majority of the Committee shall constitute a quorum. At all meetings of the Committee, every question shall be decided by a majority of the votes cast on the question. The Chief Executive Officer ("**CEO**"), Chief Financial Officer ("**CFO**") and GC shall attend Committee meetings upon the Committee's request and, subject to the Committee requesting otherwise, the Corporate Secretary, or his designee, shall act as secretary at all Committee meetings. The audit partner from the external auditor will be invited to meet with the Committee at least twice a year and may request a meeting with the Committee at any time.

The Committee shall report to the Board on all proceedings, deliberations, decisions and recommendations of the Committee at the first subsequent meeting of the Board and at such other times and in such manner as the Board may require or as the Committee may, in its discretion, consider advisable.

58

10/8/21, 1:48 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 74 of 125
cgc-ex991_131.htm
PageID: 6133

Chairperson

The Chairperson's primary role is to ensure that the Committee functions properly, meets its obligations and responsibilities, fulfills its purpose and that its organisation and mechanisms are in place and are working effectively. More specifically, the Chairperson shall:

   a.   chair meetings of the Committee;
   b.   in consultation with the Chairperson of the Board, the Lead Director, the Members, the CFO and Corporate Secretary, set the agendas for the meetings of the Committee;
   c.   in collaboration with the Chairperson of the Board, the Lead Director, the CEO, the CFO and the Corporate Secretary, ensure that agenda items for all Committee meetings are ready for presentation and that adequate information is distributed to Members in advance of such meetings in order that Members may properly inform themselves on matters to be acted upon;
   d.   assign work to Members;
   e.   approve the expense report of the Chairperson of the Board;
   f.   act as liaison and maintain communication with the Chairperson of the Board, the Lead Director and the Board to optimize and co-ordinate input from directors, and to optimize the effectiveness of the Committee;
   g.   provide leadership to the Committee with respect to its functions as described in this Mandate and as otherwise may be appropriate; and
   h.   be available to the CFO one full business day per calendar quarter to provide advice and guidance.

Authority

The Committee shall have unrestricted access to CGC's external auditors, CGC personnel and documents and shall be provided with the resources necessary to carry out its duties. The Committee may, in its sole discretion and at CGC's expense, retain and agree to compensate independent counsel or advisors to assist with the performance of its duties.

59

10/8/21, 1:48 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 75 of 125
PageID: 6134
cgc-ex993_211.htm

EX-99.3 4 cgc-ex993_211.htm EX-99.3

# CANOPY GROWTH CORPORATION

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF THE FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**FOR THE THREE MONTHS AND YEAR ENDED MARCH 31, 2018**

**JUNE 27, 2018**

---

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 76 of 125
cgc-ex993_211.htm
PageID: 6135

Canopy Growth Corporation ("the Company" or "Canopy Growth") is a publicly traded corporation, incorporated in Canada, with its head office located at 1 Hershey Drive, Smiths Falls, Ontario. Common shares of Canopy Growth trade on the Toronto Stock Exchange ("TSX") under the ticker symbol "WEED" and since May 24, 2018 trade on the New York Stock Exchange ("NYSE") under the symbol "CGC".

This Management's Discussion and Analysis of the Financial Condition and Results of Operation ("MD&A") is dated June 27, 2018. It should be read in conjunction with the Company's audited consolidated financial statements (the "Annual Financial Statements") for the year ended March 31, 2018, including the accompanying notes.

This MD&A was prepared with reference to National Instrument 52-109 – Continuous Disclosure Obligations of the Canadian Securities Administrators. Under the U.S./Canada Multijurisdictional Disclosure System, we are permitted to prepare this MD&A in accordance with Canadian disclosure requirements which may differ from U.S. disclosure requirements. This MD&A provides information for the three months and year ended March 31, 2018 and up to and including June 27, 2018.

The Annual Financial Statements and this MD&A have been reviewed by the Company's Audit Committee and was approved by the Company's Board of Directors on June 27, 2018.

The accompanying Annual Financial Statements were prepared in compliance with International Financial Reporting Standards as issued by the International Accounting Standards Board and include the accounts of the Company and its subsidiaries and the Company's interests in affiliated companies (see page 5). All intercompany balances and transactions have been eliminated on consolidation.

Additional information filed by us with the Canadian Securities Administrators, including quarterly reports, annual reports and annual information forms are available on-line at www.sedar.com or at www.sec.gov/edgar and also on the Company's website at www.canopygrowth.com, and Short Form Prospectus with respect to the bought deal dated January 31, 2018 is available on-line at www.sedar.com.

Canopy Growth does not engage in any U.S. marijuana-related activities as defined in Canadian Securities Administrators Staff Notice 51-352. While the Company has a number of partnerships with U.S.-based companies that may themselves participate in the U.S. cannabis market, these relationships are licensing relationships that see intellectual property developed in the United States brought into Canada, and in no manner involve Canopy Growth in any US activities respecting cannabis.

Financial information contained herein is expressed in thousands of Canadian dollars, except share and per share amounts, or as otherwise stated.

2

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This MD&A contains certain "forward-looking statements" and forward-looking information within the meaning of Canadian securities laws, including but not limited to statements relating to:

• assumptions and expectations described in the Company's critical accounting policies and estimates;

• the Company's expectations regarding the adoption and impact of certain accounting pronouncements;

• the Company's expectations regarding legislation, regulations and licensing related to the cultivation, production and sale of cannabis products by the Company's wholly-owned subsidiaries;

• the expected number of users of cannabis or the size of the legal cannabis market in Canada and internationally;

• the expected number of users of recreational cannabis or the size of the recreational cannabis market in Canada and internationally;

• the potential time frame for the implementation of legislation to legalize regulated recreational cannabis use in Canada and internationally and the potential form implementation of the final legislation will take, including the method of delivery and framework adopted or to be adopted by various Canadian provinces or other jurisdictions;

• the potential size of the regulated recreational cannabis market in Canada should regulated recreational use be legalized;

• the ability to enter and participate in international market opportunities;

• the Company's expectations with respect to the Company's future financial and operating performance;

• the Company's expectations with respect to future performance, results and terms of strategic initiatives, strategic agreements and supply agreements;

• product sales expectations;

• development of affiliated brands, product diversification and future corporate development;

• anticipated results of research and development;

• inventory and production capacity expectations including discussions of plans or potential for expansion of capacity at existing or new facilities;

• expectations with respect to future expenditures and capital activities;

• statements about expected use of proceeds from fund raising activities; and

• the Company's ability to achieve profitability without further equity financing.

The words "plans", "expects", "is expected", "budget", "scheduled", "estimates" "forecasts", "intends", "anticipates", or "believes" or variation (including negative variations) of such words and phrases, or statements that certain actions, events, or results "may", "could", "would", "might", or "will" be taken, occur or to achieve are all forward-looking statements. Forward-looking statements are based on the reasonable assumptions, estimates, internal and external analysis and opinions of management made in light of its experience and perception of trends, current conditions and expected developments, as well as other factors that management believes to be relevant and reasonable at the date that such statements are made. Forward-looking statements involve known and unknown risks, uncertainties, assumptions and other factors that may cause actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Such factors include, but are not limited to, the factors discussed in the section entitled "RISKS AND UNCERTAINTIES". Although the Company has attempted to identify important factors that could cause actions, events or results to differ materially from those described in the forward-looking statements, there may be other factors that cause actions, events, or results to differ from those anticipated, estimated or intended. Forward-looking statements contained herein are made as at the date of the MD&A. There can be no assurance that forward-looking statements will prove to be accurate, as actual results and future events could differ materially from those anticipated in such statements.

3

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 78 of 125
cgc-ex993_211.htm
PageID: 6137

Accordingly, readers should not place undue reliance on the forward-looking statements. The Company does not undertake to update any forward-looking statements except as required by applicable securities laws.

**CORPORATE STRATEGY**

Canopy Growth, an early mover in the Canadian market, is a multi-brand cannabis company that believes its strong focus on and investment in brand, market and product differentiation, increased cannabis supply through Company and partner cannabis production platforms, securing channels to market, and education, to help citizens safely, effectively and responsibly use cannabis, will create a dominant global business with the potential to generate a significant and sustained return on invested capital over the long-term.

To achieve this, the Company will continue making deliberate investments, including via acquisition and entering into strategic partnerships to:
- Increase the strength and differentiation of the Company's multiple brands;
- Increase awareness of the healthcare community as to the potential applications of medical cannabis;
- Increase the efficiency and effectiveness of the Company's customer engagement resources;
- Increase the diversity, quality and inventory of products, across value and premium cannabis market segments, through owned production capacity, partner or joint owned capacity as well as partner capacity offtake;
- Implement robust information technology systems including Enterprise Resources Planning;
- Drive automation into packaging and shipping to improved distribution capabilities;
- Drive production and yield efficiencies and focus on cost reduction efforts;
- Increase the sophistication, capacity and efficiency of the Company's post-harvest processing capabilities including trimming, drying and oil extraction;
- Implement effective sales management and market support capabilities in advance of launch of Canadian Regulated Recreational, or Adult Access market;
- Drive growth in international markets in which cannabis is federally legal;
- Expand the Company's business into the development of value-added products in preparation for, and the marketing, production and sale of value-added products as permitted by regulations;
- Diversify the Company's business in the distinct but complimentary legal cannabis markets; and
- Foster a positive, challenging and rewarding work environment for the Company's staff.

The Company's strategy is to focus on developing and scaling to be the world's biggest multi-platform, creator of high value branded offerings in multiple formats for medical cannabis markets in Canada and abroad where federally legal, and for regulated recreational markets when they are federally legal.

During the fourth quarter of fiscal 2018 and since then, the Company has continued to direct significant effort on major expansion plans to increase both capacity and capability and ensuring those plans are well funded as evidenced by the investment on November 2, 2017 of $244,990 by an affiliate of Constellation Brands ("Constellation") (NYSE: STZ and STZ.B), gross proceeds of $200,680 from the bought deal financing that closed on February 7, 2018 and gross proceeds of $500,000 from the convertible debenture financing that closed on June 20, 2018, including the over-allotment option.

The Company's expansion plans in Canada have more than tripled the Company's licensed space in calendar 2018, to over 2.4 million sq. ft., with an additional 3.2 million sq. ft. under development. The Company is also developing over 400,000 sq. ft globally.

Believing that distribution drives revenue and capacity alone does not, Management has invested significant effort in securing channels into the future regulated recreational markets across Canada. This effort has resulted in the Company securing supply related agreements with all five provinces that have announced to date (Newfoundland & Labrador, New Brunswick, Prince Edward Island, Quebec and Yukon), for a total multi-year commitment of 25,000 kg per annum. Negotiations with remaining provinces are ongoing.

To further strengthen the Company's channels to market, the Company has undertaken efforts to secure sales licenses (both "brick & mortar" physical stores and online e-commerce) in provinces where private retail will be allowed.  By developing and operating a Tweed "owned" retail channel, the Company believes it will enable the capture of retail gross margin (incremental to wholesale margin), capture higher market share within the owned channel and establish a powerful marketing vehicle to build the Tweed brand in an environment where opportunities to market and build brands is otherwise constrained by regulations.  To date, the Company has secured retail locations in Newfoundland & Labrador and Manitoba as well as permits to apply for retail

4

locations in Saskatchewan. In addition, the Company has also secured the license to operate online sales of cannabis in Newfoundland & Labrador, Manitoba and Saskatchewan. The Company is also pursuing a strategic retail presence in Alberta and British Columbia, as permitted by regulations in those provinces.

The Company has also committed to making investments in marketing, branding and sales functions strengthening Canopy Growth's position in Canadian and international medical markets, as well as for the coming Canadian regulated recreational market expected to commence in October 2018.

The Company is also continuing to invest in its internal administrative and supporting infrastructure, including governance programs, to build a strong and capable organization to maintain its market leadership and capture and scale into new market opportunities.

The Company's operations are focused on ensuring a consistent selection and availability of cannabis strains for sale in all formats. As at June 27, 2018, there were 41 offerings for sale on the Tweed Main Street online store including dry flower, oils, soft gel capsules across multiple branded categories.

**Investment for the Canadian Recreational Cannabis Market**

The Company continues to invest significant effort, capital and resources in activities and programs to prepare the Company to participate in and lead the Canadian recreational cannabis market. These investments cover the Company's entire business operations including production, fulfillment, marketing, sales and general administration. With the passing of Bill C-45 ("The Cannabis Act") on June 19, 2018 and the expected roll out of the recreational market in October 2018, Management believes the prudent investments being made by the Company will foster strong demand for the Company's products in the Canadian recreational cannabis market and prepare the Company to supply very large quantities of cannabis and generate significantly greater revenues beginning in the second quarter of fiscal 2019.

The Company continues to invest in the development of marketing and branding programs, the development of new permitted product SKUs, the development of recreational product packaging, building the Company's business to business sales functions, the development of cannabis retail and education programs as well as the ongoing investment in information technology.

In the third quarter of fiscal 2018, the Company began implementing a series of changes to its operations, primarily at its facility in Smiths Falls, Ontario, to better prepare the Company to become a trusted supplier to the Canadian recreational market. These changes included:

• The re-purposing of 4 of the 24 flower rooms to provide additional mother/clone rooms for the purpose of cultivating 200,000 clones that helped plant over 1.7 million sq. ft of greenhouses in British Columbia and Quebec in the fourth quarter of fiscal 2018 and in the first quarter of fiscal 2019; and

• The re-purposing of an additional 3 flower rooms to build a large footprint pre-pack room that will help the Company ready a significant amount of product for shipment to provincial and territorial agencies beginning in the second quarter of fiscal 2019.

These operational changes which decreased the amount of cannabis that the Company harvested, combined with higher overheads in the fourth quarter of fiscal 2018, led to decreased gross margins in the fourth quarter of fiscal 2018.

**Management Preamble**
The Company will no longer report on the weighted average cost per gram metric. There are three reasons for this. First, a gram is a measurement of the weight of the plant only. Management believes it will be more meaningful in the future to consider milligrams of THC or CBD cannabinoid representing ingredients to new, evolving product formats as they are introduced beyond the traditional cannabis flower, including oils and capsules. Second, management believes other key performance indicators will evolve as the legal recreational and retail market takes hold in Canada. Lastly, there is no industry standard for cost per gram components or classification to draw a meaningful comparison.

5

**CORPORATE STRUCTURE**

**Controlled or jointly controlled subsidiaries**

| Legal entity | Defined as | % Ownership | Accounting method |
|---|---|---|---|
| Tweed Inc. | Tweed | 100.0% | Consolidation |
| Tweed Farms Inc. | Tweed Farms | 100.0% | Consolidation |
| Bedrocan Canada Inc. | Bedrocan Canada | 100.0% | Consolidation |
| Spectrum Cannabis Canada Ltd. (formerly Mettrum Ltd.) | Spectrum Cannabis | 100.0% | Consolidation |
| Tweed Grasslands Cannabis Inc. | Tweed Grasslands | 100.0% | Consolidation |
| Mettrum Hempworks Inc. | Mettrum Hempworks | 100.0% | Consolidation |
| Groupe H.E.M.P.CA | Group H.E.M.P. | 75.0% | Consolidation |
| Spektrum Cannabis GmbH | Spektrum Cannabis | 100.0% | Consolidation |
| Vert Cannabis Inc. | Vert Cannabis | 100.0% | Consolidation |
| 2344823 Ontario Inc. d/b/a Bodystream | Bodystream | 100.0% | Consolidation |
| Apollo Applied Research Inc. and Apollo CRO Inc. | together "Apollo" | 100.0% | Consolidation |
| Spot Therapeutics Inc. | Spot | 100.0% | Consolidation |
| Spectrum Cannabis Australia PTY Ltd. | Spectrum Australia | 100.0% | Consolidation |
| Annabis Medical s.r.o. | Annabis Medical | 100.0% | Consolidation |
| Spectrum Chile SpA | Spectrum Chile | 85.0% | Consolidation |
| Les Serres Vert Cannabis | Vert Mirabel | 66.7% | Consolidation |
| Spectrum Cannabis Denmark Aps | Spectrum Cannabis Denmark | 62.0% | Consolidation |
| Grow House JA Limited | Tweed JA | 49.0% | Consolidation |
| Canopy Rivers Corporation | Canopy Rivers | 31.5% | Consolidation |
| BC Tweed Joint Venture Inc. | BC Tweed | 66.7% | joint operation |

**Investments in affiliates**

| Legal entity | Defined as | % Ownership | Accounting method |
|---|---|---|---|
| Agripharm Corp. | Agripharm | 40.0% | equity and FVTPL |
| Canopy Health Innovations Inc. | Canopy Health | 43.0% | Equity |
| Bedrocan Brasil S.A. | Bedrocan Brasil | 39.4% | Equity |
| Entourage Phytolab S.A. | Entourage | 38.5% | Equity |
| AusCann Group Holdings Ltd. | AusCann | 11.0% | FVTOCI and FVTPL |
| Vapium Incorporated | Vapium | 12.2% | Cost |
| HydRx Farms Ltd. (operating as Scientus Pharma Inc.) | HydRx | 8.7% | FVTOCI |
| TerrAscend Corp | TerrAscend | 24.0% | equity and FVTPL |
| James E. Wagner Cultivation Ltd. | JWC | 14.7% | FVTOCI |
| Radicle Medical Marijuana Inc. | Radicle | 23.8% | equity |

6

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3_2 Filed 10/12/21 Page 81 of 125
cgc-ex993_211.htm
PageID: 6140

**HIGHLIGHTS**

***Fourth Quarter 2018 Revenue and Operational***

- Total fourth quarter revenue was $22,806 representing a 55% increase over the quarter ended March 31, 2017 when revenue totaled $14,661 and a 5% increase over revenues of $21,700 in the third quarter of fiscal 2018.
- Approximately 74,000 registered patients at March 31, 2018 compared to approximately 69,000 at December 31, 2017.
- 2,528 kilograms and kilogram equivalents[1] sold in the fourth quarter ended March 31, 2018, representing an increase of 45% over the fourth quarter of last year, and an increase of 9% over the third quarter of fiscal 2018 in which 2,330 kilograms and kilogram equivalents were sold.
- Oil sales, including gel caps, accounted for 23% of fourth quarter product revenue (reported revenue net of merchandise revenue, clinic revenue and shipping fees). Oil sales in the fourth quarter accounted for 2,152 litres (or approximately 268 kilogram equivalents) of the kilogram and kilogram equivalents stated above.
- Average sales price per gram was $8.43 for the fourth quarter, as compared to $8.03 last year in the same quarter and $8.30 in the third quarter of fiscal 2018.
- Spektrum Cannabis sold 175 kilograms in Germany at an average price of $13.35 per gram, up from 78 kilograms at an average price of $12.61 per gram in the third quarter of fiscal 2018, representing quarter over quarter growth of 124% and 5% respectively.
- Harvested 4,811 kilograms in the fourth quarter as compared to 7,961 kilograms in the third quarter of fiscal 2018 and 1,980 kilograms in the fourth quarter of fiscal 2017.
- At quarter end the Company held inventory of 15,726 kilograms of dry cannabis, 6,969 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 356 kilograms softgel capsules., inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.
- Consolidated cash and cash equivalents were $322,560 at March 31, 2018

***Corporate Initiatives***

*Securing Channels to Market*

- The Company entered a supply Memorandum of Understanding ("MOU") with the Province of Prince Edward Island to allocate a minimum supply of 1,000 kg of high-quality cannabis for the first year. The two-year supply agreement will renew for a third-year upon mutual agreement of the Company and Province; At the time in the fourth quarter, the MOU was the fourth supply-related commitment entered into by the Company (joining commitments signed in prior quarters with Newfoundland & Labrador, New Brunswick, and Quebec.).

- The Company and partner Delta 9 Cannabis Inc. were conditionally selected by the Government of Manitoba to operate cannabis retail stores in the province after a rigorous and highly competitive RFP process.

*Capacity Expansion*

- The Company's majority owned BC Tweed Joint Venture Inc. ("BC Tweed") received a cultivation licence for its site in Aldergrove, BC. The initial license covered over 400,000 sq. ft. of growing space, allowing vegetative growth so that the mature plants can be spread into the full 1.3 million sq. ft. in the coming months for flowering and ultimate harvest.

*International Development*

- Spectrum Cannabis Denmark's 40,000 m[2] facility in Odense, Denmark received a cannabis production licence by Laegemiddelstyrelsen, Denmark's Medicines Agency.
- The Company completed a transfer of 1,500 cannabis clones to its Madrid-based partner, Alcaliber SA ("Alcaliber"), completing the first phase of a partnership announced on September 11, 2017.

---

[1] *Kilogram equivalents refers to cannabis oils where 8 ml is the equivalent of approximately 1 gram of dried cannabis.*

7

*Strategic*

- Canopy Growth closed a short form prospectus offering on a bought deal basis. A total of 5,800,000 common shares in the capital of Canopy Growth (the "Shares") were sold at a price of $34.60 per Share, for aggregate gross proceeds of $200,680,000 (the "Offering").

### Fiscal Year 2018 Revenue and Operational

- Total revenue in the fiscal year ended March 31, 2018 was $77,948 representing a 95% increase over the prior fiscal year ended March 31, 2017 when revenue totaled $39,895.
- 8,708 kilograms and kilogram equivalents sold in fiscal 2018, representing an increase of 69% over the fiscal year ended March 31, 2017 in which 5,139 kilograms and kilogram equivalents were sold.
- Average sales price per gram was $8.24 for the fiscal year ended March 31, 2018, as compared to $7.40 in the prior year.
- Spektrum Cannabis sold 254 kilograms in Germany at an average price of $13.16 per gram, up from 3 kilograms at an average price of $11.93 in the prior fiscal year.
- Harvested 22,513 kilograms in the fiscal year ended March 31, 2018 as compared to 10,837 kilograms in the prior year period.

### SUBSEQUENT EVENTS

- Completed a three-year conditional supply agreement with the Société des alcools du Québec ("SAQ") for 12,000 kgs of cannabis products.
- Majority owned Serres Vert Cannabis Inc. ("Vert Mirabel"), received a cultivation license. The 700,000 sq. ft. Vert Mirabel greenhouse is licensed for an initial 40,000 sq. ft. of growing space.
- The Company's majority owned BC Tweed Joint Venture Inc. received additional licensing at both greenhouse facilities. The license of its greenhouse facility in Aldergrove, BC was increased to 840,000 sq. ft. The BC Tweed site in Delta, BC also received a cultivation license for its first 900,000 sq. ft. of growing space.
- Canopy Growth entered a non-binding agreement to purchase, subject to certain conditions, the 33% stake of BC Tweed not currently owned by the Company. The transaction is anticipated to close in early July, following the negotiation of definitive agreements.
- Canopy Growth announced that the Company would acquire all of its unowned interest in Canopy Health Innovations and Canopy Animal Health. The transaction is anticipated to close on or before July 31, 2018.
- The common shares of the Company began trading on the NYSE, under the symbol CGC.
- The Company was selected by the Saskatchewan Liquor and Gaming Authority (SLGA) to apply for five cannabis retail permits and operate an online store serving the entire province.
- Canopy Health has been approved by Health Canada to proceed with Phase IIb "in-human" clinical trials to evaluate the use of medical cannabis in the treatment of insomnia.

### DESCRIPTION OF THE BUSINESS

### MEDICAL MARIJUANA REGULATORY FRAMEWORK IN CANADA

On August 24, 2016, the Government of Canada introduced new regulations governing the use of cannabis for medical purposes. These new regulations, known as the ACMPR, were introduced in response to the February 24, 2016 decision rendered by the Federal Court of Canada in the Allard et al v the Federal Government of Canada case. The plaintiffs in the Allard case argued that the MMPR violates their Charter of Rights and the court, in a lengthy and detailed judgment, agreed with the plaintiffs. The court gave the Government of Canada until August 24, 2016 to determine how existing regulations should be amended to ensure that patients have the access to medical cannabis that they need.

The ACMPR, remained largely consistent with the former Marihuana for Medical Purposes Regulations ("MMPR"), but restores the ability of patients to grow their own cannabis at home, including the ability to designate a fourth-party grower through regulations akin to the former *Medical Marihuana Access Regulations* (MMAR). Under the ACMPR, patients who choose to grow at home, subject to a maximum number of plants, will be required to register their production sites and provide copies of their medical authorization to Health Canada to allow for monitoring and auditing of their activities.

8

Under the ACMPR, patients are required to obtain a medical approval from their healthcare practitioner and provide a medical document to the licensed producer from which they wish to purchase cannabis. Since the requirements under the new regulations are both simpler and involve fewer obstacles to access than the previous regulatory regime, it is anticipated that the growth in the number of approved patients will accelerate. Moreover, the new system allows for competition among licensed producers on a host of factors including product quality, customer service, price, variety and brand awareness, allowing for well-positioned and capitalized producers to leverage their position in the marketplace.

Health Canada recently reported that over 269,000 patients had enrolled into the ACMPR program by December 31, 2017[2]. By 2024, Health Canada estimates that the number of patients using medical cannabis will grow to 450,000 creating a market worth an estimated $1.3 billion[3], estimates that management believes is very conservative considering the growth in patient enrollment that has been experienced to date in the program. Eight Capital estimates that by 2024 the medical cannabis market in Canada will be worth $3.0 billion[4].

## LEGALIZATION OF REGULATED RECREATIONAL CANNABIS IN CANADA

### Background

CIBC World Markets reports estimates of the potential value of the regulated recreational cannabis market in Canada range from $5.0 billion to $10.0 billion per year. The lower market value of $5.0 billion per year translates into yearly consumption of 770,000 kilograms of cannabis, assuming a price of approximately $6.50 per gram.[5] To put the potential size of the Canadian regulated recreational market in context, Statistics Canada valued the beer market in Canada, in 2014, at $8.7 billion.[6]

On April 13, 2017, the Canadian Federal Government tabled legislation (Bill C-45) which aims to legalize regulated recreational cannabis in Canada. Bill C-45 passed third reading in the Senate and was referred to the House of Commons where the government rejected several non-technical amendments returning the Bill to the Senate on June 18, 2018.  On June 19, 2018, the Bill passed the final vote in the Senate. The Government is targeting implementation over eight to twelve weeks. As expected, Canadian Licensed Producers ("LP"), which currently supply the medical marijuana market, will also be responsible for supplying marijuana to the regulated recreational market.

Canopy Growth looks forward to continued discussion on this topic as regulations are developed. The legislation does not prescribe specific limitations other than details on overly promotional language or targeting youth. Prohibiting promotion aimed at children is a common-sense approach and Canopy applauds these limitations as expressed in the bill.

Federal legislation, once created, will enable provinces to distribute and retail Cannabis. Each Canadian province and territory is preparing for the sale and distribution of cannabis for regulated recreational. Management believes that the revenue generating opportunities and economic development potential of the control and sale of cannabis for regulated recreational is not lost on provinces.

At the onset of the regulated recreational cannabis market, permitted products will be the same as what is currently offered in the medical cannabis market – dried flowers, oils and soft-gel.  As this product offering represents only a portion of the products available on the illicit market, the federal government has indicated that value-added products including higher concentrated oils and ingestibles will be permitted for sale within a year of the opening of the regulated recreational cannabis market.

---

2 http://www.hc-sc.gc.ca/dhp-mps/marihuana/info/market-marche-eng.php
3 http://www.cbc.ca/news/canada/1-3b-medical-marijuana-free-market-coming-to-canada-1.1872652
4 Eight Capital "The Value Case for Investing in the Cannabis Sector", market research report published July 26, 2017
5 http://research.cibcwm.com/economic_public/download/eijan16.pdf
6 http://www.statcan.gc.ca/daily-quotidien/150504/dq150504a-eng.htm

9

10/8/21, 1:48 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 84 of 125
cgc-ex993_211.htm
PageID: 6143

**Provincial Distribution and Retail Frameworks**

To date, the provinces of Ontario[7], New Brunswick[8], Quebec[9] , PEI[10] and Nova Scotia[11] have announced that their provincial liquor control agencies will oversee the distribution and retail on non-medicinal cannabis. The provinces of Manitoba[12], Newfoundland & Labrador[13], Saskatchewan[14], Alberta[15], British Columbia[16] and the Yukon Territory[17] have announced that the provincial liquor control agency will be responsible for distribution and oversee the private retail of non-medicinal cannabis.

While responsible government agencies and/or designated private companies in their respective provinces are likely to begin rolling out physical retail storefront locations in the months leading up to and after the legal regulated recreational market opens, Canopy Growth believes that, in certain provinces, it will take two years and possibly longer to rollout the full network of regulated cannabis retail stores that is required to satisfy consumer demand. As such, Canopy Growth believes that a significant portion of sales in the first two years of the regulated recreational market will go through provincial online sales. While the majority of provinces are expected to develop and operate ecommerce sites, select provinces are expected to outsource the development and operation of ecommerce sites for the purpose of selling cannabis to their residents.

**LEGALIZATION OF CANNABIS IN INTERNATIONAL JURISDICTIONS**

In 2014, a limited number of countries in the world, in addition to Canada, specifically, Israel, Czech Republic, Netherlands and Uruguay had established federally legal cannabis access regimes.

Figure 1: Map of countries with federally legal cannabis access regimes in 2014

**Legalized (medical)**



Since 2014, the actions of governments around the world have signaled a significant change in attitudes towards cannabis. To date, federal governments in at least 20 additional countries including Argentina, Austria, Australia, Brazil, Denmark, Chile, Columbia, Germany, Greece, Israel, Italy, Jamaica, Mexico, Netherlands, Norway, Poland, Puerto Rico, South Africa, Switzerland and Turkey have formally legalized medicinal cannabis access to either foster research into cannabis-based medical treatments and/or towards increasing legal access to medical cannabis for their citizens. For example, on January 19, 2017, the German parliament passed legislation that legalized medical cannabis and included provisions for medical cannabis treatment expenses to be covered by health insurance.

---

7 https://news.ontario.ca/mof/en/2017/09/ontarios-cannabis-retail-and-distribution-model.html

8 http://www2.gnb.ca/content/gnb/en/news/news_release.2017.09.1206.html

9 http://plus.lapresse.ca/screens/b9063848-7868-4a20-846b-a84fcd3a747f%7C_0.html

10 https://www.princeedwardisland.ca/en/news/province-sets-next-policy-directions-cannabis-legalization

11 https://novascotia.ca/cannabis/#cannabis-retail-and-distribution

12 http://news.gov.mb.ca/news/?archive=&item=42491

13 http://www.releases.gov.nl.ca/releases/2017/exec/1123n01.aspx

14 https://globalnews.ca/news/3951690/marijuana-to-be-sold-in-private-saskatchewan-stores-and-online/

15 https://www.alberta.ca/cannabis-framework.aspx

16 https://globalnews.ca/news/3897846/bc-government-unveils-how-cannabis-will-be-sold-once-legalized/

17 https://yukon.ca/en/news/government-yukon-tables-cannabis-control-and-regulation-act

10

In addition, many other countries including Belgium, Ireland, England, France, Portugal, Spain and India have established formal government efforts to explore the legalization of medicinal cannabis access.

To date, Uruguay is the only country in the world that has legalized both medical and adult access to cannabis.

Figure 2: Map of countries with/exploring federally legal cannabis access regimes in 2018



Canopy Growth, with the assistance of international subsidiaries or partners, has secured the necessary agreements to export medicinal cannabis to Australia, Brazil and Germany. Management believes that an opportunity will exist, for some time to come, to export medical cannabis to countries that require a secure supply of medicinal cannabis but have yet to develop domestic production capabilities.

Management believes that over time many countries will move to establish domestic production capabilities, in part due to the economic development opportunities that this represents. With cannabis continuing to emerge from the shadows, many countries are looking to Canada, and its regulatory framework for the production and commercialization of medical cannabis, with much interest and respect. As Canada has developed an enviable regulatory model, companies acting within that framework have expertise, knowledge and potentially product to share with the global community.

Eight Capital estimates that the total addressable market for medical cannabis globally will be approximately $180 billion over time.[18]

## OVERVIEW OF CANOPY GROWTH CORPORATION

At March 31, 2018, there were 1,033 full-time employees in the Company as compared to 546 at March 31, 2017.

Canopy Growth is a multi-brand cannabis company that believes its strong focus on and investment in brand, market and product differentiation, increased cannabis supply through Company and partner cannabis production platforms, and education, to help citizens safely, effectively and responsibly use cannabis, will create a dominant global business with the potential to generate a significant and sustained return on invested capital over the long-term.

As discussed above **(See Legalization of Cannabis in International Jurisdictions)**, many countries around the world are moving to provide their citizens with legal access to cannabis products produced by a commercial regulated industry, similar to that pioneered in Canada.

---

[18] Eight Capital, "The Value Case for Investing in the Cannabis Sector", market research report published July 26, 2017.

11

**BRANDS**

     

## PLATFORMED USER EXPERIENCE – TWEED MAIN STREET

The Company has established Tweed Main Street as the platform for its core customer experiences, both online and physical "brick and mortar" locations.

With expected prominence of online sales during the initial rollout of the regulated recreational market and the continuation of the existing ACMPR e-commerce-driven market for Canadian medical patients, Canopy Growth launched the Tweed Main Street online store in April 2017, a single online platform that enables registered patients to purchase medicinal cannabis from multiple producers across numerous brands.

Further engagement between the Company's brands and customers is facilitated by the Company's expanding network of *Tweed Main Street Shops*. These physical "brick and mortar" locations in Southern Ontario (Barrie, Guelph, Hamilton and Toronto) provide an opportunity for interested individuals to learn about medical cannabis in a helpful, supportive and consumer-friendly environment.

Tweed Main Street offers an income-tested Compassionate Pricing Promise whereby eligible patients may obtain a 20% discount off regular prices.

## PRODUCTION BRANDS

The Company's core production brands are:

### Tweed

A key focus of the Company, since its inception, has been the development of its flagship Tweed brand. From the name, quality and consistency, logo and design aesthetic, to the tone and light-hearted copy, Tweed deliberately chose to incorporate a sense of texture and approachability that welcomes customers and encourages an intimate relationship and trust with the brand. In support of its brand, Tweed focuses heavily on its social media and earned media presence as an engagement strategy. Management believes Tweed has emerged as the most dynamic brand in the industry with exceptionally strong appeal and recognition in the medical cannabis industry. Tweed is currently positioned as a diverse medical cannabis brand offering high-quality cannabis in multiple product forms – dried, oil and easy-to-consume soft gels. The Tweed brand will evolve towards an adult lifestyle brand to best serve the needs of the future regulated recreational market in Canada.

### Black Label

Black Label is Tweed's premium sub-brand meant to carry innovative product types and delivery formats in addition to certain dried strains that warrant a premium price point. On June 19, 2017, Tweed launched the sale of the sector's first encapsulated cannabis oil soft gels under the Black Label brand. Black Label soft gels provide a very convenient delivery format that is easy to carry and easy to consume.

12

**Spectrum Cannabis**

On February 1, 2017, the Company acquired ACMPR licensed producer Mettrum. As part of the acquisition, Canopy Growth acquired the trademarked Mettrum Spectrum, which simplifies the dialogue around strength and dosage by categorizing medical cannabis using a straightforward colour-coded guide.

Figure 3: Strain categorization by colour spectrum (and % of THC or CBD)



On June 19, 2017, Canopy Growth announced a new international medical brand that will serve as the Company's physician and patient-facing identity. Spectrum Cannabis, with roots in the Mettrum Spectrum, will focus on physician interactions, stakeholder outreach, and patient education.

On September 18, 2017, the Company introduced Spectrum Cannabis to the medical market in Canada. As part of the introduction of Spectrum Cannabis to the medical market in Canada, the Company rebranded Mettrum to Spectrum Cannabis. Utilizing Spectum Cannabis in Canada, Germany, Australia, Denmark, Chile and Czech Republic ensures a consistent and recognizable global brand across all federally legal jurisdictions where Canopy Growth operates.

On June 18, 2018, Spectrum Cannabis announced the launch of Spectrum Softgells.  Each coloured Softgel aligns to the broader Spectrum Cannabis offering and contains a different ratio of THC and CBD to give patients clear options while also supporting healthcare professionals' ability to make consistent treatment recommendations.

**Bedrocan Canada**

The Bedrocan brand has been associated with standardized cannabis to medical patients in the Netherlands for more than 20 years. The Company acquired the Bedrocan Canada brand in 2015 to strengthen the Company's position in the Canadian medical cannabis market. On June 7, 2018, the Company announced that under the terms of an agreement with Bedrocan International BV, the Company will cease the sale of Bedrocan products within the 2018 calendar year.

**AFFILIATED BRANDS**

**Leafs By Snoop**

Tweed has partnered with Snoop Dogg, a renowned cannabis connoisseur and business pioneer in the Cannabis sector. Snoop and business partner Ted Chung recently launched online media platform MERRY JANE, the definitive cultural destination for news and original content.

Tweed and Snoop Dogg have partnered to bring the *Leafs By Snoop* offering of diverse whole-flower and oil strains, including a high CBD option and mid to high-range THC options, to Canada and exclusively available to Tweed patients.

13

**DNA-Certified**

DNA Genetics, world-renowned Cannabis breeders, have won awards in every category in the Cannabis Cup, the world's preeminent cannabis competition. In October 2015, Tweed and DNA Genetics announced an exclusive partnership that would see Tweed leverage DNA's expertise in cannabis breeding to bring new, exclusive DNA Certified strains to Tweed patients. With an official certification on select strains, DNA is adding a stamp of approval. DNA Certified cannabis has been personally bred, phenotyped and inspected by DNA Genetics.

On October 23, 2017, the Tweed and DNA Genetics announced the renewal and expansion of their partnership through to October 2022. As part of the expansion, Tweed and DNA Genetics have expanded their exclusive licensing relationship into Jamaica, where, so long as federally legal, Tweed JA and DNA will work similarly in the medical market to cultivate the best possible cannabis genetics.

**Green House Seeds Company and Organa Brands**

For 30 years Green House Seeds Company ("Green House") has been at the forefront of cannabis legalization by advocating for its normalization and expansion into new territories. A leader in cannabis genetics, Green House has won many international awards including Cannabis Cups and Highlife Cups. Organa Brands Ltd. ("Organa Brands"), founded in 2010, is a cannabis extract product innovator. Bringing together some of the best minds in the regulated cannabis market, Organa Brands operates one of the longest-running $CO_2$ extraction facilities – Organa Labs.

On November 16, 2017 and effective December 1, 2017, the Company entered into an agreement with Green House and Organa Brands (see **"Agripharm Cannabis Production – Partner Capacity offtake"**) that will see Agripharm's production facility in Creemore, Ontario serve as the cultivation site of sought after cannabis genetics that are infused into consumer-friendly ingestion formats, and put them on stores shelves across the country, and abroad where federally legal. Agripharm will not conduct any business in the United States. Products from the new Agripharm are expected to begin entering the market in the second half of calendar 2018.

**CraftGrow**

Tweed's curated CraftGrow collection brings even more variety to registered patients by bringing otherwise unaffiliated partner's products into the Tweed Main Street store. The model increases the SKU count available through the Tweed Main Street platform while in turn providing partner's customizable access to the Company's platform including rigorous product Quality Assurance program, online market place, recognized customer care and call centre capabilities as well as Tweed's large and growing customer base.

**DOMESTIC CANNABIS PRODUCTION**

Through its wholly-owned subsidiaries, Canopy Growth operates numerous state-of-the-art production facilities with over • million sq. ft. of licensed indoor and greenhouse production capacity. Under the ACMPR program, the Company has ten licenses to cultivate cannabis and 8 licenses to sell cannabis.

As it relates to future production needs, Canopy Growth is a diversified cannabis producer. It will continue to place the highest priority on meeting the needs of medical patients, expanding internationally as federal laws permit, and increasing its capacity to serve regulated recreational customers across Canada in the future. With that in mind, widespread capacity expansion totaling over 3.2 million sq. ft. of production space has been announced to date.

**DOMESTIC CANNABIS PRODUCTION – COMPANY OWNED FACILITIES**

The Company's wholly-owned subsidiaries operate licensed cannabis production facilities in locations across Canada as described below.

**Smiths Falls, Ontario**

The license for this facility covers 168,000 sq. ft, and covers 24 completed grow rooms and related vegetation, nutrient delivery and post-production infrastructure. On June 19, 2017, the Company announced that its Smiths Falls facility received a certificate of Good Manufacturing Practices (GMP) as issued by the German authority, Regierungspräsidium Tübingen.

14

The Smiths Falls facility also includes an in-house laboratory and R&D area, cannabis oil extraction infrastructure, a high-level security vault and a breeding facility that features several breeding rooms, phenotyping rooms, as well as male and female plant rooms.

Tweed received a Dealer's License pursuant to the provisions of the Controlled Drugs and Substances Act and its Regulations and has begun operating this purpose-built area, built to Good Manufacturing Practice ("GMP") specifications, within the Smiths Falls facility. As a licensed dealer, Tweed will be able to conduct research and possess cannabis and cannabis derivatives in forms that are not currently covered by the ACMPR. Tweed can also begin development of innovative products for future market opportunities, and with necessary approvals, undertake the export of non-dried form of cannabis to other jurisdictions.

In fiscal 2018, the Company began construction of new infrastructure in the approximately 300,000 sq. ft. unlicensed portion of the original 472,000 sq. ft. building. New facilities being constructed include additional indoor growing rooms, post-harvest processing, security vault and a visitors centre. Construction of this extension is expected to be completed in the second half of calendar 2018.

In the fourth quarter of fiscal 2018, the Company also began the construction of new building footprints and the redevelopment of existing buildings that together will add over 300,000 sq. ft. to the campus in Smiths Falls.   The additional footprint will include storage, an advanced manufacturing building built to GMP specifications and a dedicated distribution centre. The distribution centre has been designed to significantly increase the capability and flexibility of the Company's fulfillment resources in an effort to better and more efficiently serve the demands of the Canadian medicinal market, expected demands of the Canadian recreational cannabis market and anticipated increase in cannabis exports to federally legal markets around the world. Construction of is expected to be completed in calendar 2018.

### Niagara-on-the-Lake, Ontario

The current production facility in Niagara-on-the-Lake, Ontario ("Niagara") is comprised of a greenhouse facility that is 375,000 sq. ft., of which 350,000 sq. ft. represents the greenhouse and 25,000 sq. ft. is used for post-harvest processing storage, shipping and offices. Currently, all dried cannabis produced in the Niagara greenhouse is transferred in bulk to the Company's facility in Smiths Falls, Ontario for final processing and sale. All 350,000 sq. ft. of the greenhouse is utilized to produce medical cannabis.

On June 19, 2017, the Company announced that its Niagara facility received a certificate of Good Manufacturing Practices (GMP) as issued by the German authority, Regierungspraesidium Tübingen.

On September 27, 2017, the Company announced the expansion of this facility to over 1,000,000 sq. ft. of greenhouse space under glass. The expansion of this site is expected to be completed in calendar 2018.

### Scarborough, Ontario

Canopy Growth's indoor facility in the Greater Toronto Area leveraged over two decades of indoor standardized cannabis growing experience of Netherlands-based Bedrocan International BV ("Bedrocan International"). This approximately 50,000 sq. ft. production facility is licensed, and includes 34 vegetative and growing rooms. The Toronto facility exclusively cultivates Bedrocan strains.

The Company acquired its facility in Toronto on August 28, 2015 as part of the acquisition of Bedrocan Canada pursuant to a definitive plan of arrangement, in which the Company acquired all of the issued and outstanding securities of Bedrocan Canada.

As part of an agreement with Bedrocan International BV to discontinue previously announced arbitration proceedings, the Company announced on June 7, 2018 that the Company will cease the sale of Bedrocan products within the calendar year while retaining ownership of licensed production and sales facilities in Scarborough, Ontario. Management will redeploy these facilities to develop new premium branded cannabis offerings.

### Bowmanville South, Ontario

The Bowmanville South facility's current license allows for the production, sale or provision, possession, shipping, transportation, delivery and destruction of dried marijuana and marijuana plants or seeds. The license covers approximately 75,000 sq. ft. and includes 13 growing rooms as well as necessary vegetation, nutrient delivery and plant destruction infrastructure.

15

10/8/21, 1:48 PM
Case 2:19-cv-20543-MCA-MAH
Document 83-3 Filed 10/12/21
Page 91 of 125
cgc-ex993_211.htm
PageID: 6150

The Bowmanville South facility sits on a 7-acre site which provides the opportunity for future expansion. The Company is currently planning the expansion of this location, by up to 100,000 sq. ft. of growing capacity, as the market for legal cannabis develops. In addition, on October 6, 2017, the Company acquired a parcel of land next to the Bowmanville South location to add approximately 33 acres for future expansion.

**Yorkton, Saskatchewan**

The Yorkton facility operates as Tweed Grasslands. Tweed Grasslands occupies a 60,000 sq. ft. facility, of which approximately 15,000 sq. ft. is currently licensed, with the capacity to expand operations to over 300,000 sq. ft. on the parcel of land if necessary. This facility received it sales license under the ACMPR in January 2018.

**Saint-Lucien, Quebec**

In November 2016, the Company acquired a pre-license applicant, Vert Cannabis (formerly Vert Medical), and the lease on a relatively small production facility in Drummondville, Quebec. Since being acquired by Canopy Growth, the Company has fully upgraded the site's approximate 10,000 sq. ft. facility to the Company's standards. On December 22, 2017, the Company announced that Vert Cannabis received its ACMPR production license. Considering the efficient use of resources, the Company has re-located certain research and development activities to this location.

The Company also has the right to purchase the 90 acres of leased land and building located in Saint-Lucien, Québec.

**Newfoundland & Labrador**

On December 8, 2017, Canopy Growth announced that the Company had entered into a supply and production agreement. Under the terms of the agreement, Canopy Growth will supply up to 8,000 kg of high quality cannabis products annually for the first two years of the deal and will establish a new production facility in Newfoundland and Labrador capable of producing 12,000 kg per year, bringing an expected 145 jobs in an emerging sector and major capital investment to the region. The new production facility is being built in St. John's. The expansion of this site is expected to be completed in calendar 2019.

**DOMESTIC CANNABIS PRODUCTION – PARTNER OR JOINTLY OWNED FACILITIES**

The Company may enter into agreements with select partners for the development of additional facilities in Canada and other international jurisdictions where cannabis is federally legal. For the select partners, the Company will look for partners that can bring specific capabilities, expertise and financial resources to the venture.

**Edmonton, Alberta**

Canopy Growth announced on June 24, 2017 that it will expand its footprint into Edmonton, Alberta with a 100,000 sq. ft. facility that will be leased to Canopy Growth by the Goldman Group, a related party, with an option to purchase the facility at the end of each 5-year quarter of the 20-year lease. The transaction closed in August 2017 with the existing tenants vacating October 1, 2017 so that expansion construction could begin. The agreement and licensing are contingent upon Health Canada and municipal approvals. The development of this site is expected to be completed in calendar 2019.

**Fredericton, New Brunswick**

On August 28, 2017, the Company announced that it had acquired Spot Therapeutics Inc. ("Spot"), an ACMPR applicant based in Fredericton, New Brunswick. Additionally, Canopy Rivers, an affiliated entity of the Company, entered into a definitive agreement to complete the purchase of an industrial building and property where the Company's Fredericton-based production and distribution platform is being established. The Company will lease the building from Canopy Rivers. The facility will operate under the Tweed brand and support the Company's global operations with high quality, large scale cannabis production capabilities. The existing building and infrastructure is in excellent condition and includes almost 50,000 sq. ft. of dedicated production space. The facility is anticipated to be ready for licensing and production before the end of calendar 2018. Once licensed, this initial footprint is anticipated to produce over 4,000 kg of dried cannabis annually.

16

10/8/21, 1:48 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 92 of 125
cgc-ex993_211.htm
PageID: 6151

The development of this site is expected to be completed in calendar 2018. The property is suited for expansion to over 100,000 sq. ft.

**British Columbia**

On October 10, 2017, the Company entered into a definitive agreement to form a new company, BC Tweed Joint Venture Inc. ("BC Tweed") together with a large-scale greenhouse operator ("the Partner") develop 1.3 million sq. ft. of greenhouse growing capacity in lower British Columbia with an option, since exercised, to develop a further 1.7 million sq. ft. of existing greenhouse infrastructure at a second BC location.

On February 20, 2018, Canopy Growth announced that it had received a cultivation license for the first of its two sites operated by BC Tweed. The initial licensing covered over 400,000 sq. ft. of growing space, allowing vegetative growth so that the mature plants can be spread into the full 1.3 million sq. ft. for flowering and ultimate harvest. The Company also announced that the site received the largest single shipment of cannabis clones in the Company's history, with over 100,000 live cannabis clones flying high from the Tweed Smiths Falls Campus to British Columbia.

On April 14, 2018, Canopy Growth announced that it received additional licensing at both greenhouse facilities operated by BC Tweed. In particular, the already operating 1.3 million sq. ft. greenhouse facility in Aldergrove, BC is licensed for 840,000 sq. ft. of growing space. The second BC Tweed site in Delta, BC, totaling 1.7 million sq. ft. of greenhouse production space, also received a cultivation license for its first 900,000 sq. ft. of growing space.

On May 14, 2018, Canopy Growth announced that it had entered into a non-binding agreement (the "Agreement") to purchase, subject to certain conditions, the remaining 33% stake of BC Tweed not currently owned by the Company. Canopy Growth, upon closing of the transaction, will issue up to $374 million worth of shares in the Company, subject to the satisfaction of certain conditions, to the minority shareholders of BC Tweed (the "Operators"). Additional details of the agreement are provided in the press release issued by the Company on May 14, 2018.

**Mirabel, Quebec**

On December 18, 2017, the Company and its subsidiary Canopy Rivers entered into an agreement to form a new company, Les Serres Vert Cannabis Inc. ("Vert Mirabel"), together with Les Serres Stéphane Bertrand Inc. ("Bertrand"), a largescale tomato greenhouse operator in Mirabel, Quebec. Bertrand operated a 700,000 sq. ft. of modern greenhouse, most of which was built in 2015. Further details on the business formation are provided in the press release issued on December 18, 2017. On May 27, 2018, the Company and Bertrand announced that Vert Mirabel received a cultivation license from Health Canada. The 700,000 sq. ft. Vert Mirabel greenhouse is licensed for an initial 40,000 sq. ft. of growing space.

**DOMESTIC CANNABIS PRODUCTION – PARTNER CAPACITY OFFTAKE**

The Company has established a number of programs designed to help sector partners, both license applicants and LPs, establish and/or grow their licensed operations and achieve greater success faster. Through these programs, additional cannabis production capacity will be secured for sale to the Company's customers.

**Tweed's Curated *CraftGrow* Line**

On April 19, 2017, Canopy Growth announced the launch of Tweed's curated *CraftGrow* line, which brings high quality cannabis grown by a diverse set of producers to Tweed Main Street's customers. To date, nine distinct partners including AB Laboratories Inc., Canada's Island Garden, Delta 9 Cannabis Inc., JWC Ltd., PhyeinMed Inc., PUF Ventures Inc. SweetGrass Inc., TerrAscend Corp. and Valens GroWorks, have joined *CraftGrow*, all with different growing styles and approaches to cannabis. Cannabis grown by Canada's Island Garden and AB Laboratories Inc. have become available for sale in Tweed Main Street.

**Agripharm**

Agripharm holds the lease and Health Canada license for a 15,000 sq. ft. facility at Creemore, Ontario. Prior to December 1, 2017 Agripharm was a wholly owned subsidiary of the Company. On December 1, 2017, the Company's interest in Agripharm was diluted from 100% to 40% under a collaborative agreement whereby in exchange for the issuance of shares, Green House and Organa Brands have granted an exclusive, royalty-free license in Canada to certain proprietary technology, trademarks, genetics, know-how and other intellectual

17

property to Agripharm, subject to compliance with applicable law. The agreement will create a new Canadian home-base for Green House and Organa Brands where they will work together with Canopy Growth to produce cannabis products for the Canadian market. Green House will oversee day-to-day operations and bring their own expertise into cultivation, while Organa Brands will implement world-class extraction functions as new and novel value-add products become part of the regulatory environment.

Pursuant to the agreement, the Company has the right to purchase all of the cannabis products produced by Agripharm, subject to the right of Agripharm to sell up to 25% of its products directly in its own physical brick and mortar retail locations. In addition, the Company will sublicense the proprietary technology, trademarks, genetics, know-how and other intellectual property from Agripharm to ensure that Canopy Growth is able to satisfy consumer demand across Canada for the suite of Green House and Organa Brands products. Agripharm will not do business in the United States.

**Canopy Rivers**

On April 27, 2017, Canopy Growth announced the commitment of $20,000 in seed capital funding for a unique investment and operating platform structured to pursue opportunities in the emerging global cannabis sector. Canopy Rivers is managed by an experienced team of qualified financial and technical professionals with deep industry experience and relationship networks.

Canopy Rivers works collaboratively with Canopy Growth to identify strategic counterparties seeking financial and/or operating support and affiliation with the Canopy Growth group of companies. The result is an ecosystem of complementary and companies operating throughout the cannabis value chain. As the portfolio continues to develop, each constituent benefits from opportunities to collaborate with Canopy Growth and among themselves, which the company believes results in an ideal environment for innovation, synergy, and value creation for Canopy Rivers, Canopy Growth, and across the entire Rivers ecosystem.

On May 12, 2017, the Company advanced $20,000 in the form of a convertible debenture. On June 16, 2017, Canopy Rivers closed an offering to raise aggregate gross proceeds of $36,230, at which time the convertible debenture including interest was converted to equity. This offering increased the cash resources available for Canopy Rivers to provide growth capital and strategic support within the regulated cannabis industry to approximately $56,000.

January 10, 2018, the Company announced that Canopy Rivers has closed a non-brokered private placement offering that raised aggregate gross proceeds of approximately $26,000. Canopy Growth invested $5,141 in the round and 9 employees and a director of Canopy Growth invested $2,357.

To date, in collaboration with Canopy Growth, Canopy Rivers has quickly established a diversified portfolio of cannabis industry investments that includes licensed producers, late stage applicants, pharmaceutical formulators, branded developers & distributors, and technology & media platforms. Investments are customized for each counterparty and include a balanced mix of equity, debt, royalty, and profit sharing agreements.

On May 30, 2018, AIM2 Ventures Inc. (TSXV:AIMB.P) ("AIM2") and Canopy Rivers announced that they had entered into a binding letter of intent dated May 30, 2018 (the "LOI"), which outlines the terms and conditions pursuant to which AIM2 and Canopy Rivers will complete a transaction that will result in a reverse take-over of AIM2 by Canopy Rivers (the "Proposed Transaction"). The Proposed Transaction will be an arm's length transaction, and, if completed, will constitute AIM2's "Qualifying Transaction" (as such term is defined in Policy 2.4 of the TSX Venture Exchange (the "TSXV")).

Also on May 30, 2018, Canopy Rivers announced that it had entered into an engagement letter with CIBC Capital Markets ("CIBC") and GMP Securities L.P. ("GMP"), as joint book runners and together with Eight Capital (collectively with CIBC and GMP, the "Co-Lead Agents") as co-lead agents, on behalf of a syndicate of agents (together with the Co-Lead Agents, the "Agents") pursuant to which Canopy Rivers proposes to issue and sell, on a private placement basis, subscription receipts (the "Subscription Receipts") at a price of $3.50 per Subscription Receipt (the "Issue Price") for aggregate gross proceeds of up to $60,000 (the "Offering").

On May 31, 2018, Canopy Rivers announced its newly appointed, majority independent Board of Directors, as well as a number of strategic appointments to its management team.

18

On June 18, 2018, Canopy Rivers announced the upsizing of its previously announced private placement offering by subscription receipts. Pursuant to the revised terms of the offering, Canopy Rivers proposes to issue and sell Subscription Receipts at a price of $3.50 per Subscription Receipt for aggregate gross proceeds of up to $104,125,00. CIBC Capital Markets, GMP Securities L.P. and Eight Capital are acting as co-lead agents, on behalf of a syndicate of agents including Cormark Securities Inc., INFOR Financial Inc. and PI Financial Corp. The Offering is expected to close on or about July 5, 2018.

**DOMESTIC CANNABIS PRODUCTION SUMMARY**

Table 1 below provides a summary of the Company's licensed facilities and the facility development projects in Canada, including their approximate size and the calendar year in which completion of the development projects is anticipated.

| Facility | Type | Status | Approx. Size (sq. ft., rounded) | Anticipated Development Project Completion |
|---|---|---|---|---|
| Smiths Falls, Ontario | Indoor | 168,000 sq. ft. licensed<br><br>Project Underway | 730,000 | CY2018 |
| Niagara-on-the-Lake, Ontario | Hybrid Greenhouse | 350,000 sq. ft. licensed<br><br>Project Underway | 1,000,000 | CY2018 |
| Aldergrove, British Columbia | Hybrid Greenhouse | 840,000 sq. ft. licensed<br><br>Project Underway | 1,300,000 | CY2018 |
| Delta, British Columbia | Hybrid Greenhouse | 900.000 sq. ft. licensed<br><br>Project Underway | 1,700,000 | CY2018 |
| Mirabel, Quebec | Hybrid Greenhouse | 40,000 sq. ft. licensed<br>Project Underway | 700,000 | CY2018 |
| Newfoundland & Labrador | Indoor | Project Underway | 150,000 | CY2019 |
| Edmonton, Alberta | Indoor | Project Underway | 100,000 | CY2019 |
| New Brunswick | Indoor | Project Underway | 50,000 | CY2018 |
| Yorkton, Saskatchewan | Indoor | 15,000 sq. ft. licensed | 60,000 | |
| Bowmanville, Ontario | Indoor | Licensed | 75,000 | |
| Creemore, Ontario[19] | Indoor | Licensed | 15,000 | |
| St. Lucien, Quebec | Indoor | Licensed | 10,000 | |
| Scarborough, Ontario | Indoor | Licensed | 50,000 | |
| Total: | | | 5,675,000 | |

Table 1: Domestic Cannabis Production Summary

---

[19] Agripharm facility 40% owned by the Company for which the Company has an off-take arrangement for between 75%-100% of production

19

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 95 of 125
cgc-ex993_211.htm
PageID: 6154

**CANOPY GROWTH'S POSITIONING FOR THE CANADIAN REGULATED RECREATIONAL MARKET**

Early in the development of the Company's plan to enter the future Canadian Regulated Cannabis Market, management realized that securing channels to market was equally, if not more, important than licensed cultivation capacity, as distribution drives revenue while capacity alone does not. Management has invested significant effort in securing channels into the future regulated recreational markets across Canada. With the provincial liquor agencies being given responsibility for establishing distribution and retail frameworks focused the majority of its management outreach on building relationships with these agencies. To aid in this effort, the Company hired a government relations team with significant direct liquor agency experience.

It is worthwhile noting that the Company has engaged in outreach to other retail networks including national pharmacy chains in Canada. As it remains unclear as to when other retail networks, including pharmacies, will be permitted to sell cannabis, the Company determined that efforts to secure supply related agreements with pharmacy chains in Canada would provide limited value to the Company in the short-term.

When selecting Licensed Producers to supply cannabis for recreational retail sales, provincial governments and/or their liquor control agencies, management believes that many factors, including cannabis inventory and production capacity, product quality, product variety, product branding, price, sales support and economic commitments to the provinces, will influence product demand and supplier selection.

In preparation for the launch of a regulated recreational cannabis market expected in October 2018, the provincial liquor agencies are actively seeking multi-year supply arrangements with a limited number of licensed producers that they believe can provide them supply certainty. Management believes that most provinces are likely to enter into supply arrangements with 4 to 6 primary suppliers.

Management believes that cannabis producers positioning to become primary provincial suppliers will need to demonstrate that they have sufficient inventory levels and in production capacity. The supply related agreements established by the provincial liquor agencies in Newfoundland & Labrador, New Brunswick, Prince Edward Island, Quebec and the Yukon Territory contemplate supply contracts of a minimum two years in length. Management believes that many, if not all, of the remaining provincial and territorial liquor agencies will enter similar supply agreements with primary suppliers.

For Licensed Producers that meet the inventory and capacity requirements sought by the provinces and who successfully secure a primary supplier relationship, management believes the two-year supply contracts can be expected to provide certainty of business operation and secure a channel to market for additional capacity that the selected producers may bring into production as well as partner capacity offtake.

To position the Company to confidently secure primary supplier contracts with all of the provincial liquor agency, the Company has invested significant resources to establish the largest cannabis inventory and in-production licensed capacity by early calendar 2018. At March 31, 2018, management believes the Company had the largest inventory of harvested product and biological assets with a value exceeding $118,000. As of June 27, 2018, management believes the Company has the largest licensed and in production platform in Canada, at over 2.4 million sq. ft. In addition, the Company expects to have up to an additional 3.2 million sq. ft. to enter production over the next year ended. With the combination of the sector's largest inventory and the Company's vast production platform, management believes the Company is well positioned to secure large supply channels into the regulated recreational market and ultimately supply a significant portion of that market.

The Company's *CraftGrow* program discussed elsewhere, which assists smaller local/regional Licensed Producers in getting their product to market, provides additional value-added consideration should provincial liquor control agencies seek the flexibility to showcase products of local/regional Licensed Producers within a trusted supply agreement with a larger producer.

With renowned cannabis brands (Tweed, *Leafs By Snoop* & DNA Genetics), strong customer and online communication, substantial product variety, investment in the development and execution of marketing, and retail programs and investment in a business to business sales function, management believes consumer demand for the Company's products will be strong.

20

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 96 of 125
cgc-ex993_211.htm
PageID: 6155

With licensed cultivation and production operations in Ontario, Saskatchewan, Quebec and British Columbia as well as announced development plans spanning Alberta, New Brunswick and Newfoundland & Labrador, Canopy Growth has made meaningful economic development commitments in various provinces. Management believes that economic development commitments will be one of the many factors that influence cannabis supply related decisions made by the provinces.

Management believes large scale Licensed Producers are well positioned to support the provinces in their efforts to establish, oversee and implement physical and online cannabis retail. The Company, with comprehensive standard operating procedures for secure cultivation, production, storage and transportation of Cannabis and significant, highly secure vault storage capacity in place or under development in multiple locations across the country, is well positioned to assist provincial agencies with the provisioning of secure cannabis storage and transportation. With the largest customer base in the legal Canadian cannabis market and broadest product portfolio in the sector, the Company can offer provincial agencies/crown corporations/retailers with significant consumer product demand intelligence to assist with product selection.

Management believes Licensed Producers will be required to have operational information technology systems, including Enterprise Resource Planning systems, to interface with the sophisticated inventory management, ordering and billing systems in operation at the various liquor boards. Canopy Growth has invested significantly in the upgrading of our IT infrastructure, including the implementation of an Enterprise Resource Planning application.

Management believes the large product volumes that will shipped to the provincial and territorial agencies will require large capacity and increasingly efficient cannabis packing and shipping capabilities. In the fourth quarter of fiscal 2018, the Company began the development of a dedicated distribution centre. This centre has been designed to significantly increase the capability and flexibility of the company's fulfillment resources. The Company is also investing significant resources in the research and development of automated systems.

The provincial and territorial agencies are being tasked with implementing and managing the distribution and, in many cases, the retail of cannabis products. As management functions within the liquor agencies and new staff being hired to support the rollout of cannabis distribution and retail likely have limited previous experience/knowledge of the product, Management believes significant in market sales support and education will be required. The Company has established a sales management and in market support team and programs to educate and prepare retail staff. To date, the Company has entered into agreements with the liquor agencies in New Brunswick and Prince Edward Island for the development and delivery of education programs.

As highlighted earlier, Canopy Growth believes that, in certain provinces, it will take two years and possibly longer to rollout the full network of regulated cannabis retail stores that is required to satisfy consumer demand. As such, Canopy Growth believes that most of the sales in the first two years of the regulated recreational market will go through provincial online sales. With less than 6 months to establish a robust online retail system and cannabis marketplace, management expects that certain, if not many, provinces could benefit from leveraging the existing online ecommerce, customer demand data and transactional information technology systems that have been deployed by the Company. The Company's Tweed Main Street online store (See **Overview of Canopy Growth Corporation, Tweed Main Street**), a single online marketplace offering cannabis for sale from multiple producers across numerous brands – delivering a shopping experience that consumers expect, is uniquely suited to deliver the online retail experience that provincial agencies/crown corporations/retailers will be expected to deliver.

21

10/8/21, 1:48 PM
Case 2:19-cv-20543-MCA-MAH    Document 83-3   Filed 10/12/21    Page 97 of 125
PageID: 6156
cgc-ex993_211.htm

## CANADIAN REGULATED RECREATIONAL CANNABIS MARKET - PRIMARY PROVINCIAL CANNABIS SUPPLY ARRANGEMENTS

Leveraging the combined strength of the Company's cannabis inventory, in production and future capacity, branding and substantial economic commitments, Canopy Growth is the sole licensed producer to have entered into cannabis-related supply agreements with each announcing provincial agency. Table 2 below provides a summary of provincial cannabis supply agreements signed to date.

| Province/Territory | Annual Quantity (Kilograms) | Term (Years) | Additional Details |
|---|---|---|---|
| Newfoundland & Labrador | 8,000 | 2 | Press Release on December 8, 2017 |
| New Brunswick | 4,000 | 2 | Press Release on September 15, 2017 |
| Prince Edward Island | 1,000 | 2 | Press Release on January 16, 2018 |
| Quebec | 12,000 | 3 | Press Releases on February 14, 2018 and April 11, 2018 |
| Yukon | 300 | 3 | Press Release on April 18, 2018 |
| Total: | 25,000 | | |

Table 2: Provincial Cannabis Supply Agreement Summary

## CANADIAN REGULATED RECREATIONAL CANNABIS MARKET - PROVINCIAL RETAIL

As highlighted earlier, the Provinces of Newfoundland & Labrador, Manitoba, Saskatchewan, Alberta and British Columbia are permitting the sale of recreational cannabis products through private retail. The Company is pursuing a cannabis retail presence in these provinces to capture retail gross margin (incremental to wholesale margin), capture higher market share within the owned channel and establish a powerful marketing vehicle to build the Tweed brand in an environment where opportunities to market and build brands is constrained by regulations.

To date, the Company has received licenses or permits to apply for licenses to operate private retail and online sites in the three of these provinces that have announced private retail operations – Newfoundland & Labrador, Manitoba and Saskatchewan. The Company is pursuing retail licenses in a select number of communities in Alberta and British Columbia. Figure 4 below provides a summary of provincial retail licenses secured by the Company.

Figure 4: Provincial Cannabis Retail Summary



22

## INTERNATIONAL DEVELOPMENT

Management believes that a significant opportunity exists today to leverage the Company's expertise, financial strength and business model in federally legal cannabis markets around the world. In addition, management believes future opportunities are likely to exist for the Company in jurisdictions where governments are actively moving towards such a legal framework. Subject to regulatory approval, strategic international business opportunities pursued by the Company could include:

- Providing advisory services to third-parties that are interested in establishing licensed cannabis cultivation and sales operations;
- The export of medical cannabis in countries outside of Canada; and
- Ownership of cannabis cultivation and sales operations in countries outside of Canada, where it is federally legal to do so.

Canopy Growth, with the assistance of international subsidiaries or partners, has secured the necessary agreements to export medicinal cannabis to Australia, Brazil and Germany. Canopy Growth believes that an opportunity will exist, for some time to come, to export medical cannabis to countries who wish to secure a supply of medicinal cannabis but have yet to develop domestic production capabilities. To date, the Company has announced subsidiaries, partnerships or business activities in Germany, Chile, Denmark, Jamaica, Lesotho, Australia, Brazil, Czech Republic and Spain as described below.

Canopy Growth does not engage in any U.S. marijuana-related activities as defined in Canadian Securities Administrators Staff Notice 51-352. While the Company has a number of partnerships with U.S.-based companies that may themselves participate in the U.S. cannabis market, these relationships are licensing relationships that see intellectual property developed in the United States brought into Canada, and in no manner involve Canopy Growth in any US activities respecting cannabis.

Figure 5: International subsidiaries, partnerships or business activities



## Spektrum Cannabis GmbH

Spektrum Cannabis GmbH ("Spektrum" and formerly MedCann GmbH Pharma and Nutraceuticals) is a German-based pharmaceutical distributor that was acquired by the Company on December 12, 2016.

On July 25, 2016, the Corporation announced that Tweed had received necessary approvals in Canada and Germany to begin export of medical cannabis for sale to German patients, and will be working with Spektrum, a then privately held pharmaceutical importer and manufacturer in Germany. Since then, Spektrum has placed Tweed-branded cannabis strains in hundreds of German pharmacies.

To date, Spektrum distributes cannabis products to over 1200 pharmacies across Germany. Spektrum's processing facility is GMP certified by Regierungspraesidium Tübingen.

23

**Spectrum Chile SpA**

The Company announced on June 20, 2017 its complementary expansion into South America with Spectrum Chile. Medical markets in Chile are emerging and the Company plans to enter the market aggressively in order to position itself as a leader. Through a strategic partnership with a domestic Chilean medical cannabis company, Spectrum Chile will work to ensure Chilean patients have access to high-quality cannabis products.

**Spectrum Denmark ApS**

On September 20, 2017 the Company formed Spectrum Denmark. Spectrum Denmark will produce, cultivate and distribute medical cannabis products in Denmark. Spectrum Denmark will also seek to establish operations in other jurisdictions in Europe where federally lawful and regulated. The Company owns 62% of the issued shares of Spectrum Denmark and Danish Cannabis ApS ("Danish Cannabis") owns the remaining 38% of shares. A principal in Danish Cannabis, Moellerup Estate, has for years been one of the largest hemp producers in Europe. Moellerup Brands include a wide range of hemp food products from gin, beer, granola, oil, to flour, cosmetics and hemp for CBD oil production. The Company will fund the operation of Spectrum Denmark through loan of up to $10 million to be released in tranches, bearing interest at 5%. Upon achievement of defined milestones Danish Cannabis will exchange its shares in Spectrum Denmark for up to 1,906,214 common shares in Canopy Growth.

On December 5, 2017, Spectrum Denmark purchased a 430,000 sq. ft. operating greenhouse facility in Odense, Denmark ("Odense") for cash consideration of $3,241. On December 18, 2017, the Company announced that Spectrum Denmark had been issued a cannabis production license by Laegemiddelstyrelsen, Denmark's Medicines Agency. The license was issued without conditions, meaning that Spectrum Cannabis Denmark will not be limited to a production cap or limited to the product formats it can produce. High quality oils and dried cannabis flowers will be produced in Odense and sold under the Spectrum Cannabis brand using the proprietary Spectrum colour-coded strain classification system. The license announced today is valid through 2021.

**Spectrum Czech ApS**

On April 15, 2018, Canopy Growth announced that it had signed a definitive agreement to acquire Annabis Medical s.r.o ("Annabis Medical"). The transaction closed on Monday, April 16, 2018. Annabis Medical is the leader in the Czech Republic's medical cannabis industry and currently imports and distributes cannabis products pursuant to federal Czech licenses, with products for sale through pharmacy channels across the Czech Republic.

**Spectrum Australia**

On April 25, 2018, Canopy Growth and the Victoria State Government announced the launch of Spectrum Australia. The Victoria facility will enable domestic cultivation and production of high quality medical cannabis for patients while serving as a distribution hub for other jurisdictions in APAC. It will also operate as the APAC Research and Development Center for the Company, supporting the ongoing research collaboration between Spectrum Australia and Agriculture Victoria on innovations in medical cannabis cultivation and production.

**Spectrum Lesotho**

On May 30, 2018, Canopy Growth announced that it had acquired Daddy Cann Lesotho PTY Ltd., trading as Highlands ("Highlands"). Based in the Kingdom of Lesotho ("Lesotho"), Highlands holds a license to cultivate, manufacture, supply, hold, import, export and transport cannabis and its resin.

Combining the domestic and regional knowledge of Highlands with the global experience and expertise of Canopy Growth is the latest example of the Company establishing a meaningful local presence. With the objective of future local production to serve the regional market, these operations are part of Canopy Growth's commitment to the Lesotho economy including supporting job creation and lasting community engagement. All key members of Highlands's management team will continue to lead the organization. Additional details on the acquisition are provided in the press release issued by the Company on May 30, 2018.

24

**Tweed JA**

On September 6, 2017, the Company subscribed for 49% of the issued and outstanding shares of Grow House JA Limited (now operating as Tweed JA), for $3,769 payable in cash. Tweed JA is a Jamaican company that had received a provisional license to cultivate and sell medical cannabis and has already begun construction of its greenhouse facility.

Canopy Growth believes that the production and formulation model it has built in Canada, combined with the strength of the existing team in Jamaica, made up of experienced entrepreneurs with substantial cannabis cultivation experience, will drive the national conversation around cannabis forward, and promote Jamaica's well-established and renowned ganja, oils and other cannabis products on a global level.

**AusCann Group Holdings Ltd.**

On May 20, 2016, the Company closed a minority stake with AusCann (ASX:AC8), in exchange for consultation in a number of areas including production, quality assurance and operations, and strategic advisory services. In exchange for these services, the Company initially received a 15% interest and options in Auscann, but, following subsequent dilutive financings, now owns an 11.01% interest in AusCann, including its pro rata participatory investment of $1,214 in AusCann's last financing which closed in May 2017. At March 31, 2018, the AusCann investment was valued at $49,573.

The expertise and advisory services offered or performed by Canopy Growth subsidiaries will be exclusively carried out by Tweed Inc. and Tweed Farms Inc.

On September 13, 2017, the Company announced that it had entered into a supply agreement with AusCann, whereby Canopy Growth will act as AusCann's exclusive supplier of medical cannabis for the Australian market, beginning with the transfer of a range of medicines for research and commercialization in Australia.

**Victoria Agriculture**

On January 16, 2018, Canopy Growth and the Victorian State Government announced the signing of a MOU to further develop research and technical capabilities in the production of medical cannabis in Australia. The work will focus on medical applications for cannabis genetics, strain development, cultivation, and processing. This partnership will directly contribute to the emerging medical cannabis industry in Australia, allowing for improved patient access in that market, creating a leadership position for Australia and Canopy Growth in the Asia Pacific geography.

**Alcaliber S.A.**

On September 11, 2017, the Company and its wholly-owned subsidiary Spektrum announced a supply license agreement with Spain's Alcaliber, S.A. ("Alcaliber"). Per the supply license agreement, Canopy Growth and Spektrum will grant Alcaliber a license to use certain strains and seeds to be grown and cultivated at Alcaliber's facilities for sale worldwide.

Alcaliber specializes in research and development, breeding and cultivation, and the extraction, purification and preparation of Narcotic Raw Materials ("NRMs") and Active Pharmaceutical Ingredients ("APIs"). Last year, Alcaliber exported 125 tonnes of alkaloids to 40 countries around the world, representing a 20% market share for NRMs. Alcaliber has been granted a license to cultivate, produce, manufacture, export/import, and commercialize cannabis for medical and scientific purposes by the Spanish Agency of Medicinal Products and Medical Devices.

On March 19, 2018, Canopy Growth confirmed that the Company had completed a transfer of 1,500 cannabis clones Alcaliber completing the first phase of the partnership announced on September 11, 2017.

**Bedrocan Brasil S.A. and Entourage Phytolab S.A**.

On June 28, 2016, the Company announced an agreement with São Paulo, Brazil-based Entourage. Under the agreement, wholly-owned subsidiary Bedrocan Canada, Bedrocan International BV (formerly Bedrocan Beheer BV) and local Brazilian partners created a new company called Bedrocan Brasil, which will facilitate the importation of Bedrocan's proprietary standardized cannabis varieties and know-how into the Brazilian market. Additionally, Canopy Growth will partner with Entourage to develop cannabis-based pharmaceutical medical products for the Brazilian and international markets and launch a clinical research plan.

25

Canopy Growth's holding in Entourage is 38.5% and its holding in Bedrocan Brasil is 39.4%.

**CORPORATE POSITION ON CONDUCTING BUSINESS IN THE UNITED STATES AND OTHER INTERNATIONAL JURISDICTIONS WHERE CANNABIS IS FEDERALLY-ILLEGAL**

As cannabis is federally illegal in the US., Canopy Growth does not engage in any U.S. cannabis- related activities as defined in Canadian Securities Administrators Staff Notice 51-352. While the Company has a number of partnerships with U.S.-based companies that may themselves participate in the U.S. cannabis market, these relationships are licensing relationships that see intellectual property developed in the United States brought into Canada, and in no manner involve Canopy Growth in any US activities respecting cannabis.

Canopy Growth will only conduct business activities related to growing or processing cannabis, in jurisdictions where it is federally legal to do so. Canopy Growth believes that conducting activities which are federally-illegal, or investing in companies which do, puts the company at risk of prosecution, puts at risk its ability to operate freely, and potentially could jeopardize its listing on major exchanges now and in the future, limiting access to capital from large and reputable global funds.

While the Company will not engage in cannabis-related activities in the U.S related to growing and processing cannabis so long as cannabis is federally-illegal, Canopy Growth has developed specific plans related to establishing business operations in the U.S. in the event cannabis becomes federally legal. The Company has entered into option agreements to purchase certain cultivation infrastructure (for capped capital investment amounts) should cannabis be rescheduled to become a legal substance in the U.S.

**PRODUCT DIVERSIFICATION**

Management also believes a significant potential future opportunity exists, within an appropriate regulatory framework, to improve the Company's profit margins by vertically integrating up the value chain towards products that treat cannabis and cannabinoids as ingredients rather than the base product. This view applies to the medical and regulated recreational cannabis/cannabinoid markets.

**Development of Cannabis-Based Medical Therapies - Canopy Health Innovations**

Canopy Growth established the cannabis research incubator, Canopy Health Innovations Inc. ("Canopy Health"), to develop and research clinically ready cannabis drug formulations and dose delivery systems. Canopy Health has put a team in place to evaluate, prepare for, and develop cannabis drug formulations and dose delivery systems. The role of the Canopy Health is to act as the pre-clinical and clinical research arm of the Company, which would include elements of product design and ingredient selection, formulation, safety and efficacy testing, and pre-clinical and clinical trials (to the extent required), for a range of products which are anticipated to be developed as the regulatory framework and market evolve.

Canopy Health established subsidiary Canopy Animal Health ("CAH") to create Cannabis-derived products for applications in veterinary medicine. CAH intends to adapt Cannabis extracts to develop formulations that can be used to create pharmaceutical products for pets. As in the human market, there is a great unmet medical need in the veterinary market to provide effective therapeutics with acceptable safety profiles. CAH is in the process of developing Cannabis-based products that veterinarians can provide via a prescription drug process.

The development and maintenance of a robust IP program is a key element of the Company Health's strategy. The purpose of the program is to build, or otherwise secure, protected status, through patents and otherwise (trademarks, trade secrets, plant breeders rights, copyrights, and other forms of intellectual property). IP is important in order to create competitive advantage in the marketplace and provide an opportunity to earn appropriate economic returns on R&D investments.

On April 9, 2018, the Company announced the launch of Beckley Canopy Therapeutics ("Beckley Canopy"), a partnership between Canopy Health and drug research pioneer Lady Amanda Feilding and the Beckley Foundation ("Beckley"). The partnership will combine Amanda Feilding's 20+ year track record of groundbreaking research and network of world-renowned scientific collaborators with Canopy Health's leadership in the commercial cannabis and pharmaceutical industries, bringing together European and North-American based research leaders in cannabis.

26

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH    Document 83-3    Filed 10/12/21    Page 102 of 125
cgc-ex993_211.htm
PageID: 6161

To date, Canopy Health has filed thirty-nine (39) US provisional patent applications, across a range of cannabis and cannabinoid uses, compositions, formulations, indications, methods of delivery, and dosing regimens, including the following areas:

- Insomnia and its various sub-groups
- Amyotrophic Lateral Sclerosis ("ALS")
- Fibromyalgia
- Anxiety and its various sub-groups (in humans and animals, in conjunction with Canopy Animal Health)
- Cognitive enhancement (in humans and animals, in conjunction with Canopy Animal Health)
- Pain and various sub-groups (in humans and animals, in conjunction with Canopy Animal Health)
- Opioid sparing, pain management, and addiction (through Beckley Canopy Therapeutics)
- Addiction and smoking cessation (through Beckley Canopy Therapeutics)
- A platform and method for delivery of cannabis-based compositions

US provisional patent applications are commonly used to establish a priority date for the protection of novel inventions. As is common practice globally, Canopy Health has used the United States as its "first to file" jurisdiction, affording protection of its provisional patent application priority dates in that jurisdiction and others through the ordinary course patent process. From the point of such a US provisional patent application filing, the filer then has one year from the filing date to add additional disclosure to the confidential application and determine whether to (a) file a non-provisional, utility patent application and proceed through prosecution with a view to patent issuance, or (b) abandon the provisional patent application. At the same time, the filer must determine whether to file what is commonly called a PCT (Patent Co-operation Treaty) patent to pursue registration in other countries. The PCT application process preserves the original US provisional patent application filing date and allows the filer approximately 30 months from the filing of the US provisional patent application filing date to select and file in the individual contracting states of its choosing.

It is the intention of Canopy Health to continue to build its intellectual property base through a range of strategies and tactics, including but not limited to, filing additional provisional applications, conversion of those provisional applications into non-provisional utility filings, prosecution of utility filings through to issuance, and extending filings into various additional countries.

Canopy Health plans to graduate product offering over time to higher order formulations and advanced delivery methods, enrich the composition of matter with actives, and ultimately combine cannabis/cannabinoid-based actives with other active pharmaceutical ingredients. This additional breadth and sophistication in offering would allow precision in delivery and innovation in content to better serve the nuanced needs of patients and address additional disease areas with increased specificity.

To date, Canopy Health has raised over $15,800 in development capital, including $4,000 from the Company. The Company's interest in Canopy Health common shares is 43.9%.

On May 15, 2018, Canopy Growth announced that the Company would acquire all of its unowned interest in Canopy Health and CAH. The Canopy Health management team will remain in place to continue pursuing IP protection, clinical work, and product formulation for both human and animal cannabinoid programs alongside Canopy Growth's team. Pursuant to the Arrangement Agreement, shareholders of Canopy Health (other than Canopy Growth) will receive 0.3790 common shares of the Company for each common share of CHI held (the "Exchange Ratio"). In addition, Canopy Growth will issue options to purchase common shares of Canopy Growth in exchange for options previously issued by Canopy Health and CAH, based on the Exchange Ratio. In the aggregate, Canopy Growth will issue 3,037,771 common shares, having a value of $91,574 (based on the 5-day volume weighted average price of Canopy Growth's common shares on the TSX as of May 11, 2018 (the "5-day VWAP)), along with options having an aggregate "in-the-money" value of $9,688 (based on the 5-day VWAP) for aggregate transaction consideration of $101,262. The transaction will be undertaken by way of a plan of arrangement and is subject to a number of customary conditions including the approval of the Ontario Superior Court, CHI shareholders and the Toronto Stock Exchange. The transaction is anticipated to close on or before July 31, 2018.

On June 12, 2018, the Company announced that Canopy Health has received approval from Health Canada to proceed with Phase IIb "in-human" clinical trials to evaluate the use of medical cannabis in the treatment of insomnia. The trial will be conducted in collaboration with a leading Canadian research institution.

27

**Development of Cannabis-based Consumer Recreational Products**

The Canadian federal government has indicated that the sale of value-added cannabis-based Consumer Recreational products will be permitted within one of year of the opening of the legal recreational cannabis market in Canada. These products can be expected to include higher concentrated vaping oils (along with related device hardware), edibles and beverages.

Canopy Growth is actively laying the foundation for these products through investment in a range of research and development efforts, the licensing of intellectual property from innovative entrepreneurs in the cannabis industry and the acquisition its select technologies.

**Development of Cannabis-based Beverages**
Management believes the benefits that cannabis-based beverages can offer consumers including tailored consumption experiences, consumption with reduced/no weight gain, no "hangover", and limited/no negative interaction with traditional pharmaceutical medications, could cause significant demand to develop for cannabis-based beverages and resulting disruption to traditional alcohol beverage markets.

Canopy has invested significant resources in researching and developing technologies, processes and applications involved in the creation of clear, shelf-stable cannabis-based beverages that offer a social experience similar to that of traditional sugar-based alcoholic beverages, specifically, a rapid on-set and shorter duration. Similar to the IP program at Canopy Health, Canopy Growth has built, or otherwise secured, protected status, through patents and other IP forms.

**Development of Cannabis-based Beverages – Strategic Relationship with Constellation Brands**

October 30, 2017, Canopy Growth announced that it had entered a strategic relationship with the leading total beverage alcohol supplier in the United States, Constellation Brands ("Constellation") (NYSE: STZ and STZ.B). Constellation is a leading international producer and marketer of a fast-growing, high-performing portfolio of beer, wine and spirits brands.

In the strategic relationship, Constellation is providing broad support in the areas of consumer analytics, market trending, marketing and brand development to Canopy Growth. In addition, Canopy Growth and Constellation intend to collaborate to develop and market cannabis-based beverages that can be marketed as regulated recreational products in markets where and when such products are federally legal.

As part of the strategic relationship, an affiliate of Constellation invested approximately $245 million in Canopy Growth in exchange for common shares that, following the transaction which closed on November 2, 2017, represents a 9.9% equity share in the Company as at such date.

In exchange for the investment, a total of 18,876,901 Canopy Growth common shares were issued on November 2, 2017 at a price of $12.9783 per share based on a 5-day volume weighted average price (VWAP) as of the close of markets on October 27, 2017. An equal number of common share purchase warrants will be issued at the same price, subject to certain restrictions, expiring 30 months from the closing date. The common shares and warrants will have a hold period of four months and one day from the closing date, with the warrants being exercisable in two equal tranches, with the first exercisable tranche date being August 1, 2018 and the second exercisable tranche date being February 1, 2019. The Company will principally use the proceeds to fund the expansion of its growing platform and to support ongoing investments in value-add processing and new product development and research.

**Cannabis-based Consumer Recreational Products – Strategic Licensing**

On July 20, 2017, Isodiol International Inc. ("Isodiol") announced it had signed a licensing agreement with the Company. Under this licensing agreement, Canopy Growth will have the right to manufacture and distribute Isodiol's "Pot-O-Coffee" and "Pot-O-Tea" branded cannabis infused single serve K-Cup products in Canada and certain other markets internationally as federal regulations allow. Licensed products include caffeinated and de-caffeinated product lines as well as Isodiol's single serve "Pot-O-Coco". In addition to the Canadian rights, Canopy Growth shall have the right of first refusal to sell the "Pot-O" brand products in any territory outside of the US, Mexico and Puerto Rico.

28

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 104 of 125
cgc-ex993_211.htm
PageID: 6163

On September 28, 2017, the Company and Skinvisible Pharmaceuticals, Inc. ("Skinvisible"), a research and development company with a patented drug delivery system, announced they have signed a definitive license agreement for Skinvisible's patented topical formulations. Per the agreement, Canopy Growth is exclusively licensed to distribute Skinvisible's topical products in Canada and shall have a first right of refusal for all other countries, excluding China and the United States. The agreement covers two distinct product lines made with Skinvisible's Invisicare® technology. Skinvisible will first develop unique topical hemp-based products that will be launched by Canopy Hemp Corporation in Canada. The agreement also includes potential cannabis-based topical products using the Invisicare® technology, when and if federal regulations permit CBD or THC infused topical products for sale in Canada.

On November 7, 2017, the Company announced it had signed a definitive licensing agreement with Farm to Farma Inc. ("FTF") for FTF's innovative Trokie® lozenges. Under this licensing agreement, Canopy Growth will have the exclusive right to manufacture and distribute FTF's Trokie® lozenges through its subsidiaries in Canada, as permitted by federal regulations, and shall have a first right of offer for all other countries where federally legal and excluding the United States.

**HEMP-Based Products**

The Company has taken steps to diversify its cannabis-related business into the development, production and sale of hemp-based medical, regulated recreational and industrial products. Hemp and cannabis come from the *Cannabis sativa L* specie, but are genetically distinct and are further distinguished by use, chemical makeup and cultivation methods. Hemp, which refers to the non-psychoactive (less than 0.3% THC) varieties of *Cannabis sativa L*, is a renewable raw material used in thousands of products including health foods, body care, clothing, construction materials, biofuels and plastic composites. The Company believes that entry into the regulated hemp market, whose regulations allow for more robust consumer-facing brand marketing, advertising and retail channels, will serve to strengthen the Company's consumer facing brands in the future.

On January 25, 2018, the Company announced that it has closed the acquisition of assets and intellectual property from Green Hemp Industrie Ltd. ("Green"). Combining the Company's expertise in large-scale cannabinoid extraction processes with Green's unique whole-plant hemp harvesting knowledge and library of stable CBD-rich hemp genetics to positions Canopy Growth leader in low-cost, high yield CBD production. On closing, the Company issued 24,576 common shares. The Company may issue up to another 24,576 common shares if certain production related milestones are achieved.

29

**RESULTS OF OPERATIONS**

The following table sets forth consolidated statements of operations and balance sheet data, which is expressed in thousands of Canadian dollars, except share and per share amounts, for the indicated periods.

**SELECTED OPERATIONAL INFORMATION**
*(CDN $000's, except share amounts)*

|  | Three Months Ended | | Year Ended | |
|  | March 31, 2018 | March 31, 2017 | March 31, 2018 | March 31, 2017 |
|---|---|---|---|---|
| Revenue | 22,806 | 14,661 | 77,948 | 39,895 |
| Gross margin before fair value impacts in cost of sales | 8,517 | 9,058 | 40,158 | 24,602 |
| Gross margin before fair value impacts in cost of sales % | 37% | 62% | 52% | 62% |
| Gross margin | 7,177 | 2,499 | 74,192 | 38,714 |
| Gross margin % | 31% | 17% | 95% | 97% |
| Operating expenses before acquisition costs and non-cash operating expenses | 32,173 | 9,509 | 114,103 | 36,141 |
| Total operating expenses | 58,209 | 23,415 | 156,473 | 52,797 |
| Loss from operations | (51,032) | (20,916) | (82,281) | (14,083) |
| Net loss after taxes | (54,361) | (12,029) | (54,134) | (7,572) |
| Net loss attributable to Canopy Growth Corporation | (61,544) | (11,994) | (70,353) | (7,521) |
| Net loss per share - basic and diluted | $ (0.31) | $ (0.08) | $ (0.40) | $ (0.06) |
| Weighted average shares - basic and diluted | 196,571,715 | 147,060,478 | 177,301,767 | 118,989,713 |

| Selected statements of financial position information | March 31, 2018 | March 31, 2017 |
|---|---|---|
| Cash and cash equivalents | 322,560 | 101,800 |
| Biological assets | 16,348 | 14,725 |
| Inventory | 101,607 | 45,981 |
| Other working capital | (49,209) | (5,874) |
| Current and long-term debt | 8,422 | 10,330 |
| Other long-term liabilities | 61,150 | 766 |
| Deferred tax liability | 33,536 | 35,924 |
| Shareholders' equity | 1,243,238 | 639,726 |

30

10/8/21, 1:48 PM   Case 2:19-cv-20543-MCA-MAH    Document 83-3  Filed 10/12/21    Page 106 of 125
cgc-ex993_211.htm
PageID: 6165

**FOURTH QUARTER REVIEW**

Results of Operations for the three months ended March 31, 2018 as compared to the three months ended March 31, 2017.





31

**SELECTED QUARTERLY INFORMATION**

|  | | Q4'18 | | Q3'18 | | Q2'18 | | Q1'18 |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 22,806 | $ | 21,700 | $ | 17,569 | $ | 15,873 |
| Net income (loss) attributable to Canopy Growth Corporation | | (61,544) | | 1,583 | | (1,338) | | (9,054) |
| Net income (loss) per share - basic | $ | (0.31) | $ | 0.01 | $ | (0.01) | $ | (0.06) |
| Weighted average shares - basic | | 196,571,715 | | 182,029,481 | | 167,226,218 | | 163,884,269 |
| Net income (loss) per share - diluted | $ | (0.31) | $ | 0.01 | $ | (0.01) | $ | (0.06) |
| Weighted average shares - diluted | | 196,571,715 | | 194,739,044 | | 167,226,218 | | 163,884,269 |

|  | | Q4'17 | | Q3'17 | | Q2'17 | | Q1'17 |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 14,661 | $ | 9,752 | $ | 8,498 | $ | 6,984 |
| Net income (loss) attributable to Canopy Growth Corporation | | (11,994) | | 2,992 | | 5,430 | | (3,949) |
| Net income (loss) per share - basic | $ | (0.08) | $ | 0.03 | $ | 0.05 | $ | (0.04) |
| Weighted average shares - basic | | 147,060,478 | | 116,813,261 | | 108,872,770 | | 103,663,724 |
| Net income (loss) per share - diluted | $ | (0.08) | $ | 0.02 | $ | 0.05 | $ | (0.04) |
| Weighted average shares - diluted | | 147,060,478 | | 123,034,872 | | 112,254,363 | | 103,663,724 |

## REVENUE

Total revenue for the three months ended March 31, 2018 was $22,806 representing a 55% increase over the quarter ended March 31, 2017.

The Company believes the sale of cannabis oils will represent a significant revenue stream going forward. In the three months ended March 31, 2018 and 2017, oils, including gel caps, both accounted for 23% of product revenue for each respective period.

The total quantity of cannabis sold during the three months ended March 31, 2018 was 2,528 kilograms and kilogram equivalents at an average price of $8.43 per gram, up from 1,740 kilograms and kilogram equivalents at an average price of $8.03 in same period last year due to changes in the mix of product sold and increasing sales in Germany.

## COST OF SALES

Plants that are in pre-harvest are considered biological assets and are capitalized on the balance sheet at fair market value less cost to sell at their point of harvest. Fair market value estimates are based directly on the Company's selling list prices for specific medical cannabis strains and estimated or expected selling prices to provincial crown corporations in a regulated domestic recreational market, as applicable, though no such prices have yet been established. Costs to sell include post-harvest, trimming, fulfillment, testing and shipping costs. As they continue to grow through the pre-harvest stages, a corresponding non-cash unrealized gain is recognized in income through cost of sales, reflecting the changes in fair value of the biological assets. At harvest, the biological assets are transferred to inventory at their fair value, which becomes the deemed cost for inventory. Inventory is later expensed to cost of sales when sold. In addition, the inventory production costs are expensed through cost of sales and represents overheads and other production costs of growing, processing and selling cannabis products. Together, the inventory production costs expensed, the fair value changes in biological assets included in inventory sold and other inventory charges, and the gain from changes in the fair value of biological assets comprise cost of sales. Management expects cost of sales to vary from quarter to quarter based on the number of pre-harvest plants, the strains being grown, and where the pre-harvest plants are in the grow cycle at the end of the period.

During the three months ended March 31, 2018, the Company harvested 4,811 kilograms. In comparison, during the three months ended March 31, 2017, the Company harvested 1,980 kilograms. The Company is ramping up production and inventories for later in calendar 2018 when the legalized recreational market is expected to commence to meet expected demand from consumers and the provinces.

The net cost of sales of $15,629 during the three months ended March 31, 2018 was comprised of inventory production costs expensed to cost of sales of $14,289, fair value changes in biological assets included in inventory sold and other inventory charges of $19,929 offset by the unrealized gain on changes in the fair value of biological assets of $18,589. The impact of changes in the fair value of biological assets recorded during the quarter was due in large part to the full utilization of Tweed Farms in Niagara-on-the-Lake and part utilization of BC Tweed offset by a lower amount of biological assets at Smiths Falls, Ontario as 7 of the 24 flower rooms at that facility were re-purposed, for clone propagation for other sites and the preparation of a large footprint pre-pack room, which reduced growing capacity for commercial harvest. In the quarter ended

32

March 31, 2017, the net recovery to cost of sales was $12,162 with inventory production costs expensed amounting to $5,603 fair value changes in biological assets included in inventory sold and other inventory charges of $9,363 offset by the unrealized gain on changes in the fair value of biological assets of $2,804.

The inventory production costs expensed to cost of sales of $14,289 is principally comprised of the cash costs of the inventory sold in the period of $8,397 and $5,892 of cash operating costs of subsidiaries not yet cultivating or selling cannabis, such as BC Tweed, Vert Mirabel, Tweed 53 (Edmonton, Alberta) and Spot Therapeutics (Fredericton, New Brunswick). This compares to the same period last year when the inventory production costs expensed to cost of sales of $5,603 was comprised of the cash costs of inventory sold in the period of $5,514 and $89 of cash operating costs of subsidiaries not yet cultivating or selling cannabis.

Management has made the decision to no longer report the weighted average cost per gram metric. There are three reasons for this change. First, there is no industry standard for cost per gram components or classification, a situation that management believes may cause investor confusion. Second, consistent with our long held and communicated view that the cannabis market will move beyond traditional dried flower products to cannabis as an ingredient in branded consumer products and medical therapies, management believes the sector will move away from measurements of the weight of the plant only, to milligram measurements of THC, CBD and other cannabinoid ingredients as new product formats are introduced. Lastly, management believes other key performance indicators will evolve as the legal recreational and retail market takes hold in Canada.

**GROSS MARGIN**

The fourth quarter Fiscal 2018 gross margin before the effects of IFRS fair value impacts in cost of sales and other inventory charges, and excluding the costs of non-cultivating subsidiaries and assets, totaling $5,892, was $14,409 or 63% of sales.

The fourth quarter Fiscal 2018 gross margin before the effects of the IFRS fair value impacts in cost of sales and other inventory charges was $8,517 or 37% of sales, as compared to $9,058 or 62% of sales in the fourth quarter of last year. The lower gross margin percentage was due primarily to the impact of cash operating costs of subsidiaries not yet cultivating or selling cannabis, described earlier in this MD&A.

The IFRS reported gross margin was $7,177 or 31% of revenue, for the three-month period ended March 31, 2018. In the comparative period ended March 31, 2017, the gross margin on the same basis was $2,499 or 17% of revenue. Gross margin includes the fair value changes in biological assets included in inventory sold and other inventory charges and unrealized gain on changes in fair value of biological assets.

The IFRS gross margin was mostly impacted by the full utilization of Tweed Farms greenhouse, partial utilization of BC Tweed facilities, full operation of the Bowmanville facility partially offset by a lower amount of biological assets at the Company's Smiths Falls facility which resulted in a higher gain on changes in the fair value of biological assets relative to the fourth quarter of last year.

As noted earlier in this MD&A, beginning in the third quarter of Fiscal 2018, 7 of 24 flower rooms in the Company's Smiths Falls, Ontario facility were repurposed for mother/clone rooms to produce over 200,000 clones deployed in the planting of over 1.7 million sq. ft. of additional greenhouse space in the first half of calendar 2018 and additional fulfillment capability, was necessary and worthwhile as it positions the Company to supply larger quantities of cannabis and generate increasing revenues beginning in the second quarter of fiscal 2019.

The Company's announced production expansion plans, which will add up to 3.2 million sq. ft. over the next 12 months, are expected to yield harvests that will produce increased volumes of available inventories for domestic sales and for export. The Company continues to refine its production processes and methodologies to increase production yields and gross margins.

33

**OPERATING EXPENSES**

Sales and marketing expenses include staffing levels in marketing and sales functions needed to service the coming regulated recreational and international markets, costs associated with the development of marketing and branding programs, the development of new permitted product SKUs, the development of recreational product packaging, the development of cannabis retail and education programs as well as costs associated with the Company's medical outreach program and the growing customer care center which interfaces directly with the Company's growing base of patients. Since March 31, 2017, the number of patients has grown from over 55,000 to over 74,000 at March 31, 2018. The outreach program is targeted towards ensuring that healthcare practitioners understand how they can incorporate medical cannabis into their practices. These expenditures are consistent with the Company's view that strong brand recognition is essential to the Company's successful ongoing customer acquisition strategy, particularly in the coming recreational market in Canada. These costs represent a strategic investment, which management believes will have a future benefit in customer acquisition and retention. Further, the Company is making these investments to aggressively seek new domestic and international business opportunities to build for the future.

As a result, sales and marketing were up significantly relative to the same periods last year for the purpose of being ready for the recreation market while currently still operating in a medical market in the fourth quarter and through the first half of fiscal 2019. Specifically, sales and marketing expenses for the three months ended March 31, 2018 were $14,751 or 65% of revenue. In comparison, sales and marketing expenses for the three months ended March 31, 2017 were $4,110 or 28% of revenue.

Research and development ("R&D") expenses for the three months ended March 31, 2018 and 2017 were $539 or 2% of revenue and ($535) or 4% of revenue, respectively.

The Company's R&D team is researching a variety of intellectual property opportunities, including those relating to growth patterns under different environmental scenarios and the genetics of various strains, the production of encapsulated cannabis oil capsules in higher volumes as well as in the development and implementation of internal testing resources, capabilities and procedures. In addition, the Company has invested in the development of patent pending technology related to equipment that the Company has engineered specifically for the cannabis industry to be incorporated in Canopy Growth's operations. Also, ongoing R&D work being performed in the Company's Dealers License Area is expected to lead to the development of new cannabis-based product form factors that will enter the market when permitted.

General and administrative ("G&A") expenses for the three months ended March 31, 2018 and 2017 were $16,883 and $5,934, respectively and 74% and 40% of sales, respectively.

The G&A expenses increased as the company scaled up to be ready for the Canadian legal recreational market, international expansion, and increased governance costs associated with listing on the New York Stock Exchange. G&A includes higher legal and professional services fees related to investments in governance, expanded operations and supporting business development as well as expanding the Company's information technology capability. G&A expenses also included higher employee compensation costs due to increased staff levels, necessary use of consultants and advisory services while expanding and commercializing the Company's operations, compliance costs associated with meeting Health Canada requirements, as well as other public company compliance related expenses including related professional fees. Overall, the increase in G&A reflects the Company's growth and building of commercial capacity and capability. As international expansion forms a key component of the Company's business growth strategy, the Company expects to incur related costs, such as legal and tax advice, while pursuing these business ventures in the future.

Acquisition-related expenses for the three-month period ended March 31, 2018 and 2017 were $915 and $5,394, respectively. Acquisition-related expenses in the fourth quarter period ended March 31, 2017 were primarily related to the Mettrum acquisition of $4,581. The remaining $813 was due to the ongoing evaluation of potential acquisitions performed during the period and increased legal, accounting and strategic business consulting services required to complete or evaluate the transactions. The Company may acquire strategic businesses and assets in the future as it pursues its growth strategy. As such, the Company may incur related acquisition expenses, including legal, accounting and strategic business consulting service related fees, in the future.

34

Share-based compensation expense for the three month period ended March 31, 2018 and 2017 related to options granted to employees and consultants of the Company and to acquisition-related milestones, of $20,170 and $5,391, respectively. The acquisition-related milestone share based compensation during the three months ended March 31, 2018 primarily related to Spectrum Denmark, BC Tweed, Apollo and Bodystream and to other affiliates, as summarized in Note 20 to the Annual Financial Statements.

## ADJUSTED EBITDA (NON-GAAP MEASURE)

The Company's "Adjusted EBITDA" is a Non-GAAP metric used by management that does not have any standardized meaning prescribed by IFRS and may not be comparable to similar measures presented by other companies. Management defines the Adjusted EBITDA as the Income (loss) from operations, as reported, before interest, tax, and adjusted for removing other non-cash items, including the share-based compensation expense, depreciation, and the non-cash effects of accounting for biological assets and inventories, and further adjusted to remove acquisition related costs. Management believes Adjusted EBITDA is a useful financial metric to assess its operating performance on a cash adjusted basis before the impact of non-cash items and acquisition activities.

Adjusted EBITDA in the fourth quarter fiscal 2018 amounted to a loss of $22,898 compared to a loss of $146 in the same period last year.

**CANOPY GROWTH CORPORATION**
**Adjusted EBITDA[1] Non-GAAP Measure**

| (In CDN$000's) | Three Months Ended | |
| --- | --- | --- |
| | March 31, 2018 | March 31, 2017 |
| **Adjusted EBITDA[1] Reconciliation** | | |
| **Loss from operations - as reported** | $ (51,032) | $ (20,916) |
| | | |
| **IFRS non-cash accounting related to biological assets and inventory** | | |
| Fair value changes in biological assets included in inventory sold and other inventory charges | 19,929 | 9,363 |
| Unrealized gain on changes in fair value of biological assets | (18,589) | (2,804) |
| | 1,340 | 6,559 |
| | | |
| Share-based compensation expense (per statement of cash flows)[2] | 20,928 | 5,696 |
| Acquisition Costs | 915 | 5,394 |
| Depreciation and amortization | 4,951 | 3,121 |
| | 26,794 | 14,211 |
| **Adjusted EBITDA** | $ (22,898) | $ (146) |

*1 - Adjusted EBITDA is Earnings Before Interest, Tax, and Depreciation and other non-cash items, and as adjusted for acquisition related items.*

*2 - Includes $8,247 and $690 for the three months ended March 31, 2018 and 2017, respectively, in share-based compensation expense related to acquisition milestones*

## OTHER EXPENSES AND NET INCOME

Other expenses are made up of fair value changes on financial assets of $46,169 for the three months ended March 31, 2018, which is recognized primarily from the strategic agreement with TerrAscend. The warrants represent a derivative financial instrument that is initially measured at fair value and subsequently remeasured to its fair value at the end of each reporting period with changes in fair value recorded in the consolidated statement of operations through profit and loss. The Company also recognized $5,776 for the three months ended March 31, 2018, which is recognized from the strategic agreement with AusCann. Under the agreement, the Company obtained shares and options. The options represent a derivative financial instrument that is initially recognized at fair value and subsequently remeasured to its fair value at the end of each reporting period. The Company also recognized $5,210 related to the Company's ownership in HydrRx. In the quarter ended March 31, 2018 HydrRx completed a financing that provided a measure of the fair value of the warrants. The difference between the carrying amount of the warrants and this fair value for the warrants was recorded in the consolidated statement of operations through profit and loss.

35

The above was more than offset by an impairment loss of $28,000 related to the arbitration proceedings against Bedrocan International BV, fair value increases on BC Tweed and Vert Mirabel put liabilities of $21,000, and a partner sharing expense of $4,995 related to the BC Tweed partners. Please refer to the Annual Financial Statements for more information.

The Company recorded an income tax expense of $8,042 for the three months ended March 31, 2018 relating to changes in the deferred tax liability. In the comparative period last year, the Company recorded income tax expense of $3,566.

Net earnings for the three months ended March 31, 2018 was $54,361 compared to net loss of $12,029 in the comparative period last year.

**ANNUAL REVIEW**

Results of Operations for the year ended March 31, 2018 as compared to the year ended March 31, 2017.

**REVENUE**

Total revenue for the year ended March 31, 2018 was $77,948 representing a 95% increase over the year ended March 31, 2017.

The Company believes the sale of cannabis oils will represent a significant revenue stream going forward. In the year ended March 31, 2018 and 2017, oils, including gel caps, accounted for 22% and 12% of product revenue, respectively.

The total quantity of cannabis sold during the year ended March 31, 2018 was 8,708 kilograms and kilogram equivalents at an average price of $8.24 per gram, up from 5,139 kilograms and kilogram equivalents at an average price of $7.40 in same period last year due to an increasing mix of oil products and oil-based soft gel caps being sold as well as the increasing Germany sales.

**COST OF SALES**

During the year ended March 31, 2018, the Company harvested 22,513 kilograms. In comparison, during the twelve ended March 31, 2017, the Company harvested 10,837 kilograms. The Company is ramping up production and inventories for later in calendar 2018 when the legalized recreational market is expected to commence to meet expected demand from consumers and the provinces.

The net cost of sales of $3,756 during the year ended March 31, 2018 was comprised of inventory production costs expensed to cost of sales of $37,790, fair value changes in biological assets included in inventory sold and other inventory charges of $66,268 offset by the unrealized gain on changes in the fair value of biological assets of $100,302. The impact of changes in the fair value of biological assets recorded during the year was due in large part to the full utilization of Tweed Farms in Niagara-on-the-Lake, part utilization of BC Tweed, the new grow rooms fully operating at Smiths Falls, and to the refitted former Mettrum Bowmanville facility back in full production. In the year ended March 31, 2017, the net cost of sales was $1,181 with inventory production costs expensed amounting to $15,293 fair value changes in biological assets included in inventory sold and other inventory charges of $34,978 offset by the unrealized gain on changes in the fair value of biological assets of $49,090.

The inventory production costs expensed to cost of sales of $37,790 is principally comprised of the cash costs of the inventory sold in the period of $26,415 $11,375 related to cash operating costs of subsidiaries not yet cultivating or selling cannabis, such as BC Tweed, Vert Mirabel (Quebec), Tweed 53 (Edmonton, Alberta) and Spot Therapeutics (Fredericton, New Brunswick). This compares to the same period last year when the inventory production costs expensed to cost of sales of $15,293 was comprised of the cash costs of inventory sold in the period of $15,154 and $139 of cash operating costs of subsidiaries not yet cultivating or selling cannabis.

36

**GROSS MARGIN**

The fiscal year 2018 gross margin before the effects of the IFRS fair value impacts in cost of sales and other inventory charges was $40,158 or 52% of sales, as compared to $24,602 or 62% of sales in fiscal 2017. The lower gross margin percentage was due primarily to the impact of cash operating costs of subsidiaries not yet cultivating or selling cannabis, described earlier in this MD&A. Excluding the costs of the non-cultivating subsidiaries totaling $11,375, the gross margin before non-cash gains and losses would have been $51,533 or 66% of sales.

The IFRS reported gross margin was $74,192 or 95% of revenue, for the twelve-month period ended March 31, 2018. In the comparative period ended March 31, 2017, the gross margin on the same basis was $38,714 or 97% of revenue. Gross margin includes the fair value changes in biological assets included in inventory sold and other inventory charges and unrealized gain on changes in fair value of biological assets.

The IFRS gross margin was mostly impacted by the full utilization of Tweed Farms, part utilization of BC Tweed, the new grow rooms in use at Smiths Falls and Bowmanville fully operating again to result in a higher gain on changes in the fair value of biological assets relative to fiscal 2017.

The Company's announced production expansion plans, which will add up to 3.2 million sq. ft. over the next 12 months, are expected to yield harvests that will produce increased volumes of available inventories for domestic sales and for export. The Company continues to refine its production processes and methodologies to increase production yields and gross margins.

**OPERATING EXPENSES**

Sales and marketing expenses include staffing levels in marketing and sales functions needed to service the coming regulated recreational and international markets, costs associated with the  development of marketing and branding programs, the development of new permitted product SKUs, the development of recreational product packaging, the development of cannabis retail and education programs as well as costs associated with the Company's medical outreach program and the growing customer care center which interfaces directly with the Company's growing base of patients. As a result, sales and marketing were up significantly relative to last year for the purpose of being ready for the recreation market while currently still operating in a medical market. Specifically, sales and marketing expenses for the year ended March 31, 2018 were $38,203 or 49% of revenue. In comparison, sales and marketing expenses for the year ended March 31, 2017 were $12,960 or 32% of sales.

Research and development ("R&D") expenses for the year ended March 31, 2018 and 2017 were $1,453 or 2% of revenue and $810 or 2% of revenue, respectively.

The Company's R&D team is researching a variety of intellectual property opportunities, including those relating to growth patterns under different environmental scenarios and the genetics of various strains, the production of encapsulated cannabis oil capsules in higher volumes as well as in the development and implementation of internal testing resources, capabilities and procedures. In addition, the Company has invested in the development of patent pending technology related to equipment that the Company has engineered specifically for the cannabis industry to be incorporated in Canopy Growth's operations. Also, ongoing R&D work being performed in the Company's Dealers License Area is expected to lead to the development of new cannabis-based product form factors that will enter the market when permitted.

General and administrative ("G&A") expenses for the year ended March 31, 2018 and 2017 were $43,819 and $16,858, respectively and 56% of sales and 42% of sales, respectively.

The G&A expenses include higher legal and professional services fees related to investments in governance, expanded operations and supporting business development as well as expanding the Company's information technology capability. G&A expenses also included higher employee compensation costs due to increased staff levels, necessary use of consultants and advisory services while expanding and commercializing the Company's operations, compliance costs associated with meeting Health Canada requirements, as well as other public company compliance related expenses including related professional fees. Overall, the increase in G&A reflects the Company's growth and building of commercial capacity and capability. As international expansion forms a key component of the Company's business growth strategy, the Company expects to incur related costs, such as legal and tax advice, while pursuing these business ventures in the future.

37

10/8/21, 1:48 PM    Case 2:19-cv-20543-MCA-MAH    Document 83-3 Filed 10/12/21    Page 113 of 125
cgc-ex993_211.htm
PageID: 6172

Acquisition-related expenses for the year ended March 31, 2018 and 2017 were $3,406 and $7,369, respectively. Acquisition-related expenses in the fiscal year ended March 31, 2018 were primarily related to the ongoing evaluation of potential acquisitions performed during the period and increased legal, accounting and strategic business consulting services required to complete or evaluate the transactions. Acquisition related expenses for the year ended March 31, 2017 included $5,190 related to the acquisition of Mettrum, $630 related to M&A advisory services, $372 related to the acquisition of Spektrum and $94 related to the acquisition of Vert. The Company may acquire strategic businesses and assets in the future as it pursues its growth strategy. As such, the Company may incur related acquisition expenses, including legal, accounting and strategic business consulting service related fees, in the future.

Share-based compensation expense related to options granted to employees and consultants of the Company and to acquisition-related milestones, of $29,631 and $19,475, respectively (year ended March 31, 2017 - $8,046 and $690, respectively). The acquisition-related milestone share based compensation primarily related to Spectrum Denmark, BC Tweed, Apollo and Bodystream and to other affiliates, as summarized in Note 20 (c) to the financial statements.

## ADJUSTED EBITDA (NON-GAAP MEASURE)

Adjusted EBITDA in the fiscal year 2018 amounted to a loss of $41,246 compared to a loss of $4,719 in the same period last year.

**CANOPY GROWTH CORPORATION**
**Adjusted EBITDA[1] Non-GAAP Measure**

| | Year Ended | |
| --- | --- | --- |
| (In CDN$000's) | March 31, 2018 | March 31, 2017 |
| **Adjusted EBITDA[1] Reconciliation** | | |
| **Loss from operations - as reported** | $ (82,281) | $ (14,083) |
| | | |
| **IFRS non-cash accounting related to biological assets and inventory** | | |
| Fair value changes in biological assets included in inventory sold and other inventory charges | 66,268 | 34,978 |
| Unrealized gain on changes in fair value of biological assets | (100,302) | (49,090) |
| | (34,034) | (14,112) |
| | | |
| Share-based compensation expense (per statement of cash flows)[2] | 51,177 | 10,043 |
| Acquisition Costs | 3,406 | 7,369 |
| Depreciation and amortization | 20,486 | 6,064 |
| | 75,069 | 23,476 |
| **Adjusted EBITDA** | $ (41,246) | $ (4,719) |

*1 - Adjusted EBITDA is Earnings Before Interest, Tax, and Depreciation and other non-cash items, and as adjusted for acquisition related items.*

*2 - Includes $19,475 and $690 for the year ended March 31, 2018 and 2017, respectively, in share-based compensation expense related to acquisition milestones*

## OTHER EXPENSES AND NET INCOME

Other expenses are made up of fair value changes on financial assets of $78,172 for the year ended March 31, 2018, which is recognized primarily from the strategic agreement with TerrAscend. The warrants represent a derivative financial instrument that is initially measured at fair value and subsequently remeasured to its fair value at the end of each reporting period with changes in fair value recorded in the consolidated statement of operations through profit and loss. The Company also recognized $5,210 related to the Company's ownership in HydrRx. In the quarter ended March 31, 2018 HydRx completed a financing that provided a measure of the fair value of the warrants. The difference between the carrying amount of the warrants and this fair value for the warrants was recorded in the consolidated statement of operations through profit and loss. The Company also recognized $4,785 for the three months ended March 31, 2018, which is recognized from the strategic agreement with AusCann. Under the agreement, the Company obtained shares and options. The options represent a derivative financial instrument that is initially recognized at fair value and subsequently remeasured to its fair value at the end of each reporting period. In connection with the Agripharm agreement entered into

38

10/8/21, 1:48 PM    Case 2:19-cv-20543-MCA-MAH    Document 83-3 _Filed 10/12/21    Page 114 of 125
cgc-ex993_211.htm
PageID: 6173

with Green House and Organa Brands where the Company's ownership interest was reduced to 40%, the Company recognized a gain of $8,820 during the year ended March 31, 2018.

The above was offset by an impairment loss of $28,000 related to the arbitration proceedings against Bedrocan International BV, fair value increases on BC Tweed and Vert Mirabel put liabilities of $21,000, and a partner sharing expense of $4,995 related to the BC Tweed partners. Please refer to the Annual Financial Statements for more information.

The Company recorded an income tax recovery of $1,593 for the year ended March 31, 2018 relating to changes in the deferred tax liability. In the comparative period last year, the Company recorded income tax expense of $2,703.

Net loss for the year ended March 31, 2018 amounted to $54,134 compared to net loss of $7,572 in the comparative period last year.

## LIQUIDITY

As at March 31, 2018, the Company had cash and cash equivalents available of $322,560, up from $101,800 at the end of fiscal 2017. The increase from the end of fiscal 2017 was mainly due to the cash received from the Canopy Rivers private placement of $36,320 in June 2017, a $25,000 private placement common share issuance in July 2017, investment of approximately $245,000 by an affiliate of Constellation Brands, gross proceeds of $200,700 from a bought deal financing that closed on February 7, 2018 and the exercise of options and warrants totaling $11,823 offset by cash used to fund operations of $92,516 and investments in facility enhancements totaling $212,573. The Company's cash and cash equivalents includes cash held by Canopy Rivers, amounting to $322,560 at March 31, 2018.

While the Company has incurred cash losses to date, management anticipates success and eventual cash profitability of the business, though there can be no assurance that the Company will gain adequate market acceptance for its products or be able to generate sufficient positive cash flow to achieve its business plans.

The Company's objectives when managing its liquidity and capital structure are to generate sufficient cash to fund the Company's operating, acquisition and organic growth requirements.

The table below sets out the cash, biological assets, inventory, other working capital, and long-term debt at March 31, 2018 and March 31, 2017.

| (CDN $000's) | | March 31, 2018 | | March 31, 2017 |
|---|---|---|---|---|
| Cash & cash equivalents | $ | 322,560 | $ | 101,800 |
| Biological assets | | 16,348 | | 14,725 |
| Inventory | | 101,607 | | 45,981 |
| Other working capital | | (49,209) | | (5,874) |
| Current and long-term debt | | 8,422 | | 10,330 |
| Other long-term liabilities | | 61,150 | | 766 |

The increase in total working capital to $389,749 (March 31, 2017 - $154,941) was primarily due to the increase in inventory, the investment in the Company by an affiliate of Constellation Brands, gross proceeds of $200,700 from the February 2018 bought deal financing and the cash raised by Canopy Rivers which was consolidated in the financial statements.

As at March 31, 2018, on average, the biological assets were 12% complete as to the next expected harvest date, compared to 43% average stage of completion as at March 31, 2017.

At March 31, 2018, inventory quantities amounted to 15,726 kilograms of dry cannabis. Of this amount, 2,982 kilograms was finished goods available for sale; 3,480 kilograms of product in process of testing and awaiting release for sale, and 9,264 kilograms of extract-grade cannabis held for conversion to oils and capsules. This compares to March 31, 2017 when a total of 8,360 kilograms of dry cannabis was in inventory, comprised of 377 kilograms of finished goods, 3,173 kilograms of product awaiting approvals to be released for sale, and 4,810 kilograms of extract-grade cannabis being held for conversion to oils and to capsules. In addition, the Company had a total of 6,969 litres of cannabis oil, ranging from concentrated resins, or refined oil, to oil in its finished state and available for sale, up from 1,799 litres held at March 31, 2017, also ranging from

39

concentrated resins to finished oils available for sale. The Company also had 356 kilograms of capsules on hand at March 31, 2018.

Inventory at March 31, 2018 amounted to $101,607 (March 31, 2017 - $45,981) and biological assets amounted to $16,348 (March 31, 2017 - $14,725), together totaling $117,955 (March 31, 2017 - $60,706) all of which Management believes is required to meet expected market demands, including the legalized recreational market expected later in calendar 2018.

The increase in inventory since March 31, 2017 was due to the new grow rooms coming on line at Smiths Falls, having Spectrum operations integrated and online, and the harvests at the Company's greenhouse in Niagara-on-the-Lake. Harvested plants were added to inventories during the quarter and quantities maintained to meet the growth in sales expected and meet strain availability requirements, and the expansion of oils.

The long-term assets which total $955,040 (March 31, 2017 - $523,934) were comprised principally of intangible assets and goodwill of $416,449, property, plant and equipment and assets in process of $303,682, investments in associates of $63,106 and investments in other financial assets of $163,463 which are comprised of various investments the Company and its subsidiaries have made, and other long-term assets of $8,340 which mainly consists of deposits on property, plant and equipment.

The chart below highlights the Company's cash flows during the year ended March 31, 2018 and 2017.

| (CDN $000's) | Year Ended | | | |
|---|---|---|---|---|
| Net cash provided by (used in) | | March 31, 2018 | | March 31, 2017 |
| Operating activities | $ | (81,506) | $ | (27,093) |
| Investing activities | | (223,583) | | (18,602) |
| Financing activities | | 525,849 | | 132,098 |
| Cash and cash equivalents, beginning of year | | 101,800 | | 15,397 |
| Cash and cash equivalents, end of year | $ | 322,560 | $ | 101,800 |

## CASH USED IN OPERATING ACTIVITIES

The cash used in operating activities prior to changes in working capital during the year ended March 31, 2018 amounted to $52,987, with a net loss of $54,134, which included the IFRS accounting unrealized gain on biological assets of $100,302 and the non-cash other income and expenses of $78,172 more than offset the fair value changes in biological assets included in inventory sold and other inventory charges of $66,268 and other non-cash items such as depreciation and amortization of $20,486, total share-based compensation of $51,177, and income tax expense of $1,593. The cash used in operating activities after changes in working capital during the year ended March 31, 2018 amounted to $81,506.

In comparison, the cash used in operating activities prior to changes in working capital during the year ended March 31, 2017 amounted to $10,745, with net loss of $7,572 which included the non-cash unrealized gain on biological assets of $35,807, the non-cash other income and expenses of $5,702 and income tax recovery of $2,703 to more than offset net changes in inventory and biological assets of $21,695 and other non-cash items such as depreciation and amortization of $6,064, and total share-based compensation of $10,043. The cash used in operating activities after changes in working capital during the year ended March 31, 2017 amounted to $27,093.

## CASH USED IN INVESTING ACTIVITIES

The cash used in investing activities during the twelve-months ended March 31, 2018 of $223,583 was primarily due to the expansion of growing capacity at Tweed and Tweed Farms, and the development of Tweed BC amount to investments of $176,037, investments made by the Company and its subsidiaries of $48,618, partially offset by proceeds on the sale of Bennett North of $7,000.

In comparison, the cash used in investing activities during the year ended March 31, 2017 of $18,602 was primarily due to the expansion of growing capacity at Tweed, acquisition of the Smiths Falls facility from the landlord, improvements at Vert, and investments made to improve production efficiencies such as high capacity oil extraction and new offerings such as soft-gel capsules amounting together to $29,391, partially offset by the cash and cash equivalents acquired, net of the cash paid for the acquisitions of Mettrum, Vert, Hemp and MedCann GmbH of $11,193.

40

**CASH FROM FINANCING ACTIVITIES**

The cash provided by financing activities during the year ended March 31, 2018 of $470,670 due to investment by an affiliate of Constellation of approximately $245,000, net proceeds of $192,514 from a bought deal in the fourth quarter of fiscal 2018, $35,135 raised by Canopy Rivers and net proceeds from July private placement of $24,160 and the exercise of stock options and warrants amounting to $11,823, which were partially offset by the repayment of long-term debt amounting to $1,195 and payment of share issue costs of $10,008.

In comparison, the cash provided by financing activities during the year ended March 31, 2017 of $132,098 mainly resulted from the bought deal financings which closed on April 15, 2016, August 24, 2016 and December 22, 2016 for combined net proceeds of $99,026, private placement closed on March 22, 2017 for net proceeds of $24,160, the proceeds from the issuance of new mortgage debt of $3,500, and the proceeds from the exercise of warrants and stock options amounting to $7,087. The cash proceeds were partially offset by the repayment of long-term debt amounting to $959.

**LIQUIDITY, FINANCING AND CAPITAL RESOURCES**

The Company is subject to risks including, but not limited to, its inability to raise additional funds through debt and/or equity financing to support the Company's development and continued operations and to meet the Company's liabilities and commitments as they come due. Specifically, the Company has a history of losses with an accumulated deficit of $91,649, share capital of $1,076,838 and working capital of $389,749 as at March 31, 2018. This compares to an accumulated deficit of $21,296, share capital of $621,541 and working capital of $154,941 as at March 31, 2017. See below under the heading "Risk Factors".

**CAPITAL ACTIVITIES**

The Company manages its capital with the objective of maximizing shareholder value and sustaining future development of the business. The Company defines capital as the Company's equity and any debt it may issue. The Company manages its capital structure and makes adjustments to it, based on the funds available to the Company, in order to support the Company's activities. The Company, upon approval from its Board of Directors, will undertake to balance its overall capital structure through new share issues, the issue of debt or by undertaking other activities as deemed appropriate under the specific circumstances.

The Company's principal capital needs are for funds to expand its growing rooms, ancillary rooms, strategic acquisitions, and general working capital requirements to fund operations and to support growth including new opportunities to produce and sell cannabis oil and dry cannabis buds. Since its formation, the Company has financed its cash requirements primarily through the issuance of capital stock with the following exceptions.

On November 7, 2014, a mortgage was obtained on the Tweed Farms property. The mortgage was obtained from Farm Credit Canada for an original amount of $1,875 (March 31, 2018 - $1,089) at an annual interest rate of 5.3% and had a term of 5 years and an amortization period of 7 years. On August 5, 2016, the Company obtained a second mortgage on the Tweed Farms property with the same Canadian financial institution for an original amount of $3,500 (March 31, 2018 – $2,777) with an annual interest rate of 4.9%, term of 5 years and an amortization period of 7 years. Through the acquisition of Mettrum on January 31, 2017, the Company has an additional mortgage of $2,648, also with the same Canadian financial institution, on the Mettrum property, with an annual interest rate of 4.8%, term of 5 years and an amortization period of 7 years. Through the acquisition of Bedrocan on August 28, 2015, the Company has a long-term debt facility totaling $1,564 with an interest rate of 10%, due on July 1, 2024, payable in blended monthly payments (See **"Transactions with Related Parties"**).

The Company also has revolving lines of credit for up to $5,500 with the same Canadian financial institution holding the three mortgages, with variable interest rates based on the CIBC prime rate plus 1.2% with a 5-year term and interest only payments on drawn amounts, but is payable on demand or may be prepaid at any time at the option of the Company. The lines of credit are subject to disbursement conditions related to capital expenditures at Tweed Farms and Mettrum. The lines of credit were undrawn as at March 31, 2018.

41

The Company's authorized share capital is an unlimited number of common shares of which 199,557,208 common shares were issued and outstanding as at March 31, 2018, after including 236,227 escrowed shares to be released after meeting certain conditions (March 31, 2017 – 162,187,262 common shares).

The Company has 17,245,835 options outstanding at March 31, 2018 under the Company employee stock option plan ("ESOP") at prices between $0.56 and $33,66 per share (March 31, 2017 – 10,044,112 option shares).

At March 31, 2018 the Company also had 18,912,012 warrants for common shares outstanding. This includes 18,876,901 warrants held by an affiliate of Constellation with an exercise price of $12.9783 which expire on May 1, 2020 and 35,111 warrants with exercise prices between $3.80 and $4.56 which expire on April 30, 2018.

**OFF-BALANCE SHEET ARRANGEMENTS**

The Company has no off-balance sheet arrangements other than those as stated below in the section titled "Transactions with Related Parties".

**TRANSACTIONS WITH RELATED PARTIES**

The Company had previously been leasing office premises from Tweed Hershey Drive Inc., which was related through common ownership (the Company's CEO and chairman is a significant shareholder of the lessor). On January 13, 2017, the Company acquired the land and buildings at 1 Hershey Drive in Smiths Falls, Ontario. Details of the amounts expensed and owing related to these premises are detailed in Note 25 Related Parties in the Annual Financial Statements.

The Company leases premises for the two Bedrocan facilities in Toronto and a facility in Edmonton from a company controlled by Murray Goldman, a director of Canopy Growth Corporation. The Bedrocan facility leases expire on October 15, 2018 and August 31, 2024 and the Edmonton facility lease expires on July 31, 2037. Details of the amounts expensed and owing related to these premises are described in Note 25 Related Parties in the Annual Financial Statements.

The Company leases premises for the Mettrum Hemp's production facility located in Barrie, Ontario from Greg Herriott, the former founder and shareholder of Mettrum Hemp and former officer of Mettrum, now the president of Mettrum Hemp and a shareholder of the Company. The lease has a term of five (5) years with an expiration date of March 31, 2020 together with one (1) extension term of five (5) years. Details of the amounts expensed and owing related to these premises are described in Note 25 Related Parties in the Annual Financial Statements.

The Chief Executive Officer has been engaged to provide services to the Company at $55 per quarter and is eligible for up to a $300 annual bonus. Details of the amounts expensed and owing are described in Note 25 Related Parties in the Annual Financial Statements.

The Company currently has a loan payable to Murray Goldman, a director of the Company. Included in interest expense for the year ended March 31, 2018 was an amount of $169 (for the year ended March 31, 2017 - $179). At March 31, 2018, the loan balance was $1,564 (March 31, 2017 - $1,724).

Pursuant to the share purchase agreement with Hemp.CA, the company entered into a lease for the Vert and Hemp.CA properties with Dany Lefebvre, a shareholder of Hemp.CA who for a period of time following the acquisition was an employee of Canopy. The lease was to expire on November 1, 2036 and the Company had two automatic renewal terms of 10 years each. As of March 31, 2018, the related lease was cancelled and the expense incurred under the lease including base rent, operating costs, and cancellation costs were $84 since acquisition.

42

10/8/21, 1:48 PM Case 2:19-cv-20543-MCA-MAH Document 83-3 Filed 10/12/21 Page 118 of 125
PageID: 6177
cgc-ex993_211.htm

During the year ended March 31, 2018, $708 was expensed in director's fees (for the year ended March 31, 2017 - $203). The Company had $nil owing in accounts payable and accrued liabilities to directors at March 31, 2018 and 2017.

At March 31, 2018 the Company had loans receivable from six officers and two directors (see below) relating to the share purchase loan described in the Annual Financial Statements. At March 31, 2018, the total loans receivable was $503 with the balance due from employees of or consultants to the Company. The loans receivables relating to officers and directors of $288 were discharged in full on May 8, 2018 (March 31, 2017 - $nil).

| Name | Title | Loan amount |
|------|-------|-------------|
| Bruce Linton | Chief Executive Officer | $ 83 |
| Tim Saunders | Chief Financial Officer | 42 |
| Dave Pryce | VP, International Market Expansion and Government Relations | 4 |
| John Bell | Independent Director | 33 |
| Mark Zekulin | President | 63 |
| Murray Goldman | Director | 21 |
| Phil Shaer | Chief Legal Officer | 25 |
| Ru Wadasinghe | Chief Information Officer | 17 |
| | | $ 288 |

These transactions are in the normal course of operations and are measured at the exchange amounts being the amounts agreed to by the parties.

## CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

The Company maintains a set of disclosure controls and procedures designed to provide reasonable assurance that information required to be publicly disclosed is recorded, processed, summarized and reported on a timely basis. An evaluation of the design of Disclosure Controls was done under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, because of the material weakness in our internal control over financial reporting described below, our Disclosure Controls were not effective as at March 31, 2018.

### Internal Controls Over Financial Reporting

National Instrument 52-109 requires the CEO and CFO to certify that they are responsible for establishing and maintaining internal controls over financial reporting ("ICFR") for the Company and that those internal controls have been designed and are effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with IFRS. The CEO and CFO are also responsible for disclosing any changes to the Company's internal controls during the most recent period that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

The Company's management, under the supervision and with the participation of its Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the Company´s internal control over financial reporting as of March 31, 2018, using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework (2013 (the "COSO 2013 Framework"). Based on this evaluation management concluded that a material weakness existed as of March 31, 2018, as described below.

As of March 31, 2018, the Company did not maintain effective internal controls over Corporate-wide EUC spreadsheets, the accounting complexities encountered in the financial reporting relies on equally complex spreadsheets. Spreadsheets are inherently prone to error due to their manual nature. The Company´s controls related to spreadsheets did not address all risks associated with updating assumptions, manual entry into spreadsheets, completeness of data entry, nor evidence of review of completed spreadsheets.

Because of the material weakness described above, management concluded that the Company's internal controls over financial reporting were not effective as at March 31, 2018. Accordingly, a reasonable possibility exists that material misstatements in the Company's financial statements will not be prevented or detected on a timely basis.

43

**Remediation of material weaknesses previously identified as not remediated and related material changes in internal control over financial reporting**

**Reliance on End User Computing ("EUC")** – Throughout fiscal 2018 Management continued to strengthen and improve controls related to the remaining material weaknesses related to End User Computing in the following ways:

- Continued engagement of third party resources to assist the Company in its risk assessment process and in completing the design and implementation of certain internal controls over financial reporting pursuant to the COSO 2013 Framework;
- Inventoried EUC spreadsheets in use and associated control and implementation of several IT supported systems to reduce reliance on EUC tools. Further IT support initiatives are underway to reduce the use of EUC tools;
- A cross-functional business transformation process, enabled by a new end to end Enterprise Resource Planning ("ERP") system was launched in June 2017 to standardize and automate business processes and controls across the organization domestically and internationally. The project is a major initiative that is utilizing third party consultants and will expand the depth and breadth of the finance and information technology organizations. The project, named Project Summit, will enable continuous improvement and scalability.

The material weakness related to reliance on EUC has not been fully remediated as at March 31, 2018. Remediation is expected to be completed in fiscal 2019 with the implementation of the ERP system.

**IT General Controls** - Management previously concluded that, as of March 31, 2017, the Company's IT general controls, specifically user access and change management processes, were determined to be a material weakness in the Company's internal control over financial reporting. Management implemented process improvements in both the areas of user access and change management. A revalidation of information technology user access and refresher training was undertaken. Additionally, tools to allow for tighter management of user access were implemented on key systems. Management considers the previously identified material weakness related to IT General Controls to be remediated as at March 31, 2018.

Other than those described above, there have been no changes in the Company's internal control over financial reporting during the three months ended March 31, 2018 that have materially affected, or are likely to materially affect, the Company's internal control over financial reporting.

No assurance can be provided at this time that the actions and remediation efforts will effectively remediate the material weakness described above or prevent the incidence of other material weaknesses in the Company's internal control over financial reporting in the future. Management, including the Chief Executive Officer and Chief Financial Officer, does not expect that disclosure controls and procedures or internal control over financial reporting will prevent all errors, even as the remediation measures are implemented and further improved to address the material weaknesses. A control system is subject to inherent limitations and even those systems determined to be effective can provide only reasonable, but not absolute, assurance that control objectives will be met with respect to financial statement preparation and presentation.

The Company's management, with the participation of its Chief Executive Officer and Chief Financial Officer, has limited the scope of the design of the Company's disclosure controls and procedures and internal controls over financial reporting to exclude controls, policies and procedures and internal controls over financial reporting of the recently acquired operations of Tweed Grasslands Cannabis Inc. (acquired May 1, 2017), Spot Thrapeutics Inc (acquired on August 28, 2017), Grow House JA Limited (acquired 49% on September 6, 2017), Spectrum Cannabis Denmark ApS (acquired control on September 20, 2017), Les Serres Vert Cannabis (acquired 66.7% interest on December 18, 2017) and BC Tweed Joint Venture Inc (acquired 66.7% interest  on October 10, 2017). The operations of Tweed Grasslands Cannabis Inc., Spot Therapeutics Inc.,Grow House JA Limited, Spectrum Cannabis Denmark ApS , Les Serres Vert Cannabis and BC Tweed Joint Venture Inc combined, represent approximately 12% of the Company's assets (approximately 1% of current assets and 21% of non-current assets); they also represent approximately 26% of current liabilities and 6% of long-term liabilities, 0% of the Company's revenues and 7% of operating expenses for the year ended March 31, 2018 and 0% of the Company's revenues and 24% of operating expenses for the three months ended March 31, 2018.

44

**ADDITIONAL GAAP MEASURES**

The Company uses "Income from operations" as an additional GAAP financial measure within the financial statements and MD&A, but is not a defined term under IFRS to assess performance. Management believes that this measure provides useful supplemental information to investors and is computed on a consistent basis for each reporting period.

Income from operations is calculated as total revenues less total operating expenses derived from the Consolidated Statements of Operations. It is used by management to analyze operating performance, but it is not intended to represent an alternative to net earnings or other measures of financial performance in accordance with IFRS.

**NON-GAAP MEASURE**

"Adjusted EBITDA" is a metric used by management which is Income (loss) from operations, as reported, before interest, tax, and adjusted for removing other non-cash items, including the stock-based compensation expense, depreciation, and the non-cash effects of accounting for biological assets and inventories, and further adjusted to remove acquisition related costs. Management believes "Adjusted EBITDA" is a useful financial metric to assess its operating performance on a cash basis before the impact of non-cash items and acquisition related activities.

**RISKS AND UNCERTAINTIES**

Many factors could cause the Company's actual results, performance and achievements to differ materially from those expressed or implied by the forward-looking statements and forward-looking information, including without limitation, the following factors, which are discussed in greater detail under the heading "Risk Factors" in the Company's AIF dated June 27 2018 and in the Company's Short-Form Prospectuses dated December 16, 2016, August 18, 2016, and April 8, 2016 and January 31, 2018 filed with securities regulators and available on www.sedar.com, which risk factors are incorporated by reference into this document, and should be reviewed in detail by all readers:

- The Company has a history of losses, may incur significant losses in the future and may not achieve or maintain profitability;

- The Company's ability to grow, store and sell medical cannabis in Canada are dependent upon licenses from Health Canada which are subject to ongoing compliance and reporting requirements;

45

- The activities of the Company are subject to regulation by governmental authorities, particularly Health Canada;

- The laws, regulations and guidelines generally applicable to the cannabis industry domestically and internationally may change in ways currently unforeseen by the Company;

- Any amendment to or replacement of the ACMPR may cause adverse effects to the Company's operations. The risks to the business of the Company represented by this decision and subsequent regulatory changes could reduce the addressable market for the Company's products and could materially and adversely affect the business, financial condition and results of operations of the Company;

- On April 13, 2017, the Government of Canada released the proposed Cannabis Act to regulate the production, distribution and sale of cannabis for unqualified adult use. On November 27, 2017, the House of Commons passed the proposed Cannabis Act, and on December 20, 2017, the Prime Minister communicated that the Canadian Federal Government intends to legalize cannabis in the summer of 2018. The proposed Cannabis Act is currently before the Senate. It is unknown whether the Cannabis Act will be passed. Several recommendations from the Task Force reflected in the Cannabis Act including, but not limited to, permitting home cultivation, potentially easing barriers to entry into the Canadian recreational cannabis market and restrictions on advertising and branding, could materially and adversely affect the business, financial condition and results of operations of the Company;

- The proposed Cannabis Act is not yet in force, and the regulations to the Cannabis Act have not yet been published. There can be no assurance that the legalization of recreational cannabis by the Canadian Federal Government will occur on the terms in the proposed Cannabis Act or at all, and the legislative framework pertaining to the Canadian recreational cannabis market is uncertain;

- The governments of British Columbia, Alberta, Manitoba, Ontario, Québec and New Brunswick have also made varying announcements on the proposed regulatory regimes for the distribution and sale of cannabis for recreational purposes. There is no guarantee that provincial legislation regulating the distribution and sale of cannabis for recreational purposes will be enacted according to the terms announced by such provinces, or at all, or that any such legislation, if enacted, will create the growth opportunities that the Corporation currently anticipates;

- The Company's operations are subject to various laws, regulations and guidelines relating to the manufacture, management, transportation, storage and disposal of medical cannabis but also including laws and regulations relating to health and safety, the conduct of operations and the protection of the environment;

- Third parties with which the Company does business may perceive that they are exposed to reputational risk because of the Company's cannabis business activities;

- The operation of the Company can be impacted by adverse changes or developments affecting the facilities of the Company's wholly-owned subsidiaries;

- The Company's ability to recruit and retain management, skilled labour and suppliers is crucial to the Company's success;

- The Company's growth strategy contemplates outfitting its facilities with additional production resources. A variety of factors could cause these activities to not be achieved on time, on budget, or at all. As a result, there is a risk that the Company may not have product or sufficient product available to meet the anticipated demand or to meet future demand when it arises;

- The Company and its wholly-owned subsidiaries have limited operating histories;

- Even if its financial resources are sufficient to fund its current operations, there is no guarantee that the Company will be able to achieve its business objectives. The continued development of the Company may require additional financing and there can be no assurance that additional capital or other types of financing will be available if needed or that, if available, the terms of such financing will be favourable to the Company;

- There is potential that the Company will face intense competition from other companies, some of which can be expected to have longer operating histories and more financial resources and manufacturing and marketing experience than the Company;

46

- The Company believes the cannabis industry is highly dependent upon consumer perception regarding the safety, efficacy and quality of the cannabis produced. Consumer perception of the Company's products can be significantly influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of cannabis products. There can be no assurance that future scientific research, findings, regulatory proceedings, litigation, media attention or other research findings or publicity will be favourable to the medical cannabis market or any product, or consistent with earlier publicity;

- The Company and its wholly-owned subsidiaries face an inherent risk of exposure to product liability claims, regulatory action and litigation if its products are alleged to have caused significant loss or injury;

- The products of the Company's wholly-owned subsidiaries could be subject to the recall or return of their products for a variety of reasons. If a product recall or return should happen, the Company could be required to incur unexpected expenses and divert management attention and could see harm caused to its image and product sales decline. In addition, as result of the product recall or return, the Company and its wholly-owned subsidiaries could face increase operational scrutiny by Health Canada or other regulatory agencies, requiring further management attention and potential legal fees and other expenses;

- The introduction of home and designated growing may have a negative impact on the Company's sales and infringe on the Company's market;

- Greater access to medical cannabis, through home and designated growing and illegal dispensaries, may decrease the number of patients registering with the Company and may cause registered patients to leave the Company and grow for themselves;

- Home and designated growing may increase access to cannabis in the illegal market, potentially impacting the public's perception of the Company, and the cannabis industry as a whole;

- Any significant interruption or negative change in the availability or economics of the supply chain for key inputs could materially impact the business, financial condition and operating results of the Company;

- The Company is largely reliant on its own market research to forecast sales as detailed forecasts are not generally obtainable from other sources at this early stage of the medical cannabis industry in Canada. A failure in the demand for its products to materialize because of competition, technological change or other factors could have a material adverse effect on the business, results of operations and financial condition of the Company;

- The Company may be subject to growth-related risks including capacity constraints and pressure on its internal systems and controls;

- The Company may engage in acquisitions or other strategic transactions or make investments that could result in significant changes or management disruption;

- The Company could fail to integrate acquired companies into the business of the Company;

- Completed acquisitions, strategic transaction or investments could fail to increase shareholder value;

- Certain of the Directors and Officers of the Company are also directors and officers of other companies, and conflicts of interest may arise between their duties as officers and directors of the Company and as officers and directors of such other companies;

- The Company may become party to litigation, mediation and/or arbitration from time to time in the ordinary course of business which could adversely affect its business;

- The market price for the common shares may be volatile and subject to wide fluctuations in response to numerous factors, many of which are beyond the Company's control;

- There can be no assurance that an active and liquid market for the common shares will be maintained and an investor may find it difficult to resell any securities of the Company;

- Prior to the start of trading on March 20, 2017, the Company was the first cannabis company to be added to the health care section of the S&P/TSX Composite Index. In order to be added to the Composite Index, the Company had to meet certain market capitalization, liquidity, and domicile

47

requirements. Big institutional investors and index funds use the Composite Index to guide buying decisions, which could influence the trading price of the Company's shares;

- October 16, 2017, the TSX provided clarity regarding the Requirements to applicants and TSX-listed issuers with business activities in the cannabis sector. In TSX Staff Notice 2017-0009, the TSX notes that issuers with ongoing business activities that violate U.S. federal law regarding cannabis are not in compliance with the Requirements. These business activities may include (i) direct or indirect ownership of, or investment in, entities engaging in activities related to the cultivation, distribution or possession of cannabis in the U.S., (ii) commercial interests or arrangements with such entities, (iii) providing services or products specifically targeted to such entities, or (iv) commercial interests or arrangements with entities engaging in providing services or products to U.S. cannabis companies. The TSX reminded issuers that, among other things, should the TSX find that a listed issuer is engaging in activities contrary to the Requirements, the TSX has the discretion to initiate a delisting review. If the TSX were to initiate a delisting review in respect of the Company, there could be an adverse effect on the trading price of the Company's shares;

- The Company does not anticipate paying any dividends on the common shares in the foreseeable future. Dividends paid by the Company would be subject to tax and, potentially, withholdings;

- The Company's operations are subject to environmental and safety laws and regulations concerning, among other things, emissions and discharges to water, air and land; the handling and disposal of hazardous and non-hazardous materials and wastes, and employee health and safety;

- The Company has, and will have, certain business arrangements with third parties, the breakdown/loss of which could impact its operations;

- On October 30, 2017, The Company announced that it entered into a strategic relationship with an affiliate of Constellation. The Company and the affiliate of Constellation entered into an Investor Rights Agreement pursuant to which the Company granted registration rights to the affiliate of Constellation and certain pre-emptive rights whereby, subject to certain exceptions, the affiliate of Constellation may maintain its pro rata ownership in the Company or cause the Company to take steps to assist it in selling some or all of the Common Shares it holds. In addition, in connection with the Constellation transaction, the Company is subject to a number of restrictions on activities that the Company cannot undertake without consent of the Constellation affiliate. These restrictions limit the Company's ability to conduct certain business, and it is possible that such restrictions could significantly adversely affect the business, financial condition and results of operations of the Company;

- An affiliate of Constellation owns a substantial number of the outstanding common shares of the Company (on a fully diluted basis) and, through its pre-emptive rights, has the ability to maintain its ownership level. As such, this shareholder is in a position to exercise significant influence over matters requiring shareholder approval, including the election of directors and the determination of significant corporate actions. As well, this shareholder could delay or prevent a change in control of the Company that could otherwise be beneficial to the Company's shareholders;

- The Company currently has, and may in the future enter into further, strategic alliances with third parties that it believes will complement or augment its existing business. The Company's ability to complete strategic alliances is dependent upon, and may be limited by, the availability of suitable candidates and capital. In addition, strategic alliances could present unforeseen integration obstacles or costs, may not enhance the Company's business, and may involve risks that could adversely affect the Company, including significant amounts of management time that may be diverted from operations to pursue and complete such transactions or maintain such strategic alliances. Future strategic alliances could result in the incurrence of additional debt, costs and contingent liabilities, and there can be no assurance that future strategic alliances will achieve, or that the Company's existing strategic alliances will continue to achieve, the expected benefits to the Company's business or that the Company will be able to consummate future strategic alliances on satisfactory terms, or at all. Any of the foregoing risks and uncertainties could have a material adverse effect on the Company's business, financial condition and results of operations;

48

- The Company's expansion into jurisdictions outside of Canada is subject to risks. In addition, in jurisdictions outside of Canada, there can be no assurance that any market for the Company's products will develop. The Company may face new or unexpected risks or significantly increase its exposure to one or more existing risk factors, including economic instability, changes in laws and regulations, and the effects of competition. These factors may limit the Company's ability to successfully expand its operations into such jurisdictions and may have a material adverse effect on the Company's business, financial condition and results of operations;

- The Company's operations in emerging markets are subject to political and other risks associated with operating in a foreign jurisdiction;

- The Company continues to monitor developments and policies in the emerging markets in which it operates and assess the impact thereof to its operations; however, such developments cannot be accurately predicted and could have an adverse effect on the Company's operations or profitability;

- Corruption and fraud in certain emerging markets relating to ownership of real property may adversely affect the Company's business;

- Inflation in emerging markets, along with governmental measures to combat inflation, may have a significant negative effect on local economies and also on the Company's financial condition and results of operations;

- The Company's operations may be impaired as a result of restrictions on the acquisition or use of properties by foreign investors or local companies under foreign control;

- The legal and regulatory requirements in the foreign countries in which the Company operates with respect to the cultivation and sale of marijuana, banking system and controls, as well as local business culture and practices are different from those in Canada. The officers and directors of the Company must rely, to a great extent, on the Company's local legal counsel and local consultants retained by the Company in order to keep abreast of material legal, regulatory and governmental developments as they pertain to and affect the Company's business operations, and to assist the Company with its governmental relations. The Company must rely, to some extent, on those members of management and the Company's board of directors who have previous experience working and conducting business in these countries, if any, in order to enhance its understanding of and appreciation for the local business culture and practices. The Company also relies on the advice of local experts and professionals in connection with current and new regulations that develop in respect of the cultivation and sale of marijuana as well as in respect of banking, financing, labour, litigation and tax matters in these jurisdictions. Any developments or changes in such legal, regulatory or governmental requirements or in local business practices are beyond the control of the Company. The impact of any such changes may adversely affect the business of the Company;

- The Company may expand into other geographic areas, which could increase the Corporation's operational, regulatory and other risks; and

- The Company may be responsible for corruption and anti-bribery law violations.

49